UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

IN RE:

                                  Case No. 20-23359-LMI

MICRON DEVICES, LLC,

                                  Chapter 11

      Debtor.

_____/

### TRUSTEE'S MOTION FOR APPROVAL OF THE SETTLEMENT AGREEMENT ENTERED INTO BY THE SUBCHAPTER V CHAPTER 11 TRUSTEE, KENNEDY LEWIS INVESTMENT MANAGEMENT, LLC AND STIMWAVE TECHNOLOGIES INC.

### Evidentiary Hearing Requested[1]

The Subchapter V Chapter 11 Trustee ("Trustee"), on behalf of itself and debtor Micron Devices LLC ("Debtor")[2] moves, pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et.seq.* (the "Bankruptcy Code"), Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9019(A) of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida (the "Local Rules"),  for an Order authorizing and approving the settlement agreement (the "Settlement Agreement"), as outlined in the term sheet attached hereto as **Exhibit A**, made and entered into by the Trustee, Stimwave Technologies, Inc. ("Stimwave"), Kennedy Lewis Investment Management, LLC ("Kennedy Lewis" and together with the Debtor and Stimwave, the "Parties").  In support of this motion (the "Motion"), the Trustee states:

---

[1] The Trustee will separately file and serve on all interested parties a fully executed Settlement Agreement.  All exhibits cited in this Motion and any supplemental exhibits that support the factual basis for the relief sought in this Motion shall be made available to any interested party upon written request to the Trustee.

[2] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is Micron Devices, LLC (8470).

## JURISDICTION, VENUE AND STATUTORY PREDICATES

1.      The Bankruptcy Court has jurisdiction over this motion pursuant to 28. U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rule 9019(a) and Local Rule 9019(A).

## STATUS OF THE CHAPTER 11 CASE

4.      On December 7, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida.

5.      From the Petition Date through March 8, 2021, the Debtor operated its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

6.      On February 19, 2021, the Court entered an *Order to Show Cause Why Debtor Should Not be Removed as Debtor-In-Possession and Setting Hearing*.  [ECF No. 180].

7.      On March 4, 2021, the Debtor filed a Proposed Plan of Reorganization.  [ECF No. 196].

8.      On March 8, 2021, following a hearing, the Court entered an *Order Removing the Debtor-in-Possession and Expanding the Powers of Subchapter V Trustee* [ECF No. 206]. Subsequently, the Trustee took over operating the business of the Debtor and possession of all property of the Debtor's estate.

## THE LITIGATION MATTERS

9.      Prior to the Petition Date, in 2018 and early 2019, the Debtor executed a series of agreements (collectively, the "Transfer Agreements") that purported to transfer to its then-affiliate

Stimwave equity of an entity called StimQ Medical LLC (the "StimQ Equity") and the ownership of a portfolio of intellectual property, including, but not limited to licenses, patents, and certain other contractual rights (the "Disputed IP").

10.    The Transfer Agreements included:

a.    The StimQ Contribution Agreement. The Debtor contributed the StimQ Equity to Stimwave pursuant to the StimQ Contribution Agreement, dated as of March 25, 2018. The Debtor received "no cash or other property" in consideration for its contribution of the StimQ Equity.  Nevertheless, the StimQ Contribution Agreement states that the Debtor effected the StimQ Contribution "in the interest of improving opportunities for operating and financing opportunities of [Stimwave] and StimQ," which the Debtor determined to be "in the best interests of [its] equity holders," and effecting the StimQ Equity contribution in a manner that qualified "under the appropriate provision of the Internal Revenue Code . . . as a tax free capital contribution." Laura Perryman executed the StimQ Contribution Agreement on behalf of both the Debtor (in her capacity as its Manager) and Stimwave (in her capacity as its President and Chief Executive Officer).  A true and correct copy of the StimQ Contribution Agreement is attached hereto as **Exhibit "B."**

b.    License Assignment Agreement.  The Debtor assigned certain licenses to Stimwave pursuant to the License Assignment Agreement dated as of October 13, 2018 (the "License Assignment").  Under the License Assignment Agreement, Stimwave assumed all of the Debtor's duties, liabilities and obligations under the agreements relating to the assigned licenses and agreed "to pay, perform, and discharge, as and when due," all of the Debtor's obligations under such agreements accruing on and after the date of the License Assignment. The License Assignment Agreement was executed on behalf of the Debtor by Mark Coleman, a director, and

on behalf of Stimwave by Ms. Perryman (as Chief Executive Officer). A true and correct copy of the License Assignment is attached hereto as **Exhibit "C."**

      c.      <u>Patent Assignment Agreement</u>. The Debtor assigned certain patents and inventions to Stimwave pursuant to the Patent Assignment, dated as of November 6, 2018 (the "<u>Patent Assignment Agreement</u>"). The Debtor acknowledged in the Patent Assignment Agreement that it received "good and valuable consideration." The Patent Assignment Agreement was executed by Ms. Perryman on behalf of both the Debtor (as Manager) and Stimwave (as Chief Executive Officer). A true and correct copy of the Patent Assignment Agreement is attached hereto as **Exhibit "D."**

      d.      <u>Epimed Assignment Agreement</u>. The Debtor assigned to Stimwave all of its rights under a contract with Epimed International, Inc. (the "<u>Epimed Contract</u>") pursuant to the Epimed Assignment Agreement dated as of January 23, 2019 (the "<u>Epimed Assignment</u>"). Pursuant to the Epimed Assignment Agreement, Stimwave assumed all of the Debtor's "duties, liabilities, and obligations" under the Epimed Contract and agreed "to pay, perform, and discharge, as and when due," all of the Debtor's obligations under the Epimed Contract accruing on and after the date of the Epimed Assignment. The Epimed Assignment Agreement was executed on behalf of the Debtor by Mark Coleman in his capacity a director and on behalf of Stimwave by Ms. Perryman in her capacity as Chief Executive Officer. A true and correct copy of the Epimed Assignment is attached hereto as **Exhibit "E."**

11.     At all times during 2018 and early 2019, which is when the Transfer Agreements were entered into, the owners of the Debtor owned nearly all of Stimwave's outstanding shares in substantially the same relative proportion that they owned the Debtor.[3] As the Transfer

---

[3] See Comparison of Capitalization Tables for Stimwave and the Debtor attached hereto as **Exhibit "F."** This chart was found in the Debtor's business records. The Trustee has not independently verified its accuracy.

Agreements make clear, the contribution of the StimQ Equity and the transfer of the Disputed IP was not and did not purport to be a sale of assets, but rather a consolidation transaction to benefit the entities' ultimate owners.  *See generally*, Exhibits A and C.

12.     In December 2018, in furtherance of the winding down of the Debtor, and the consolidation of ownership interests in Stimwave, Ms. Perryman filed a cancellation of the Debtor with the Delaware Secretary of State and caused all employees who previously had been employed by both the Debtor and Stimwave to sign new employment agreements confirming that they were to be employed solely by Stimwave.[4]  Shortly thereafter, the Debtor completed its winding up and ultimately closed its only bank account.[5]  Finally, the Debtor's business records reflect that  in March of 2019, the Debtor sent its Members a final K-1.[6]

13.     In sum, the Debtor had been wound up and the StimQ Equity and Disputed IP had been transferred to Stimwave.  As Stimwave continued to grow, it raised additional capital through equity financings. In total, Stimwave raised approximately $60 million in less than 18-months, in each case representing that the StimQ Equity was owned by Stimwave and, beginning in late 2018, that the transfers of StimQ Equity and Disputed IP had been consummated via the StimQ Contribution Agreement, the License Assignment Agreement, the Patent Assignment Agreement, and the Epimed Assignment Agreement.[7]

---

[4] A copy of the Debtor's State of Delaware Certificate of Cancelation is attached hereto as **Exhibit "G."**  Copies of the Stimwave Employment Agreements are attached hereto as **Composite Exhibit "H."**

[5] See ECF No. 1 at P. 39 (Debtor's Checking Account closed on July, 2019).

[6] A copy of the alleged final form 1065 and an alleged final K-1 are attached hereto as **Exhibit "I."**

[7] See Stimwave's Series D Shareholder Agreement attached hereto as **Exhibit "J."**

14.     Thereafter, Stimwave entered into a loan and security agreement (the "LSA") with Kennedy Lewis under which Kennedy Lewis alleges a first-priority lien on all of Stimwave's personal property in return for providing a loan and commitment.[8]   Kennedy Lewis currently alleges unpaid secured obligations of over $20,000,000. Kennedy Lewis alleges that its loan was made in reliance on the statements of Ms. Perryman, as CEO of Stimwave and Managing Member of the Debtotr, that Stimwave owned the Disputed IP and the eqyity in StimQ that comprises the security for the loan.

15.     On or about November, 2019, Laura Perryman resigned her position as CEO of Stimwave.  Shortly after Mrs. Perryman's resignation from Stimwave, the Debtor filed with the Delaware Secretary of State an amendment to the Cancelation Certificate indicating it was filed as a clerical error.[9]   The Debtor's business records included an amended form 1065 that revised the 2018 K-1s to reflect that it was no longer a final return.[10]

16.     Beginning in December 2019, the Debtor and its former Managing Member Laura Perryman, who signed and executed the Transfer Agreements, were engaged in litigation against Stimwave and Kennedy Lewis involving, among other things, the effectiveness of the Transfer Agreements, the ownership and use of the Disputed IP and the StimQ Equity, and the inclusion of those assets as Kennedy Lewis's loan collateral (the "Prepetition Litigation").[11]

---

[8] A true and correct copy of the LSA is attached hereto as **Exhibit "K."**

[9] A true and correct copy of the Certificate of Correction is attached hereto as **Exhibit "L."**

[10] A copy of the amended form 1065 and a K-1 is attached hereto as **Exhibit "M."**

[11] For a detailed summary of the Prepetition Litigation, the Trustee reincorporates by reference all allegations in ECF Nos. 27 and 45 summarizing the pending Prepetition Litigation among the parties as if fully restated herein.

17.     The Prepetition Litigation includes an action by Stimwave against the Debtor, Perryman, and others, commenced in Delaware Chancery Court in December 2019 (the "Delaware Action").  *See Stimwave Tech., Inc. v. Micron Devices, LLC*, No. 2019-1003-SG (Del. Ch. 2019). The Debtor and Perryman filed counterclaims and third-party claims in the Delaware Action, including third-party claims against Kennedy Lewis. Prior to the Petition Date, in the Delaware Action, Kennedy Lewis and Stimwave had each fully briefed and argued motions to dismiss the Debtor's counterclaims and third-party claims, and Stimwave's claims against the Debtor had been set for trial in January 2021.[12]

18.     The Prepetition Litigation and the property that is the subject matter thereof have been at the center of the Debtor's bankruptcy.  At the Court's direction [ECF No. 87], between January 27, 2021 and February 28, 2021, the Debtor, Stimwave, Kennedy Lewis and Perryman participated in a Judicial Settlement Conference presided over by the Honorable Judge Mindy A. Mora.  The Trustee attended and participated in the Judicial Settlement Conference.  The goal of the Judicial Settlement Conference was to resolve the Prepetition Litigation and, by doing so, to provide a framework for the Debtor to exit bankruptcy.  The Judicial Settlement Conference was unsuccessful, and on March 1, 2021, Judge Mora filed a final report with the Bankruptcy Court stating that the parties to the Judicial Settlement Conference had reached an impasse.  [ECF No. 185]

19.     On February 2, 2021, while the Judicial Settlement Conference was ongoing, the Debtor commenced two adversary proceedings against Stimwave (the "Adversary Proceedings" and collectively with the Prepetition Litigation, the "Litigation Matters").  In Case Number 21-

---

[12] Following the Debtor's petition for bankruptcy protection, the Delaware Action was removed to the United States District Court for the District of Delaware.  1:20-cv-01670-UNA *Stimwave Technologies Inc. v. Perryman* (697820/0018).

01033-LMI (the "Turnover Action"), the Debtor seeks, *inter alia*, turnover of funds that it claims Stimwave owes the Debtor.  In Case Number 21-01034-LMI (the "Declaratory Judgement Action"), the Debtor seeks, *inter alia*, a declaratory judgment that the Transfer Agreements were null and void *ab initio* and related monetary relief.  On February 11, 2021, the Debtor amended the Declaratory Judgement Action to add claims for breach of fiduciary duties against Perryman.[13] [Declaratory Judgment Action, ECF No. 05]

20.    Kennedy Lewis moved to intervene in the Declaratory Judgment on February 16, 2021.  [Declaratory Judgment Action, ECF No. 08] On March 15, 2021, the Court granted Kennedy Lewis's motion.  [Order Granting Motion to Intervene, Declaratory Judgment Action, No. ECF No. 19]

21.    In addition to the aforementioned claims, Stimwave maintains various contractual claims, claims arising from discovery sanctions, and accruing claims related to Debtor's operations that allegedly infringe upon Stimwave's intellectual property rights and other contractual rights. Moreover, Kennedy Lewis has indicated in its proofs of claim that it maintains potential clams for fraudulent misrepresentation against the Debtor arising, *inter alia*, from the various fraudulent representations and warranties made by Laura Perryman in connection with Kennedy Lewis' financing transactions with Stimwave. [14]

## THE SETTLEMENT AGREEMENT

22.    As a result of good-faith, arm's-length negotiations, the Trustee, on behalf of himself and the Debtor's estate, Stimwave, and Kennedy Lewis have reached a compromise and

---

[13] Perryman moved to dismiss the Declaratory Judgment Action on March 12, 2021.  [Declaratory Judgment Action, ECF No. 13]

[14] Stimwave and Kennedy Lewis have taken the position that the Debtor's business activities in the pain relief market violate Stimwave's intellectual property rights, as well as its contractual rights under certain employment agreements.

proposed settlement of all existing and potential claims and disputes among the Parties. The proposed settlement was reached following three weeks of intensive negotiations between the parties based in part upon the settlement structure Judge Mora facilitated during several weeks of negotiations pursuant to a Judicial Settlement Conference conducted by Judge Mora.[15]

23.    For the Court's convenience, a summary of the material terms of the proposed settlement are set forth below; however, reference should be made to term sheet attached hereto as **Exhibit A** for the actual terms of the Settlement Agreement which shall control.

24.    The Settlement Agreement will provide that, upon the Settlement Effective Date[16]:

a) Stimwave will pay the Trustee $1,000,000.00 (the "Settlement Payment").

b) The Debtor's estate shall be entitled to receive 25% of the net proceeds[17] recovered from KLIM's or Stimwave's prosecution of any claim conveyed by the Debtor's estate to KLIM or Stimwave pursuant to the Settlement Agreement.

c) As consideration for the Settlement Payment, the Debtor will be forever estopped from challenging, and will covenant not to sue regarding, the accuracy, validity, and binding nature and enforceability of various prior transactions and transfer documents involving the Debtor, Stimwave, and KLIM, including, but not limited to, all of the Transfer Agreements and the LSA (the "Settled Claims"). The Debtor will also transfer and assign any and all of its rights to contest the accuracy, validity, and binding nature and enforceability of the Transfer Agreements and the LSA to Stimwave and KLIM.

d) The Debtor will stipulate to the entry of final judgments in favor of Stimwave and KLIM in the Turnover Action and the Declaratory Judgment Action. With respect to the Declaratory Judgment Action only, the Settlement Agreement will be contingent upon a factual finding by this Court declaring the accuracy, validity, and binding nature and enforceability of the Transfer Agreements and the LSA. All other Prepetition Litigation will be terminated at the election of KLIM and/or Stimwave,

---

[15] The Parties wanted to expressly acknowledge Judge Mora's efforts and to express their collective gratitude to Judge Mora and her chambers for all of their time and effort aiding the Parties in the achievement of the proposed settlement.

[16] Capitalized terms used but not defined herein has the meanings assigned to them in the settlement term Sheet attached hereto as Exhibit B.

[17] "Net proceeds" shall mean any sum actually recovered by KLIM after application of KLIM's reasonable attorneys' fees and costs incurred in the recovery upon the claim.

e) With the exception of non-assignable litigation claims and certain executory contracts and unexpired leases, the Debtor will transfer any and all of its assets, without limitation, to Stimwave, subject to a security interest in favor of KLIM.

f) The Debtor shall have no authority, power, or ability to continue or commence, and shall immediately cease, any development, manufacture, marketing, sales, commercial distribution and, or clinical trials of any pain relief product, system, or method, including, without limitation, any PNS wireless neurostimulator that has been offered, marketed, or sold under any name by Debtor, and will not continue or commence any development, manufacture, marketing, sales, commercial distribution or clinical trials of any Pain Product or provide services to or otherwise assist or support any affiliate of Debtor, including without limitation Micron Medical, and, or Laura Perryman, Patrick Larson, or any other employee or former employee of Debtor, or any other entity or person,  in the development, manufacture, marketing, sales, commercial distribution or clinical trials of any pain relief product and, or system, or method, including without limitation the Pain Product or any other PNS wireless neurostimulator.

g) KLIM and Stimwave's claims against the Debtor's estate, including any allowed administrative expense claims, shall be subordinated to all allowed claims in the bankruptcy case. KLIM and Stimwave's claims shall be stipulated to by the Trustee in an amount further detailed in the term sheet, attached hereto as Exhibit B.

h) The Debtor has granted a full release of Stimwave, KLIM, their respective affiliates and their and their respective affiliates' directors, officers, employees and other personnel, advisors and other agents and representatives. KLIM and Stimwave have, in turn, granted a full release of the Trustee. For the avoidance of doubt, KLIM and Stimwave have not released their subordinated claims and will not release from any direct claims the Debtor's affiliates, directors, officers, employees and other personnel, advisors and other agents and representatives, and have specially excluded certain parties, including, without limitation, the following: Micron Medical, Stimguard, Neural Diabetes, Laura Tyler Perryman, Gary Perryman, Ron Perryman, Brandyn Perryman, Michael Perryman, any entity (other than the Debtor) currently or formerly directly or indirectly owned or controlled by any of the above-referenced Perrymans, or any employees or former employees of Debtor or Micron Medical including, but not limited to, Patrick Larson, Graham Greene, Benjamin Speck, Richard LeBaron, Elizabeth Greene, Ron Perryman, Brandyn Perryman, Sherri Costa, Gil Bao, Evelyn Valerio and Marlene Pena.

i) The Settlement Effective Date is conditioned upon execution and delivery and execution of ancillary agreements and approval of the Settlement Approval Motion by the Bankruptcy Court. In the event the Settlement Effective Date has not occurred within 120 days of all parties execution of the term sheet, any party to the agreement has the right to unilaterally terminate the Settlement Agreement.

25.    The Settlement Agreement will provide for a full and final resolution of all existing and potential claims and disputes between the Debtor and Stimwave or Kennedy Lewis, including the Parties' competing assertions of ownership over the Disputed IP and StimQ Equity, which have been at the center of these bankruptcy proceedings.  Resolution of these disputes provides a path for the Debtor to exit from bankruptcy, as well as the settlement of various ancillary claims and disputes among the Parties.  In addition, as discussed below, the Settlement Agreement provides the only known avenue for the Debtor to provide a dividend to unsecured creditors under a chapter 11 plan.

## LEGAL ARGUMENT AND CITATION TO AUTHORITY

26.    Bankruptcy Code section 363, among other things, permits the sale or use of property other than in the ordinary course of business.  *See* 11 U.S.C. § 363.  Under the prevailing standard for approval under Bankruptcy Code section 363(b), a trustee must establish "sound business reasons for the terms of the proposed sale."  *In re Knott*, No. 6:12-BK-07764-KSJ, 2015 WL 251705, at *2 (Bankr. M.D. Fla. Jan. 20, 2015) (citing *In re Diplomat Const., Inc.*, 481 B.R. 215, 218-19 (Bankr. N.D. Ga. 2012)).  Once established, a trustee's sound business reasons in support of a sale are entitled to judicial respect and deference.  *Id.*

27.    The Trustee submits that the Settlement Agreement and all transactions contemplated therein reflect sound business reasons by the Trustee and, as described in greater detail below, are value maximizing and in the best interest of the Debtor's estate and its creditors.

28.    The Settlement Agreement likewise satisfies the standard for approval under Bankruptcy Rule 9019, which provides, in pertinent part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. Proc. 9019(a).  As a general matter, compromises and settlements are favored in order to minimize

litigation and expedite the administration of the bankruptcy estate.  *Munford v. Munford (In re Munford, Inc.)*, 97 F.3d 449, 455 (11th Cir. 1996).

29.    Before approving a compromise or settlement under Bankruptcy Rule 9019, a bankruptcy court must determine if the proposed compromise or settlement is fair, equitable, reasonable, and in the interests of the debtor's estate.  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968); *In re Se.Banking Corp.,* 314 B.R. 250, 272 (Bankr. S.D. Fla. 2004) (a bankruptcy court must consider whether a settlement is "fair and equitable").  The Court should approve the proposed settlement unless it "fall[s] below the lowest point in the range of reasonableness."  *In re S.E. Banking Corp*., 314 B.R. 250, 272 (Bankr. S.D. Fla. 2004); *see also In re Arrow Air, Inc.,* 85 B.R. 886, 891 (Bankr. S.D. Fla. 1988); *Martin v. Pahiakos (In re Martin),* 490 F.3d 1272, 1274-75 (11th Cir. 2007).  A bankruptcy court considering a proposed settlement, "may give weight to the trustee's informed judgment that a compromise is fair and equitable."  *In re S & I Investments*, 421 B.R. 569, 584 (Bankr. S.D. Fla. 2009).

30.    When determining whether a settlement or compromise falls within the range of reasonableness, courts in the Eleventh Circuit generally consider the following factors:  "(i) the probability of success in litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."  *Wallace v. Justice Oaks II, Ltd. (In re Justice Oaks, II, Ltd.),* 898 F.2d 1544, 1459 (11th Cir. 1990).

31.    In evaluating a proposed settlement, the bankruptcy court "need not rest its decision whether to approve a settlement upon a resolution of ultimate factual and legal issues which

underlie the disputes that are proposed to be compromised … [R]ather, the Court may, and should, make a pragmatic decision on the basis of all equitable factors." *In re Holywell Corp.*, 93 B.R. 291, 295 (Bankr. S.D. Fla. 1988) (emphasis in original, citations omitted).  Further, the Court is not obligated to decide the merits of any claims but must simply assess the probability of success on those claims.  *See In re Vazquez,* 325 B.R. 30, 35 (Bankr. S.D. Fla. 2005).

32.     Approval of a settlement or compromise in a bankruptcy proceeding is within the sound discretion of a bankruptcy court, and will not be disturbed or modified on appeal unless approval or disapproval is an abuse of discretion.  *See In re Chira,* 367 B.R. 888, 896 n.10 (S.D. Fla. 2007) (citing *In re Air Safety Intern., L.C.,* 336 B.R. 843, 852 (S.D. Fla. 2005)); *In re Arrow Air, Inc.,* 85 B.R. 886, 891 (Bankr. S.D. Fla. 1988).

33.     The Trustee respectfully submits that the Settlement Agreement satisfies the factors set forth in *Justice Oaks*.  Considering the interests of creditors, the costs and uncertain risks of litigation, and the inconvenience and delay caused by the Parties' disputes, execution of the Settlement Agreement is prudent, reasonable, fair and equitable and in the interest of the estate.

A.    **The Probability of Success in the Litigation.**

34.     The likelihood that the Debtor could prevail on the merits of its Litigation Matters, including any Prepetition Litigation[18] forming the basis of the Settled Claims, is dubious at best.

i.    **The Turnover Action**

35.     The Trustee's review of the Debtor's books and records and the evidentiary record in this case indicates that a myriad of factual and legal obstacles exist to the collection of any alleged debt against Stimwave because, *inter alia*:

---

[18] The issues implicated in both the Turnover Action and the Declaratory Judgment Action, i.e. the effectiveness of the Assignment Agreements, the ownership and use of the Disputed IP and the StimQ Equity, are duplicative of those raised in the Prepetition Litigation.

a) **Stimwave Alleged Substantial Setoff Rights.** Stimwave asserts substantial setoff claims in excess of $3.7M against the Debtor based upon, *inter alia*: (i) previously awarded discovery sanctions [See ECF Nos. 135, 157 and 163 and POC No. 18-1], (ii) unliquidated tort claims, (iii) unliquidated unjust enrichment claims; and (iv) unliquidated alter ego claims. In addition, the Trustee's review of a summary of transfers between Stimwave and the Debtor for the periods between 2014 and 2019, identifies aggregate transfers from Stimwave to the Debtor in excess of $6,600,000 compared to transfers from the Debtor to Stimwave in the approximate amount of $400,000.

b) **Statute of Limitations**. At least $387,000 of the approximate $1,000,000 the Debtor alleges that Stimwave owes the Debtor dates back to time periods before December 2016 and are outside the applicable four-year statute of limitations. The Debtor's records do not indicate any prior collection activity or any attempts by the Debtor to preserve the statute of limitations on account of these alleged transfers.

c) **Lack of Documentary Support**. Debtor's books and records do not reflect any documentary support for any amounts allegedly owed by Stimwave to the Debtor. The Trustee has not identified any loan agreements, promissory notes, executory contracts, purchase orders, invoices, repayment terms, or any other similar indicia that would evidence a past due and unpaid debt by Stimwave to the Debtor.

d) **Lack of Credible Testimony**. The Debtor's representatives have previously testified under oath that the sole individual with knowledge as to any obligations owed by Stimwave to the Debtor is Laura Perryman, the Debtor's former managing member. At a subsequent Rule 2004 Examination, Laura Perryman plead the 5th amendment and refused to answer all questions interposed by Stimwave, including, all questions related any alleged debt Stimwave owed to the Debtor and the accuracy of the Debtor's Schedules.

e) **Prior Accounting**. The Debtor has not scheduled as an asset of the Debtor's estate the accounts receivable identified in the Turnover Action.[19] The Debtor's Schedules attribute no value to all accounts receivable 90 days old. *Id.* The Debtor has previously written off any alleged obligations owed by Stimwave to the Debtor.[20]

f) **Laura Perryman Prior Representations and Warranties**. Mrs. Perryman, during the time she was the managing member of the Debtor, represented and warranted to third parties that Stimwave did not owe any obligations to any affiliate, including the Debtor.[21]

---

[19] *See* ECF No. 1 at Item 11.

[20] See ECF No. 1-2 Items 11000, 11910, 14011, 14999.

[21] *See* Kennedy Lewis Perfection Certificate, a true and correct copy is attached hereto as **Exhibit "G"** and the Series D Shareholder Agreement attached hereto as **Exhibit J**.

g) **No factual support exists to hold Stimwave liable for alleged affiliate obligations**. The claims asserted in the Turnover Action total $4,479,928.27.[22] Of that amount, only $1,081,405.16 is attributable to Stimwave Technologies, Inc.[23] The remaining $3,398,523.11 consists of claims against affiliates of Stimwave Technologies, Inc. not included as defendants in the adversary proceeding—StimQ Medical, LLC and StimRelieve, LLC.[24] StimRelieve, LLC is no longer an operating entity. Moreover, the complaint in the Turnover Action as well as the record before the Bankruptcy Court is devoid of **any** factual allegations that could provide the foundation for a legal determination that Stimwave Technologies, Inc. is liable for the debts of its current (StimQ Medical, LLC) and former (StimRelieve, LLC) affiliates.

h) **Turnover Action is Procedurally Defective**.  The current action seeks recovery of disputed alleged obligations pursuant to 11 U.S.C. Sections 362 and 542.  Based upon recent Supreme Court authority cited by Stimwave, no cause of action exists related to a secured party's passive retention of assets it asserts an interest in.  Similarly, Section 542 is inapplicable to the recovery of claims based upon an alleged breach of contract.  Thus, the current Turnover Action is unlikely to prevail as currently plead.

36.    The aforementioned factual and legal obstacles constitute a significant impediment to the Debtor's estate recovering any amounts against Stimwave.  Moreover, continued litigation with Stimwave could ultimately result in an adverse judgment against the Debtor's estate through the liquidation of a claim in favor of Stimwave that exceeds $3.7M.

**ii.    The Declaratory Judgment Action**

37.    The Trustee's review of the Debtor's books and records and the evidentiary record in this case likewise reveals a myriad of factual and legal obstacles undermining the determination sought by the Debtor that it is the rightful owner of both the Disputed IP and StimQ Equity.

a) **A Substantial Issue Exists as to Whether Member Approval was Required to Authorize the Transfers.** The Debtor has alleged that the Transfer Agreements were not validly authorized on behalf of the Debtor under section 5.4(b)(ii) of the Debtor's Limited Liability Company Agreement, dated as of July 31, 2013, as amended pursuant to amendment No. 1 thereof dated as of April 21, 2018 (the "LLC Agreement").[confirm]  As a threshold matter, a review of section 5.4(b)(ii) of the LLC

---

[22] See *Complaint for Violations of the Automatic Stay, Injunctive Relief, and Turnover of Property of the Estate* [Adv. Case No. 21-01033-LMI; ECF No. 1].

[23] Complaint at ¶ 11.

[24] Complaint at ¶¶ 12-15.

Agreement (the "Member Approval Requirement") reveals that a written consent or affirmative vote of the Debtor's members constituting a majority interest was only required to authorize one or more of the Transfer Agreements if, and only if, such Transfer Agreement constituted "a sale of all or substantially all of the assets" of the Debtor.[25] Here, the Transfer Agreements did not involve the exchange of any pecuniary consideration and neither Stimwave nor the Debtor had the status of "buyer" or "seller." Thus, under the common understanding of the term "sale" as applied by Delaware Court of Chancery in *Stream TV Networks, Inc. v. SeeCubic, Inc.,* 2020 WL 7230419 (Del. Ch. Dec. 8, 2020), the Transfer Agreements likely do not constitute "sales" within the meaning of the Member Approval Requirement. As such, there is a substantial issue as to whether a member vote would have been required under the Member Approval Requirement to authorize the Transfer Agreements.

b) **A Substantial Issue Exists as to Whether the Trustee Can Void the Transfer Agreements as Ultra Vires Acts Under Delaware Law.** Even if the Transfer Agreements were not duly authorized under the LLC Agreement, Stimwave and Kennedy Lewis argue that the absence of such authorization does not necessarily render the applicable Transfer Agreement ineffective or unenforceable. Rather, the effectiveness and enforceability of an act rendered defective by the failure to obtain any such required approval turns on the nature of the defective act and, if applicable, any affirmative defenses.[26] Stimwave and Kennedy Lewis further argue that Delaware law recognizes two types of defective corporate or entity acts: void acts and voidable acts. The distinction between void and voidable acts may be critical since voidable acts may be ratified or otherwise validated in equity, but void acts cannot. Traditionally, the "essential distinction between voidable and void acts is that the former are those which may be found to have been performed in the interest of the corporation but beyond the authority of management, as distinguished from acts which are Ultra vires, fraudulent or gifts or waste of corporate assets" that have historically been classified as void.[27] In this connection, a corporate or entity act is *ultra vires* only if the company lacks the power and authority to take the act and cannot lawfully effectuate the act in any circumstance.[28] Under the LLC Act, Delaware limited liability companies are granted

---

[25] See LLC Agreement, section 5.4(b)(ii) attached hereto as **Exhibit "N."**

[26] Agency law provides an independent basis on which a third party may enforce a contract entered into on behalf of a counterparty without proper authorization if the agent that entered into the contract had apparent authority to bind such counterparties. *See, e.g.,* *Sarissa Capital Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *19 (Del. Dec. 8, 2017). In this case, however, agency law does not provide a basis to enforce the Transfer Agreements against Micron because Perryman executed each of the Transaction Agreements on behalf of Stimwave with "constructive knowledge of the LLC Agreement's terms because [s]he was a member, manager, and signatory to the LLC Agreement," which is imputed to Stimwave such that Stimwave could not have reasonably believed that those executing the Tranfer Agreements on behalf of Micron had the authority to act on its behalf to the extent that any additional approvals were required. *CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807, 823–24 (Del. 2018).

[27] *Michelson v. Duncan*, 407 A.2d 211, 218–19 (Del. 1979).

[28] *See generally Carsanaro v. Bloodhound Techs., Inc*., 65 A.3d 618, 648–653 (Del. Ch. 2013); *Applied Energetics, Inc. v. Farley*, 2020 WL 4432271 (Del. Ch. Aug. 3, 2020).

"broad authority and "'such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the limited liability company,'" including the power "to enter into contracts" and "interested transactions."[29]   As such, a contract entered into by a Delaware limited liability company without the receipt of an approval required under its operating Agreement will ordinarily fall within the power and capacity of the company notwithstanding the failure to obtain such approval.[30]   In this case, Stimwave and Kennedy Lewis have argued that the Transfer Agreements are not *ultra vires* or rendered void as a result of the failure to receive the any alleged required approval.[31]

c) **A Substantial Issue Exists as to Whether The Contribution of the StimQ Equity Constituted the "Sale of All or Substantially All" of the Debtor's Assets.** Assuming, that the Transfer Agreements somehow constituted "sales" that could be subject to the Member Approval Requirement raises a second threshold question as to whether the Transfer Agreements should be viewed individually or collectively for purposes of determining the necessary authorization. Plainly put, it is alleged and the facts appear to not support the consolidation of the StimQ Contribution Agreement with any of the other Transfer Agreements. It is alleged and none of the relevant documents or materials appear to indicate that the contribution of the StimQ Equity was a prearranged transaction intended to have been consummated in connection with any of the transfers of the Disputed IP to achieve any particular end result. In fact, it is alleged that the Stimwave Board separately decided to proceed with the contribution of the StimQ Equity and the transfers of the Disputed IP, with its decision on the latter coming over **nine months** after the contribution of the StimQ Equity.  Additionally, the Transfer Agreements contain no language that would imply that the contribution of the StimQ Equity and transfer of the Disputed IP depended on one another or were part of any one binding commitment. Finally, and most persuasively, it is clear from contemporaneous documentation that the contribution of the StimQ Equity was effected for the express purposes of securing an investment in Stimwave's Series D financing, which was consummated months prior to the IP Assignments.  It is further alleged that even when viewed collectively, the License Assignment Agreement, the Patent Assignment Agreement, and the Epimed Assignment Agreement——without the inclusion of the StimQ Contribution Agreement ——cannot be considered to constitute a sale of all or substantially all of the Debtor's assets.

---

[29] *CompoSecure*, 206 A.3d at 817 n.36 (quoting 6 *Del. C.* § 18-106(b)).

[30] *See id.* at 817.

[31] *See, e.g., id.* (observing that, "[o]rdinarily," a contract entered into by a limited liability company without the required approval under its operating agreement "would be voidable"); *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *48 (Del. Ch. Feb. 12, 2018) ("There is no dispute that Oxbow had the power as an entity to issue units and admit new members. Oxbow could have issued units to the Small Holders and admitted them as members, if the parties had adhered to the procedures specified in the LLC Agreement.  Consequently, assuming for the sake of analysis that the parties failed to follow the requisite procedures, the issuance of units to the Small Holders and their admission as members would be voidable, not void."), *aff'd in part, rev'd in part on other grounds sub nom. Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482 (Del. 2019).

d) **A Good Faith Argument Exists That The Transfer Agreements have been Validated Under Several Equitable Doctrines**. Even assuming, that any of the Transfer Agreements were not duly authorized under the LLC Agreement, it can be argued that the absence of such authorization does not, in and of itself, render the applicable Transfer Agreement ineffective or unenforceable. Stimwave, has relied upon doctrines of acquiescence[32], ratification[33], unclean hands, and laches, argues that any unauthorized Transfer Agreements are voidable ——not void——transactions that have since been validated or ratified by the Debtor and its members in equity. Stimwave argues that its position is  compelling in light of Ms. Perryman's actions, and the inequitable nature of her challenge to the validity of the Transfer Agreements —— especially when considering her critical role in the design, structuring and effectuation of the entirety of the Transfer Agreements ——as well as the failure of the Debtor and its members to timely dispute the validity of the Transfer Agreement.

e) **Lack of Credible Testimony**.   Similar to the Turnover Action, the Debtor's ability to successfully prosecute the Declaratory Judgment Action is greatly impeded, if not defeated, by the inability of the Debtor to produce a corporate representative with knowledge willing and able to actually testify in support of the Debtor's allegations. As detailed above, when asked to testify at a Rule 2004 about topics such as the Disputed IP , the contribution of the StimQ Equity, and the veracity of the Debtor's bankruptcy schedules, Ms. Perryman exercised her right to take the 5th Amendment. Debtor's former counsel admitted on record that Ms. Perryman had the most knowledge of the 2004 exam topics[34] and the Debtor's corporate representatives, Patrick Larson, Evelyn Valerio, and Pam Beidleman, all stipulated that the **only** person with knowledge as to these topics was Ms. Perryman.[35]

---

[32] Acquiescence "is assertable against a party who remains inactive for a considerable period of time, or who recognizes the validity of the complained of act or who acts in a manner inconsistent with the subsequent repudiation and thus leads the other party to believe the act has been approved." *Julin v. Julin,* 787 A.2d 82, 84 (Del. 2001).  A "claimant is deemed to have acquiesced in a complained-of act where he `as full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved." *Klaassen v. Allegro Dev. Corp*., 106 A.3d 1035, at 1047 (Del. 2014). Notably, acquiescence does not require any affirmative action on the part of the acquiescing party  or detrimental reliance by the party asserting the doctrine of acquiescence. *See Papaioanu v. Comm 'rs of Rehoboth,* 186 A.2d 745 (De1.Ch. 1962); *Balin v. Anierimar Realty Co.,* 1996 WL 684377 (Del. Ch. 1996).

[33] Ratification involves a party's after-the-fact assent to an unauthorized transaction with actual or implied knowledge "of all material facts." *See Frank v. Wilson & Co.,* 32 A.2d 277, 305 (Del. 1943). Such assent must generally include "a voluntary and positive act," but "inaction alone" may nevertheless "amount to a positive act" for this purpose. *Nevins v. Bryan,* 885 A.2d 233, 254 (Del. Ch. May 4, 2005) (quoting *Frank,* 32 A.2d at 283), *aff'd,* 884 A.2d 512 (Del. 2005). Ratification may therefore be either express or implied. *Hannigan v. Halo Petroleum Corp. of Am.,* 47 A.2d 169, 171 (Del. 1945).

[34] 1/14/21 Hg. Tr. at 45:8–17.

[35] 2004 Tr. at 23:11–24; 24:13–25:6

38.    The aforementioned factual and legal obstacles constitute a significant impediment to the Debtor's estate prevailing on the Declaratory Judgment Action.  It appears a substantial possibility that continued litigation could result in an adverse declaratory judgment against the Debtor's estate finding the Debtor to possess no right, title, or interest in either the StimQ Equity or the Disputed IP.  [Add language that if Debtor prevails it would perfect KL's fraud claims against the Debtor]

## B.    The Difficulties, if any, to be Encountered in the Matter of Collection.

39.    In addition, to the extent the Debtor's estate did prevail on any of its claims, the Trustee's ability to collect on any judgments in its favor is uncertain.  Kennedy Lewis alleges a blanket first priority lien against all the property subject to the Transfer Agreements securing aggregate unpaid obligations of over $20,000,000.00 In the event the Trustee prevailed in the Turnover Action, any monetary judgment would be subordinate to the existing liens encumbering the property subject to the Transfer Agreements.  Thus, if the Trustee was successful in recovering the property for the benefit of the Debtor's estate, the Debtor's estate would need to satisfy all of Kennedy Lewis' secured claims and all administrative expense claims prior to realizing any net benefit for creditors of the Debtor's estate.  Moreover, there is no assurance that resulting monetary awards (assuming they are collectable) will be in excess of the costs and expenses borne by the estate in pursuit of litigation.  Finally, any declaratory judgment in favor of the Debtor's estate will likely result in substantial claims in favor of Kennedy Lewis and Stimwave resulting from the various negligent and fraudulent representations made by Laura Perryman in the various Transfer Agreements.  It is entirely uncertain that the value of any property recovered by the Trustee would exceed the ultimate claims allowed in favor of Kennedy Lewis and Stimwave that are being consensually subordinated pursuant to the Settlement Agreement.

**C.    The Complexity of the Litigation Involved and the Expense, Inconvenience and Delay Necessarily Attending It.**

40.    It is self-evident that the Settled Claims are deeply complex in nature, involve significant factual disputes dating as far back as 2013, and require resolution of legal issues spanning corporate governance, contract, tort and intellectual property law.  As is evident from the record, the Litigation Matters have grown in number, scope, and amount of parties since the commencement of the Delaware Action.  And while the Litigation Matters have been pursued vigorously by the Parties, they appear to be no closer to resolution today than they were one year ago.  Adjudication of the Settled Claims would require substantial efforts by the Parties to complete discovery, develop their claims and defenses, and prepare for trial.  Meanwhile, the Parties will incur all attendant expenses and inconveniences, which the Trustee expects to be substantial based on the lengthy litigation record in this case.  Finally, the claims subject to the dispute between Stimwave and the Debtor are critical to Stimwave's continued going concern.  Thus, Stimwave has expressly advised the Trustee that it will exhaust every post-judgment remedy and appeal available to Stimwave in the unlikely event of an adverse judgment.  Rather than protract litigation and encumber the Debtor's estate with expenses that it cannot afford, the Settlement Agreement will achieve an expedient, cost-efficient, and equitable resolution of the Settled Claims.

**D.    The Paramount Interest of the Creditors and Proper Deference to their Reasonable Views in the Premises.**

41.    Finally, the Trustee is of the view that the Settlement Agreement represents the best available means to vindicate and protect the interests of creditors in this bankruptcy.  Indeed, following its inspection of the Debtor's premises and books and records, the Trustee has determined that the Debtor will likely become administratively insolvent and unable to confirm a chapter 11 plan absent the Court's approval of the Settlement Agreement and the Debtor's receipt of the Settlement Payment.

42.     The proposed Settlement Payment coupled with the consensual subordination of all KLIM and Stimwave claims projects to fund a substantial distribution of undisputed allowed claims.  Even taking into account the allowance of disputed claims, the proposed Settlement Payment would result in a meaningful distribution on an expedited time frame.

43.     Accordingly, absent approval of the Settlement Agreement, this proceeding will most likely be converted to a chapter 7 liquidation.  Conversion to a liquidation, in turn, all but guarantees that creditors will receive diminished recoveries on their claims compared to recoveries available under chapter 11.  In liquidation, the Debtor's estate will incur additional administrative costs, including trustee fees, at the expense of its creditors while receiving no guarantee that the Settled Claims will be prosecuted successfully or settled for value.  The Settlement Agreement, by contrast, provides valuable consideration for the Settled Claims which, in Trustee's estimation, will be sufficient to pay administrative and priority claims in full and to make a substantial distribution to unsecured creditors.  Given the alternative, the Settlement Agreement represents the best possible outcome for the Debtor's creditors and maximizes the value of the estate's assets available for distribution.

44.     In sum, the Settlement Agreement takes into account the relative probabilities of success on the Parties' claims, as well as the costs and expenses to be incurred by the Parties from pursuit of further litigation and proposes a global resolution of all claims that the Parties have determined to be fair, equitable, reasonable, and in the interests of the estate.

## **CONCLUSION**

WHEREFORE, the Trustee respectfully requests that the Court enter an order: (i) granting the Motion, (ii) authorizing and approving the Settlement Agreement; and (iii) granting such other and further relief as may be just and proper.

Dated: April 1st, 2021

Respectfully submitted,

By: /s/ *Marc Barmat* _____
FURR COHEN
2255 Glades Road, Suite 301
Boca Raton, FL 33431
Tel: 561-417-1567
E-mail: mbarmat@furrcohen.com

*Counsel for Subchapter V Chapter 11 Trustee*