# EXHIBIT "H"

# STIMWAVE TECHNOLOGIES INCORPORATED

## EMPLOYMENT AGREEMENT

This Employment Agreement (the "**Agreement**") is entered into as of February 25th, 2014, (the "**Effective Date**") by and between Stimwave Technologies Incorporated (the "**Company**") and Laura Perryman ("**Employee**").

1.  Duties and Scope of Employment. Employee's employment with the Company commenced on January 1st, 2014 (the "**Start Date**"). As of the Effective Date, Employee will continue to serve as President and Chief Executive Officer of the Company. Employee will render such business and professional services in the performance of Employee's duties, consistent with Employee's position within the Company, as will reasonably be assigned to Employee by the Company's Board of Directors (the "**Board**"). The Board may modify Employee's job title and duties as it deems necessary and appropriate in light of the Company's needs and interests from time to time. The period of Employee's employment under this Agreement is referred to herein as the "**Employment Term**."

2.  At-Will Employment. The parties agree that Employee's employment with the Company will be "at-will" employment and may be terminated at any time with or without Cause or notice. Employee understands and agrees that neither Employee's job performance nor promotions, commendations, bonuses or the like from the Company give rise to or in any way serve as the basis for modification, amendment, or extension, by implication or otherwise, of Employee's employment with the Company. However, as described in this Agreement, Employee may be entitled to severance benefits depending on the circumstances of Employee's termination of employment with the Company.

3.  Term of Agreement. This Agreement will have an initial term running from the Effective Date through the third anniversary of the Start Date (the "**Initial Term**"). On the third anniversary of the Start Date, this Agreement will renew automatically for additional one (1) year terms (each an "**Additional Term**"), unless either party provides the other party with written notice of non-renewal at least thirty (30) days prior to the date of automatic renewal. If Employee becomes entitled to benefits under Section 8 during the term of this Agreement, the Agreement will not terminate until all of the obligations of the parties hereto with respect to this Agreement have been satisfied.

4.  Compensation.

    (a)  Base Salary. During the Employment Term, the Company will pay Employee an annual salary of $100,000 as compensation for Employee's services paid as bonuses quarterly (the "**Base Salary**").

    (b)  Annual Bonus. Employee will be eligible to participate in any additional bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "**Committee**"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of (i) the

fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned, or (ii) March 15 following the calendar year in which the bonus is earned.

(c)    <u>Equity</u>.  Employee will be eligible to receive equity awards pursuant to any plans or arrangements the Company may have in effect from time to time.  Employee will also be eligible to receive equity awards pursuant to any plans or arrangements that a subsidiary entity of the Company may have in effect from time to time. The Board or the Committee (or with respect to a subsidiary entity of the Company, the respective board of directors or committee of such subsidiary entity) will determine in its discretion whether Employee will be granted any such equity awards and the terms of any such award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

5.    <u>Employee Benefits</u>.  During the Employment Term, Employee will be entitled to participate in the employee benefit plans currently and hereafter maintained by the Company of general applicability to other employees of the Company, including, without limitation, the Company's group medical, dental, vision, disability, life insurance, and flexible-spending account plans.  The Company reserves the right to cancel or change the benefit plans and programs it offers to its employees at any time.

6.    <u>Vacation</u>.  Employee will be entitled to receive paid annual vacation of up to four (4) weeks at such time as may be mutually agreed by the Company and Employee.  Notwithstanding anything in the Company manual or policy to the contrary, any unused vacation shall accumulate and Company shall be required to reimburse the Employee for unused time at the applicable rate, at the conclusion of the Term.

7.    <u>Expenses</u>.    The Company will reimburse Employee for reasonable travel, entertainment or other expenses incurred by Employee in the furtherance of or in connection with the performance of Employee's duties hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time. If the Employee shall undertake travel, the Employee shall be furnished with business class or better air travel.

8.    <u>Severance</u>.  If the Company terminates Employee's employment with the Company without Cause (excluding death or Disability) or if Employee resigns from such employment for Good Reason, and, in each case, Employee signs and does not revoke a standard release of claims with the Company in a form acceptable to the Company and subject to Section 10 below, then Employee will receive, in addition to Employee's salary payable through the date of termination of employment and any other employee benefits earned and owed through the date of termination, the following benefits from the Company:

(a) continuing payments of severance pay at a rate equal to Employee's Base Salary rate, as then in effect, for twelve months from the date of such termination in accordance with the Company's normal payroll policies; and

(b) if Employee elects continuation coverage pursuant to the Consolidated Budget Reconciliation Act of 1985 ("**COBRA**") within the time period prescribed pursuant to COBRA for Employee and Employee's eligible dependents, then the Company will reimburse Employee on the last day of each month for a period ending three months after Employee's employment termination

date for the COBRA premiums paid during such period for such coverage (at the coverage levels in effect immediately prior to Employee's termination); provided, that such coverage shall end upon such earlier date that Employee and/or Employee's eligible dependents become covered under similar plans. Notwithstanding the foregoing, if the Company determines in its sole discretion that it cannot provide the benefit described in this Section 8(b) without potentially violating, or being subject to an excise tax under, applicable law (including, without limitation, Section 2716 of the Public Health Service Act), the Company will in lieu thereof provide to Employee a taxable monthly payment, payable on the last day of a given month, in an amount equal to the monthly COBRA premium that Employee would be required to pay to continue Employee's group health coverage in effect on the termination of employment date (which amount will be based on the premium for the first month of COBRA coverage), which payments will be made regardless of whether Employee elects COBRA continuation coverage and will commence on the month following Employee's termination of employment and will end on the earlier of (A) the date upon which Employee obtains other employment or (B) the date the Company has paid an amount equal to three payments. For the avoidance of doubt, the taxable payments in lieu of COBRA reimbursements may be used for any purpose, including, but not limited to continuation coverage under COBRA, and will be subject to all applicable tax withholdings.

9.    Change in Control Benefits.  In the event of a Change in Control that occurs while Employee remains an employee of the Company, 100% of any Equity Awards held by Employee as of the Closing shall vest and become fully exercisable (to the extent applicable) as of the Closing. With respect to Equity Awards granted on or after the Effective Date, but granted prior to the Closing, the same vesting acceleration provisions provided in the prior sentence will apply to such Equity Awards except to the extent provided in the applicable equity award agreement by explicit reference to this Agreement.

10.    Conditions to Receipt of Severance; No Duty to Mitigate.

(a)    Separation Agreement and Release of Claims.  The payment of any severance set forth in Section 8 above is contingent upon Employee signing and not revoking the Company's standard separation and release of claims agreement upon Employee's termination of employment and such agreement becoming effective no later than sixty (60) days following Employee's employment termination date (such deadline, the "**Release Deadline**").  In no event will severance payments be paid or provided until the release actually becomes effective.  Any severance payments or benefits under this Agreement will be paid on, or, in the case of installments, will not commence until, the sixtieth (60th) day following Employee's separation from service, or if later, such time as required by Section 10(c). Except as required by Section 10(c), any installment payments that would have been made to Employee during the sixty (60) day period immediately following Employee's separation from service but for the preceding sentence will be paid to Employee on the sixtieth (60th) day following Employee's separation from service and the remaining payments will be made as provided in the Agreement.

(b)    Confidential Information Agreement.  Employee's receipt of any payments or benefits under Section 8 will be subject to Employee continuing to comply with the terms of Employee's Confidential Information Agreement (as defined in Section 13).

(c)    Section 409A.

(i)     Notwithstanding anything to the contrary in this Agreement, no severance pay or benefits payable upon separation that is payable to Employee, if any, pursuant to this Agreement, when considered together with any other severance payments or separation benefits that are considered deferred compensation (together, the "**Deferred Payments**") under Section 409A of the Internal Revenue Code, as amended (the "**Code**") and the final regulations and official guidance thereunder ("**Section 409A**") will be payable until Employee has a "separation from service" within the meaning of Section 409A.

(ii)     Notwithstanding anything to the contrary in this Agreement, if Employee is a "specified employee" within the meaning of Section 409A at the time of Employee's termination (other than due to death), then the Deferred Payments, if any, that are payable within the first six (6) months following Employee's separation from service, will become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the date of Employee's separation from service. All subsequent Deferred Payments, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit. Notwithstanding anything herein to the contrary, if Employee dies following Employee's separation from service, but prior to the six (6) month anniversary of the separation from service, then any payments delayed in accordance with this Section 10(c) will be payable in a lump sum as soon as administratively practicable after the date of Employee's death and all other Deferred Payments will be payable in accordance with the payment schedule applicable to each payment or benefit. Each payment, installment and benefit payable under this Agreement is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

(iii)     Any severance payment that satisfies the requirements of the "short-term deferral" rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations shall not constitute Deferred Payments for purposes herein. Any amount paid under this Agreement that qualifies as a payment made as a result of an involuntary separation from service pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations that does not exceed the Section 409A Limit (as defined below) will not constitute Deferred Payments for purposes herein.

(iv)     For purposes of this Agreement, "**Section 409A Limit**" means the lesser of two (2) times: (x) Employee's annualized compensation based upon the annual rate of pay paid to Employee during Employee's taxable year preceding Employee's taxable year of Employee's termination of employment as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any Internal Revenue Service guidance issued with respect thereto, or (y) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Code for the year in which Employee's employment is terminated.

(v)     The foregoing provisions are intended to comply with or be exempt from the requirements of Section 409A so that none of the severance payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. Employee and the Company agree to work together in good faith to consider amendments to this Agreement and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition prior to actual payment to Employee under Section 409A.

11.    <u>No Duty to Mitigate</u>.  Employee will not be required to mitigate the amount of any payment contemplated by this Agreement, nor will any earnings that Employee may receive from any other source reduce any such payment.

12.    <u>Definitions</u>.

(a)    <u>Cause</u>.  For purposes of this Agreement, "**Cause**" means: (i) Employee's act of personal dishonesty in connection with Employee's responsibilities as an employee that is intended to result in Employee's substantial personal enrichment; (ii) Employee being convicted of, or pleading no contest or guilty to, (x) a misdemeanor that the Company reasonably believes has had or will have a material detrimental effect on the Company, or (y) any felony; (iii) Employee's gross misconduct; (iv) Employee's willful and continued failure to perform the duties and responsibilities of Employee's position after there has been delivered to Employee a written demand for performance from the Company that describes the basis for the Company's belief that Employee has not substantially performed Employee's duties and Employee has not corrected such failure within thirty (30) days of such written demand; or (v) Employee's material violation of any written Company employment policy or standard of conduct.

(b)    <u>Change in Control</u>.  For purposes of this Agreement, "**Change in Control**" means (i) any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becoming the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company (or with respect to any subsidiary entity of the Company, such subsidiary entity) having the right to vote for the election of members of the board of directors (other than in connection with a bonafide equity financing for capital raising purposes), (ii) any reorganization, merger or consolidation of the Company (or with respect to any subsidiary entity of the Company, such subsidiary entity), other than a transaction or series of related transactions in which the holders of the voting securities of the Company (or with respect to any subsidiary entity of the Company, such subsidiary entity) outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company (or with respect to any subsidiary entity of the Company, such subsidiary entity) or such other surviving or resulting entity (other than in connection with a bonafide equity financing for capital raising purposes) or (iii) a sale or other disposition of all or substantially all of the assets of the Company (or with respect to any subsidiary entity of the Company, such subsidiary entity).

(c)    <u>Closing</u>.  For purposes of this Agreement, "**Closing**" means the closing of the first transaction constituting a Change in Control that occurs on or following the Effective Date.

(d)    <u>Disability</u>.  For purposes of this Agreement, "**Disability**" means Employee's inability to perform Employee's duties due to Employee's physical or mental incapacity, as reasonably determined by the Board or its designee, for an aggregate of 180 days in any 365 consecutive day period.

(e)    <u>Equity Awards</u>.  For purposes of this Agreement, "**Equity Awards**" means any Company equity compensation awards to Employee.

(f)    Good Reason.    For purposes of this Agreement, "**Good Reason**" means Employee's resignation within thirty (30) days following the expiration of any Company cure period (discussed below) following the occurrence of one or more of the following, without Employee's consent: (i) a material reduction in Employee's Base Salary, excluding a reduction in Base Salary that is applicable to all Company senior management; (ii) a material reduction of Employee's authority, duties or responsibilities, unless Employee is provided with a comparable position; provided, however, that a reduction in authority, duties, or responsibilities solely by virtue of the Company being acquired and made part of a larger entity whether as a subsidiary, business unit or otherwise (as, for example, when the Chief Executive Officer of the Company remains as such following an acquisition where the Company becomes a wholly owned subsidiary of the acquirer, but is not made the Chief Executive Officer of the acquiring corporation) will not constitute "Good Reason"; or (iii) a material change in the geographic location of Employee's primary work facility or location; provided, that a relocation of fifty (50) miles or less from Employee's then present location or to Employee's home as Employee's primary work location will not be considered a material change in geographic location.  In order for an event to qualify as Good Reason, Employee must not terminate employment with the Company without first providing the Company with written notice of the acts or omissions constituting the grounds for "Good Reason" within ninety (90) days of the initial existence of the grounds for "Good Reason" and a reasonable cure period of not less than thirty (30) days following the date of such notice, and such grounds must not have been cured during such time.

13.    Limitation on Payments.    In the event that the severance benefits provided for in this Agreement or otherwise payable to Employee (i) constitute "parachute payments" within the meaning of Section 280G of the Code and (ii) but for this Section 13, would be subject to the excise tax imposed by Section 4999 of the Code, then Employee's severance benefits under Section 8 will be either:

(a)    delivered in full, or

(b)    delivered as to such lesser extent which would result in no portion of such severance benefits being subject to excise tax under Section 4999 of the Code,

whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the excise tax imposed by Section 4999, results in the receipt by Employee on an after-tax basis, of the greatest amount of severance benefits, notwithstanding that all or some portion of such severance benefits may be taxable under Section 4999 of the Code.  If a reduction in severance and other benefits constituting "parachute payments" is necessary so that benefits are delivered to a lesser extent, reduction will occur in the following order: (i) reduction of cash payments, which shall occur in reverse chronological order such that the cash payment owed on the latest date following the occurrence of the event triggering such excise tax will be the first cash payment to be reduced; (ii) reduction of acceleration of vesting of equity awards, which shall occur in the reverse order of the date of grant for such stock awards (i.e., the vesting of the most recently granted stock awards will be reduced first); and (iii) reduction of other benefits paid or provided to the Employee, which shall occur in reverse chronological order such that the benefit owed on the latest date following the occurrence of the event triggering such excise tax will be the first benefit to be reduced. If more than one equity award was made to the Employee on the same date of grant, all

such awards shall have their acceleration of vesting reduced pro rata. In no event shall the Employee have any discretion with respect to the ordering of payment reductions.

Unless the Company and Employee otherwise agree in writing, any determination required under this Section 13 will be made in writing by a nationally recognized firm of independent public accountants selected by the Company (the "**Accountants**"), whose determination will be conclusive and binding upon Employee and the Company for all purposes. For purposes of making the calculations required by this Section 13, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Sections 280G and 4999 of the Code. The Company and Employee will furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this Section. The Company will bear all costs the Accountants may reasonably incur in connection with any calculations contemplated by this Section 13.

14.   Confidential Information.   Employee confirms Employee's continuing obligations under the Company's standard Confidential Information and Invention Assignment Agreement (the "**Confidential Information Agreement**") dated as of the date hereof and attached as Attachment 1 hereto.

15.   Assignment.   This Agreement will be binding upon and inure to the benefit of (a) the heirs, executors and legal representatives of Employee upon Employee's death and (b) any successor of the Company. Any such successor of the Company will be deemed substituted for the Company under the terms of this Agreement for all purposes. For this purpose, "**successor**" means any person, firm, corporation or other business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly acquires all or substantially all of the assets or business of the Company. None of the rights of Employee to receive any form of compensation payable pursuant to this Agreement may be assigned or transferred except by will or the laws of descent and distribution. Any other attempted assignment, transfer, conveyance or other disposition of Employee's right to compensation or other benefits will be null and void.

16.   Notices.   All notices, requests, demands and other communications called for hereunder will be in writing and will be deemed given (i) on the date of delivery if delivered personally; (ii) one (1) day after being sent by a well established commercial overnight service; or (iii) four (4) days after being mailed by registered or certified mail, return receipt requested, prepaid and addressed to the parties or their successors at the following addresses, or at such other addresses as the parties may later designate in writing:

If to the Company:

Stimwave Technologies Incorporated
420 Lincoln Road, Suite 365
Miami Beach, FL 33139

If to Employee:

at the last residential address known by the Company.

17.    <u>Severability</u>.  In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement will continue in full force and effect without said provision.

18.    <u>Integration</u>.    This Agreement, together with the Operating Agreement and the Confidential Information Agreement represents the entire agreement and understanding between the parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral.  This Agreement may be modified only by agreement of the parties by a written instrument executed by the parties that is designated as an amendment to this Agreement.

19.    <u>Waiver of Breach</u>.    The waiver of a breach of any term or provision of this Agreement, which must be in writing, will not operate as or be construed to be a waiver of any other previous or subsequent breach of this Agreement.

20.    <u>Headings</u>.    All captions and section headings used in this Agreement are for convenient reference only and do not form a part of this Agreement.

21.    <u>Tax Withholding</u>.  All payments made pursuant to this Agreement will be subject to withholding of applicable taxes.

22.    <u>Governing Law</u>.  This Agreement will be governed by the laws of the State of Florida (with the exception of its conflict of laws provisions).

23.    <u>Acknowledgment</u>.  Employee acknowledges that Employee has had the opportunity to discuss this matter with and obtain advice from Employee's private attorney, has had sufficient time to, and has carefully read and fully understands all the provisions of this Agreement, and is knowingly and voluntarily entering into this Agreement.

24.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, and each counterpart will have the same force and effect as an original and will constitute an effective, binding agreement on the part of each of the undersigned.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by their duly authorized officers, as of the day and year first above written.

**EMPLOYEE**                                **STIMWAVE TECHNOLOGIES**
                                            **INCORPORATED**


By: _Laura Tyler Perryman_____          By: _Laura Tyler Perryman_____
    DocuSigned by:                             DocuSigned by:
    LAURA PERRYMAN                             LAURA PERRYMAN


                                            Title: Chairman of the Board


**[SIGNATURE PAGE TO LAURA PERRYMAN EMPLOYMENT AGREEMENT]**

## ATTACHMENT A

## STIMWAVE TECHNOLOGIES INCORPORATED
### AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT, AND ARBITRATION AGREEMENT

As a condition of my employment with Stimwave Technologies Incorporated, its subsidiaries, affiliates, successors or assigns (together, the "**Company**"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following provisions of this Stimwave Technologies Incorporated At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (this "**Agreement**"):

### 1.    AT-WILL EMPLOYMENT

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT-WILL" EMPLOYMENT.  I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE PRESIDENT OR CEO OF THE COMPANY.  ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE.  I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

### 2.    APPLICABILITY TO PAST ACTIVITIES

The Company and I acknowledge that I have been engaged to provide services by the Company for a period of time prior to the date of this Agreement (the "**Prior Engagement Period**"). Accordingly, I agree that if and to the extent that, during the Prior Engagement Period: (i) I received access to any information from or on behalf of Company that would have been "Company Confidential Information" (as defined below) if I received access to such information during the period of my employment with Company under this Agreement; or (ii) I conceived, created, authored, invented, developed or reduced to practice any item, including any intellectual property rights with respect thereto, that would have been an "Invention" (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the period of my employment with Company under this Agreement; then any such information shall be deemed "Company Confidential Information" hereunder and any such item shall be deemed an "Invention" hereunder, and this Agreement shall apply to such information or item as if conceived, created, authored, invented, developed or reduced to practice under this Agreement.

### 3.    CONFIDENTIALITY

A. *Definition of Confidential Information*.  I understand that "**Company Confidential Information**" means information that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential.  Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during

the course of my employment with Company.  Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information.  By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by Company to me; (ii) becomes publicly known or made generally available after disclosure by Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by my then-contemporaneous written records.  I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

B.  *Nonuse and Nondisclosure*.  I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure when compelled by applicable law; I shall provide prior written notice to the President, CEO, and General Counsel of the Company (as applicable).  I agree that I obtain no title to any Company Confidential Information, and that as between Company and myself, the Company retains all Confidential Information as the sole property of the Company.  I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.  I understand that my obligations under this **Section 3.B** shall continue after termination of my employment.

C.  *Former Employer Confidential Information*.  I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence.  I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D.  *Third Party Information*.  I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("**Associated Third Parties**"), their

confidential or proprietary information ("**Associated Third Party Confidential Information**") subject to a duty on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes.  By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties.  I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information.  I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

4.    <u>OWNERSHIP</u>

A.    *Assignment of Inventions*.  As between Micron Devices LLC, Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, will be the sole property of Micron Devices LLC.  I also agree to promptly make full written disclosure to Micron Devices LLC and, upon request by Micron Devices LLC, to the Company, of any Inventions, and to deliver and assign and hereby irrevocably assign fully to Micron Devices LLC all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to Micron Devices LLC of ownership of Inventions that are not yet in existence.  I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.  I understand and agree that the decision whether or not to commercialize or market any Inventions is within the sole discretion of Micron Devices LLC or the Company, as applicable, and for the sole benefit of Micron Devices LLC or the Company, as applicable, and that no royalty or other consideration will be due to me as a result of Micron Devices LLC's or the Company's efforts, as applicable, to commercialize or market any such Inventions.

B.    *Pre-Existing Materials*.  I have attached hereto as <u>Exhibit A</u>, a list describing all inventions, discoveries, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company, and which relate to the Company's proposed business, products, or research and development ("**Prior Inventions**"); or, if no such list is attached, I represent and warrant that there are no such Prior Inventions.  Furthermore, I represent and warrant that if any Prior Inventions are included on <u>Exhibit A</u>, they will not materially affect my ability

to perform all obligations under this Agreement.  I will inform the Micron Devices LLC and the Company in writing before incorporating such Prior Inventions into any Invention or otherwise utilizing such Prior Invention in the course of my employment with the Company, and I hereby grant both Micron Devices LLC and the Company a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any invention, improvement, development, concept, discovery, work of authorship or other proprietary information owned by any third party into any Invention without Micron Devices LLC's or the Company's prior written permission.

   C. *Moral Rights*.  Any assignment to Micron Devices LLC of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**").  To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

   D. *Maintenance of Records*. I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company.  The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by Micron Devices LLC or, upon request by Micron Devices LLC, by the Company.  As between Micron Devices LLC, the Company and myself, the records are and will be available to and remain the sole property of Micron Devices LLC, or upon request of Micron Devices LLC, of the Company, at all times.

   E. *Further Assurances*.  I agree to assist Micro Devices LLC, or upon request by Micron LLC, the Company, or its designee, at the Company's expense, in every proper way to secure the rights of Micron Devices LLC in the Inventions in any and all countries, including the disclosure to Micro Devices LLC, or upon request by Micron Devices LLC, to the Company, of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that Micro Devices LLC shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to Micron Devices LLC, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions.  I further agree that my obligations under this **Section 4.E** shall continue after the termination of this Agreement.

   F. *Attorney-in-Fact*.  I agree that, if Micron Devices LLC is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to Micron Devices LLC in **Section 4.A**, then I hereby irrevocably designate and appoint Micro Devices LLC and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully

permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

G. *License Agreement*.  Micron Devices LLC and the Company hereby acknowledge and agree that they have entered into that certain License Agreement dated January 15, 2014 (the "**License Agreement**"), and all Patents (as defined in the License Agreement) covering any Inventions shall be deemed "Licensed Patents" and all other Inventions shall be deemed "Micron Technical Information" each subject to the licenses granted by Micron Devices LLC to Company as set forth in Section 2.2 of the License Agreement.

H. *Party Status*.  Micron Devices LLC, the Company and I hereby acknowledge and agree that this Article 4 represents agreement among Micron Devices LLC, the Company and myself, and Micron Devices LLC and Company each shall have the right to directly enforce their respective rights hereunder.

5. <u>**CONFLICTING OBLIGATIONS**</u>

A. *Current Obligations*.  I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company, other than those activities for Micron Devices LLC and its affiliated companies.

B. *Prior Relationships*.  Without limiting **Section 5.A**, I represent and warrant that I have no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company.  I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law.  I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement).  Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

6. <u>**RETURN OF COMPANY MATERIALS**</u>

Upon separation from employment with the Company, on Company's earlier request during my employment, or at any time subsequent to my employment upon demand from the Company, I will immediately deliver to the Company, and will not keep in my possession, recreate, or deliver to anyone

else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to **Section 4.D**. I also consent to an exit interview to confirm my compliance with this **Article 6**.

### 7.  TERMINATION CERTIFICATION

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as Exhibit C. I also agree to keep the Company advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

### 8.  NOTIFICATION OF NEW EMPLOYER

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

### 9.  SOLICITATION OF EMPLOYEES

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this **Article 9** shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Article 3**.

### 10. NON-COMPETITION

A.  I agree that during the course of my employment and for a period of one (1) year immediately following the termination of my relationship with the Company for any reason, whether with or without cause, at the option either of the Company or myself, with or without notice, I will not, either directly or indirectly, (i) serve as an advisor, agent, consultant, director, employee, officer, partner, proprietor or otherwise of, (ii) have any ownership interest in (except for passive ownership of one percent (1%) or less of any entity whose securities have been registered under the Securities Act of 1933, as amended, or Section 12 of the Securities Exchange Act of 1934, as amended) or (iii) participate in the organization, financing, operation, management or control of, any business in competition with the Company's business as conducted by the Company at any time during the course of my employment with the Company. The foregoing covenant shall cover my activities in every part of the Territory, as defined herein, to the extent permitted by applicable law. "**Territory**" shall mean: (i) all counties in the State of Florida, (ii) all other states of the United States of America and (iii) all other countries of the world; provided that, with respect to clauses (ii) and (iii), the Company maintains non-trivial operations,

facilities, or customers in such geographic area prior to the date of the termination of my relationship with the Company.

B.    I acknowledge and agree that my fulfillment of the obligations contained in this Agreement, including, but not limited to, my obligation neither to use, except for the benefit of the Company, or to disclose the Company's Confidential Information and my obligation not to compete contained in **Section 10.A** is necessary to protect the Company's Confidential Information and trade secrets, and to preserve the Company's value and goodwill.  I further acknowledge the time, geographic and scope limitations of my obligations under **Section 10.A** are reasonable, especially in light of the Company's desire to protect its Confidential Information, and that I will not be precluded from gainful employment if I am obligated not to compete with the Company during the period and within the Territory as described above.

C.    The covenants contained in subsection **Section 10.A** shall be construed as a series of separate covenants, one for each city, county and state of any geographic area in the Territory. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant contained in subsection **Section 10.A**.  If, in any judicial or arbitration proceeding, a court or arbitrator refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced.  In the event the provisions of subsection **Section 10.A** are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed by the court or arbitrator to cover the maximum time, geographic or scope limitations, as the case may be, then permitted by such law.

11.    CONFLICT OF INTEREST GUIDELINES

I agree to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines.  A copy of the Company's current Conflict of Interest Guidelines is attached as Exhibit D hereto, but I understand that these Conflict of Interest Guidelines may be revised from time to time during my employment.

12.    REPRESENTATIONS

I represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company.  I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

13.    AUDIT

I acknowledge that I have no reasonable expectation of privacy in any computer, technology system, email, handheld device, telephone, voicemail, or documents that are used to conduct the business of the Company.  All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company.  As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes

in the Company's sole discretion.  I understand that I am not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites.  I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment.

I am aware that the Company has or may acquire software and systems that are capable of monitoring and recording all network traffic to and from any computer I may use.  The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to me and/or in my absence.  This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information I have downloaded.  In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

### 14.  ARBITRATION AND EQUITABLE RELIEF

A. *Arbitration*. IN CONSIDERATION OF MY EMPLOYMENT WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES, AND MY RECEIPT OF THE COMPENSATION, PAY RAISES, AND OTHER BENEFITS PAID TO ME BY THE COMPANY, AT PRESENT AND IN THE FUTURE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM MY EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF MY EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION PROVISIONS SET FORTH IN THE FLORIDA ARBITRATION CODE (THE "**FAC**"), AND PURSUANT TO FLORIDA LAW.  THE FEDERAL ARBITRATION ACT SHALL CONTINUE TO APPLY WITH FULL FORCE AND EFFECT NOTWITHSTANDING THE APPLICATION OF PROCEDURAL RULES SET FORTH IN THE FAC.  **DISPUTES THAT I AGREE TO ARBITRATE, AND THEREBY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY STATUTORY OR COMMON LAW CLAIMS.  NOTWITHSTANDING THE FOREGOING, I UNDERSTAND THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF MY RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**  I

FURTHER UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME.

B. *Procedure*. I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("**JAMS**"), PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE "**JAMS RULES**"), WHICH ARE AVAILABLE AT http://www.jamsadr.com/rules-employment-arbitration/. I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, AND MOTIONS TO DISMISS AND DEMURRERS, APPLYING THE STANDARDS SET FORTH UNDER THE FLORIDA RULES OF CIVIL PROCEDURE.  I AGREE THAT THE ARBITRATOR SHALL ISSUE A WRITTEN DECISION ON THE MERITS.  I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, WHERE PROVIDED BY LAW. I AGREE THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF. I UNDERSTAND THAT THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT I SHALL PAY ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION THAT I INITIATE, BUT ONLY SO MUCH OF THE FILING FEES AS I WOULD HAVE INSTEAD PAID HAD I FILED A COMPLAINT IN A COURT OF LAW. I AGREE THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH FLORIDA LAW, INCLUDING THE FLORIDA RULES OF CIVIL PROCEDURE AND EVIDENCE CODE, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL FLORIDA LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW.  TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH FLORIDA LAW, FLORIDA LAW SHALL TAKE PRECEDENCE. I AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN MIAMI-DADE COUNTY, FLORIDA.

C. *Remedy*. EXCEPT AS PROVIDED BY THE FAC AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE, AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE FAC AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

D. *Administrative Relief*. I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

E.    *Voluntary Nature of Agreement*. I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES, AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *I AM WAIVING MY RIGHT TO A JURY TRIAL*. FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

15.    MISCELLANEOUS

A.    *Governing Law; Consent to Personal Jurisdiction*. This Agreement will be governed by the laws of the State of Florida without regard to Florida's conflicts of law rules that may result in the application of the laws of any jurisdiction other than Florida. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Florida for any lawsuit filed against me by the Company.

B.    *Assignability*. This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as may be expressly otherwise stated. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

C.    *Entire Agreement*. This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein (except that Article 4 of this Agreement represents the entire agreement and understanding between Micron Devices LLC, the Company and me with respect to the subject matter therein) and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations. I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any subsequent change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

D.    *Headings*. Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E.    *Severability*. If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F.    *Modification, Waiver*. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the President

or CEO of the Company and me.  Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.  *Survivorship.*  The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

*[signature page follows]*

The undersigned has executed this At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement.


By: _Laura Tyler Perryman_
        9C090890D94C493
        LAURA PERRYMAN


February 25th, 2014


AGREED AND ACKNOWLEDGED:

STIMWAVE TECHNOLOGIES INCORPORATED

By: _Laura Tyler Perryman_
        9C090890D94C493
        LAURA PERRYMAN


CEO
Title


MICRON DEVICES LLC

By: _Laura Tyler Perryman_
        9C090890D94C493
        LAURA PERRYMAN


Manager
Title


5366934_2.DOC

**EXHIBIT A**

**STIMWAVE TECHNOLOGIES INCORPORATED**
**LIST OF PRIOR INVENTIONS**
**AND ORIGINAL WORKS OF AUTHORSHIP**

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
| Method, System and Apparatus for Control of Pancreatic Beta Cell Function to Improve Glucose Homeostasis and Insulin Production | December 17th, 2010 | All activities related to the products developed for Neural Diabetes LLC |
| Inhibition of Insulin Release by Neuromodulation | December 17th, 2010 | All activities related to the products developed for Neural Diabetes LLC |
| Excitation of Insulin Release by Neuromodulation | December 17th, 2010 | All activities related to the products developed for Neural Diabetes LLC |

___ No inventions or improvements

___ Additional Sheets Attached

Date: _2/25/2014_____

DocuSigned by:
_Laura Tyler Perryman_
8C29C99CC94C193...
**Signature**

_Laura Tyler Perryman_
**Name of Employee (typed or printed)**

# EXHIBIT B

## STIMWAVE TECHNOLOGIES INCORPORATED

### COMPENSATION AND STOCK PARTICIPATION

1.    <u>Services</u>.  Employee will perform the position of President and CEO.

2.    <u>Bonus Compensation.</u>

    (a)    <u>Guaranteed Bonus.</u>
Employee will be paid a guaranteed bonus of $25,000 per quarter for every quarter that the Employee exceeds delivery on agreed upon performance objectives.

    (b)    <u>Discretionary Bonus.</u>
Employee will be eligible for discretionary bonuses from time to time. If given, a discretionary bonus will be based upon the profitability of the Company and good will contributions Employee makes to the Company, as well as prevailing compensation for positions of a similar nature.  This bonus is wholly discretionary and is predicated upon performance factors.

3.    <u>Participation in Benefit Plans.</u>

    (a)    <u>Fringe Benefits.</u>  Employee shall be permitted during the Term to participate in any group life, medical, hospitalization, dental and disability plans, to the extent that Employee is eligible under the provisions of such plans, and such benefits are maintained by the Company for Employees of the stature and rank of Employee during the Term hereof, each in accordance with the terms and conditions of such plans (collectively referred to herein as "Fringe Benefits").

    (b)    <u>Vacation, Holidays and Sick Leave</u>.  Employee shall have the right during each year to paid vacation time in accordance with the Company guidelines, for at least 4 weeks per year.

    (c)    <u>Options</u>. Employee will be eligible to participate in the Company's stock option plan for similar level employees. Such options shall be granted by the Company's Board of Directors from time to time.

4.    <u>Business Expenses</u>.  Employee may incur reasonable expenses in connection with his duties, including expenses for business travel, meals, lodging and similar items, with business class travel at a minimum.  The Company will reimburse Employee for all such reasonable and necessary expenses upon Employee's periodic presentation of an itemized and documented account of such expenditures and in accordance with the Company's expense reimbursement policies, which are in effect at the time the expense, is incurred. To the extent that such expenses represent accountable automobile or board-approved expenses, employee compensation shall be adjusted accordingly.

This **Exhibit B** is accepted and agreed upon as of January 1st, 2014.

**EMPLOYEE**                                          **STIMWAVE TECHNOLOGIES INCORPORATED**



By: _____                By: _____

LAURA PERRYMAN                              LAURA PERRYMAN

Title: <u>Chairman of the Board</u>

**EXHIBIT C**

**STIMWAVE TECHNOLOGIES INCORPORATED**
**TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave Technologies Incorporated, its subsidiaries, affiliates, successors or assigns (together, the "**Company**").

I further certify that I have complied with all the terms of the Company's At-Will Employment, Confidential Information, and Arbitration Agreement signed by me.

I further agree that, in compliance with the At-Will Employment, Confidential Information, and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for twelve (12) months from this date, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this paragraph shall affect my continuing obligations under the At-Will Employment, Confidential Information, and Arbitration Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Article 3** (Confidentiality) thereof.

After leaving the Company's employment, I will be employed by _____
_____ in the position of
_____.


Date: _____          _____
                                                  Signature


                                                  _____
                                                  Name of Employee (typed or printed)

Address for Notifications:                         _____

**EXHIBIT D**

**STIMWAVE TECHNOLOGIES INCORPORATED**
**CONFLICT OF INTEREST GUIDELINES**

It is the policy of Stimwave Technologies Incorporated to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5. Initiating or approving any form of personal or social harassment of employees.

6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7. Borrowing from or lending to employees, customers, or suppliers.

8. Acquiring real estate of interest to the Company.

9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.

11. Making any unlawful agreement with distributors with respect to prices.

12. Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning.

## EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT

This Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 22rd day of May, 2019 (the "Effective Date") by and between Stimwave LLC ("Employer" or "the Company") and Andrea Berry ("Employee") (each party individually a "Party" and collectively the "Parties").

### RECITALS:

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement (referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1. **Definitions.**

    1.1 **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by Stimwave LLC and/or its subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

DocuSign Envelope ID: 332E0F17-6426-46DA-3BCA-2520FA177F68

      1.2     **Competitive Business.** "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company.

      1.3     **Customer.** "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

      1.4     **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company.

      1.5     **Electronic Media Equipment.** "Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

      1.6     **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

      1.7     **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company.

      1.8     **Person.** "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

      1.9     **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

**2.**     **Terms and Termination.**

      2.1     **Employment "At-Will" Relationship.** Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's

employment relationship with the Company at any time, with or without cause and with or without notice.

2.2     **Full-Time Best Efforts.**  Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company.

2.3     **Compensation and Benefits.** For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

3.     **Duties and Obligations of Employee.**

3.1     **Duty of Loyalty.** Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2     **Conflict of Interest.**  Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions.  Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

3.3     **Compliance with Laws.**  Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States

Page **3** of **23**

Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA").  Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.    Restrictive Covenants.**

**4.1    Covenant Not to Compete.**

**4.1.1    Competitive Business.** Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

**4.1.2    Same or Similar Services.** Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods provided by, the Company (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

**4.1.3    Continuation for Violation.** In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's last competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

**4.2    Covenant Not to Solicit.**

**4.2.1    Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work

DocuSign Envelope ID: 332E0F17-6426-46DA-38CA-2B20EA177568

for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

      4.2.2  **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

      4.2.3  **Continuation for Violation.** In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's last solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

## 5. Confidential Information.

      5.1  **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

      5.2  **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is

learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

5.3    **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

5.4    **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical

expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

5.5    **Third-Party Information.**  Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

5.6    **Non-Confidential Information.** The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7    **Former Employer Confidential Information.** Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other

person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

## 6.    Inventions.

6.1    **Inventions Retained and Licensed.** Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.** Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention. Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while

employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3    **Moral Rights.**  Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4    **Maintenance of Records.**  Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5    **Patent, Trademark and Copyright Registrations.**  Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement  and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

**7.**    **Acknowledgements.**  Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1    The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2    Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3    The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4    The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5    This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.    Survival and Remedies.** Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.    Return of Company Property.**

9.1 **Return of Company Property.** All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2 **Termination Certificate.** Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3 **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4 **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information). Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5 **No Expectation of Privacy in Company Property.** Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for

DocuSign Envelope ID: 332E0F17-6426-46DA-3BCA-252CEA177F68

Company purposes. Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9** and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10.    **Audit.** Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

11.    **Setoff.** Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck, including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

**12.     No Conflicting Agreements or Improper Use of Third-Party Information.**  During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

**13.     Duty to Disclose Subsequent Employment.**  During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

**14.     Arbitration.**

      14.1     **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF**

**EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2    **Procedure.**  Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator. The arbitrator shall be selected in the manner provided in the AHLA Rules. The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law.  The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3    **Method of Selection.** Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4    **Notice in Connection with Arbitration.**  All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5    **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6    **Satisfaction of Award.**  If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the

maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7    **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8    **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9    **Administrative Relief.** EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

## 15.    **General Provisions.**

15.1    **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2    **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives)

and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3 **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company. The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4 **Waiver.** The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5 **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6 **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8 **Further Assurances.** Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9 **Title, Headings and Gender.** The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement. Throughout this Agreement, where such meanings would be

appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

     15.10   **Attorney's Fees.** Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

     15.11   **Notices.** All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:       Stimwave LLC
                     Attention: Laura Tyler Perryman, CEO
                     1310 Park Central Blvd South
                     Pompano Beach, Florida 33064

To Employee:      Andrea Berry
                     4736 Tillman Trail
                     Farmington, MO 63640

     15.12   **No Third-party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee. It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

     15.13   **Invalid Provisions.** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement will be construed and enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect. Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

     15.14   **Representations and Warranties.** Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under,

constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15    **Representation of Attorney.** Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16    **Voluntary Agreement.**  Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _____

Print Name: Andrea Berry

**WITNESS:**

Signature: _____

Print Name:  Elizabeth Greene

**EMPLOYER:**

**Stimwave LLC**

Signature: _____

By: Laura Tyler Perryman

Title: CEO

       Representative with authority to bind
       Stimwave LLC

## COMPENSATION SCHEDULE

**1.     Base Salary.**  For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $120,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2.     Bonuses and Commissions.** Employee shall receive a bonus and/or commission in accordance with the Stimwave Sales Compensation Plan.

**3.     Equity.**  Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. The Board or the Committee will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**4.     Employee Benefits.**  In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **3** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 4.4** below, shall terminate upon the cessation of Employee's employment:

4.1     **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof.  Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

4.2     **Vacation.** Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

4.3     **Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP**

Identifying Number or
Title                                        Date                    Brief Description

_____ No inventions or improvements

_____ Additional Sheets Attached

Date: _____Jun 4, 2019_____         _____
                                              Employee's Signature

                                              _____Andrea Berry_____
                                              Print Name of Employee

**EXHIBIT B**

**STIMWAVE LLC TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:
_____
_____
_____

Date: _____        _____
                                              Employee's Signature

                                              _____
                                              Print Name of Employee

# EXHIBIT C

## STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

## AMENDED AND RESTATED
## EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT

This Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 1st day of January, 2019 (the "Effective Date") by and between Stimwave Technologies Incorporated ("Employer" or "the Company") and Benjamin Speck ("Employee") (each party individually a "Party" and collectively the "Parties").

## RECITALS:

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement with any Affiliated Entity (as hereinafter defined) (such employment and consulting agreements collectively referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.      **Definitions.**

        1.1      **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by the Company and/or its parent or subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management

or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise. Affiliated Entities specifically including, but are not limited to: Stimwave LLC, StimQ Medical LLC ("StimQ"), StimRelieve LLC, StimGuard LLC, Micron Devices LLC, Stimwave Limited, Stimwave Medical Pty, Freedom Neuromodulation LLC and Freedom Neuro BV.

      1.2    **Competitive Business.** "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company in the field of neuromodulation; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company in the field of neuromodulation.

      1.3    **Customer.** "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

      1.4    **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company in the field of neuromodulation.

      1.5    **Electronic Media Equipment.** "Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

      1.6    **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

      1.7    **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company in the field of neuromodulation.

      1.8    **Person.** "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

1.9 **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

## 2. Terms and Termination.

2.1 **Employment "At-Will" Relationship.** Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's employment relationship with the Company at any time, with or without cause and with or without notice.

2.2 **Full-Time Best Efforts.** Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company, or as detailed in Exhibit A.

2.3 **Compensation and Benefits.** For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

## 3. Duties and Obligations of Employee.

3.1 **Duty of Loyalty.** Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2 **Conflict of Interest.** Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions. Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's

Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

      3.3    **Compliance with Laws.**  Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA").  Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.**    **Restrictive Covenants.**

      4.1    **Covenant Not to Compete.**

         4.1.1    **Competitive Business.**  Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

         4.1.2    **Same or Similar Services.**  Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods in the field of neuromodulation provided by, the Company in the field of neuromodulation (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

         4.1.3    **Continuation for Violation.**  In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

      4.2    **Covenant Not to Solicit.**

4.2.1 **Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

4.2.2 **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company  and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

4.2.3 **Continuation for Violation.**  In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

## 5. Confidential Information.

5.1 **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

DocuSign Envelope ID: C825D223-A16A-4F58-A5EQ-3C448A62F5AE

5.2 **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

5.3 **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

5.4 **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential

Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

      **5.5    Third-Party Information.**  Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

      **5.6    Non-Confidential Information.**  The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential

Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7    **Former Employer Confidential Information.**  Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

## 6.    Inventions.

6.1    **Inventions Retained and Licensed.**  Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.**  Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to

commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention. Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3    **Moral Rights.**  Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4    **Maintenance of Records.**  Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5    **Patent, Trademark and Copyright Registrations.**  Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company in the field of neuromodulation as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with

the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

**7.     Acknowledgements.**  Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1     The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2     Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3     The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4     The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5     This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.     Survival and Remedies.**  Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits

derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

## 9.   Return of Company Property.

9.1   **Return of Company Property.**   All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2   **Termination Certificate.**  Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3   **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4   **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information).  Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5    **No Expectation of Privacy in Company Property.**  Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises, or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for Company purposes.  Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9**, and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10.    **Audit.**  Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

11.    **Setoff.**  Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck,

including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

**12.     No Conflicting Agreements or Improper Use of Third-Party Information.**  During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

**13.     Duty to Disclose Subsequent Employment.**  During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

**14.     Arbitration.**

    14.1     **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII**

**OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2    **Procedure.**  Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator.  The arbitrator shall be selected in the manner provided in the AHLA Rules.  The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law.  The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3    **Method of Selection.**  Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4    **Notice in Connection with Arbitration.**  All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5 **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6 **Satisfaction of Award.** If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7 **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8 **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9 **Administrative Relief.** EMPLOYE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

**15. General Provisions.**

15.1 **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2 **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives) and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3 **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company. The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4 **Waiver.** The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5 **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6 **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8    **Further Assurances.**  Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9    **Title, Headings and Gender.**  The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement.  Throughout this Agreement, where such meanings would be appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10   **Attorney's Fees.**  Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11   **Notices.**  All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:        Stimwave Technologies Incorporated
                    Attention: Laura Tyler Perryman, CEO
                    1310 Park Central Blvd South
                    Pompano Beach, Florida 33064

                    With a copy to:

                    Michael Brown
                    DLA Piper LLP
                    4365 Executive Drive, Suite 1100
                    San Diego CA 92121-2133

To Employee:        Benjamin Speck19974 Villa Lante Pl Boca Raton, FL 33343

15.12   **No Third-party Beneficiaries.**  The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee.  It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13   **Invalid Provisions.**  If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement will be construed and enforced without such illegal, invalid or unenforceable provision, and the remainder of this

Agreement will continue in full force and effect. Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

15.14 **Representations and Warranties.** Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15 **Representation of Attorney.** Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16 **Voluntary Agreement.** Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _____

Print Name: Benjamin Speck

**WITNESS:**

Signature: _____

Print Name: Elizabeth Greene

**EMPLOYER:**

**Stimwave Technologies Incorporated**

Signature: _____

By: Laura Tyler Perryman
Title: CEO
     Representative with authority to bind
     Stimwave Technologies Incorporated

**KEY AND EQUITY EMPLOYEES'**
**ADDENDUM TO AMENDED AND RESTATED**
**EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL**
**INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT**

This Key and Equity Employees' Addendum to Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Addendum") is made and entered into on the 1st day of January, 2019 (the "Effective Date") by and between Stimwave Technologies Incorporated ("Employer" or "the Company") and Benjamin Speck  ("Employee") (each party individually a "Party" and collectively the "Parties").

**RECITALS:**

WHEREAS, Company and Employee entered into an Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") or will enter into such an Agreement simultaneously with the execution of this Addendum to the Agreement; and

WHEREAS, Company and Employee desire to amend the Agreement, as provided in this Addendum to the Agreement; and

WHEREAS, Company and Employee understand and agree that this Addendum shall be an integral part of the Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

**1.**    **Integration.**  All of the terms and conditions of the Agreement are incorporated herein and by this reference made a part hereof, and shall remain the same except to the extent modified by this Addendum.  In the event of a conflict between a provision of the Agreement and of this Addendum, the provision in this Addendum shall be controlling. All capitalized terms in this Addendum shall have the meaning ascribed to those words in the Agreement unless the context in which the word is used clearly indicates to the contrary.

**2.**    **Services**.  "Services" means the services to be provided and the duties to be performed by Employee, as described in a written job description setting forth the specific duties the Employee is required to perform, as well as such other duties as may be assigned to Employee from time to time by Employer.

**3.**    **Employment**.  The Company hereby employs Employee in accordance with the terms of the Agreement, as modified by this Addendum, and Employee hereby accepts such employment with the Company, for the Term set forth in **Section 4.1** hereof.

**4.**    **Term and Termination.  Section 2.1** of the Agreement shall be deleted and replaced by the following provisions:

4.1    **Term.**  This Agreement shall be in effect for an initial term of five (5) years, commencing on January 1st, 2019 ("Effective Date") and terminating on December 31st, 2023,

unless sooner terminated as provided for in this Agreement. Thereafter, this Agreement shall be automatically renewed for successive one (1) year terms until it is terminated as provided herein. Any reference in this Agreement to the "Term" of this Agreement means the initial and any annual renewal term.

4.2     **Termination without Cause.**  Either Party may terminate this Agreement at any time, without cause, upon ninety (90) days' prior written notice to the other Party.  Upon notice of termination by Employer pursuant to this **Section 4.2**, Employer also may direct Employee to immediately cease providing the Services, provided that Employer continues to compensate Employee during the ninety (90) days following such notice of termination (the "Notice Period"). Notwithstanding the foregoing: (i) the provisions of **Section 4.3** will remain in effect during the Notice Period; and (ii) Employer reserves the right to exercise the "Termination for Cause" provisions in **Section 4.4** during the Notice Period and cease compensation during the Notice Period.

4.3     **Automatic Termination for Cause by Employer.** This Agreement shall automatically terminate upon the occurrence of any one of the following events:

4.3.1    Discontinuance of business by Employer;

4.3.2    The death of Employee;

4.3.3    The exclusion of Employee from participation in any federally or state funded healthcare program, including Medicare and Medicaid, or Employee's breach of **Section 5.3** of this Addendum;

4.3.4    The existence of any physical, mental or emotional disability that renders Employee unable to fulfill substantially all of Employee's obligations under the Agreement or this Addendum, even with reasonable accommodation by Employer, as reasonably determined by the Board of Directors of the Company (the "Board") or its designee, for an aggregate of ninety (90) days in any three hundred and sixty-five (365) consecutive day period or, if Employee has qualified for, and is receiving benefits under Employer's short-term disability plan, if any, such longer period as is required prior to eligibility for benefits as provided for in Employer's long-term disability policy applicable to similarly-situated employees, as in effect from time to time; or

4.3.5    The commission by Employee of any act of dishonesty, misrepresentation, fraud or moral turpitude, as reasonably determined by the Board or its designee.

4.4     **Termination for Cause by Employer with Notice.**  Employer may terminate this Agreement for "cause" at any time by giving written notice of termination (a "Termination Notice") to Employee, specifying the reason for termination. The termination of Employee's employment shall be effective thirty (30) days after delivery of the Termination Notice to Employee, if Employee fails to cure the default stated in the Termination Notice prior to the expiration of the thirty (30) day cure period. For purposes of this **Section 4.4**, "cause" shall include, without limitation, any of the following events (the occurrence of which shall be determined by Employer in its sole discretion):

4.4.1    The breach of any of Employee's warranties or the falsity of the representations made by Employee in **Section 5** of this Addendum;

4.4.2    Employee engages in disruptive or otherwise unacceptable behavior or conduct substantially incompatible with the goals, objectives, or business interests of Employer, or that Employer, in its sole discretion, reasonably believes could jeopardize or adversely affect the customers, staff, property, image, or reputation of Employer;

4.4.3    The commencement of an investigation or the indictment of Employee for any act constituting a felony or for any crime involving the delivery of, or billing or payment for, healthcare items or services;

4.4.4    A material breach by Employee of any of the terms of the Agreement or this Addendum not otherwise set forth in **Section 4.3** or this **Section 4.4**, or a material violation by Employee of any written Company policy or standard of conduct; or

4.4.5    Employee's willful and continued failure to perform the Services after delivery by the Company to Employee of a written demand for performance that describes the basis for the Company's belief that Employee has not substantially performed the Services.

4.5    **Regulatory Termination.** If, prior to the expiration of the term of the Agreement, any federal, state or local regulatory body, including, but not limited to, the Centers for Medicare and Medicaid Services, the Department of Health and Human Services ("HHS") or the Internal Revenue Service, determines that this Agreement is illegal, or otherwise materially affects either Party's ability to perform its obligations under this Agreement, then the affected Party shall give the other Party such notice as is reasonable under the circumstances and shall make available a reasonable period within which to cure. If no cure is implemented by the parties, then Employer, in its discretion, may terminate this Agreement with such notice as is, in its sole discretion, reasonable under the circumstances.

4.6    **Termination for Cause or Good Reason by Employee.** Employee may terminate this Agreement "For Cause" or for Good Reason (as hereinafter defined) thirty (30) days after delivery of a written notice of the acts or omissions constituting the grounds for the "For Cause" termination or the "Good Reason" to Employer by Employee.  For purposes of this **Section 4.6**, "For Cause" shall mean the failure of Employer to comply with any material term of this Agreement that is not cured within thirty (30) days after delivery of a written notice of termination to Employer by Employee.  "Good Reason" means the occurrence of one or more of the following, without Employee's consent: (i) a material reduction in Employee's Base Salary, excluding a reduction in Base Salary that is applicable to all Company management; (ii) a material reduction of Employee's authority, duties or responsibilities, unless Employee is provided with a comparable position; provided, however, that a reduction in authority, duties, or responsibilities solely by virtue of the Company being acquired and made part of a larger entity whether as a subsidiary, business unit or otherwise will not constitute Good Reason.

4.7    **Termination by Mutual Agreement.**  This Agreement may be terminated by the mutual agreement of both Parties, in writing, at any time.

4.8    **Services Upon Termination.**  In the event of termination of this Agreement without cause by Employee, at Employer's sole discretion, Employee shall continue to perform

the Services as directed by Employer during the Notice Period. In the event of termination of this Agreement for any other reason, Employer shall have the option to demand that Employee immediately cease providing the Services, *provided, however*, that the Company shall be required to compensate Employee through the date of termination of Employee's employment, as applicable.

4.9    **Compensation Upon Termination.** Upon termination of Employee's employment hereunder, Employee shall be entitled to receive compensation earned and accrued, but unpaid, through the effective date of termination, and shall not be entitled to additional compensation, except as expressly provided for in this Addendum.

**5.    Employee Representations and Warranties.** Employee represents and warrants to Employer that:

5.1    **Validity and Enforceability**. Employee has the legal right to enter into the Agreement and this Addendum and to perform the Services in accordance with the terms of the Agreement and this Addendum.

5.2    **No Conflict**. Employee is not subject to or bound by any contractual obligations (such as any non-compete, non-disclosure or other restrictive covenant), governmental orders or other restrictions that would impede with or interfere in the performance of the Services in accordance with the terms of the Agreement and this Addendum.

5.3    **No Exclusion**. Employee represents and warrants to Employer that he or she has not:

5.3.1    Been convicted of a criminal offense in connection with the delivery of a healthcare item or service or with respect to any act or omission in a state or federal healthcare program relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct, or otherwise sanctioned by the Office of Inspector General of HHS or other enforcement agency;

5.3.2    Been suspended or excluded from participation in, or otherwise sanctioned, under any federal healthcare program or the healthcare program of any state;

5.3.3    Been convicted of a criminal offense in connection with the making or causing to be made of a false statement or representation or a false claim for the purpose of securing a benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized under a state or federal healthcare program;

5.3.4    Been convicted of a criminal offense in connection with the offer, inducement, solicitation, payment or receipt of any unlawful remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a healthcare entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a state or federal healthcare program, or in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a state or federal healthcare program;

5.3.5   Had a direct or indirect ownership or control interest of five percent (5%) or more in, and is not, and in the past has not been, an officer, director, or managing employee or partner of, any business enterprise that has been convicted of any criminal offense described in this Section 5.3; or

5.3.6   Had a direct or indirect ownership or control interest of five percent (5%) or more in, and is not, and in the past has not been, an officer, director, or managing employee or partner of, any business enterprise that has been suspended or excluded from participation in, or otherwise sanctioned, under any federal healthcare program or the healthcare program of any state.

Employee hereby agrees to immediately notify Employer of any threatened, proposed or actual exclusion from any federally or state funded healthcare program, including Medicare and Medicaid. In the event that Employee is excluded from participation in any federally or state funded healthcare program during the term of the Agreement, or if at any time after the Effective Date of the Agreement it is determined that Employee is in breach of this **Section 5.3**, the Agreement shall, as of the effective date of such exclusion or breach, automatically terminate. Employee shall indemnify Employer for any and all damages incurred by the Company that result from Employee's exclusion from any federally or state funded healthcare program, including Medicare and Medicaid.

5.4   **Compliance with Law**. Employee shall perform his or her obligations under the Agreement and this Addendum in compliance with all applicable federal and state laws and regulations, as well as all compliance guidance published by federal or state agencies, including, without limitation, the Health Insurance Portability and Accountability Act ("HIPAA"), the Medicare and Medicaid anti-kickback law, the Stark self-referral prohibition, Section 1128G of the Social Security Act enacted pursuant to Section 6002 of the Affordable Care Act (the "Sunshine Act") and the rules issued thereunder by HHS and compliance guidance published by the Office of the Inspector General or HHS related to any of the foregoing. Employee acknowledges that Employee understands these requirements, shall remain educated and informed regarding the applicable federal and state laws and regulations, and shall participate in all compliance programs adopted by the Company. In the event Employee knows or suspects that any activities of Employee, the Company, any personnel or contractor of the Company, or any client of the Company implicates any such requirements or guidance, Employee shall immediately inform the Company in writing.

5.5   **No Payment of Remuneration or Solicitation of Patients.** To the extent that Employee is employed as a sales and marketing representative to provide marketing, business development and related services and duties, in addition to complying with Employer's policies, procedures, and protocols relating to marketing, business development, and related services, Employee agrees not to:

5.5.1   Directly solicit patients, by telephone, computer, in-person, or otherwise;

5.5.2   Offer, induce, solicit, pay or receive any unlawful remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for the referral of an individual to a healthcare entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a state or federal healthcare program, or in return for purchasing, leasing, ordering, or arranging for or

recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a state or federal healthcare program.

**6.    Compensation and Benefits.** During the Term of the Agreement, as set forth in this Addendum, Employer shall pay to Employee, and Employee agrees to accept from Employer, as payment for the Services performed by Employee under the terms of the Agreement and this Addendum, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing ("Compensation Schedule").

**7.    Change in Control Benefits.**

7.1    **Stimwave Technologies Incorporated.**  In the event of a Change in Control (as hereinafter defined) of the Company that occurs while Employee is employed by the Company, 100% of any Equity Awards (as hereinafter defined) held by Employee as of the Closing (as hereinafter defined) shall vest and become fully exercisable as of the Closing. With respect to Equity Awards granted on or after the Effective Date, but granted prior to the Closing, the same vesting acceleration provisions provided in the prior sentence will apply to such Equity Awards except to the extent provided in the applicable equity award agreement by explicit reference to this Addendum to the Agreement. For purposes of this **Section 7.1**, the following definitions shall apply:

7.1.1    **Change in Control**.  "Change in Control" means: (i) any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becoming the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) having the right to vote for the election of members of the Board (other than in connection with a bona fide equity financing for capital raising purposes); (ii) any reorganization, merger or consolidation of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity), other than a transaction or series of related transactions in which the holders of the voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) or such other surviving or resulting entity (other than in connection with a bona fide equity financing for capital raising purposes); or (iii) a sale or other disposition of all or substantially all of the assets of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity).

7.1.2    **Closing.**  "Closing" means the closing of the first transaction constituting a Change in Control that occurs on or following the Effective Date.

7.1.3    **Equity Award.** "Equity Award" means any equity interests issued or granted by the Company to Employee as compensation and any equity interest in an Affiliated Entity of the Company, as applicable.

7.2    **Affiliated Entities.**  In the event of a Change in Control of an Affiliated Entity of the Company, to or for which Employee provides services, that occurs while Employee is

employed by the Company, 100% of any Equity Awards in such Affiliated Entity held by Employee as of the Closing shall vest and become fully exercisable as of the Closing. With respect to Equity Awards in such Affiliated Entity granted on or after the Effective Date, but granted prior to the Closing, the same vesting acceleration provisions provided in the prior sentence will apply to such Equity Awards in such Affiliated Entity except to the extent provided in the applicable equity award agreement by explicit reference to this Addendum to the Agreement.

**8.      Conditions to Receipt of Severance.**

8.1      **Separation Agreement and Release of Claims.** The payment of any severance set forth in **Section 5.4 of the Compensation Schedule** is contingent upon Employee signing and not revoking the Company's standard separation and release of claims agreement upon Employee's cessation of employment and such agreement becoming effective no later than sixty (60) days following Employee's employment cessation date (such deadline, the "Release Deadline"). In no event will severance payments be paid or provided until the release actually becomes effective. Any severance payments or benefits under this Addendum to the Agreement will be paid on, or, in the case of installments, will not commence until, the sixtieth (60th) day following Employee's separation from service, or if later, such time as required by **Section 5.4 of the Compensation Schedule**. Except as required by **Section 10**, any installment payments that would have been made to Employee during the sixty (60) day period immediately following Employee's separation from service but for the preceding sentence will be paid to Employee on the sixtieth (60th) day following Employee's separation from service and the remaining payments will be made as provided in the Agreement or this Addendum to the Agreement.

8.2      **Section 409A.**

8.2.1      Notwithstanding anything to the contrary in this Addendum, no severance pay or benefits payable upon separation that are payable to Employee, if any, pursuant to this Addendum, when considered together with any other severance payments or separation benefits that are considered deferred compensation (together, the "Deferred Payments") under Section 409A of the Internal Revenue Code, as amended (the "Code") and the final regulations and official guidance thereunder ("Section 409A") will be payable until such time as Employee has a "separation from service" within the meaning of Section 409A.

8.2.2      Notwithstanding anything to the contrary in this Addendum, if Employee is a "specified employee" within the meaning of Section 409A at the time of Employee's termination (other than due to death), then the Deferred Payments, if any, that are payable within the first six (6) months following Employee's separation from service will become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the date of Employee's separation from service. All subsequent Deferred Payments, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit. Notwithstanding anything herein to the contrary, if Employee dies following Employee's separation from service, but prior to the six (6) month anniversary of the separation from service, then any payments delayed in accordance with this **Section 8.2.2** will be payable in a lump sum as soon as administratively practicable after the date of Employee's death, and all other Deferred Payments

will be payable in accordance with the payment schedule applicable to each payment or benefit. Each payment, installment and benefit payable under this Addendum is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

8.2.3    Any severance payment that satisfies the requirements of the "short-term deferral" rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations shall not constitute Deferred Payments for purposes hereof.  Any amount paid under the Agreement that qualifies as a payment made as a result of an involuntary separation from service pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations, which does not exceed the Section 409A Limit (as defined below), will not constitute Deferred Payments for purposes hereof.

8.2.4    For purposes of this Addendum "Section 409A Limit" means the lesser of two (2) times: (x) Employee's annualized compensation based upon the annual rate of pay paid to Employee during the tax year preceding the date of Employee's termination of employment, as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any Internal Revenue Service guidance issued with respect thereto; or (y) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Code for the year in which Employee's employment is terminated.

8.2.5    The foregoing provisions are intended to comply with or be exempt from the requirements of Section 409A so that none of the severance payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply.  Employee and the Company agree to work together in good faith to consider amendments to this Addendum and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition under Section 409A prior to actual payment of severance benefits to Employee.

**9.      No Duty to Mitigate.**  In the event that Employee becomes employed elsewhere during the period Employee is receiving severance payments from Company pursuant to **Section 5.4 of the Compensation Schedule**, Employee shall be entitled to continue to receive such severance payments and shall not be required to mitigate the amount of any payments contemplated by this Addendum, nor will any earnings that Employee may receive from any other source reduce any such payments.

**10.    Limitation on Payments.**

10.1    In the event that the severance benefits provided for in this Addendum or otherwise payable to Employee: (i) constitute "parachute payments" within the meaning of Section 280G of the Code; and (ii) but for this **Section 10** would be subject to the excise tax imposed by Section 4999 of the Code, then Employee's severance benefits under **Section 5.4 of the Compensation Schedule** will be either:

10.1.1  Delivered in full;

10.1.2 Delivered to such lesser extent as would result in no portion of such severance benefits being subject to excise tax under Section 4999 of the Code,

whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the excise tax imposed by Section 4999, results in the receipt by Employee on an after-tax basis, of the greatest amount of severance benefits, notwithstanding that all or some portion of such severance benefits may be taxable under Section 4999 of the Code.  If a reduction in severance and other benefits constituting "parachute payments" is necessary so that benefits are delivered to a lesser extent, reduction will occur in the following order: (i) reduction of cash payments, which shall occur in reverse chronological order such that the cash payment owed on the latest date following the occurrence of the event triggering such excise tax will be the first cash payment to be reduced; (ii) reduction of acceleration of vesting of Equity Awards, which shall occur in the reverse order of the date of grant for such Equity Awards (i.e., the vesting of the most recently granted Equity Awards will be reduced first); and (iii) reduction of other benefits paid or provided to Employee, which shall occur in reverse chronological order such that the benefit owed on the latest date following the occurrence of the event triggering such excise tax will be the first benefit to be reduced. If more than one Equity Award was made to Employee on the same date of grant, all such Equity Awards shall have their acceleration of vesting reduced pro rata.  In no event shall Employee have any discretion with respect to the ordering of payment reductions.

10.2    Unless the Company and Employee otherwise agree in writing, any determination required under this **Section 10** will be made in writing by a nationally recognized firm of independent public accountants selected by the Company (the "Accountants"), whose determination will be conclusive and binding upon Employee and the Company for all purposes. For purposes of making the calculations required by this **Section 10**, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Sections 280G and 4999 of the Code. The Company and Employee will furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this Section. The Company will bear all reasonable expenses incurred in connection with any calculations contemplated by this **Section 10**, including reasonable accounting fees charged by the Accountants.

IN WITNESS WHEREOF, this Key and Equity Employees' Addendum to Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _____

Print Name: Benjamin Speck

**WITNESS:**

Signature: _____

Print Name: Elizabeth Greene_

**EMPLOYER: Stimwave Technologies Incorporated**

Signature: _____

By: Laura Tyler Perryman
Title: CEO

## COMPENSATION SCHEDULE

**1. Base Salary.** For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $150,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2. Commission.** Employer shall pay Employee a commission on sales, if applicable, in accordance with the Sales Compensation Leadership Plan.

**3. Bonuses.** Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**4. Equity.** Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. Employee will also be eligible to receive Equity Awards pursuant to any plans or arrangements that an Affiliated Entity of the Company may have in effect from time to time. The Board or the Committee (or with respect to an Affiliated Entity of the Company, the respective board of directors or compensation committee of such Affiliated Entity) will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**5. Employee Benefits.** In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **4** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 5.4** below, shall terminate upon the cessation of Employee's employment:

5.1 **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof. Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

5.2 **Vacation.**   Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

5.3 **Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

5.4 **Severance.** If the Company terminates Employee's employment with the Company without cause or if Employee resigns from such employment for Good Reason, and, in each case, Employee signs and does not revoke a standard release of claims with the Company in a form acceptable to the Company and subject to **Sections 8** and **10** of the Addendum, then Employee will receive, in addition to Employee's salary payable through the date of termination of employment and any other employee benefits earned and unpaid through the date of termination, continuing payments of severance pay at a rate equal to Employee's Base Salary rate, as then in effect, for twelve (12) months from the date of such termination in accordance with the Company's normal payroll policies.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS**
**AND ORIGINAL WORKS OF AUTHORSHIP**

Identifying Number or
<u>Title</u>                                                    <u>Date</u>                                    <u>Brief Description</u>

Date: _____          _____    _____
        May 31, 2019                                                    Employee's Signature

                                             Benjamin Speck
_____
Print Name of Employee

**EXHIBIT B**

**STIMWAVE LLC TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:
_____
_____
_____

Date: _____        _____
                                             Employee's Signature

                                             _____
                                             Print Name of Employee

**EXHIBIT C**

**STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES**

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

## AMENDED AND RESTATED
## EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL
## INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT

This Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 1st day of January, 2019 (the "Effective Date") by and between Stimwave Technologies Incorporated ("Employer" or "the Company") and Evelyn Valerio-Rivera ("Employee") (each party individually a "Party" and collectively the "Parties").

### RECITALS:

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement with any Affiliated Entity (as hereinafter defined) (such employment and consulting agreements collectively referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.      **Definitions.**

        1.1     **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by the Company and/or its parent or subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management

or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise. Affiliated Entities specifically including, but are not limited to: Stimwave LLC, StimQ Medical LLC ("StimQ"), StimRelieve LLC, StimGuard LLC, Micron Devices LLC, Stimwave Limited, Stimwave Medical Pty, Freedom Neuromodulation LLC and Freedom Neuro BV.

 1.2 **Competitive Business.** "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company in the field of neuromodulation; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company in the field of neuromodulation.

 1.3 **Customer.** "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

 1.4 **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company in the field of neuromodulation.

 1.5 **Electronic Media Equipment.** **"**Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

 1.6 **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

 1.7 **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company in the field of neuromodulation.

 1.8 **Person.** "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

1.9    **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

## 2.    Terms and Termination.

2.1    **Employment "At-Will" Relationship.**  Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's employment relationship with the Company at any time, with or without cause and with or without notice.

2.2    **Full-Time Best Efforts.**  Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company, or as detailed in Exhibit A.

2.3    **Compensation and Benefits.**  For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

## 3.    Duties and Obligations of Employee.

3.1    **Duty of Loyalty.**  Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2    **Conflict of Interest.**  Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions.  Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's

Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

      3.3    **Compliance with Laws.**  Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA").  Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.**    **Restrictive Covenants.**

      4.1    **Covenant Not to Compete.**

          4.1.1    **Competitive Business.**  Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

          4.1.2    **Same or Similar Services.**  Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods in the field of neuromodulation provided by, the Company in the field of neuromodulation (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

          4.1.3    **Continuation for Violation.**  In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

      4.2    **Covenant Not to Solicit.**

       4.2.1 **Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

       4.2.2 **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company  and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

       4.2.3 **Continuation for Violation.**  In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

**5.**      **Confidential Information.**

     5.1     **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

DocuSign Envelope ID: 87AC1B22-87AE-4AF2-8AE0-1B8692337DC4

     **5.2**    **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization.  Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

     **5.3**    **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

     **5.4**    **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential

Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

       5.5    **Third-Party Information.**  Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

       5.6    **Non-Confidential Information.**  The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential

Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7 **Former Employer Confidential Information.** Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

## 6. Inventions.

6.1 **Inventions Retained and Licensed.** Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2 **Assignment of Inventions.** Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to

commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention. Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3    **Moral Rights.**  Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4    **Maintenance of Records.**  Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5    **Patent, Trademark and Copyright Registrations.**  Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company in the field of neuromodulation as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with

the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

**7.      Acknowledgements.**  Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1      The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2      Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3      The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4      The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5      This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.      Survival and Remedies.**  Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits

derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.     Return of Company Property.**

      9.1     **Return of Company Property.**   All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

      9.2     **Termination Certificate.**  Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

      9.3     **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

      9.4     **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information).  Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5    **No Expectation of Privacy in Company Property.**  Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises, or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for Company purposes.  Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9**, and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10.    **Audit.**  Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

11.    **Setoff.**  Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck,

including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

12.    **No Conflicting Agreements or Improper Use of Third-Party Information.**  During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

13.    **Duty to Disclose Subsequent Employment.**  During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

14.    **Arbitration.**

14.1    **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII**

DocuSign Envelope ID: 87AC1022-87AE-4AF2-8AE9-1866923375C4

**OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2    **Procedure.**  Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator.  The arbitrator shall be selected in the manner provided in the AHLA Rules.  The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law.  The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3    **Method of Selection.**  Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4    **Notice in Connection with Arbitration.**  All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5 **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6 **Satisfaction of Award.** If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7 **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8 **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9 **Administrative Relief.** EMPLOYE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

15. **General Provisions.**

15.1 **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2 **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives) and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3 **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company. The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4 **Waiver.** The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5 **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6 **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8     **Further Assurances.**  Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9     **Title, Headings and Gender.**  The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement.  Throughout this Agreement, where such meanings would be appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10     **Attorney's Fees.**  Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11     **Notices.**  All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:          Stimwave Technologies Incorporated
                      Attention: Laura Tyler Perryman, CEO
                      1310 Park Central Blvd South
                      Pompano Beach, Florida 33064

                      With a copy to:

                      Michael Brown
                      DLA Piper LLP
                      4365 Executive Drive, Suite 1100
                      San Diego CA 92121-2133

To Employee:          Evelyn Valerio-Rivera
                      7880 Pasadena Blvd Apt 107, Pembroke Pines, FL 33024

15.12     **No Third-party Beneficiaries.**  The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee.  It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13     **Invalid Provisions.**  If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement will be construed and

enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect. Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

15.14 **Representations and Warranties.** Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15 **Representation of Attorney.** Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16 **Voluntary Agreement.** Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _____

Print Name: Evelyn Valerio-Rivera

**WITNESS:**

Signature: _____

Print Name: Elizabeth Greene

**EMPLOYER:**

**Stimwave Te...**

Signature: _____

By: Laura Tyler Perryman
Title: CEO
　　　　Representative with authority to bind
　　　　Stimwave Technologies Incorporated

**KEY AND EQUITY EMPLOYEES'
ADDENDUM TO AMENDED AND RESTATED
EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL
INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT**

This Key and Equity Employees' Addendum to Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Addendum") is made and entered into on the 1st day of January, 2019 (the "Effective Date") by and between Stimwave Technologies Incorporated ("Employer" or "the Company") and Evelyn Valerio-Rivera ("Employee") (each party individually a "Party" and collectively the "Parties").

**RECITALS:**

WHEREAS, Company and Employee entered into an Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") or will enter into such an Agreement simultaneously with the execution of this Addendum to the Agreement; and

WHEREAS, Company and Employee desire to amend the Agreement, as provided in this Addendum to the Agreement; and

WHEREAS, Company and Employee understand and agree that this Addendum shall be an integral part of the Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

**1.        Integration.**  All of the terms and conditions of the Agreement are incorporated herein and by this reference made a part hereof, and shall remain the same except to the extent modified by this Addendum.  In the event of a conflict between a provision of the Agreement and of this Addendum, the provision in this Addendum shall be controlling. All capitalized terms in this Addendum shall have the meaning ascribed to those words in the Agreement unless the context in which the word is used clearly indicates to the contrary.

**2.        Services**.  "Services" means the services to be provided and the duties to be performed by Employee, as described in a written job description setting forth the specific duties the Employee is required to perform, as well as such other duties as may be assigned to Employee from time to time by Employer.

**3.        Employment**.  The Company hereby employs Employee in accordance with the terms of the Agreement, as modified by this Addendum, and Employee hereby accepts such employment with the Company, for the Term set forth in **Section 4.1** hereof.

**4.        Term and Termination.  Section 2.1** of the Agreement shall be deleted and replaced by the following provisions:

4.1        **Term.**  This Agreement shall be in effect for an initial term of five (5) years, commencing on January 1st, 2019 ("Effective Date") and terminating on December 31st, 2023,

unless sooner terminated as provided for in this Agreement. Thereafter, this Agreement shall be automatically renewed for successive one (1) year terms until it is terminated as provided herein. Any reference in this Agreement to the "Term" of this Agreement means the initial and any annual renewal term.

4.2    **Termination without Cause.**  Either Party may terminate this Agreement at any time, without cause, upon ninety (90) days' prior written notice to the other Party.  Upon notice of termination by Employer pursuant to this **Section 4.2**, Employer also may direct Employee to immediately cease providing the Services, provided that Employer continues to compensate Employee during the ninety (90) days following such notice of termination (the "Notice Period"). Notwithstanding the foregoing: (i) the provisions of **Section 4.3** will remain in effect during the Notice Period; and (ii) Employer reserves the right to exercise the "Termination for Cause" provisions in **Section 4.4** during the Notice Period and cease compensation during the Notice Period.

4.3    **Automatic Termination for Cause by Employer.** This Agreement shall automatically terminate upon the occurrence of any one of the following events:

4.3.1    Discontinuance of business by Employer;

4.3.2    The death of Employee;

4.3.3    The exclusion of Employee from participation in any federally or state funded healthcare program, including Medicare and Medicaid, or Employee's breach of **Section 5.3** of this Addendum;

4.3.4    The existence of any physical, mental or emotional disability that renders Employee unable to fulfill substantially all of Employee's obligations under the Agreement or this Addendum, even with reasonable accommodation by Employer, as reasonably determined by the Board of Directors of the Company (the "Board") or its designee, for an aggregate of ninety (90) days in any three hundred and sixty-five (365) consecutive day period or, if Employee has qualified for, and is receiving benefits under Employer's short-term disability plan, if any, such longer period as is required prior to eligibility for benefits as provided for in Employer's long-term disability policy applicable to similarly-situated employees, as in effect from time to time; or

4.3.5    The commission by Employee of any act of dishonesty, misrepresentation, fraud or moral turpitude, as reasonably determined by the Board or its designee.

4.4    **Termination for Cause by Employer with Notice.**  Employer may terminate this Agreement for "cause" at any time by giving written notice of termination (a "Termination Notice") to Employee, specifying the reason for termination. The termination of Employee's employment shall be effective thirty (30) days after delivery of the Termination Notice to Employee, if Employee fails to cure the default stated in the Termination Notice prior to the expiration of the thirty (30) day cure period. For purposes of this **Section 4.4**, "cause" shall include, without limitation, any of the following events (the occurrence of which shall be determined by Employer in its sole discretion):

4.4.1   The breach of any of Employee's warranties or the falsity of the representations made by Employee in **Section 5** of this Addendum;

4.4.2   Employee engages in disruptive or otherwise unacceptable behavior or conduct substantially incompatible with the goals, objectives, or business interests of Employer, or that Employer, in its sole discretion, reasonably believes could jeopardize or adversely affect the customers, staff, property, image, or reputation of Employer;

4.4.3   The commencement of an investigation or the indictment of Employee for any act constituting a felony or for any crime involving the delivery of, or billing or payment for, healthcare items or services;

4.4.4   A material breach by Employee of any of the terms of the Agreement or this Addendum not otherwise set forth in **Section 4.3** or this **Section 4.4**, or a material violation by Employee of any written Company policy or standard of conduct; or

4.4.5   Employee's willful and continued failure to perform the Services after delivery by the Company to Employee of a written demand for performance that describes the basis for the Company's belief that Employee has not substantially performed the Services.

4.5   **Regulatory Termination.** If, prior to the expiration of the term of the Agreement, any federal, state or local regulatory body, including, but not limited to, the Centers for Medicare and Medicaid Services, the Department of Health and Human Services ("HHS") or the Internal Revenue Service, determines that this Agreement is illegal, or otherwise materially affects either Party's ability to perform its obligations under this Agreement, then the affected Party shall give the other Party such notice as is reasonable under the circumstances and shall make available a reasonable period within which to cure. If no cure is implemented by the parties, then Employer, in its discretion, may terminate this Agreement with such notice as is, in its sole discretion, reasonable under the circumstances.

4.6   **Termination for Cause or Good Reason by Employee.** Employee may terminate this Agreement "For Cause" or for Good Reason (as hereinafter defined) thirty (30) days after delivery of a written notice of the acts or omissions constituting the grounds for the "For Cause" termination or the "Good Reason" to Employer by Employee.  For purposes of this **Section 4.6**, "For Cause" shall mean the failure of Employer to comply with any material term of this Agreement that is not cured within thirty (30) days after delivery of a written notice of termination to Employer by Employee.  "Good Reason" means the occurrence of one or more of the following, without Employee's consent: (i) a material reduction in Employee's Base Salary, excluding a reduction in Base Salary that is applicable to all Company management; (ii) a material reduction of Employee's authority, duties or responsibilities, unless Employee is provided with a comparable position; provided, however, that a reduction in authority, duties, or responsibilities solely by virtue of the Company being acquired and made part of a larger entity whether as a subsidiary, business unit or otherwise will not constitute Good Reason.

4.7   **Termination by Mutual Agreement.**  This Agreement may be terminated by the mutual agreement of both Parties, in writing, at any time.

4.8   **Services Upon Termination.**   In the event of termination of this Agreement without cause by Employee, at Employer's sole discretion, Employee shall continue to perform

the Services as directed by Employer during the Notice Period. In the event of termination of this Agreement for any other reason, Employer shall have the option to demand that Employee immediately cease providing the Services, *provided, however*, that the Company shall be required to compensate Employee through the date of termination of Employee's employment, as applicable.

4.9     **Compensation Upon Termination.** Upon termination of Employee's employment hereunder, Employee shall be entitled to receive compensation earned and accrued, but unpaid, through the effective date of termination, and shall not be entitled to additional compensation, except as expressly provided for in this Addendum.

**5.     Employee Representations and Warranties.** Employee represents and warrants to Employer that:

5.1     **Validity and Enforceability**. Employee has the legal right to enter into the Agreement and this Addendum and to perform the Services in accordance with the terms of the Agreement and this Addendum.

5.2     **No Conflict**. Employee is not subject to or bound by any contractual obligations (such as any non-compete, non-disclosure or other restrictive covenant), governmental orders or other restrictions that would impede with or interfere in the performance of the Services in accordance with the terms of the Agreement and this Addendum.

5.3     **No Exclusion**. Employee represents and warrants to Employer that he or she has not:

5.3.1   Been convicted of a criminal offense in connection with the delivery of a healthcare item or service or with respect to any act or omission in a state or federal healthcare program relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct, or otherwise sanctioned by the Office of Inspector General of HHS or other enforcement agency;

5.3.2   Been suspended or excluded from participation in, or otherwise sanctioned, under any federal healthcare program or the healthcare program of any state;

5.3.3   Been convicted of a criminal offense in connection with the making or causing to be made of a false statement or representation or a false claim for the purpose of securing a benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized under a state or federal healthcare program;

5.3.4   Been convicted of a criminal offense in connection with the offer, inducement, solicitation, payment or receipt of any unlawful remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a healthcare entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a state or federal healthcare program, or in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a state or federal healthcare program;

5.3.5  Had a direct or indirect ownership or control interest of five percent (5%) or more in, and is not, and in the past has not been, an officer, director, or managing employee or partner of, any business enterprise that has been convicted of any criminal offense described in this Section 5.3; or

5.3.6  Had a direct or indirect ownership or control interest of five percent (5%) or more in, and is not, and in the past has not been, an officer, director, or managing employee or partner of, any business enterprise that has been suspended or excluded from participation in, or otherwise sanctioned, under any federal healthcare program or the healthcare program of any state.

Employee hereby agrees to immediately notify Employer of any threatened, proposed or actual exclusion from any federally or state funded healthcare program, including Medicare and Medicaid.  In the event that Employee is excluded from participation in any federally or state funded healthcare program during the term of the Agreement, or if at any time after the Effective Date of the Agreement it is determined that Employee is in breach of this **Section 5.3**, the Agreement shall, as of the effective date of such exclusion or breach, automatically terminate. Employee shall indemnify Employer for any and all damages incurred by the Company that result from Employee's exclusion from any federally or state funded healthcare program, including Medicare and Medicaid.

5.4     **Compliance with Law**.  Employee shall perform his or her obligations under the Agreement and this Addendum in compliance with all applicable federal and state laws and regulations, as well as all compliance guidance published by federal or state agencies, including, without limitation, the Health Insurance Portability and Accountability Act ("HIPAA"), the Medicare and Medicaid anti-kickback law, the Stark self-referral prohibition, Section 1128G of the Social Security Act enacted pursuant to Section 6002 of the Affordable Care Act (the "Sunshine Act") and the rules issued thereunder by HHS and compliance guidance published by the Office of the Inspector General or HHS related to any of the foregoing. Employee acknowledges that Employee understands these requirements, shall remain educated and informed regarding the applicable federal and state laws and regulations, and shall participate in all compliance programs adopted by the Company.  In the event Employee knows or suspects that any activities of Employee, the Company, any personnel or contractor of the Company, or any client of the Company implicates any such requirements or guidance, Employee shall immediately inform the Company in writing.

5.5     **No Payment of Remuneration or Solicitation of Patients.**  To the extent that Employee is employed as a sales and marketing representative to provide marketing, business development and related services and duties, in addition to complying with Employer's policies, procedures, and protocols relating to marketing, business development, and related services, Employee agrees not to:

5.5.1   Directly solicit patients, by telephone, computer, in-person, or otherwise;

5.5.2   Offer, induce, solicit, pay or receive any unlawful remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for the referral of an individual to a healthcare entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a state or federal healthcare program, or in return for purchasing, leasing, ordering, or arranging for or

recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a state or federal healthcare program.

**6.**     **Compensation and Benefits.** During the Term of the Agreement, as set forth in this Addendum, Employer shall pay to Employee, and Employee agrees to accept from Employer, as payment for the Services performed by Employee under the terms of the Agreement and this Addendum, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing ("Compensation Schedule").

**7.**     **Change in Control Benefits.**

7.1     **Stimwave Technologies Incorporated.**  In the event of a Change in Control (as hereinafter defined) of the Company that occurs while Employee is employed by the Company, 100% of any Equity Awards (as hereinafter defined) held by Employee as of the Closing (as hereinafter defined) shall vest and become fully exercisable as of the Closing. With respect to Equity Awards granted on or after the Effective Date, but granted prior to the Closing, the same vesting acceleration provisions provided in the prior sentence will apply to such Equity Awards except to the extent provided in the applicable equity award agreement by explicit reference to this Addendum to the Agreement. For purposes of this **Section 7.1**, the following definitions shall apply:

7.1.1     **Change in Control**.  "Change in Control" means: (i)  any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becoming the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) having the right to vote for the election of members of the Board (other than in connection with a bona fide equity financing for capital raising purposes); (ii) any reorganization, merger or consolidation of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity), other than a transaction or series of related transactions in which the holders of the voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) or such other surviving or resulting entity (other than in connection with a bona fide equity financing for capital raising purposes); or (iii) a sale or other disposition of all or substantially all of the assets of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity).

7.1.2     **Closing.**  "Closing" means the closing of the first transaction constituting a Change in Control that occurs on or following the Effective Date.

7.1.3     **Equity Award.** "Equity Award" means any equity interests issued or granted by the Company to Employee as compensation and any equity interest in an Affiliated Entity of the Company, as applicable.

7.2     **Affiliated Entities.**  In the event of a Change in Control of an Affiliated Entity of the Company, to or for which Employee provides services, that occurs while Employee is

employed by the Company, 100% of any Equity Awards in such Affiliated Entity held by Employee as of the Closing shall vest and become fully exercisable as of the Closing. With respect to Equity Awards in such Affiliated Entity granted on or after the Effective Date, but granted prior to the Closing, the same vesting acceleration provisions provided in the prior sentence will apply to such Equity Awards in such Affiliated Entity except to the extent provided in the applicable equity award agreement by explicit reference to this Addendum to the Agreement.

## 8.    Conditions to Receipt of Severance.

8.1    **Separation Agreement and Release of Claims.** The payment of any severance set forth in **Section 5.4 of the Compensation Schedule** is contingent upon Employee signing and not revoking the Company's standard separation and release of claims agreement upon Employee's cessation of employment and such agreement becoming effective no later than sixty (60) days following Employee's employment cessation date (such deadline, the "Release Deadline"). In no event will severance payments be paid or provided until the release actually becomes effective. Any severance payments or benefits under this Addendum to the Agreement will be paid on, or, in the case of installments, will not commence until, the sixtieth (60th) day following Employee's separation from service, or if later, such time as required by **Section 5.4 of the Compensation Schedule**. Except as required by **Section 10**, any installment payments that would have been made to Employee during the sixty (60) day period immediately following Employee's separation from service but for the preceding sentence will be paid to Employee on the sixtieth (60th) day following Employee's separation from service and the remaining payments will be made as provided in the Agreement or this Addendum to the Agreement.

8.2    **Section 409A.**

8.2.1    Notwithstanding anything to the contrary in this Addendum, no severance pay or benefits payable upon separation that are payable to Employee, if any, pursuant to this Addendum, when considered together with any other severance payments or separation benefits that are considered deferred compensation (together, the "Deferred Payments") under Section 409A of the Internal Revenue Code, as amended (the "Code") and the final regulations and official guidance thereunder ("Section 409A") will be payable until such time as Employee has a "separation from service" within the meaning of Section 409A.

8.2.2    Notwithstanding anything to the contrary in this Addendum, if Employee is a "specified employee" within the meaning of Section 409A at the time of Employee's termination (other than due to death), then the Deferred Payments, if any, that are payable within the first six (6) months following Employee's separation from service will become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the date of Employee's separation from service. All subsequent Deferred Payments, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit. Notwithstanding anything herein to the contrary, if Employee dies following Employee's separation from service, but prior to the six (6) month anniversary of the separation from service, then any payments delayed in accordance with this **Section 8.2.2** will be payable in a lump sum as soon as administratively practicable after the date of Employee's death, and all other Deferred Payments

will be payable in accordance with the payment schedule applicable to each payment or benefit. Each payment, installment and benefit payable under this Addendum is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

8.2.3    Any severance payment that satisfies the requirements of the "short-term deferral" rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations shall not constitute Deferred Payments for purposes hereof.  Any amount paid under the Agreement that qualifies as a payment made as a result of an involuntary separation from service pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations, which does not exceed the Section 409A Limit (as defined below), will not constitute Deferred Payments for purposes hereof.

8.2.4    For purposes of this Addendum "Section 409A Limit" means the lesser of two (2) times: (x) Employee's annualized compensation based upon the annual rate of pay paid to Employee during the tax year preceding the date of Employee's termination of employment, as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any Internal Revenue Service guidance issued with respect thereto; or (y) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Code for the year in which Employee's employment is terminated.

8.2.5    The foregoing provisions are intended to comply with or be exempt from the requirements of Section 409A so that none of the severance payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply.  Employee and the Company agree to work together in good faith to consider amendments to this Addendum and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition under Section 409A prior to actual payment of severance benefits to Employee.

**9.    No Duty to Mitigate.**  In the event that Employee becomes employed elsewhere during the period Employee is receiving severance payments from Company pursuant to **Section 5.4 of the Compensation Schedule**, Employee shall be entitled to continue to receive such severance payments and shall not be required to mitigate the amount of any payments contemplated by this Addendum, nor will any earnings that Employee may receive from any other source reduce any such payments.

**10.    Limitation on Payments.**

10.1    In the event that the severance benefits provided for in this Addendum or otherwise payable to Employee: (i) constitute "parachute payments" within the meaning of Section 280G of the Code; and (ii) but for this **Section 10** would be subject to the excise tax imposed by Section 4999 of the Code, then Employee's severance benefits under **Section 5.4 of the Compensation Schedule** will be either:

10.1.1  Delivered in full;

10.1.2 Delivered to such lesser extent as would result in no portion of such severance benefits being subject to excise tax under Section 4999 of the Code,

whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the excise tax imposed by Section 4999, results in the receipt by Employee on an after-tax basis, of the greatest amount of severance benefits, notwithstanding that all or some portion of such severance benefits may be taxable under Section 4999 of the Code.  If a reduction in severance and other benefits constituting "parachute payments" is necessary so that benefits are delivered to a lesser extent, reduction will occur in the following order: (i) reduction of cash payments, which shall occur in reverse chronological order such that the cash payment owed on the latest date following the occurrence of the event triggering such excise tax will be the first cash payment to be reduced; (ii) reduction of acceleration of vesting of Equity Awards, which shall occur in the reverse order of the date of grant for such Equity Awards (i.e., the vesting of the most recently granted Equity Awards will be reduced first); and (iii) reduction of other benefits paid or provided to Employee, which shall occur in reverse chronological order such that the benefit owed on the latest date following the occurrence of the event triggering such excise tax will be the first benefit to be reduced. If more than one Equity Award was made to Employee on the same date of grant, all such Equity Awards shall have their acceleration of vesting reduced pro rata.  In no event shall Employee have any discretion with respect to the ordering of payment reductions.

10.2    Unless the Company and Employee otherwise agree in writing, any determination required under this **Section 10** will be made in writing by a nationally recognized firm of independent public accountants selected by the Company (the "Accountants"), whose determination will be conclusive and binding upon Employee and the Company for all purposes. For purposes of making the calculations required by this **Section 10**, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Sections 280G and 4999 of the Code. The Company and Employee will furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this Section. The Company will bear all reasonable expenses incurred in connection with any calculations contemplated by this **Section 10**, including reasonable accounting fees charged by the Accountants.

IN WITNESS WHEREOF, this Key and Equity Employees' Addendum to Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**                                          **WITNESS:**

Signature: _____ *Evelyn Valerio-Rivera*            Signature: _____ *Elizabeth Greene* _____

Print Name: Evelyn Valerio-Rivera                   Print Name: Elizabeth Greene

**EMPLOYER:** ~~Technologies~~ **Incorporated**

Signature: _____ *Laura Tyler Perryman* _____
By: Laura Tyler Perryman
Title: CEO

## COMPENSATION SCHEDULE

**1. Base Salary.** For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $104,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2. Commission.** Employer shall pay Employee a commission on sales, if applicable, in accordance with the Sales Compensation Leadership Plan.

**3. Bonuses.** Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**4. Equity.** Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. Employee will also be eligible to receive Equity Awards pursuant to any plans or arrangements that an Affiliated Entity of the Company may have in effect from time to time. The Board or the Committee (or with respect to an Affiliated Entity of the Company, the respective board of directors or compensation committee of such Affiliated Entity) will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**5. Employee Benefits.** In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **4** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 5.4** below, shall terminate upon the cessation of Employee's employment:

5.1 **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof. Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

5.2 **Vacation.** Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

5.3 **Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

5.4 **Severance.** If the Company terminates Employee's employment with the Company without cause or if Employee resigns from such employment for Good Reason, and, in each case, Employee signs and does not revoke a standard release of claims with the Company in a form acceptable to the Company and subject to **Sections 8** and **10** of the Addendum, then Employee will receive, in addition to Employee's salary payable through the date of termination of employment and any other employee benefits earned and unpaid through the date of termination, continuing payments of severance pay at a rate equal to Employee's Base Salary rate, as then in effect, for twelve (12) months from the date of such termination in accordance with the Company's normal payroll policies.

## EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP

Identifying Number or
Title                                  Date                    Brief Description


Date: _May 31, 2019_____          _Evelyn Valerio-Rivera_
                                       F38CB7059BAC467...
                                      _____
                                      Employee's Signature

                                      _Evelyn Valerio-Rivera_____
                                      _____
                                      Print Name of Employee

## EXHIBIT B

### STIMWAVE LLC TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:
_____
_____
_____

Date: _____          _____
                                                Employee's Signature

                                                _____
                                                Print Name of Employee

## EXHIBIT C

## STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

## EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT

This Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 3ⁿᵈ day of September 2019 (the "Effective Date") by and between Stimwave LLC ("Employer" or "the Company") and Gilbert Bao ("Employee") (each party individually a "Party" and collectively the "Parties").

### RECITALS:

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement (referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.    **Definitions.**

   1.1    **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by Stimwave LLC and/or its subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

1.2    **Competitive Business.** "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company.

1.3    **Customer.** "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

1.4    **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company.

1.5    **Electronic Media Equipment.** "Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

1.6    **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

1.7    **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company.

1.8    **Person.** "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

1.9    **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

2.    **Terms and Termination.**

2.1    **Employment "At-Will" Relationship.** Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's

employment relationship with the Company at any time, with or without cause and with or without notice.

 2.2 **Full-Time Best Efforts.**  Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company.

 2.3 **Compensation and Benefits.** For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

**3.** **Duties and Obligations of Employee.**

 3.1 **Duty of Loyalty.** Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

 3.2 **Conflict of Interest.**  Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions.  Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

 3.3 **Compliance with Laws.**  Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States

Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA").  Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.      Restrictive Covenants.**

       4.1      **Covenant Not to Compete.**

           4.1.1      **Competitive Business.** Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

           4.1.2      **Same or Similar Services.** Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods provided by, the Company (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

           4.1.3      **Continuation for Violation.** In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's last competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

       4.2      **Covenant Not to Solicit.**

           4.2.1      **Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work

for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

        4.2.2   **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company  and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

        4.2.3   **Continuation for Violation.** In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's last solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

**5.**     **Confidential Information.**

      5.1   **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

      5.2   **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is

learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

5.3    **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

5.4    **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical

expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

5.5    **Third-Party Information.**  Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

5.6    **Non-Confidential Information.** The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7    **Former Employer Confidential Information.** Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other

person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

## 6.    Inventions.

6.1    **Inventions Retained and Licensed.** Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.** Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention.  Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while

employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3    **Moral Rights.**  Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4    **Maintenance of Records.**  Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5    **Patent, Trademark and Copyright Registrations.**  Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement  and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

**7.**    **Acknowledgements.**  Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1     The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2     Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3     The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4     The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5     This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.      Survival and Remedies.** Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.      Return of Company Property.**

9.1    **Return of Company Property.** All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2    **Termination Certificate.**  Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3    **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4    **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information).  Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5    **No Expectation of Privacy in Company Property.** Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for

Company purposes. Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9** and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10.    **Audit.**  Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

**11.    Setoff.**  Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck, including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

**12.      No Conflicting Agreements or Improper Use of Third-Party Information.**  During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

**13.      Duty to Disclose Subsequent Employment.**  During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

**14.      Arbitration.**

      14.1      **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF**

**EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2    **Procedure.**  Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator. The arbitrator shall be selected in the manner provided in the AHLA Rules. The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law.  The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3    **Method of Selection.** Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4    **Notice in Connection with Arbitration.**  All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5    **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6    **Satisfaction of Award.**  If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the

maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7    **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8    **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9    **Administrative Relief.** EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

## 15.    General Provisions.

15.1    **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2    **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives)

and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3    **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company.  The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4    **Waiver.** The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5    **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6    **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8    **Further Assurances.** Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9    **Title, Headings and Gender.** The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement. Throughout this Agreement, where such meanings would be

appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10    **Attorney's Fees.** Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11    **Notices.** All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:            Stimwave LLC
                        Attention: Laura Tyler Perryman, CEO
                        1310 Park Central Blvd South
                        Pompano Beach, Florida 33064

To Employee:            Gilbert Bao
                        4612 Sweetgale Dr
                        San Ramon, CA 94582

15.12    **No Third-party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee. It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13    **Invalid Provisions.** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement shall be construed and enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect.    Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

15.14    **Representations and Warranties.**    Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under,

DocuSign Envelope ID: 4FB349D8-5C37-4ED4-ABB2-009B98EF9345

constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15   **Representation of Attorney.**  Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16   **Voluntary Agreement.**  Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _____

Print Name: Gilbert Bao

**WITNESS:**

Signature: _____

Print Name:  Elizabeth Greene

**EMPLOYER:**

**Stimwave LLC**

Signature: _____
By: Laura Tyler Perryman
Title: CEO
        Representative with authority to bind
        Stimwave LLC

## COMPENSATION SCHEDULE

**1.    Base Salary.**  For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $120,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2.    Bonuses.**  Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**3.    Equity.**  Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. The Board or the Committee will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**4.    Employee Benefits.**  In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **3** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 4.4** below, shall terminate upon the cessation of Employee's employment:

4.1    **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof.  Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

4.2    **Vacation.** Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

4.3     **Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP**

Identifying Number or
<u>Title</u>                                             <u>Date</u>                      <u>Brief Description</u>

GB ___ No inventions or improvements

_____Additional Sheets Attached

Date: _Sep 6, 2019_____

_Gilbert Bao_____
Employee's Signature

_Gilbert Bao_____
Print Name of Employee

**EXHIBIT B**

**STIMWAVE LLC TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:
_____
_____
_____

Date: _____        _____
                                                Employee's Signature

                                                _____
                                                Print Name of Employee

## EXHIBIT C

### STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

**AMENDED AND RESTATED**
**EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL**
**INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT**

This Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 1st day of January, 2019 (the "Effective Date") by and between Stimwave Technologies Incorporated ("Employer" or "the Company") and Graham Greene ("Employee") (each party individually a "Party" and collectively the "Parties").

**RECITALS:**

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement with any Affiliated Entity (as hereinafter defined) (such employment and consulting agreements collectively referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.      **Definitions.**

        1.1      **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by the Company and/or its parent or subsidiaries.  For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management

or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise. Affiliated Entities specifically including, but are not limited to: Stimwave LLC, StimQ Medical LLC ("StimQ"), StimRelieve LLC, StimGuard LLC, Micron Devices LLC, Stimwave Limited, Stimwave Medical Pty, Freedom Neuromodulation LLC and Freedom Neuro BV.

1.2　　**Competitive Business.**　"Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company in the field of neuromodulation; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company in the field of neuromodulation.

1.3　　**Customer.**　"Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

1.4　　**Business Associates.**　"Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company in the field of neuromodulation.

1.5　　**Electronic Media Equipment.**　"Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

1.6　　**Electronic Media Systems.**　"Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

1.7　　**Inventions.**　"Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company in the field of neuromodulation.

1.8　　**Person.**　"Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

DocuSign Envelope ID: 1C0C063E-2AE9-1739-81C9-08F88150B14E

1.9    **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

2.    **Terms and Termination.**

2.1    **Employment "At-Will" Relationship.**  Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's employment relationship with the Company at any time, with or without cause and with or without notice.

2.2    **Full-Time Best Efforts.**  Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company, or as detailed in Exhibit A.

2.3    **Compensation and Benefits.**  For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

3.    **Duties and Obligations of Employee.**

3.1    **Duty of Loyalty.**  Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2    **Conflict of Interest.**  Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions.  Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's

Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

   3.3 **Compliance with Laws.** Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA"). Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.**  **Restrictive Covenants.**

   4.1 **Covenant Not to Compete.**

    4.1.1 **Competitive Business.** Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

    4.1.2 **Same or Similar Services.** Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods in the field of neuromodulation provided by, the Company in the field of neuromodulation (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

    4.1.3 **Continuation for Violation.** In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

   4.2 **Covenant Not to Solicit.**

       **4.2.1**   **Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

       **4.2.2**   **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company  and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

       **4.2.3**   **Continuation for Violation.**  In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

**5.**     **Confidential Information.**

     **5.1**   **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

     5.2    **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

     5.3    **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

     5.4    **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential

Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

      5.5    **Third-Party Information.**  Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

      5.6    **Non-Confidential Information.**  The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential

Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7    **Former Employer Confidential Information.**  Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

## 6.    Inventions.

6.1    **Inventions Retained and Licensed.**  Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.**  Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to

commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention. Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3     **Moral Rights.**  Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4     **Maintenance of Records.**  Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5     **Patent, Trademark and Copyright Registrations.**  Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company in the field of neuromodulation as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with

the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

**7.    Acknowledgements.**  Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1    The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2    Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3    The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4    The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5    This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.    Survival and Remedies.**  Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits

derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.      Return of Company Property.**

    9.1      **Return of Company Property.**    All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

    9.2      **Termination Certificate.**  Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

    9.3      **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

    9.4      **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information).   Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5    **No Expectation of Privacy in Company Property.**  Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises, or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for Company purposes.  Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9**, and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10.    **Audit.**  Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

11.    **Setoff.**  Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck,

DocuSign Envelope ID: 1C0C963E-2AE9-1736-81C9-08F8B150891E

including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

**12.     No Conflicting Agreements or Improper Use of Third-Party Information.** During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

**13.     Duty to Disclose Subsequent Employment.** During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

**14.     Arbitration.**

**14.1     Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII**

**OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2    **Procedure.**  Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator.  The arbitrator shall be selected in the manner provided in the AHLA Rules.  The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law.  The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3    **Method of Selection.**  Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4    **Notice in Connection with Arbitration.**  All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5     **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6     **Satisfaction of Award.** If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7     **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8     **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9     **Administrative Relief.** EMPLOYE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

15.     **General Provisions.**

15.1    **Governing Law; Consent to Personal Jurisdiction and Venue.**  It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida.  Exclusive venue shall lie in Broward County, Florida.

15.2    **Entire Agreement.**  This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives) and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3    **Modification.**  No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company.  The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4    **Waiver.**  The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5    **Successors and Assigns.**  This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6    **Construction without Presumption.**  The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8    **Further Assurances.**  Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9    **Title, Headings and Gender.**  The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement.  Throughout this Agreement, where such meanings would be appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10    **Attorney's Fees.**  Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11    **Notices.**  All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:        Stimwave Technologies Incorporated
                    Attention: Laura Tyler Perryman, CEO
                    1310 Park Central Blvd South
                    Pompano Beach, Florida 33064

                    With a copy to:

                    Michael Brown
                    DLA Piper LLP
                    4365 Executive Drive, Suite 1100
                    San Diego CA 92121-2133


To Employee:        Graham Greene 271 SE 22nd St Fort Lauderdale FL 33316

15.12    **No Third-party Beneficiaries.**  The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee.  It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13    **Invalid Provisions.**  If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement will be construed and

enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect. Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

     15.14 **Representations and Warranties.** Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

     15.15 **Representation of Attorney.** Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

     15.16 **Voluntary Agreement.** Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _____

Print Name: Graham Greene

**WITNESS:**

Signature: _____

Print Name: Elizabeth Greene

**EMPLOYER:**

**Stimwave Te_____**

Signature: _____

By: Laura Tyler Perryman

Title: CEO

     Representative with authority to bind
     Stimwave Technologies Incorporated

**KEY AND EQUITY EMPLOYEES'**
**ADDENDUM TO AMENDED AND RESTATED**
**EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL**
**INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT**

This Key and Equity Employees' Addendum to Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Addendum") is made and entered into on the 1st day of January, 2019 (the "Effective Date") by and between Stimwave Technologies Incorporated ("Employer" or "the Company") and Graham Greene ("Employee") (each party individually a "Party" and collectively the "Parties").

**RECITALS:**

WHEREAS, Company and Employee entered into an Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") or will enter into such an Agreement simultaneously with the execution of this Addendum to the Agreement; and

WHEREAS, Company and Employee desire to amend the Agreement, as provided in this Addendum to the Agreement; and

WHEREAS, Company and Employee understand and agree that this Addendum shall be an integral part of the Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

**1.      Integration.**  All of the terms and conditions of the Agreement are incorporated herein and by this reference made a part hereof, and shall remain the same except to the extent modified by this Addendum.  In the event of a conflict between a provision of the Agreement and of this Addendum, the provision in this Addendum shall be controlling. All capitalized terms in this Addendum shall have the meaning ascribed to those words in the Agreement unless the context in which the word is used clearly indicates to the contrary.

**2.      Services**.  "Services" means the services to be provided and the duties to be performed by Employee, as described in a written job description setting forth the specific duties the Employee is required to perform, as well as such other duties as may be assigned to Employee from time to time by Employer.

**3.      Employment**.  The Company hereby employs Employee in accordance with the terms of the Agreement, as modified by this Addendum, and Employee hereby accepts such employment with the Company, for the Term set forth in **Section 4.1** hereof.

**4.      Term and Termination.  Section 2.1** of the Agreement shall be deleted and replaced by the following provisions:

4.1      **Term.**  This Agreement shall be in effect for an initial term of five (5) years, commencing on January 1st, 2019 ("Effective Date") and terminating on December 31st, 2023,

unless sooner terminated as provided for in this Agreement. Thereafter, this Agreement shall be automatically renewed for successive one (1) year terms until it is terminated as provided herein. Any reference in this Agreement to the "Term" of this Agreement means the initial and any annual renewal term.

4.2     **Termination without Cause.**  Either Party may terminate this Agreement at any time, without cause, upon ninety (90) days' prior written notice to the other Party.  Upon notice of termination by Employer pursuant to this **Section 4.2**, Employer also may direct Employee to immediately cease providing the Services, provided that Employer continues to compensate Employee during the ninety (90) days following such notice of termination (the "Notice Period"). Notwithstanding the foregoing: (i) the provisions of **Section 4.3** will remain in effect during the Notice Period; and (ii) Employer reserves the right to exercise the "Termination for Cause" provisions in **Section 4.4** during the Notice Period and cease compensation during the Notice Period.

4.3     **Automatic Termination for Cause by Employer.** This Agreement shall automatically terminate upon the occurrence of any one of the following events:

4.3.1    Discontinuance of business by Employer;

4.3.2    The death of Employee;

4.3.3    The exclusion of Employee from participation in any federally or state funded healthcare program, including Medicare and Medicaid, or Employee's breach of **Section 5.3** of this Addendum;

4.3.4    The existence of any physical, mental or emotional disability that renders Employee unable to fulfill substantially all of Employee's obligations under the Agreement or this Addendum, even with reasonable accommodation by Employer, as reasonably determined by the Board of Directors of the Company (the "Board") or its designee, for an aggregate of ninety (90) days in any three hundred and sixty-five (365) consecutive day period or, if Employee has qualified for, and is receiving benefits under Employer's short-term disability plan, if any, such longer period as is required prior to eligibility for benefits as provided for in Employer's long-term disability policy applicable to similarly-situated employees, as in effect from time to time; or

4.3.5    The commission by Employee of any act of dishonesty, misrepresentation, fraud or moral turpitude, as reasonably determined by the Board or its designee.

4.4     **Termination for Cause by Employer with Notice.**  Employer may terminate this Agreement for "cause" at any time by giving written notice of termination (a "Termination Notice") to Employee, specifying the reason for termination. The termination of Employee's employment shall be effective thirty (30) days after delivery of the Termination Notice to Employee, if Employee fails to cure the default stated in the Termination Notice prior to the expiration of the thirty (30) day cure period. For purposes of this **Section 4.4**, "cause" shall include, without limitation, any of the following events (the occurrence of which shall be determined by Employer in its sole discretion):

4.4.1   The breach of any of Employee's warranties or the falsity of the representations made by Employee in **Section 5** of this Addendum;

4.4.2   Employee engages in disruptive or otherwise unacceptable behavior or conduct substantially incompatible with the goals, objectives, or business interests of Employer, or that Employer, in its sole discretion, reasonably believes could jeopardize or adversely affect the customers, staff, property, image, or reputation of Employer;

4.4.3   The commencement of an investigation or the indictment of Employee for any act constituting a felony or for any crime involving the delivery of, or billing or payment for, healthcare items or services;

4.4.4   A material breach by Employee of any of the terms of the Agreement or this Addendum not otherwise set forth in **Section 4.3** or this **Section 4.4**, or a material violation by Employee of any written Company policy or standard of conduct; or

4.4.5   Employee's willful and continued failure to perform the Services after delivery by the Company to Employee of a written demand for performance that describes the basis for the Company's belief that Employee has not substantially performed the Services.

4.5     **Regulatory Termination.** If, prior to the expiration of the term of the Agreement, any federal, state or local regulatory body, including, but not limited to, the Centers for Medicare and Medicaid Services, the Department of Health and Human Services ("HHS") or the Internal Revenue Service, determines that this Agreement is illegal, or otherwise materially affects either Party's ability to perform its obligations under this Agreement, then the affected Party shall give the other Party such notice as is reasonable under the circumstances and shall make available a reasonable period within which to cure. If no cure is implemented by the parties, then Employer, in its discretion, may terminate this Agreement with such notice as is, in its sole discretion, reasonable under the circumstances.

4.6     **Termination for Cause or Good Reason by Employee.** Employee may terminate this Agreement "For Cause" or for Good Reason (as hereinafter defined) thirty (30) days after delivery of a written notice of the acts or omissions constituting the grounds for the "For Cause" termination or the "Good Reason" to Employer by Employee.  For purposes of this **Section 4.6**, "For Cause" shall mean the failure of Employer to comply with any material term of this Agreement that is not cured within thirty (30) days after delivery of a written notice of termination to Employer by Employee.  "Good Reason" means the occurrence of one or more of the following, without Employee's consent: (i) a material reduction in Employee's Base Salary, excluding a reduction in Base Salary that is applicable to all Company management; (ii) a material reduction of Employee's authority, duties or responsibilities, unless Employee is provided with a comparable position; provided, however, that a reduction in authority, duties, or responsibilities solely by virtue of the Company being acquired and made part of a larger entity whether as a subsidiary, business unit or otherwise will not constitute Good Reason.

4.7     **Termination by Mutual Agreement.**  This Agreement may be terminated by the mutual agreement of both Parties, in writing, at any time.

4.8     **Services Upon Termination.**  In the event of termination of this Agreement without cause by Employee, at Employer's sole discretion, Employee shall continue to perform

the Services as directed by Employer during the Notice Period. In the event of termination of this Agreement for any other reason, Employer shall have the option to demand that Employee immediately cease providing the Services, *provided, however*, that the Company shall be required to compensate Employee through the date of termination of Employee's employment, as applicable.

4.9 **Compensation Upon Termination.** Upon termination of Employee's employment hereunder, Employee shall be entitled to receive compensation earned and accrued, but unpaid, through the effective date of termination, and shall not be entitled to additional compensation, except as expressly provided for in this Addendum.

**5. Employee Representations and Warranties.** Employee represents and warrants to Employer that:

5.1 **Validity and Enforceability**. Employee has the legal right to enter into the Agreement and this Addendum and to perform the Services in accordance with the terms of the Agreement and this Addendum.

5.2 **No Conflict**. Employee is not subject to or bound by any contractual obligations (such as any non-compete, non-disclosure or other restrictive covenant), governmental orders or other restrictions that would impede with or interfere in the performance of the Services in accordance with the terms of the Agreement and this Addendum.

5.3 **No Exclusion**. Employee represents and warrants to Employer that he or she has not:

5.3.1 Been convicted of a criminal offense in connection with the delivery of a healthcare item or service or with respect to any act or omission in a state or federal healthcare program relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct, or otherwise sanctioned by the Office of Inspector General of HHS or other enforcement agency;

5.3.2 Been suspended or excluded from participation in, or otherwise sanctioned, under any federal healthcare program or the healthcare program of any state;

5.3.3 Been convicted of a criminal offense in connection with the making or causing to be made of a false statement or representation or a false claim for the purpose of securing a benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized under a state or federal healthcare program;

5.3.4 Been convicted of a criminal offense in connection with the offer, inducement, solicitation, payment or receipt of any unlawful remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a healthcare entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a state or federal healthcare program, or in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a state or federal healthcare program;

5.3.5 Had a direct or indirect ownership or control interest of five percent (5%) or more in, and is not, and in the past has not been, an officer, director, or managing employee or partner of, any business enterprise that has been convicted of any criminal offense described in this Section 5.3; or

5.3.6 Had a direct or indirect ownership or control interest of five percent (5%) or more in, and is not, and in the past has not been, an officer, director, or managing employee or partner of, any business enterprise that has been suspended or excluded from participation in, or otherwise sanctioned, under any federal healthcare program or the healthcare program of any state.

Employee hereby agrees to immediately notify Employer of any threatened, proposed or actual exclusion from any federally or state funded healthcare program, including Medicare and Medicaid. In the event that Employee is excluded from participation in any federally or state funded healthcare program during the term of the Agreement, or if at any time after the Effective Date of the Agreement it is determined that Employee is in breach of this **Section 5.3**, the Agreement shall, as of the effective date of such exclusion or breach, automatically terminate. Employee shall indemnify Employer for any and all damages incurred by the Company that result from Employee's exclusion from any federally or state funded healthcare program, including Medicare and Medicaid.

5.4 **Compliance with Law**. Employee shall perform his or her obligations under the Agreement and this Addendum in compliance with all applicable federal and state laws and regulations, as well as all compliance guidance published by federal or state agencies, including, without limitation, the Health Insurance Portability and Accountability Act ("HIPAA"), the Medicare and Medicaid anti-kickback law, the Stark self-referral prohibition, Section 1128G of the Social Security Act enacted pursuant to Section 6002 of the Affordable Care Act (the "Sunshine Act") and the rules issued thereunder by HHS and compliance guidance published by the Office of the Inspector General or HHS related to any of the foregoing. Employee acknowledges that Employee understands these requirements, shall remain educated and informed regarding the applicable federal and state laws and regulations, and shall participate in all compliance programs adopted by the Company. In the event Employee knows or suspects that any activities of Employee, the Company, any personnel or contractor of the Company, or any client of the Company implicates any such requirements or guidance, Employee shall immediately inform the Company in writing.

5.5 **No Payment of Remuneration or Solicitation of Patients.** To the extent that Employee is employed as a sales and marketing representative to provide marketing, business development and related services and duties, in addition to complying with Employer's policies, procedures, and protocols relating to marketing, business development, and related services, Employee agrees not to:

5.5.1 Directly solicit patients, by telephone, computer, in-person, or otherwise;

5.5.2 Offer, induce, solicit, pay or receive any unlawful remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for the referral of an individual to a healthcare entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a state or federal healthcare program, or in return for purchasing, leasing, ordering, or arranging for or

recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a state or federal healthcare program.

**6.      Compensation and Benefits.** During the Term of the Agreement, as set forth in this Addendum, Employer shall pay to Employee, and Employee agrees to accept from Employer, as payment for the Services performed by Employee under the terms of the Agreement and this Addendum, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing ("Compensation Schedule").

**7.      Change in Control Benefits.**

7.1      **Stimwave Technologies Incorporated.**  In the event of a Change in Control (as hereinafter defined) of the Company that occurs while Employee is employed by the Company, 100% of any Equity Awards (as hereinafter defined) held by Employee as of the Closing (as hereinafter defined) shall vest and become fully exercisable as of the Closing. With respect to Equity Awards granted on or after the Effective Date, but granted prior to the Closing, the same vesting acceleration provisions provided in the prior sentence will apply to such Equity Awards except to the extent provided in the applicable equity award agreement by explicit reference to this Addendum to the Agreement. For purposes of this **Section 7.1**, the following definitions shall apply:

7.1.1    **Change in Control**.  "Change in Control" means: (i) any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becoming the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) having the right to vote for the election of members of the Board (other than in connection with a bona fide equity financing for capital raising purposes); (ii) any reorganization, merger or consolidation of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity), other than a transaction or series of related transactions in which the holders of the voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) or such other surviving or resulting entity (other than in connection with a bona fide equity financing for capital raising purposes); or (iii) a sale or other disposition of all or substantially all of the assets of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity).

7.1.2    **Closing.**  "Closing" means the closing of the first transaction constituting a Change in Control that occurs on or following the Effective Date.

7.1.3    **Equity Award.** "Equity Award" means any equity interests issued or granted by the Company to Employee as compensation and any equity interest in an Affiliated Entity of the Company, as applicable.

7.2      **Affiliated Entities.**  In the event of a Change in Control of an Affiliated Entity of the Company, to or for which Employee provides services, that occurs while Employee is

employed by the Company, 100% of any Equity Awards in such Affiliated Entity held by Employee as of the Closing shall vest and become fully exercisable as of the Closing.  With respect to Equity Awards in such Affiliated Entity granted on or after the Effective Date, but granted prior to the Closing, the same vesting acceleration provisions provided in the prior sentence will apply to such Equity Awards in such Affiliated Entity except to the extent provided in the applicable equity award agreement by explicit reference to this Addendum to the Agreement.

**8.      Conditions to Receipt of Severance.**

8.1      **Separation Agreement and Release of Claims.** The payment of any severance set forth in **Section 5.4 of the Compensation Schedule** is contingent upon Employee signing and not revoking the Company's standard separation and release of claims agreement upon Employee's cessation of employment and such agreement becoming effective no later than sixty (60) days following Employee's employment cessation date (such deadline, the "Release Deadline").  In no event will severance payments be paid or provided until the release actually becomes effective.  Any severance payments or benefits under this Addendum to the Agreement will be paid on, or, in the case of installments, will not commence until, the sixtieth (60th) day following Employee's separation from service, or if later, such time as required by **Section 5.4 of the Compensation Schedule**.  Except as required by **Section 10**, any installment payments that would have been made to Employee during the sixty (60) day period immediately following Employee's separation from service but for the preceding sentence will be paid to Employee on the sixtieth (60th) day following Employee's separation from service and the remaining payments will be made as provided in the Agreement or this Addendum to the Agreement.

8.2      **Section 409A.**

8.2.1      Notwithstanding anything to the contrary in this Addendum, no severance pay or benefits payable upon separation that are payable to Employee, if any, pursuant to this Addendum, when considered together with any other severance payments or separation benefits that are considered deferred compensation (together, the "Deferred Payments") under Section 409A of the Internal Revenue Code, as amended (the "Code") and the final regulations and official guidance thereunder ("Section 409A") will be payable until such time as Employee has a "separation from service" within the meaning of Section 409A.

8.2.2      Notwithstanding anything to the contrary in this Addendum, if Employee is a "specified employee" within the meaning of Section 409A at the time of Employee's termination (other than due to death), then the Deferred Payments, if any, that are payable within the first six (6) months following Employee's separation from service will become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the date of Employee's separation from service. All subsequent Deferred Payments, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit.  Notwithstanding anything herein to the contrary, if Employee dies following Employee's separation from service, but prior to the six (6) month anniversary of the separation from service, then any payments delayed in accordance with this **Section 8.2.2** will be payable in a lump sum as soon as administratively practicable after the date of Employee's death, and all other Deferred Payments

will be payable in accordance with the payment schedule applicable to each payment or benefit. Each payment, installment and benefit payable under this Addendum is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

8.2.3    Any severance payment that satisfies the requirements of the "short-term deferral" rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations shall not constitute Deferred Payments for purposes hereof.  Any amount paid under the Agreement that qualifies as a payment made as a result of an involuntary separation from service pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations, which does not exceed the Section 409A Limit (as defined below), will not constitute Deferred Payments for purposes hereof.

8.2.4    For purposes of this Addendum "Section 409A Limit" means the lesser of two (2) times: (x) Employee's annualized compensation based upon the annual rate of pay paid to Employee during the tax year preceding the date of Employee's termination of employment, as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any Internal Revenue Service guidance issued with respect thereto; or (y) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Code for the year in which Employee's employment is terminated.

8.2.5    The foregoing provisions are intended to comply with or be exempt from the requirements of Section 409A so that none of the severance payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply.  Employee and the Company agree to work together in good faith to consider amendments to this Addendum and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition under Section 409A prior to actual payment of severance benefits to Employee.

**9.    No Duty to Mitigate.**  In the event that Employee becomes employed elsewhere during the period Employee is receiving severance payments from Company pursuant to **Section 5.4 of the Compensation Schedule**, Employee shall be entitled to continue to receive such severance payments and shall not be required to mitigate the amount of any payments contemplated by this Addendum, nor will any earnings that Employee may receive from any other source reduce any such payments.

**10.    Limitation on Payments.**

10.1    In the event that the severance benefits provided for in this Addendum or otherwise payable to Employee: (i) constitute "parachute payments" within the meaning of Section 280G of the Code; and (ii) but for this **Section 10** would be subject to the excise tax imposed by Section 4999 of the Code, then Employee's severance benefits under **Section 5.4 of the Compensation Schedule** will be either:

10.1.1  Delivered in full;

10.1.2 Delivered to such lesser extent as would result in no portion of such severance benefits being subject to excise tax under Section 4999 of the Code,

DocuSign Envelope ID: 1C0C863E-2AE9-4738-81C9-08F8B150B14E

whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the excise tax imposed by Section 4999, results in the receipt by Employee on an after-tax basis, of the greatest amount of severance benefits, notwithstanding that all or some portion of such severance benefits may be taxable under Section 4999 of the Code.  If a reduction in severance and other benefits constituting "parachute payments" is necessary so that benefits are delivered to a lesser extent, reduction will occur in the following order: (i) reduction of cash payments, which shall occur in reverse chronological order such that the cash payment owed on the latest date following the occurrence of the event triggering such excise tax will be the first cash payment to be reduced; (ii) reduction of acceleration of vesting of Equity Awards, which shall occur in the reverse order of the date of grant for such Equity Awards (i.e., the vesting of the most recently granted Equity Awards will be reduced first); and (iii) reduction of other benefits paid or provided to Employee, which shall occur in reverse chronological order such that the benefit owed on the latest date following the occurrence of the event triggering such excise tax will be the first benefit to be reduced. If more than one Equity Award was made to Employee on the same date of grant, all such Equity Awards shall have their acceleration of vesting reduced pro rata.  In no event shall Employee have any discretion with respect to the ordering of payment reductions.

10.2    Unless the Company and Employee otherwise agree in writing, any determination required under this **Section 10** will be made in writing by a nationally recognized firm of independent public accountants selected by the Company (the "Accountants"), whose determination will be conclusive and binding upon Employee and the Company for all purposes. For purposes of making the calculations required by this **Section 10**, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Sections 280G and 4999 of the Code. The Company and Employee will furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this Section. The Company will bear all reasonable expenses incurred in connection with any calculations contemplated by this **Section 10**, including reasonable accounting fees charged by the Accountants.

IN WITNESS WHEREOF, this Key and Equity Employees' Addendum to Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**                                                           **WITNESS:**

Signature: _____        Signature: _____

Print Name: Graham Greene                            Print Name: Elizabeth Greene

**EMPLOYER:** _____ Technologies Incorporated

Signature: _____

By: Laura Tyler Perryman
Title: CEO

## COMPENSATION SCHEDULE

**1. Base Salary.** For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $120,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2. Commission.** Employer shall pay Employee a commission on sales, if applicable, in accordance with the Sales Compensation Leadership Plan.

**3. Bonuses.** Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**4. Equity.** Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. Employee will also be eligible to receive Equity Awards pursuant to any plans or arrangements that an Affiliated Entity of the Company may have in effect from time to time. The Board or the Committee (or with respect to an Affiliated Entity of the Company, the respective board of directors or compensation committee of such Affiliated Entity) will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**5. Employee Benefits.** In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **4** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 5.4** below, shall terminate upon the cessation of Employee's employment:

5.1 **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof. Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

5.2 **Vacation.**   Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

5.3 **Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

5.4 **Severance.** If the Company terminates Employee's employment with the Company without cause or if Employee resigns from such employment for Good Reason, and, in each case, Employee signs and does not revoke a standard release of claims with the Company in a form acceptable to the Company and subject to **Sections 8** and **10** of the Addendum, then Employee will receive, in addition to Employee's salary payable through the date of termination of employment and any other employee benefits earned and unpaid through the date of termination, continuing payments of severance pay at a rate equal to Employee's Base Salary rate, as then in effect, for twelve (12) months from the date of such termination in accordance with the Company's normal payroll policies.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS**
**AND ORIGINAL WORKS OF AUTHORSHIP**

Identifying Number or
<u>Title</u>                                                              <u>Date</u>                                    <u>Brief Description</u>

Date: <u>   May 30, 2019   </u>          _Graham Greene_

                                                    4B171331EB8C411...
Employee's Signature

       Graham Greene
_____
Print Name of Employee

**EXHIBIT B**

**STIMWAVE LLC TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:

_____

_____

_____

Date: _____          _____

                                                                        Employee's Signature

                                                                        _____

                                                                        Print Name of Employee

## EXHIBIT C

### STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

**AMENDED AND RESTATED
EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL
INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT**

This Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 1st day of January, 2019 (the "Effective Date") by and between Stimwave Technologies Incorporated ("Employer" or "the Company") and Richard LeBaron ("Employee") (each party individually a "Party" and collectively the "Parties").

**RECITALS:**

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement with any Affiliated Entity (as hereinafter defined) (such employment and consulting agreements collectively referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.  **Definitions.**

    1.1    **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by the Company and/or its parent or subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management

or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise. Affiliated Entities specifically including, but are not limited to: Stimwave LLC, StimQ Medical LLC ("StimQ"), StimRelieve LLC, StimGuard LLC, Micron Devices LLC, Stimwave Limited, Stimwave Medical Pty, Freedom Neuromodulation LLC and Freedom Neuro BV.

1.2    **Competitive Business.**  "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company in the field of neuromodulation; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company in the field of neuromodulation.

1.3    **Customer.**  "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

1.4    **Business Associates.**  "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company in the field of neuromodulation.

1.5    **Electronic Media Equipment.  "**Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

1.6    **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

1.7    **Inventions.**  "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company in the field of neuromodulation.

1.8    **Person.**  "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

1.9     **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

## 2.      Terms and Termination.

2.1     **Employment "At-Will" Relationship.**  Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's employment relationship with the Company at any time, with or without cause and with or without notice.

2.2     **Full-Time Best Efforts.**  Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company, or as detailed in Exhibit A.

2.3     **Compensation and Benefits.**  For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

## 3.      Duties and Obligations of Employee.

3.1     **Duty of Loyalty.**  Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2     **Conflict of Interest.**  Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions.  Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's

Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

       3.3    **Compliance with Laws.**  Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA"). Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.**    **Restrictive Covenants.**

       4.1    **Covenant Not to Compete.**

       4.1.1    **Competitive Business.**  Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

       4.1.2    **Same or Similar Services.**  Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods in the field of neuromodulation provided by, the Company in the field of neuromodulation (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

       4.1.3    **Continuation for Violation.**  In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

       4.2    **Covenant Not to Solicit.**

       4.2.1   **Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

       4.2.2   **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company  and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

       4.2.3   **Continuation for Violation.**  In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

**5.**     **Confidential Information.**

     5.1   **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

5.2 **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

5.3 **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

5.4 **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential

Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

       **5.5    Third-Party Information.**  Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

       **5.6    Non-Confidential Information.**  The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential

Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7    **Former Employer Confidential Information.**  Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

## 6.    Inventions.

6.1    **Inventions Retained and Licensed.**  Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.**  Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to

commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention. Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3     **Moral Rights.**  Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4     **Maintenance of Records.**  Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5     **Patent, Trademark and Copyright Registrations.**  Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company in the field of neuromodulation as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with

the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

**7.    Acknowledgements.**  Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1    The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2    Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3    The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4    The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5    This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.    Survival and Remedies.**  Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits

derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.      Return of Company Property.**

9.1      **Return of Company Property.**   All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2      **Termination Certificate.**   Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3      **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4      **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information).   Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5 **No Expectation of Privacy in Company Property.** Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises, or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for Company purposes. Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9**, and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10. **Audit.** Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

11. **Setoff.** Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck,

including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

**12.     No Conflicting Agreements or Improper Use of Third-Party Information.** During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

**13.     Duty to Disclose Subsequent Employment.** During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

**14.     Arbitration.**

        14.1     **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII**

**OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2    **Procedure.**  Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator.  The arbitrator shall be selected in the manner provided in the AHLA Rules.  The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law.  The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3    **Method of Selection.**  Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4    **Notice in Connection with Arbitration.**  All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5    **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6    **Satisfaction of Award.** If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7    **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8    **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9    **Administrative Relief.** EMPLOYE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

**15.    General Provisions.**

15.1     **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2     **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives) and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3     **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company. The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4     **Waiver.** The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5     **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6     **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7     **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8     **Further Assurances.**  Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9     **Title, Headings and Gender.**  The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement.  Throughout this Agreement, where such meanings would be appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10     **Attorney's Fees.**  Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11     **Notices.**  All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:          Stimwave Technologies Incorporated
                      Attention: Laura Tyler Perryman, CEO
                      1310 Park Central Blvd South
                      Pompano Beach, Florida 33064

                      With a copy to:

                      Michael Brown
                      DLA Piper LLP
                      4365 Executive Drive, Suite 1100
                      San Diego CA 92121-2133


To Employee:          Richard LeBaron 2522 W Morten Avenue, Phoenix, AZ 85051

15.12     **No Third-party Beneficiaries.**  The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee.  It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13     **Invalid Provisions.**  If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement will be construed and

enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect.    Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

15.14    **Representations and Warranties.**    Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15    **Representation of Attorney.** Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16    **Voluntary Agreement.**    Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _____

Print Name: Richard LeBaron

**WITNESS:**

Signature: _____

Print Name: Elizabeth Greene

**EMPLOYER:**

**Stimwave Technologies Incorporated**

Signature: _____

By: Laura Tyler Perryman

Title: CEO

      Representative with authority to bind
      Stimwave Technologies Incorporated

**KEY AND EQUITY EMPLOYEES'**
**ADDENDUM TO AMENDED AND RESTATED**
**EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL**
**INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT**

This Key and Equity Employees' Addendum to Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Addendum") is made and entered into on the 1st day of January, 2019 (the "Effective Date") by and between Stimwave Technologies Incorporated ("Employer" or "the Company") and Richard LeBaron ("Employee") (each party individually a "Party" and collectively the "Parties").

**RECITALS:**

WHEREAS, Company and Employee entered into an Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") or will enter into such an Agreement simultaneously with the execution of this Addendum to the Agreement; and

WHEREAS, Company and Employee desire to amend the Agreement, as provided in this Addendum to the Agreement; and

WHEREAS, Company and Employee understand and agree that this Addendum shall be an integral part of the Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.    **Integration.**  All of the terms and conditions of the Agreement are incorporated herein and by this reference made a part hereof, and shall remain the same except to the extent modified by this Addendum.  In the event of a conflict between a provision of the Agreement and of this Addendum, the provision in this Addendum shall be controlling. All capitalized terms in this Addendum shall have the meaning ascribed to those words in the Agreement unless the context in which the word is used clearly indicates to the contrary.

2.    **Services**.  "Services" means the services to be provided and the duties to be performed by Employee, as described in a written job description setting forth the specific duties the Employee is required to perform, as well as such other duties as may be assigned to Employee from time to time by Employer.

3.    **Employment**.  The Company hereby employs Employee in accordance with the terms of the Agreement, as modified by this Addendum, and Employee hereby accepts such employment with the Company, for the Term set forth in **Section 4.1** hereof.

4.    **Term and Termination.  Section 2.1** of the Agreement shall be deleted and replaced by the following provisions:

4.1    **Term.**  This Agreement shall be in effect for an initial term of five (5) years, commencing on January 1st, 2019 ("Effective Date") and terminating on December 31st, 2023,

unless sooner terminated as provided for in this Agreement. Thereafter, this Agreement shall be automatically renewed for successive one (1) year terms until it is terminated as provided herein. Any reference in this Agreement to the "Term" of this Agreement means the initial and any annual renewal term.

4.2    **Termination without Cause.**  Either Party may terminate this Agreement at any time, without cause, upon ninety (90) days' prior written notice to the other Party.  Upon notice of termination by Employer pursuant to this **Section 4.2**, Employer also may direct Employee to immediately cease providing the Services, provided that Employer continues to compensate Employee during the ninety (90) days following such notice of termination (the "Notice Period"). Notwithstanding the foregoing: (i) the provisions of **Section 4.3** will remain in effect during the Notice Period; and (ii) Employer reserves the right to exercise the "Termination for Cause" provisions in **Section 4.4** during the Notice Period and cease compensation during the Notice Period.

4.3    **Automatic Termination for Cause by Employer.** This Agreement shall automatically terminate upon the occurrence of any one of the following events:

4.3.1    Discontinuance of business by Employer;

4.3.2    The death of Employee;

4.3.3    The exclusion of Employee from participation in any federally or state funded healthcare program, including Medicare and Medicaid, or Employee's breach of **Section 5.3** of this Addendum;

4.3.4    The existence of any physical, mental or emotional disability that renders Employee unable to fulfill substantially all of Employee's obligations under the Agreement or this Addendum, even with reasonable accommodation by Employer, as reasonably determined by the Board of Directors of the Company (the "Board") or its designee, for an aggregate of ninety (90) days in any three hundred and sixty-five (365) consecutive day period or, if Employee has qualified for, and is receiving benefits under Employer's short-term disability plan, if any, such longer period as is required prior to eligibility for benefits as provided for in Employer's long-term disability policy applicable to similarly-situated employees, as in effect from time to time; or

4.3.5    The commission by Employee of any act of dishonesty, misrepresentation, fraud or moral turpitude, as reasonably determined by the Board or its designee.

4.4    **Termination for Cause by Employer with Notice.**  Employer may terminate this Agreement for "cause" at any time by giving written notice of termination (a "Termination Notice") to Employee, specifying the reason for termination. The termination of Employee's employment shall be effective thirty (30) days after delivery of the Termination Notice to Employee, if Employee fails to cure the default stated in the Termination Notice prior to the expiration of the thirty (30) day cure period. For purposes of this **Section 4.4**, "cause" shall include, without limitation, any of the following events (the occurrence of which shall be determined by Employer in its sole discretion):

4.4.1   The breach of any of Employee's warranties or the falsity of the representations made by Employee in **Section 5** of this Addendum;

4.4.2   Employee engages in disruptive or otherwise unacceptable behavior or conduct substantially incompatible with the goals, objectives, or business interests of Employer, or that Employer, in its sole discretion, reasonably believes could jeopardize or adversely affect the customers, staff, property, image, or reputation of Employer;

4.4.3   The commencement of an investigation or the indictment of Employee for any act constituting a felony or for any crime involving the delivery of, or billing or payment for, healthcare items or services;

4.4.4   A material breach by Employee of any of the terms of the Agreement or this Addendum not otherwise set forth in **Section 4.3** or this **Section 4.4**, or a material violation by Employee of any written Company policy or standard of conduct; or

4.4.5   Employee's willful and continued failure to perform the Services after delivery by the Company to Employee of a written demand for performance that describes the basis for the Company's belief that Employee has not substantially performed the Services.

4.5    **Regulatory Termination.** If, prior to the expiration of the term of the Agreement, any federal, state or local regulatory body, including, but not limited to, the Centers for Medicare and Medicaid Services, the Department of Health and Human Services ("HHS") or the Internal Revenue Service, determines that this Agreement is illegal, or otherwise materially affects either Party's ability to perform its obligations under this Agreement, then the affected Party shall give the other Party such notice as is reasonable under the circumstances and shall make available a reasonable period within which to cure. If no cure is implemented by the parties, then Employer, in its discretion, may terminate this Agreement with such notice as is, in its sole discretion, reasonable under the circumstances.

4.6    **Termination for Cause or Good Reason by Employee.** Employee may terminate this Agreement "For Cause" or for Good Reason (as hereinafter defined) thirty (30) days after delivery of a written notice of the acts or omissions constituting the grounds for the "For Cause" termination or the "Good Reason" to Employer by Employee.  For purposes of this **Section 4.6**, "For Cause" shall mean the failure of Employer to comply with any material term of this Agreement that is not cured within thirty (30) days after delivery of a written notice of termination to Employer by Employee.  "Good Reason" means the occurrence of one or more of the following, without Employee's consent: (i) a material reduction in Employee's Base Salary, excluding a reduction in Base Salary that is applicable to all Company management; (ii) a material reduction of Employee's authority, duties or responsibilities, unless Employee is provided with a comparable position; provided, however, that a reduction in authority, duties, or responsibilities solely by virtue of the Company being acquired and made part of a larger entity whether as a subsidiary, business unit or otherwise will not constitute Good Reason.

4.7    **Termination by Mutual Agreement.**  This Agreement may be terminated by the mutual agreement of both Parties, in writing, at any time.

4.8    **Services Upon Termination.**  In the event of termination of this Agreement without cause by Employee, at Employer's sole discretion, Employee shall continue to perform

the Services as directed by Employer during the Notice Period. In the event of termination of this Agreement for any other reason, Employer shall have the option to demand that Employee immediately cease providing the Services, *provided, however*, that the Company shall be required to compensate Employee through the date of termination of Employee's employment, as applicable.

4.9    **Compensation Upon Termination.** Upon termination of Employee's employment hereunder, Employee shall be entitled to receive compensation earned and accrued, but unpaid, through the effective date of termination, and shall not be entitled to additional compensation, except as expressly provided for in this Addendum.

**5.    Employee Representations and Warranties.** Employee represents and warrants to Employer that:

5.1    **Validity and Enforceability**. Employee has the legal right to enter into the Agreement and this Addendum and to perform the Services in accordance with the terms of the Agreement and this Addendum.

5.2    **No Conflict**. Employee is not subject to or bound by any contractual obligations (such as any non-compete, non-disclosure or other restrictive covenant), governmental orders or other restrictions that would impede with or interfere in the performance of the Services in accordance with the terms of the Agreement and this Addendum.

5.3    **No Exclusion**. Employee represents and warrants to Employer that he or she has not:

5.3.1  Been convicted of a criminal offense in connection with the delivery of a healthcare item or service or with respect to any act or omission in a state or federal healthcare program relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct, or otherwise sanctioned by the Office of Inspector General of HHS or other enforcement agency;

5.3.2  Been suspended or excluded from participation in, or otherwise sanctioned, under any federal healthcare program or the healthcare program of any state;

5.3.3  Been convicted of a criminal offense in connection with the making or causing to be made of a false statement or representation or a false claim for the purpose of securing a benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized under a state or federal healthcare program;

5.3.4  Been convicted of a criminal offense in connection with the offer, inducement, solicitation, payment or receipt of any unlawful remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a healthcare entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a state or federal healthcare program, or in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a state or federal healthcare program;

5.3.5  Had a direct or indirect ownership or control interest of five percent (5%) or more in, and is not, and in the past has not been, an officer, director, or managing employee or partner of, any business enterprise that has been convicted of any criminal offense described in this Section 5.3; or

5.3.6  Had a direct or indirect ownership or control interest of five percent (5%) or more in, and is not, and in the past has not been, an officer, director, or managing employee or partner of, any business enterprise that has been suspended or excluded from participation in, or otherwise sanctioned, under any federal healthcare program or the healthcare program of any state.

Employee hereby agrees to immediately notify Employer of any threatened, proposed or actual exclusion from any federally or state funded healthcare program, including Medicare and Medicaid.  In the event that Employee is excluded from participation in any federally or state funded healthcare program during the term of the Agreement, or if at any time after the Effective Date of the Agreement it is determined that Employee is in breach of this **Section 5.3**, the Agreement shall, as of the effective date of such exclusion or breach, automatically terminate. Employee shall indemnify Employer for any and all damages incurred by the Company that result from Employee's exclusion from any federally or state funded healthcare program, including Medicare and Medicaid.

5.4     **Compliance with Law**.  Employee shall perform his or her obligations under the Agreement and this Addendum in compliance with all applicable federal and state laws and regulations, as well as all compliance guidance published by federal or state agencies, including, without limitation, the Health Insurance Portability and Accountability Act ("HIPAA"), the Medicare and Medicaid anti-kickback law, the Stark self-referral prohibition, Section 1128G of the Social Security Act enacted pursuant to Section 6002 of the Affordable Care Act (the "Sunshine Act") and the rules issued thereunder by HHS and compliance guidance published by the Office of the Inspector General or HHS related to any of the foregoing. Employee acknowledges that Employee understands these requirements, shall remain educated and informed regarding the applicable federal and state laws and regulations, and shall participate in all compliance programs adopted by the Company.  In the event Employee knows or suspects that any activities of Employee, the Company, any personnel or contractor of the Company, or any client of the Company implicates any such requirements or guidance, Employee shall immediately inform the Company in writing.

5.5     **No Payment of Remuneration or Solicitation of Patients.**  To the extent that Employee is employed as a sales and marketing representative to provide marketing, business development and related services and duties, in addition to complying with Employer's policies, procedures, and protocols relating to marketing, business development, and related services, Employee agrees not to:

5.5.1  Directly solicit patients, by telephone, computer, in-person, or otherwise;

5.5.2  Offer, induce, solicit, pay or receive any unlawful remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for the referral of an individual to a healthcare entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a state or federal healthcare program, or in return for purchasing, leasing, ordering, or arranging for or

recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a state or federal healthcare program.

**6.**  **Compensation and Benefits.** During the Term of the Agreement, as set forth in this Addendum, Employer shall pay to Employee, and Employee agrees to accept from Employer, as payment for the Services performed by Employee under the terms of the Agreement and this Addendum, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing ("Compensation Schedule").

**7.**  **Change in Control Benefits.**

7.1   **Stimwave Technologies Incorporated.**  In the event of a Change in Control (as hereinafter defined) of the Company that occurs while Employee is employed by the Company, 100% of any Equity Awards (as hereinafter defined) held by Employee as of the Closing (as hereinafter defined) shall vest and become fully exercisable as of the Closing. With respect to Equity Awards granted on or after the Effective Date, but granted prior to the Closing, the same vesting acceleration provisions provided in the prior sentence will apply to such Equity Awards except to the extent provided in the applicable equity award agreement by explicit reference to this Addendum to the Agreement. For purposes of this **Section 7.1**, the following definitions shall apply:

7.1.1   **Change in Control**.  "Change in Control" means: (i) any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becoming the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) having the right to vote for the election of members of the Board (other than in connection with a bona fide equity financing for capital raising purposes); (ii) any reorganization, merger or consolidation of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity), other than a transaction or series of related transactions in which the holders of the voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) or such other surviving or resulting entity (other than in connection with a bona fide equity financing for capital raising purposes); or (iii) a sale or other disposition of all or substantially all of the assets of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity).

7.1.2   **Closing.**  "Closing" means the closing of the first transaction constituting a Change in Control that occurs on or following the Effective Date.

7.1.3   **Equity Award.** "Equity Award" means any equity interests issued or granted by the Company to Employee as compensation and any equity interest in an Affiliated Entity of the Company, as applicable.

7.2   **Affiliated Entities.**  In the event of a Change in Control of an Affiliated Entity of the Company, to or for which Employee provides services, that occurs while Employee is

employed by the Company, 100% of any Equity Awards in such Affiliated Entity held by Employee as of the Closing shall vest and become fully exercisable as of the Closing. With respect to Equity Awards in such Affiliated Entity granted on or after the Effective Date, but granted prior to the Closing, the same vesting acceleration provisions provided in the prior sentence will apply to such Equity Awards in such Affiliated Entity except to the extent provided in the applicable equity award agreement by explicit reference to this Addendum to the Agreement.

**8.    Conditions to Receipt of Severance.**

8.1    **Separation Agreement and Release of Claims.** The payment of any severance set forth in **Section 5.4 of the Compensation Schedule** is contingent upon Employee signing and not revoking the Company's standard separation and release of claims agreement upon Employee's cessation of employment and such agreement becoming effective no later than sixty (60) days following Employee's employment cessation date (such deadline, the "Release Deadline"). In no event will severance payments be paid or provided until the release actually becomes effective. Any severance payments or benefits under this Addendum to the Agreement will be paid on, or, in the case of installments, will not commence until, the sixtieth (60th) day following Employee's separation from service, or if later, such time as required by **Section 5.4 of the Compensation Schedule**. Except as required by **Section 10**, any installment payments that would have been made to Employee during the sixty (60) day period immediately following Employee's separation from service but for the preceding sentence will be paid to Employee on the sixtieth (60th) day following Employee's separation from service and the remaining payments will be made as provided in the Agreement or this Addendum to the Agreement.

8.2    **Section 409A.**

8.2.1    Notwithstanding anything to the contrary in this Addendum, no severance pay or benefits payable upon separation that are payable to Employee, if any, pursuant to this Addendum, when considered together with any other severance payments or separation benefits that are considered deferred compensation (together, the "Deferred Payments") under Section 409A of the Internal Revenue Code, as amended (the "Code") and the final regulations and official guidance thereunder ("Section 409A") will be payable until such time as Employee has a "separation from service" within the meaning of Section 409A.

8.2.2    Notwithstanding anything to the contrary in this Addendum, if Employee is a "specified employee" within the meaning of Section 409A at the time of Employee's termination (other than due to death), then the Deferred Payments, if any, that are payable within the first six (6) months following Employee's separation from service will become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the date of Employee's separation from service. All subsequent Deferred Payments, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit. Notwithstanding anything herein to the contrary, if Employee dies following Employee's separation from service, but prior to the six (6) month anniversary of the separation from service, then any payments delayed in accordance with this **Section 8.2.2** will be payable in a lump sum as soon as administratively practicable after the date of Employee's death, and all other Deferred Payments

will be payable in accordance with the payment schedule applicable to each payment or benefit. Each payment, installment and benefit payable under this Addendum is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

8.2.3    Any severance payment that satisfies the requirements of the "short-term deferral" rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations shall not constitute Deferred Payments for purposes hereof.  Any amount paid under the Agreement that qualifies as a payment made as a result of an involuntary separation from service pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations, which does not exceed the Section 409A Limit (as defined below), will not constitute Deferred Payments for purposes hereof.

8.2.4    For purposes of this Addendum "Section 409A Limit" means the lesser of two (2) times: (x) Employee's annualized compensation based upon the annual rate of pay paid to Employee during the tax year preceding the date of Employee's termination of employment, as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any Internal Revenue Service guidance issued with respect thereto; or (y) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Code for the year in which Employee's employment is terminated.

8.2.5    The foregoing provisions are intended to comply with or be exempt from the requirements of Section 409A so that none of the severance payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply.  Employee and the Company agree to work together in good faith to consider amendments to this Addendum and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition under Section 409A prior to actual payment of severance benefits to Employee.

**9.     No Duty to Mitigate.**  In the event that Employee becomes employed elsewhere during the period Employee is receiving severance payments from Company pursuant to **Section 5.4 of the Compensation Schedule**, Employee shall be entitled to continue to receive such severance payments and shall not be required to mitigate the amount of any payments contemplated by this Addendum, nor will any earnings that Employee may receive from any other source reduce any such payments.

**10.    Limitation on Payments.**

10.1    In the event that the severance benefits provided for in this Addendum or otherwise payable to Employee: (i) constitute "parachute payments" within the meaning of Section 280G of the Code; and (ii) but for this **Section 10** would be subject to the excise tax imposed by Section 4999 of the Code, then Employee's severance benefits under **Section 5.4 of the Compensation Schedule** will be either:

10.1.1  Delivered in full;

10.1.2 Delivered to such lesser extent as would result in no portion of such severance benefits being subject to excise tax under Section 4999 of the Code,

whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the excise tax imposed by Section 4999, results in the receipt by Employee on an after-tax basis, of the greatest amount of severance benefits, notwithstanding that all or some portion of such severance benefits may be taxable under Section 4999 of the Code. If a reduction in severance and other benefits constituting "parachute payments" is necessary so that benefits are delivered to a lesser extent, reduction will occur in the following order: (i) reduction of cash payments, which shall occur in reverse chronological order such that the cash payment owed on the latest date following the occurrence of the event triggering such excise tax will be the first cash payment to be reduced; (ii) reduction of acceleration of vesting of Equity Awards, which shall occur in the reverse order of the date of grant for such Equity Awards (i.e., the vesting of the most recently granted Equity Awards will be reduced first); and (iii) reduction of other benefits paid or provided to Employee, which shall occur in reverse chronological order such that the benefit owed on the latest date following the occurrence of the event triggering such excise tax will be the first benefit to be reduced. If more than one Equity Award was made to Employee on the same date of grant, all such Equity Awards shall have their acceleration of vesting reduced pro rata. In no event shall Employee have any discretion with respect to the ordering of payment reductions.

10.2    Unless the Company and Employee otherwise agree in writing, any determination required under this **Section 10** will be made in writing by a nationally recognized firm of independent public accountants selected by the Company (the "Accountants"), whose determination will be conclusive and binding upon Employee and the Company for all purposes. For purposes of making the calculations required by this **Section 10**, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Sections 280G and 4999 of the Code. The Company and Employee will furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this Section. The Company will bear all reasonable expenses incurred in connection with any calculations contemplated by this **Section 10**, including reasonable accounting fees charged by the Accountants.

IN WITNESS WHEREOF, this Key and Equity Employees' Addendum to Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**                                                **WITNESS:**

Signature: _____           Signature: _____

Print Name: Richard LeBaron                       Print Name: Elizabeth Greene

**EMPLOYER:** _____ Technologies Incorporated

Signature: _____
By: Laura Tyler Perryman
Title: CEO

## COMPENSATION SCHEDULE

**1.    Base Salary.**  For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $135,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week, and any reduction of hours shall adjust the salary pro rata. When applicable, employee shall advise of unpaid days off for the upcoming week by the prior Friday at 5 pm EST. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2.    Stock Options.**  Employee is eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time, including the stock option plan of Stimwave ("Stimwave SOP"). Employee was granted options to purchase up to 13,175 shares of the common stock of Stimwave (the "Options"), per the terms set forth in a Stock Option Purchase Agreement (the "SOPA"), all of which remain in full force and effect and is not amended by the Agreement. The vesting schedule for the Options is set forth in the SOPA and is subject to all of the terms and conditions of the Stimwave SOP.

**3.    Employee Benefits.**  In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **2** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 5.4** below, shall terminate upon the cessation of Employee's employment:

3.1    **Participation in Plans.**  During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof.  Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

3.2    **Vacation.**  Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

3.3    **Expenses.**  The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

4.      **Bonuses**

4.1      **Performance Bonus**.  Employee shall be entitled to receive a bonus per calendar quarter, for each calendar quarter during which Employee meets or exceeds the performance objectives established by Company and Employee relating to Services provided to the Company or Affiliated Entities.

4.2      **Discretionary Bonus**.  Employee shall also be eligible to receive discretionary bonuses from time to time, which may be based on performance and other factors, as determined by the Board or the Compensation Committee, in its or their sole discretion.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP**

Identifying Number or
Title                                    Date                    Brief Description

Date: _____Apr 29, 2019_____        _____Richard LeBaron_____
                                         Employee's Signature

                                         Richard LeBaron
                                         _____
                                         Print Name of Employee

## **EXHIBIT B**

### **STIMWAVE LLC TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:
_____
_____
_____

Date: _____            _____
                                                                                  Employee's Signature

                                                                                  _____
                                                                                  Print Name of Employee

## EXHIBIT C

## STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

# EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT

This Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the _1_ day of _Jan_, _2014_ the "Effective Date") by and between Stimwave LLC ("Employer" or "the Company") and _Ronald Ferryman_ ("Employee") (each party individually a "Party" and collectively the "Parties").

## RECITALS:

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement (referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1. **Definitions.**

    1.1 **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by Stimwave LLC and/or its subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or the policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise. Affiliated Entities specifically include Stimwave Technologies Incorporated, Micron

**2.    Terms and Termination.**

2.1    **Employment "At-Will" Relationship.**  Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's employment relationship with the Company at any time, with or without cause and with or without notice.

2.2    **Full-Time Best Efforts.**  Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company.

2.3    **Compensation and Benefits.** For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

**3.    Duties and Obligations of Employee.**

3.1    **Duty of Loyalty.**  Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2    **Conflict of Interest.**  Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions.  Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

4.2.2  **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company  and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

4.2.3  **Continuation for Violation.** In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's last solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

5.  **Confidential Information.**

5.1  **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

5.5    **Third-Party Information.**  Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

5.6    **Non-Confidential Information.** The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual

Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention. Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3    **Moral Rights.** Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4    **Maintenance of Records.** Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5    **Patent, Trademark and Copyright Registrations.** Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement  and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and

under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.      Return of Company Property.**

9.1      **Return of Company Property.** All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2      **Termination Certificate.** Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3      **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4      **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of

Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

**11.    Setoff.** Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck, including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

**12.    No Conflicting Agreements or Improper Use of Third-Party Information.** During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

**13.    Duty to Disclose Subsequent Employment.** During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

**14.    Arbitration.**

      14.1    **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING**

14.4    **Notice in Connection with Arbitration.** All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5    **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6    **Satisfaction of Award.** If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7    **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8    **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9    **Administrative Relief.** EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**                                  **WITNESS:**

Signature: _Ronald W. Perryman_     Signature: _____

Print Name: _Ronald W. Perryman_     Print Name: _Gina Pacheco_

**EMPLOYER:**

**Stimwave LLC**

By: _____

Title: _____
            Representative with authority to bind
            Stimwave LLC

consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6 **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8 **Further Assurances.** Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9 **Title, Headings and Gender.** The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement. Throughout this Agreement, where such meanings would be appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10 **Attorney's Fees.** Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11 **Notices.** All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:      Stimwave LLC
                  Attention: Laura Tyler Perryman, Manager
                  1310 Park Central Blvd South
                  Pompano Beach, Florida 33064

To Employee:      Ron Perryman
                  480 NW 33rd Terrace #302
                  Pompano Bch. FL, 33069

## EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP

Identifying Number or
Title                                              Date                        Brief Description


$\times$  No inventions or improvements

_____ Additional Sheets Attached

Date: 1/1/2014

_____

_Ru Perryman_
Employee's Signature

_Ronald W Perryman_
Print Name of Employee

## EXHIBIT C

## STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

## EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT

This Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 30th day of September, 2019 (the "Effective Date") by and between Stimwave LLC ("Employer" or "the Company") and Sherri Costa ("Employee") (each party individually a "Party" and collectively the "Parties").

## RECITALS:

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement (referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.      **Definitions.**

        1.1     **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by Stimwave LLC and/or its subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

1.2 **Competitive Business.** "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company.

1.3 **Customer.** "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

1.4 **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company.

1.5 **Electronic Media Equipment.** "Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

1.6 **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

1.7 **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company.

1.8 **Person.** "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

1.9 **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

2. **Terms and Termination.**

2.1 **Employment "At-Will" Relationship.** Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's

employment relationship with the Company at any time, with or without cause and with or without notice.

2.2    **Full-Time Best Efforts.**  Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company.

2.3    **Compensation and Benefits.**  For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

**3.    Duties and Obligations of Employee.**

3.1    **Duty of Loyalty.**  Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2    **Conflict of Interest.**  Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions.  Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

3.3    **Compliance with Laws.**  Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States

Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA").  Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.      Restrictive Covenants.**

      4.1      **Covenant Not to Compete.**

           4.1.1      **Competitive Business.** Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

           4.1.2      **Same or Similar Services.** Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods provided by, the Company (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

           4.1.3      **Continuation for Violation.** In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's last competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

      4.2      **Covenant Not to Solicit.**

           4.2.1      **Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work

for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

         **4.2.2**   **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company  and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

         **4.2.3**   **Continuation for Violation.** In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's last solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

## 5.   Confidential Information.

         **5.1**   **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

         **5.2**   **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is

learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

5.3     **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

5.4     **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical

expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

5.5     **Third-Party Information.**  Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

5.6     **Non-Confidential Information.** The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7     **Former Employer Confidential Information.** Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other

person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

**6.    Inventions.**

6.1    **Inventions Retained and Licensed.** Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.** Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention.  Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while

employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3 **Moral Rights.** Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4 **Maintenance of Records.** Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5 **Patent, Trademark and Copyright Registrations.** Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

7. **Acknowledgements.** Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1     The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2     Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3     The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4     The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5     This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.     Survival and Remedies.** Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.     Return of Company Property.**

9.1     **Return of Company Property.** All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2     **Termination Certificate.** Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3     **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4     **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information).  Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5     **No Expectation of Privacy in Company Property.** Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for

Company purposes. Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9** and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10.    **Audit.** Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

**11.    Setoff.** Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck, including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

12.     **No Conflicting Agreements or Improper Use of Third-Party Information.**  During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

13.     **Duty to Disclose Subsequent Employment.**  During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

14.     **Arbitration.**

14.1     **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF**

**EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2     **Procedure.**  Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator. The arbitrator shall be selected in the manner provided in the AHLA Rules. The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law.  The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3     **Method of Selection.** Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4     **Notice in Connection with Arbitration.**  All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5     **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6     **Satisfaction of Award.**  If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the

maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7    **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8    **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9    **Administrative Relief.** EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

## 15.    General Provisions.

15.1    **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2    **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives)

and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3    **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company.  The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4    **Waiver.** The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5    **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6    **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8    **Further Assurances.** Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9    **Title, Headings and Gender.** The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement. Throughout this Agreement, where such meanings would be

appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10   **Attorney's Fees.** Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11   **Notices.** All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:       Stimwave LLC
                   Attention: Laura Tyler Perryman, CEO
                   1310 Park Central Blvd South
                   Pompano Beach, Florida 33064

To Employee:       Sherri Costa
                   4008 Eastridge Circle
                   Pompano Beach, FL 33064

15.12   **No Third-party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee. It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13   **Invalid Provisions.** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement will be construed and enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect.   Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

15.14   **Representations and Warranties.**  Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under,

constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15   **Representation of Attorney.**  Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16   **Voluntary Agreement.**   Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _____

Print Name: Sherri Costa

**WITNESS:**

Signature: _____

Print Name:  Elizabeth Greene

**EMPLOYER:**

**Stimwave LLC**

Signature: _____

By: Laura Tyler Perryman

Title: CEO

     Representative with authority to bind
     Stimwave LLC

## <u>COMPENSATION SCHEDULE</u>

**1.      Base Salary.** For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $80,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2.      Bonuses.** Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**3.      Equity.** Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. The Board or the Committee will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**4.      Employee Benefits.** In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **3** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 4.4** below, shall terminate upon the cessation of Employee's employment:

      4.1      **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof. Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

      4.2      **Vacation.** Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

4.3    **Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP**

Identifying Number or
Title                                        Date                    Brief Description

[SC] No inventions or improvements

_____Additional Sheets Attached

Sep 30, 2019

Date: _____

_____
Employee's Signature

Sherri Costa
_____
Print Name of Employee

**EXHIBIT B**

**STIMWAVE LLC TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:

_____

_____

_____

Date: _____    _____
                                             Employee's Signature

                                             _____
                                             Print Name of Employee

# EXHIBIT C

## STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

## EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT

This Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 14th of January 2019 (the "Effective Date") by and between Stimwave LLC ("Employer" or "the Company") and Tyler Vila ("Employee") (each party individually a "Party" and collectively the "Parties").

## RECITALS:

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement (referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.      **Definitions.**

        1.1      **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by Stimwave LLC and/or its subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

1.2    **Competitive Business.** "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company.

1.3    **Customer.** "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

1.4    **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company.

1.5    **Electronic Media Equipment.** "Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

1.6    **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

1.7    **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company.

1.8    **Person.** "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

1.9    **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

2.    **Terms and Termination.**

2.1    **Employment "At-Will" Relationship.** Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's

employment relationship with the Company at any time, with or without cause and with or without notice.

2.2    **Full-Time Best Efforts.**  Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company.

2.3    **Compensation and Benefits.** For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

**3.    Duties and Obligations of Employee.**

3.1    **Duty of Loyalty.** Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2    **Conflict of Interest.**  Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions.  Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

3.3    **Compliance with Laws.**  Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States

Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA"). Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.      Restrictive Covenants.**

      4.1      **Covenant Not to Compete.**

           4.1.1      **Competitive Business.** Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

           4.1.2      **Same or Similar Services.** Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods provided by, the Company (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

           4.1.3      **Continuation for Violation.** In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's last competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

      4.2      **Covenant Not to Solicit.**

           4.2.1      **Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work

for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

      **4.2.2**  **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company  and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

      **4.2.3**  **Continuation for Violation.** In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's last solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

## 5.   Confidential Information.

      **5.1**  **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

      **5.2**  **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is

learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

     5.3    **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

     5.4    **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical

DocuSign Envelope ID: B356BDCF-8828-463B-ABFE-E50EB3F9BCF

expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

5.5    **Third-Party Information.** Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

5.6    **Non-Confidential Information.** The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7    **Former Employer Confidential Information.** Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other

person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

## 6.    Inventions.

6.1    **Inventions Retained and Licensed.** Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.** Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention.  Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while

employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3 **Moral Rights.** Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4 **Maintenance of Records.** Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5 **Patent, Trademark and Copyright Registrations.** Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement  and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

7. **Acknowledgements.** Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1    The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2    Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3    The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4    The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5    This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.    Survival and Remedies.** Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.    Return of Company Property.**

9.1    **Return of Company Property.** All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2    **Termination Certificate.**  Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3    **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4    **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information).  Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5    **No Expectation of Privacy in Company Property.** Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for

DocuSign Envelope ID: B356BDCF-8828-463B-AFFF-F52DEB3F9BCF

Company purposes. Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9** and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10.    **Audit.**  Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

**11.    Setoff.**  Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck, including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

DocuSign Envelope ID: B356BDCF-0828-463B-4EFE-E520EB3F9BCF

**12.     No Conflicting Agreements or Improper Use of Third-Party Information.**  During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

**13.     Duty to Disclose Subsequent Employment.**  During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

**14.     Arbitration.**

**14.1     Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF**

**EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2 **Procedure.** Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator. The arbitrator shall be selected in the manner provided in the AHLA Rules. The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law. The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3 **Method of Selection.** Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4 **Notice in Connection with Arbitration.** All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5 **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6 **Satisfaction of Award.** If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the

maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7 **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8 **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9 **Administrative Relief.** EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

## 15. General Provisions.

15.1 **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2 **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives)

and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3    **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company.  The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4    **Waiver.**  The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5    **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6    **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8    **Further Assurances.** Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9    **Title, Headings and Gender.** The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement. Throughout this Agreement, where such meanings would be

appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

     15.10 **Attorney's Fees.** Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

     15.11 **Notices.** All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:       Stimwave LLC
                    Attention: Laura Tyler Perryman, CEO
                    1310 Park Central Blvd South
                    Pompano Beach, Florida 33064

To Employee:      Tyler Vila
                    6911 SW 1st CT
                    Margate, FL 33068

     15.12 **No Third-party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee. It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

     15.13 **Invalid Provisions.** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement shall be construed and enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect. Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

     15.14 **Representations and Warranties.** Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under,

DocuSign Envelope ID: B356BDCF-8828-463D-AEEE-E520EB3F9BCF

constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15 **Representation of Attorney.** Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16 **Voluntary Agreement.** Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _____

Print Name: Tyler Vila

**WITNESS:**

Signature: _____

Print Name:  Elizabeth Greene

**EMPLOYER:**

**Stimwave LLC**

Signature: _____

By: Laura Tyler Perryman
Title: CEO
     Representative with authority to bind
     Stimwave LLC

## COMPENSATION SCHEDULE

**1.    Base Salary.**  For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $40,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2.    Bonuses.**  Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**3.    Equity.**  Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. The Board or the Committee will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**4.    Employee Benefits.**  In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **3** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 4.4** below, shall terminate upon the cessation of Employee's employment:

    4.1    **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof.  Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

    4.2    **Vacation.** Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

    4.3    **Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

# EXHIBIT A

## LIST OF PRIOR INVENTIONS
## AND ORIGINAL WORKS OF AUTHORSHIP

| Identifying Number or Title | Date | Brief Description |
|---|---|---|
| | | |

_____ No inventions or improvements

_____ Additional Sheets Attached

Date: _____
    Jul 16, 2019

_____
Employee's Signature

    Tyler Vila

_____
Print Name of Employee

**EXHIBIT B**

**STIMWAVE LLC TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:

_____

_____

_____

Date: _____        _____

                                                                     Employee's Signature

                                                                     _____

                                                                     Print Name of Employee

## EXHIBIT C

## STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

**EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT**

This Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 7th day of January, 2019 (the "Effective Date") by and between Stimwave LLC ("Employer" or "the Company") and Yenise Rosado ("Employee") (each party individually a "Party" and collectively the "Parties").

**RECITALS:**

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement (referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1. **Definitions.**

    1.1    **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by Stimwave LLC and/or its subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

DocuSign Envelope ID: E2AC4A7-C300-4D38-8884-FA4FB6A9C3BD

    1.2    **Competitive Business.** "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company.

    1.3    **Customer.** "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

    1.4    **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company.

    1.5    **Electronic Media Equipment.** "Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

    1.6    **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

    1.7    **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company.

    1.8    **Person.** "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

    1.9    **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

**2.**    **Terms and Termination.**

    2.1    **Employment "At-Will" Relationship.** Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's

employment relationship with the Company at any time, with or without cause and with or without notice.

     2.2    **Full-Time Best Efforts.** Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company.

     2.3    **Compensation and Benefits.** For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

**3.**    **Duties and Obligations of Employee.**

     3.1    **Duty of Loyalty.** Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

     3.2    **Conflict of Interest.** Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions. Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

     3.3    **Compliance with Laws.** Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States

Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA").  Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.**    **Restrictive Covenants.**

    4.1    **Covenant Not to Compete.**

        4.1.1    **Competitive Business.** Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

        4.1.2    **Same or Similar Services.** Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods provided by, the Company (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

        4.1.3    **Continuation for Violation.** In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's last competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

    4.2    **Covenant Not to Solicit.**

        4.2.1    **Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work

for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

4.2.2 **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company  and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

4.2.3 **Continuation for Violation.** In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's last solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

## 5. Confidential Information.

5.1 **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

5.2 **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is

learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

     5.3    **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

     5.4    **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical

expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

5.5    **Third-Party Information.**  Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

5.6    **Non-Confidential Information.** The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7    **Former Employer Confidential Information.** Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other

person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

## 6.    Inventions.

6.1    **Inventions Retained and Licensed.** Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.** Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention. Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while

employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3 **Moral Rights.** Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4 **Maintenance of Records.** Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5 **Patent, Trademark and Copyright Registrations.** Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

7. **Acknowledgements.** Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1     The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2     Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3     The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4     The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5     This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.     Survival and Remedies.** Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.     Return of Company Property.**

9.1    **Return of Company Property.** All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2    **Termination Certificate.**  Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3    **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4    **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information).  Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5    **No Expectation of Privacy in Company Property.** Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for

Company purposes. Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9** and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10.    **Audit.** Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

11.    **Setoff.** Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck, including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

**12.    No Conflicting Agreements or Improper Use of Third-Party Information.**  During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

**13.    Duty to Disclose Subsequent Employment.**  During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

**14.    Arbitration.**

      14.1    **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF**

**EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2    **Procedure.**  Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator. The arbitrator shall be selected in the manner provided in the AHLA Rules. The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law.  The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3    **Method of Selection.** Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4    **Notice in Connection with Arbitration.**  All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5    **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6    **Satisfaction of Award.**  If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the

maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7    **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8    **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9    **Administrative Relief.** EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

## 15.    General Provisions.

15.1    **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2    **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives)

and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3    **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company.  The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4    **Waiver.**  The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5    **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6    **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8    **Further Assurances.** Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9    **Title, Headings and Gender.** The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement. Throughout this Agreement, where such meanings would be

appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10   **Attorney's Fees.** Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11   **Notices.** All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:          Stimwave LLC
                      Attention: Laura Tyler Perryman, CEO
                      1310 Park Central Blvd South
                      Pompano Beach, Florida 33064

To Employee:          Yenise Rosado
                      8501 SW 16th Ct
                      Davie, FL 33324

15.12   **No Third-party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee. It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13   **Invalid Provisions.**  If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement will be construed and enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect.   Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

15.14   **Representations and Warranties.**  Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under,

DocuSign Envelope ID: E2AC4A7-C30D-4D39-884-FA4FB6A9C3BB

constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15 **Representation of Attorney.** Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16 **Voluntary Agreement.** Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _____

Print Name: Yenise Rosado

**WITNESS:**

Signature: _____

Print Name:  Elizabeth Greene

**EMPLOYER:**

**Stimwave LLC**

Signature: _____

By: Laura Tyler Perryman

Title: CEO

      Representative with authority to bind
      Stimwave LLC

## COMPENSATION SCHEDULE

**1.    Base Salary.**  For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $40,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2.    Bonuses.**  Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**3.    Equity.**  Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. The Board or the Committee will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**4.    Employee Benefits.**  In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **3** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 4.4** below, shall terminate upon the cessation of Employee's employment:

      4.1    **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof.  Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

      4.2    **Vacation.** Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

4.3    **Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS**
**AND ORIGINAL WORKS OF AUTHORSHIP**

Identifying Number or
<u>Title</u>                                    <u>Date</u>                        <u>Brief Description</u>

o inventions or improvements

_____Additional Sheets Attached

Date: Jun 4, 2019
_____

_____    _____
Employee's Signature

Yenise Rosado

_____
Print Name of Employee

## EXHIBIT B

### STIMWAVE LLC TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:
_____
_____
_____

Date: _____       _____

                                               Employee's Signature

                                               _____

                                               Print Name of Employee

## EXHIBIT C

### STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

**AMENDED AND RESTATED**
**EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL**
**INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT**

This Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 1st day of June, 2019 (the "Effective Date") by and between Stimwave Technologies Incorporated ("Employer" or "the Company") and Patrick Larson ("Employee") (each party individually a "Party" and collectively the "Parties").

**RECITALS:**

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement with any Affiliated Entity (as hereinafter defined) (such employment and consulting agreements collectively referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.      **Definitions.**

        1.1      **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by the Company and/or its parent or subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management

or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise. Affiliated Entities specifically including, but are not limited to: Stimwave LLC, StimQ Medical LLC ("StimQ"), StimRelieve LLC, StimGuard LLC, Micron Devices LLC, Stimwave Limited, Stimwave Medical Pty, Freedom Neuromodulation LLC and Freedom Neuro BV.

1.2 **Competitive Business.** "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company in the field of neuromodulation; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company in the field of neuromodulation.

1.3 **Customer.** "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

1.4 **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company in the field of neuromodulation.

1.5 **Electronic Media Equipment. "**Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

1.6 **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

1.7 **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company in the field of neuromodulation.

1.8 **Person.** "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

1.9    **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

2.    **Terms and Termination.**

2.1    **Employment "At-Will" Relationship.** Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's employment relationship with the Company at any time, with or without cause and with or without notice.

2.2    **Full-Time Best Efforts.** Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company, or as detailed in Exhibit A.

2.3    **Compensation and Benefits.** For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

3.    **Duties and Obligations of Employee.**

3.1    **Duty of Loyalty.** Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2    **Conflict of Interest.** Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions. Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's

Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

   3.3  **Compliance with Laws.** Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA"). Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.**  **Restrictive Covenants.**

   4.1  **Covenant Not to Compete.**

    4.1.1  **Competitive Business.** Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

    4.1.2  **Same or Similar Services.** Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods in the field of neuromodulation provided by, the Company in the field of neuromodulation (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

    4.1.3  **Continuation for Violation.** In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

   4.2  **Covenant Not to Solicit.**

4.2.1 **Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

4.2.2 **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

4.2.3 **Continuation for Violation.** In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

**5.     Confidential Information.**

5.1     **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

5.2 **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

5.3 **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

5.4 **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential

Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

       **5.5**    **Third-Party Information.**  Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

       **5.6**    **Non-Confidential Information.**  The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential

Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7    **Former Employer Confidential Information.**  Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

## 6.    Inventions.

6.1    **Inventions Retained and Licensed.**  Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.**  Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to

commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention. Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3    **Moral Rights.**  Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4    **Maintenance of Records.**  Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5    **Patent, Trademark and Copyright Registrations.**  Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company in the field of neuromodulation as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with

the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

**7.    Acknowledgements.**  Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1    The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2    Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3    The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4    The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5    This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.    Survival and Remedies.**  Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits

derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.     Return of Company Property.**

9.1     **Return of Company Property.**    All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2     **Termination Certificate.**    Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3     **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4     **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information).   Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5    **No Expectation of Privacy in Company Property.**  Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises, or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for Company purposes.  Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9**, and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10.    **Audit.**  Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

11.    **Setoff.**  Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck,

including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

12.    **No Conflicting Agreements or Improper Use of Third-Party Information.**  During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

13.    **Duty to Disclose Subsequent Employment.**  During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

14.    **Arbitration.**

14.1    **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII**

DocuSign Envelope ID: 816207AA-4E81-436A-9598-7BF0F94D5542

**OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2    **Procedure.**  Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator.  The arbitrator shall be selected in the manner provided in the AHLA Rules.  The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law.  The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3    **Method of Selection.**  Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4    **Notice in Connection with Arbitration.**  All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5    **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6    **Satisfaction of Award.** If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7    **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8    **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9    **Administrative Relief.** EMPLOYE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

**15.    General Provisions.**

15.1 **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2 **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives) and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3 **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company. The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4 **Waiver.** The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5 **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6 **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8    **Further Assurances.**  Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9    **Title, Headings and Gender.**  The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement.  Throughout this Agreement, where such meanings would be appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10    **Attorney's Fees.**  Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11    **Notices.**  All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:        Stimwave Technologies Incorporated
                    Attention: Laura Tyler Perryman, CEO
                    1310 Park Central Blvd South
                    Pompano Beach, Florida 33064

                    With a copy to:

                    Michael Brown
                    DLA Piper LLP
                    4365 Executive Drive, Suite 1100
                    San Diego CA 92121-2133


To Employee:        Patrick Larson 19849 Villa Medici Pl Boca Raton, FL 33434-5618

15.12    **No Third-party Beneficiaries.**  The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee.  It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13    **Invalid Provisions.**  If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement will be construed and

DocuSign Envelope ID: 816207AA-4E81-436A-95B8-7BF0F94D5543

enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect. Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

15.14 **Representations and Warranties.** Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15 **Representation of Attorney.** Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16 **Voluntary Agreement.** Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _____

Print Name: Patrick Larson

**WITNESS:**

Signature: _____

Print Name: Elizabeth Greene

**EMPLOYER:**

**Stimwave Technologies Incorporated**

Signature: _____

By: Laura Tyler Perryman

Title: CEO

      Representative with authority to bind

      Stimwave Technologies Incorporated

**KEY AND EQUITY EMPLOYEES'**
**ADDENDUM TO AMENDED AND RESTATED**
**EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL**
**INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT**

This Key and Equity Employees' Addendum to Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Addendum") is made and entered into on the 1st day of June, 2019 (the "Effective Date") by and between Stimwave Technologies Incorporated ("Employer" or "the Company") and Patrick Larson ("Employee") (each party individually a "Party" and collectively the "Parties").

**RECITALS:**

WHEREAS, Company and Employee entered into an Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") or will enter into such an Agreement simultaneously with the execution of this Addendum to the Agreement; and

WHEREAS, Company and Employee desire to amend the Agreement, as provided in this Addendum to the Agreement; and

WHEREAS, Company and Employee understand and agree that this Addendum shall be an integral part of the Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.    **Integration.**  All of the terms and conditions of the Agreement are incorporated herein and by this reference made a part hereof, and shall remain the same except to the extent modified by this Addendum.  In the event of a conflict between a provision of the Agreement and of this Addendum, the provision in this Addendum shall be controlling. All capitalized terms in this Addendum shall have the meaning ascribed to those words in the Agreement unless the context in which the word is used clearly indicates to the contrary.

2.    **Services**.  "Services" means the services to be provided and the duties to be performed by Employee, as described in a written job description setting forth the specific duties the Employee is required to perform, as well as such other duties as may be assigned to Employee from time to time by Employer.

3.    **Employment**.  The Company hereby employs Employee in accordance with the terms of the Agreement, as modified by this Addendum, and Employee hereby accepts such employment with the Company, for the Term set forth in **Section 4.1** hereof.

4.    **Term and Termination.  Section 2.1** of the Agreement shall be deleted and replaced by the following provisions:

4.1    **Term.**  This Agreement shall be in effect for an initial term of five (5) years, commencing on January 1st, 2019 ("Effective Date") and terminating on December 31st, 2023,

unless sooner terminated as provided for in this Agreement. Thereafter, this Agreement shall be automatically renewed for successive one (1) year terms until it is terminated as provided herein. Any reference in this Agreement to the "Term" of this Agreement means the initial and any annual renewal term.

4.2    **Termination without Cause.**  Either Party may terminate this Agreement at any time, without cause, upon ninety (90) days' prior written notice to the other Party.  Upon notice of termination by Employer pursuant to this **Section 4.2**, Employer also may direct Employee to immediately cease providing the Services, provided that Employer continues to compensate Employee during the ninety (90) days following such notice of termination (the "Notice Period"). Notwithstanding the foregoing: (i) the provisions of **Section 4.3** will remain in effect during the Notice Period; and (ii) Employer reserves the right to exercise the "Termination for Cause" provisions in **Section 4.4** during the Notice Period and cease compensation during the Notice Period.

4.3    **Automatic Termination for Cause by Employer.** This Agreement shall automatically terminate upon the occurrence of any one of the following events:

4.3.1    Discontinuance of business by Employer;

4.3.2    The death of Employee;

4.3.3    The exclusion of Employee from participation in any federally or state funded healthcare program, including Medicare and Medicaid, or Employee's breach of **Section 5.3** of this Addendum;

4.3.4    The existence of any physical, mental or emotional disability that renders Employee unable to fulfill substantially all of Employee's obligations under the Agreement or this Addendum, even with reasonable accommodation by Employer, as reasonably determined by the Board of Directors of the Company (the "Board") or its designee, for an aggregate of ninety (90) days in any three hundred and sixty-five (365) consecutive day period or, if Employee has qualified for, and is receiving benefits under Employer's short-term disability plan, if any, such longer period as is required prior to eligibility for benefits as provided for in Employer's long-term disability policy applicable to similarly-situated employees, as in effect from time to time; or

4.3.5    The commission by Employee of any act of dishonesty, misrepresentation, fraud or moral turpitude, as reasonably determined by the Board or its designee.

4.4    **Termination for Cause by Employer with Notice.**  Employer may terminate this Agreement for "cause" at any time by giving written notice of termination (a "Termination Notice") to Employee, specifying the reason for termination. The termination of Employee's employment shall be effective thirty (30) days after delivery of the Termination Notice to Employee, if Employee fails to cure the default stated in the Termination Notice prior to the expiration of the thirty (30) day cure period. For purposes of this **Section 4.4**, "cause" shall include, without limitation, any of the following events (the occurrence of which shall be determined by Employer in its sole discretion):

4.4.1 The breach of any of Employee's warranties or the falsity of the representations made by Employee in **Section 5** of this Addendum;

4.4.2 Employee engages in disruptive or otherwise unacceptable behavior or conduct substantially incompatible with the goals, objectives, or business interests of Employer, or that Employer, in its sole discretion, reasonably believes could jeopardize or adversely affect the customers, staff, property, image, or reputation of Employer;

4.4.3 The commencement of an investigation or the indictment of Employee for any act constituting a felony or for any crime involving the delivery of, or billing or payment for, healthcare items or services;

4.4.4 A material breach by Employee of any of the terms of the Agreement or this Addendum not otherwise set forth in **Section 4.3** or this **Section 4.4**, or a material violation by Employee of any written Company policy or standard of conduct; or

4.4.5 Employee's willful and continued failure to perform the Services after delivery by the Company to Employee of a written demand for performance that describes the basis for the Company's belief that Employee has not substantially performed the Services.

4.5 **Regulatory Termination.** If, prior to the expiration of the term of the Agreement, any federal, state or local regulatory body, including, but not limited to, the Centers for Medicare and Medicaid Services, the Department of Health and Human Services ("HHS") or the Internal Revenue Service, determines that this Agreement is illegal, or otherwise materially affects either Party's ability to perform its obligations under this Agreement, then the affected Party shall give the other Party such notice as is reasonable under the circumstances and shall make available a reasonable period within which to cure. If no cure is implemented by the parties, then Employer, in its discretion, may terminate this Agreement with such notice as is, in its sole discretion, reasonable under the circumstances.

4.6 **Termination for Cause or Good Reason by Employee.** Employee may terminate this Agreement "For Cause" or for Good Reason (as hereinafter defined) thirty (30) days after delivery of a written notice of the acts or omissions constituting the grounds for the "For Cause" termination or the "Good Reason" to Employer by Employee. For purposes of this **Section 4.6**, "For Cause" shall mean the failure of Employer to comply with any material term of this Agreement that is not cured within thirty (30) days after delivery of a written notice of termination to Employer by Employee. "Good Reason" means the occurrence of one or more of the following, without Employee's consent: (i) a material reduction in Employee's Base Salary, excluding a reduction in Base Salary that is applicable to all Company management; (ii) a material reduction of Employee's authority, duties or responsibilities, unless Employee is provided with a comparable position; provided, however, that a reduction in authority, duties, or responsibilities solely by virtue of the Company being acquired and made part of a larger entity whether as a subsidiary, business unit or otherwise will not constitute Good Reason.

4.7 **Termination by Mutual Agreement.** This Agreement may be terminated by the mutual agreement of both Parties, in writing, at any time.

4.8 **Services Upon Termination.** In the event of termination of this Agreement without cause by Employee, at Employer's sole discretion, Employee shall continue to perform

the Services as directed by Employer during the Notice Period.  In the event of termination of this Agreement for any other reason, Employer shall have the option to demand that Employee immediately cease providing the Services, *provided, however*, that the Company shall be required to compensate Employee through the date of termination of Employee's employment, as applicable.

4.9     **Compensation Upon Termination.** Upon termination of Employee's employment hereunder, Employee shall be entitled to receive compensation earned and accrued, but unpaid, through the effective date of termination, and shall not be entitled to additional compensation, except as expressly provided for in this Addendum.

**5.      Employee Representations and Warranties.** Employee represents and warrants to Employer that:

5.1     **Validity and Enforceability**. Employee has the legal right to enter into the Agreement and this Addendum and to perform the Services in accordance with the terms of the Agreement and this Addendum.

5.2     **No Conflict**. Employee is not subject to or bound by any contractual obligations (such as any non-compete, non-disclosure or other restrictive covenant), governmental orders or other restrictions that would impede with or interfere in the performance of the Services in accordance with the terms of the Agreement and this Addendum.

5.3     **No Exclusion**.  Employee represents and warrants to Employer that he or she has not:

5.3.1  Been convicted of a criminal offense in connection with the delivery of a healthcare item or service or with respect to any act or omission in a state or federal healthcare program relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct, or otherwise sanctioned by the Office of Inspector General of HHS or other enforcement agency;

5.3.2  Been suspended or excluded from participation in, or otherwise sanctioned, under any federal healthcare program or the healthcare program of any state;

5.3.3  Been convicted of a criminal offense in connection with the making or causing to be made of a false statement or representation or a false claim for the purpose of securing a benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized under a state or federal healthcare program;

5.3.4  Been convicted of a criminal offense in connection with the offer, inducement, solicitation, payment or receipt of any unlawful remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a healthcare entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a state or federal healthcare program, or in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a state or federal healthcare program;

5.3.5  Had a direct or indirect ownership or control interest of five percent (5%) or more in, and is not, and in the past has not been, an officer, director, or managing employee or partner of, any business enterprise that has been convicted of any criminal offense described in this Section 5.3; or

5.3.6  Had a direct or indirect ownership or control interest of five percent (5%) or more in, and is not, and in the past has not been, an officer, director, or managing employee or partner of, any business enterprise that has been suspended or excluded from participation in, or otherwise sanctioned, under any federal healthcare program or the healthcare program of any state.

Employee hereby agrees to immediately notify Employer of any threatened, proposed or actual exclusion from any federally or state funded healthcare program, including Medicare and Medicaid.  In the event that Employee is excluded from participation in any federally or state funded healthcare program during the term of the Agreement, or if at any time after the Effective Date of the Agreement it is determined that Employee is in breach of this **Section 5.3**, the Agreement shall, as of the effective date of such exclusion or breach, automatically terminate. Employee shall indemnify Employer for any and all damages incurred by the Company that result from Employee's exclusion from any federally or state funded healthcare program, including Medicare and Medicaid.

5.4    **Compliance with Law**.  Employee shall perform his or her obligations under the Agreement and this Addendum in compliance with all applicable federal and state laws and regulations, as well as all compliance guidance published by federal or state agencies, including, without limitation, the Health Insurance Portability and Accountability Act ("HIPAA"), the Medicare and Medicaid anti-kickback law, the Stark self-referral prohibition, Section 1128G of the Social Security Act enacted pursuant to Section 6002 of the Affordable Care Act (the "Sunshine Act") and the rules issued thereunder by HHS and compliance guidance published by the Office of the Inspector General or HHS related to any of the foregoing. Employee acknowledges that Employee understands these requirements, shall remain educated and informed regarding the applicable federal and state laws and regulations, and shall participate in all compliance programs adopted by the Company.  In the event Employee knows or suspects that any activities of Employee, the Company, any personnel or contractor of the Company, or any client of the Company implicates any such requirements or guidance, Employee shall immediately inform the Company in writing.

5.5    **No Payment of Remuneration or Solicitation of Patients.**  To the extent that Employee is employed as a sales and marketing representative to provide marketing, business development and related services and duties, in addition to complying with Employer's policies, procedures, and protocols relating to marketing, business development, and related services, Employee agrees not to:

5.5.1    Directly solicit patients, by telephone, computer, in-person, or otherwise;

5.5.2    Offer, induce, solicit, pay or receive any unlawful remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for the referral of an individual to a healthcare entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a state or federal healthcare program, or in return for purchasing, leasing, ordering, or arranging for or

recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a state or federal healthcare program.

**6.**    **Compensation and Benefits.** During the Term of the Agreement, as set forth in this Addendum, Employer shall pay to Employee, and Employee agrees to accept from Employer, as payment for the Services performed by Employee under the terms of the Agreement and this Addendum, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing ("Compensation Schedule").

**7.**    **Change in Control Benefits.**

7.1    **Stimwave Technologies Incorporated.**  In the event of a Change in Control (as hereinafter defined) of the Company that occurs while Employee is employed by the Company, 100% of any Equity Awards (as hereinafter defined) held by Employee as of the Closing (as hereinafter defined) shall vest and become fully exercisable as of the Closing. With respect to Equity Awards granted on or after the Effective Date, but granted prior to the Closing, the same vesting acceleration provisions provided in the prior sentence will apply to such Equity Awards except to the extent provided in the applicable equity award agreement by explicit reference to this Addendum to the Agreement. For purposes of this **Section 7.1**, the following definitions shall apply:

7.1.1    **Change in Control**.  "Change in Control" means: (i) any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becoming the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) having the right to vote for the election of members of the Board (other than in connection with a bona fide equity financing for capital raising purposes); (ii) any reorganization, merger or consolidation of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity), other than a transaction or series of related transactions in which the holders of the voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) or such other surviving or resulting entity (other than in connection with a bona fide equity financing for capital raising purposes); or (iii) a sale or other disposition of all or substantially all of the assets of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity).

7.1.2    **Closing.**  "Closing" means the closing of the first transaction constituting a Change in Control that occurs on or following the Effective Date.

7.1.3    **Equity Award.** "Equity Award" means any equity interests issued or granted by the Company to Employee as compensation and any equity interest in an Affiliated Entity of the Company, as applicable.

7.2    **Affiliated Entities.**  In the event of a Change in Control of an Affiliated Entity of the Company, to or for which Employee provides services, that occurs while Employee is

employed by the Company, 100% of any Equity Awards in such Affiliated Entity held by Employee as of the Closing shall vest and become fully exercisable as of the Closing.  With respect to Equity Awards in such Affiliated Entity granted on or after the Effective Date, but granted prior to the Closing, the same vesting acceleration provisions provided in the prior sentence will apply to such Equity Awards in such Affiliated Entity except to the extent provided in the applicable equity award agreement by explicit reference to this Addendum to the Agreement.

**8.      Conditions to Receipt of Severance.**

8.1      **Separation Agreement and Release of Claims.** The payment of any severance set forth in **Section 5.4 of the Compensation Schedule** is contingent upon Employee signing and not revoking the Company's standard separation and release of claims agreement upon Employee's cessation of employment and such agreement becoming effective no later than sixty (60) days following Employee's employment cessation date (such deadline, the "Release Deadline").  In no event will severance payments be paid or provided until the release actually becomes effective. Any severance payments or benefits under this Addendum to the Agreement will be paid on, or, in the case of installments, will not commence until, the sixtieth (60th) day following Employee's separation from service, or if later, such time as required by **Section 5.4 of the Compensation Schedule**.  Except as required by **Section 10**, any installment payments that would have been made to Employee during the sixty (60) day period immediately following Employee's separation from service but for the preceding sentence will be paid to Employee on the sixtieth (60th) day following Employee's separation from service and the remaining payments will be made as provided in the Agreement or this Addendum to the Agreement.

8.2      **Section 409A.**

8.2.1      Notwithstanding anything to the contrary in this Addendum, no severance pay or benefits payable upon separation that are payable to Employee, if any, pursuant to this Addendum, when considered together with any other severance payments or separation benefits that are considered deferred compensation (together, the "Deferred Payments") under Section 409A of the Internal Revenue Code, as amended (the "Code") and the final regulations and official guidance thereunder ("Section 409A") will be payable until such time as Employee has a "separation from service" within the meaning of Section 409A.

8.2.2      Notwithstanding anything to the contrary in this Addendum, if Employee is a "specified employee" within the meaning of Section 409A at the time of Employee's termination (other than due to death), then the Deferred Payments, if any, that are payable within the first six (6) months following Employee's separation from service will become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the date of Employee's separation from service. All subsequent Deferred Payments, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit.  Notwithstanding anything herein to the contrary, if Employee dies following Employee's separation from service, but prior to the six (6) month anniversary of the separation from service, then any payments delayed in accordance with this **Section 8.2.2** will be payable in a lump sum as soon as administratively practicable after the date of Employee's death, and all other Deferred Payments

will be payable in accordance with the payment schedule applicable to each payment or benefit. Each payment, installment and benefit payable under this Addendum is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

8.2.3    Any severance payment that satisfies the requirements of the "short-term deferral" rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations shall not constitute Deferred Payments for purposes hereof. Any amount paid under the Agreement that qualifies as a payment made as a result of an involuntary separation from service pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations, which does not exceed the Section 409A Limit (as defined below), will not constitute Deferred Payments for purposes hereof.

8.2.4    For purposes of this Addendum "Section 409A Limit" means the lesser of two (2) times: (x) Employee's annualized compensation based upon the annual rate of pay paid to Employee during the tax year preceding the date of Employee's termination of employment, as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any Internal Revenue Service guidance issued with respect thereto; or (y) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Code for the year in which Employee's employment is terminated.

8.2.5    The foregoing provisions are intended to comply with or be exempt from the requirements of Section 409A so that none of the severance payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. Employee and the Company agree to work together in good faith to consider amendments to this Addendum and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition under Section 409A prior to actual payment of severance benefits to Employee.

**9.    No Duty to Mitigate.** In the event that Employee becomes employed elsewhere during the period Employee is receiving severance payments from Company pursuant to **Section 5.4 of the Compensation Schedule**, Employee shall be entitled to continue to receive such severance payments and shall not be required to mitigate the amount of any payments contemplated by this Addendum, nor will any earnings that Employee may receive from any other source reduce any such payments.

**10.    Limitation on Payments.**

10.1    In the event that the severance benefits provided for in this Addendum or otherwise payable to Employee: (i) constitute "parachute payments" within the meaning of Section 280G of the Code; and (ii) but for this **Section 10** would be subject to the excise tax imposed by Section 4999 of the Code, then Employee's severance benefits under **Section 5.4 of the Compensation Schedule** will be either:

10.1.1  Delivered in full;

10.1.2 Delivered to such lesser extent as would result in no portion of such severance benefits being subject to excise tax under Section 4999 of the Code,

whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the excise tax imposed by Section 4999, results in the receipt by Employee on an after-tax basis, of the greatest amount of severance benefits, notwithstanding that all or some portion of such severance benefits may be taxable under Section 4999 of the Code.  If a reduction in severance and other benefits constituting "parachute payments" is necessary so that benefits are delivered to a lesser extent, reduction will occur in the following order: (i) reduction of cash payments, which shall occur in reverse chronological order such that the cash payment owed on the latest date following the occurrence of the event triggering such excise tax will be the first cash payment to be reduced; (ii) reduction of acceleration of vesting of Equity Awards, which shall occur in the reverse order of the date of grant for such Equity Awards (i.e., the vesting of the most recently granted Equity Awards will be reduced first); and (iii) reduction of other benefits paid or provided to Employee, which shall occur in reverse chronological order such that the benefit owed on the latest date following the occurrence of the event triggering such excise tax will be the first benefit to be reduced. If more than one Equity Award was made to Employee on the same date of grant, all such Equity Awards shall have their acceleration of vesting reduced pro rata.  In no event shall Employee have any discretion with respect to the ordering of payment reductions.

10.2    Unless the Company and Employee otherwise agree in writing, any determination required under this **Section 10** will be made in writing by a nationally recognized firm of independent public accountants selected by the Company (the "Accountants"), whose determination will be conclusive and binding upon Employee and the Company for all purposes. For purposes of making the calculations required by this **Section 10**, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Sections 280G and 4999 of the Code. The Company and Employee will furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this Section. The Company will bear all reasonable expenses incurred in connection with any calculations contemplated by this **Section 10**, including reasonable accounting fees charged by the Accountants.

IN WITNESS WHEREOF, this Key and Equity Employees' Addendum to Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**                                                      **WITNESS:**

Signature: _____          Signature: _____

Print Name: Patrick Larson                                Print Name: Elizabeth Greene

**EMPLOYER:** _____ s Incorporated

Signature: _____
By: Laura Tyler Perryman
Title: CEO

## COMPENSATION SCHEDULE

**1. Base Salary.** For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $180,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2. Commission.** Employer shall pay Employee a commission on sales, if applicable, in accordance with the Sales Compensation Leadership Plan.

**3. Bonuses.** Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**4. Equity.** Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. Employee will also be eligible to receive Equity Awards pursuant to any plans or arrangements that an Affiliated Entity of the Company may have in effect from time to time. The Board or the Committee (or with respect to an Affiliated Entity of the Company, the respective board of directors or compensation committee of such Affiliated Entity) will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**5. Employee Benefits.** In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **4** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 5.4** below, shall terminate upon the cessation of Employee's employment:

5.1 **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof. Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

DocuSign Envelope ID: 816207AA-4581-436A-9508-7BF0F94D5543

**5.2 Vacation.** Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

**5.3 Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

**5.4 Severance.** If the Company terminates Employee's employment with the Company without cause or if Employee resigns from such employment for Good Reason, and, in each case, Employee signs and does not revoke a standard release of claims with the Company in a form acceptable to the Company and subject to **Sections 8** and **10** of the Addendum, then Employee will receive, in addition to Employee's salary payable through the date of termination of employment and any other employee benefits earned and unpaid through the date of termination, continuing payments of severance pay at a rate equal to Employee's Base Salary rate, as then in effect, for twelve (12) months from the date of such termination in accordance with the Company's normal payroll policies.

**<u>EXHIBIT A</u>**

**LIST OF PRIOR INVENTIONS**
**AND ORIGINAL WORKS OF AUTHORSHIP**

Identifying Number or
<u>Title</u>                                              <u>Date</u>                        <u>Brief Description</u>

Date: _Jun 3, 2019_____          _____ _____
                                                Employee's Signature

                                                         Patrick Larson
                                                _____
                                                Print Name of Employee

## **EXHIBIT B**

### **STIMWAVE LLC TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:
_____
_____
_____

Date: _____          _____

                                                                    Employee's Signature

                                                                    _____

                                                                    Print Name of Employee

## EXHIBIT C

### STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

**AMENDED AND RESTATED**
**EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL**
**INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT**

This Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 1st day of January, 2019 (the "Effective Date") by and between Stimwave Technologies Incorporated ("Employer" or "the Company") and Elizabeth Greene ("Employee") (each party individually a "Party" and collectively the "Parties").

**RECITALS:**

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement with any Affiliated Entity (as hereinafter defined) (such employment and consulting agreements collectively referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.      **Definitions.**

        1.1      **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by the Company and/or its parent or subsidiaries.  For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management

or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise. Affiliated Entities specifically including, but are not limited to: Stimwave LLC, StimQ Medical LLC ("StimQ"), StimRelieve LLC, StimGuard LLC, Micron Devices LLC, Stimwave Limited, Stimwave Medical Pty, Freedom Neuromodulation LLC and Freedom Neuro BV.

     1.2    **Competitive Business.** "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company in the field of neuromodulation; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company in the field of neuromodulation.

     1.3    **Customer.** "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

     1.4    **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company in the field of neuromodulation.

     1.5    **Electronic Media Equipment. "**Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

     1.6    **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

     1.7    **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company in the field of neuromodulation.

     1.8    **Person.** "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

1.9     **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

## 2.     Terms and Termination.

2.1     **Employment "At-Will" Relationship.**  Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's employment relationship with the Company at any time, with or without cause and with or without notice.

2.2     **Full-Time Best Efforts.**  Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company, or as detailed in Exhibit A.

2.3     **Compensation and Benefits.**  For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

## 3.     Duties and Obligations of Employee.

3.1     **Duty of Loyalty.**  Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2     **Conflict of Interest.**  Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions.  Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's

Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

3.3     **Compliance with Laws.**  Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA").  Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

4.     **Restrictive Covenants.**

4.1     **Covenant Not to Compete.**

4.1.1     **Competitive Business.**  Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

4.1.2     **Same or Similar Services.**  Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods in the field of neuromodulation provided by, the Company in the field of neuromodulation (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

4.1.3     **Continuation for Violation.**  In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

4.2     **Covenant Not to Solicit.**

4.2.1 **Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

4.2.2 **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company  and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

4.2.3 **Continuation for Violation.**  In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

**5.** **Confidential Information.**

5.1 **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

    5.2    **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

    5.3    **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

    5.4    **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential

Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

   5.5 **Third-Party Information.** Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

   5.6 **Non-Confidential Information.** The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential

Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7 **Former Employer Confidential Information.** Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

## 6. Inventions.

6.1 **Inventions Retained and Licensed.** Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2 **Assignment of Inventions.** Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to

commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention. Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3    **Moral Rights.**  Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4    **Maintenance of Records.**  Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5    **Patent, Trademark and Copyright Registrations.**  Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company in the field of neuromodulation as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with

Page **9** of 33

the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

**7.     Acknowledgements.**  Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1     The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2     Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3     The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4     The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5     This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.     Survival and Remedies.**  Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits

derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

## 9.     Return of Company Property.

9.1     **Return of Company Property.**   All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2     **Termination Certificate.**  Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3     **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4     **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information).   Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5    **No Expectation of Privacy in Company Property.**  Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises, or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for Company purposes.  Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9**, and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10.    **Audit.**  Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

11.    **Setoff.**  Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck,

including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

**12.    No Conflicting Agreements or Improper Use of Third-Party Information.**  During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

**13.    Duty to Disclose Subsequent Employment.**  During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

**14.    Arbitration.**

    14.1    **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII**

**OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2    **Procedure.**  Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator.  The arbitrator shall be selected in the manner provided in the AHLA Rules.  The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law.  The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3    **Method of Selection.**  Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4    **Notice in Connection with Arbitration.**  All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5 **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6 **Satisfaction of Award.** If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7 **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8 **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9 **Administrative Relief.** EMPLOYE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

15. **General Provisions.**

15.1    **Governing Law; Consent to Personal Jurisdiction and Venue.**  It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida.  Exclusive venue shall lie in Broward County, Florida.

15.2    **Entire Agreement.**  This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives) and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3    **Modification.**  No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company.  The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4    **Waiver.**  The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5    **Successors and Assigns.**  This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6    **Construction without Presumption.**  The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8 **Further Assurances.** Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9 **Title, Headings and Gender.** The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement. Throughout this Agreement, where such meanings would be appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10 **Attorney's Fees.** Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11 **Notices.** All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:        Stimwave Technologies Incorporated
                       Attention: Laura Tyler Perryman, CEO
                       1310 Park Central Blvd South
                       Pompano Beach, Florida 33064

                       With a copy to:

                       Michael Brown
                       DLA Piper LLP
                       4365 Executive Drive, Suite 1100
                       San Diego CA 92121-2133

To Employee:        Elizabeth Greene 271 SE 22nd St Fort Lauderdale FL 33316

15.12 **No Third-party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee. It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13 **Invalid Provisions.** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement will be construed and

enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect.  Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

15.14    **Representations and Warranties.**  Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15    **Representation of Attorney.** Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16    **Voluntary Agreement.**  Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _Elizabeth Greene_ _____
2273CE828D43495...

Print Name: Elizabeth Greene

**WITNESS:**

Signature: _Graham Greene_ _____
4B171331EB8C411...

Print Name: Graham Greene

**EMPLOYER:**

**Stimwave Technologies Incorporated**

Signature: _Laura Tyler Perryman_ ___
8C90069DB4C4D3...

By: Laura Tyler Perryman
Title: CEO
      Representative with authority to bind
      Stimwave Technologies Incorporated

**KEY AND EQUITY EMPLOYEES'**
**ADDENDUM TO AMENDED AND RESTATED**
**EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL**
**INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT**

This Key and Equity Employees' Addendum to Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Addendum") is made and entered into on the 1st day of January, 2019 (the "Effective Date") by and between Stimwave Technologies Incorporated ("Employer" or "the Company") and Elizabeth Greene ("Employee") (each party individually a "Party" and collectively the "Parties").

**RECITALS:**

WHEREAS, Company and Employee entered into an Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") or will enter into such an Agreement simultaneously with the execution of this Addendum to the Agreement; and

WHEREAS, Company and Employee desire to amend the Agreement, as provided in this Addendum to the Agreement; and

WHEREAS, Company and Employee understand and agree that this Addendum shall be an integral part of the Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

**1.      Integration.**  All of the terms and conditions of the Agreement are incorporated herein and by this reference made a part hereof, and shall remain the same except to the extent modified by this Addendum.  In the event of a conflict between a provision of the Agreement and of this Addendum, the provision in this Addendum shall be controlling. All capitalized terms in this Addendum shall have the meaning ascribed to those words in the Agreement unless the context in which the word is used clearly indicates to the contrary.

**2.      Services**.  "Services" means the services to be provided and the duties to be performed by Employee, as described in a written job description setting forth the specific duties the Employee is required to perform, as well as such other duties as may be assigned to Employee from time to time by Employer.

**3.      Employment**.  The Company hereby employs Employee in accordance with the terms of the Agreement, as modified by this Addendum, and Employee hereby accepts such employment with the Company, for the Term set forth in **Section 4.1** hereof.

**4.      Term and Termination.  Section 2.1** of the Agreement shall be deleted and replaced by the following provisions:

4.1      **Term.**  This Agreement shall be in effect for an initial term of five (5) years, commencing on January 1st, 2019 ("Effective Date") and terminating on December 31st, 2023,

unless sooner terminated as provided for in this Agreement. Thereafter, this Agreement shall be automatically renewed for successive one (1) year terms until it is terminated as provided herein. Any reference in this Agreement to the "Term" of this Agreement means the initial and any annual renewal term.

4.2 **Termination without Cause.** Either Party may terminate this Agreement at any time, without cause, upon ninety (90) days' prior written notice to the other Party. Upon notice of termination by Employer pursuant to this **Section 4.2**, Employer also may direct Employee to immediately cease providing the Services, provided that Employer continues to compensate Employee during the ninety (90) days following such notice of termination (the "Notice Period"). Notwithstanding the foregoing: (i) the provisions of **Section 4.3** will remain in effect during the Notice Period; and (ii) Employer reserves the right to exercise the "Termination for Cause" provisions in **Section 4.4** during the Notice Period and cease compensation during the Notice Period.

4.3 **Automatic Termination for Cause by Employer.** This Agreement shall automatically terminate upon the occurrence of any one of the following events:

4.3.1 Discontinuance of business by Employer;

4.3.2 The death of Employee;

4.3.3 The exclusion of Employee from participation in any federally or state funded healthcare program, including Medicare and Medicaid, or Employee's breach of **Section 5.3** of this Addendum;

4.3.4 The existence of any physical, mental or emotional disability that renders Employee unable to fulfill substantially all of Employee's obligations under the Agreement or this Addendum, even with reasonable accommodation by Employer, as reasonably determined by the Board of Directors of the Company (the "Board") or its designee, for an aggregate of ninety (90) days in any three hundred and sixty-five (365) consecutive day period or, if Employee has qualified for, and is receiving benefits under Employer's short-term disability plan, if any, such longer period as is required prior to eligibility for benefits as provided for in Employer's long-term disability policy applicable to similarly-situated employees, as in effect from time to time; or

4.3.5 The commission by Employee of any act of dishonesty, misrepresentation, fraud or moral turpitude, as reasonably determined by the Board or its designee.

4.4 **Termination for Cause by Employer with Notice.** Employer may terminate this Agreement for "cause" at any time by giving written notice of termination (a "Termination Notice") to Employee, specifying the reason for termination. The termination of Employee's employment shall be effective thirty (30) days after delivery of the Termination Notice to Employee, if Employee fails to cure the default stated in the Termination Notice prior to the expiration of the thirty (30) day cure period. For purposes of this **Section 4.4**, "cause" shall include, without limitation, any of the following events (the occurrence of which shall be determined by Employer in its sole discretion):

4.4.1   The breach of any of Employee's warranties or the falsity of the representations made by Employee in **Section 5** of this Addendum;

4.4.2   Employee engages in disruptive or otherwise unacceptable behavior or conduct substantially incompatible with the goals, objectives, or business interests of Employer, or that Employer, in its sole discretion, reasonably believes could jeopardize or adversely affect the customers, staff, property, image, or reputation of Employer;

4.4.3   The commencement of an investigation or the indictment of Employee for any act constituting a felony or for any crime involving the delivery of, or billing or payment for, healthcare items or services;

4.4.4   A material breach by Employee of any of the terms of the Agreement or this Addendum not otherwise set forth in **Section 4.3** or this **Section 4.4**, or a material violation by Employee of any written Company policy or standard of conduct; or

4.4.5   Employee's willful and continued failure to perform the Services after delivery by the Company to Employee of a written demand for performance that describes the basis for the Company's belief that Employee has not substantially performed the Services.

4.5     **Regulatory Termination.** If, prior to the expiration of the term of the Agreement, any federal, state or local regulatory body, including, but not limited to, the Centers for Medicare and Medicaid Services, the Department of Health and Human Services ("HHS") or the Internal Revenue Service, determines that this Agreement is illegal, or otherwise materially affects either Party's ability to perform its obligations under this Agreement, then the affected Party shall give the other Party such notice as is reasonable under the circumstances and shall make available a reasonable period within which to cure. If no cure is implemented by the parties, then Employer, in its discretion, may terminate this Agreement with such notice as is, in its sole discretion, reasonable under the circumstances.

4.6     **Termination for Cause or Good Reason by Employee.** Employee may terminate this Agreement "For Cause" or for Good Reason (as hereinafter defined) thirty (30) days after delivery of a written notice of the acts or omissions constituting the grounds for the "For Cause" termination or the "Good Reason" to Employer by Employee.  For purposes of this **Section 4.6**, "For Cause" shall mean the failure of Employer to comply with any material term of this Agreement that is not cured within thirty (30) days after delivery of a written notice of termination to Employer by Employee.  "Good Reason" means the occurrence of one or more of the following, without Employee's consent: (i) a material reduction in Employee's Base Salary, excluding a reduction in Base Salary that is applicable to all Company management; (ii) a material reduction of Employee's authority, duties or responsibilities, unless Employee is provided with a comparable position; provided, however, that a reduction in authority, duties, or responsibilities solely by virtue of the Company being acquired and made part of a larger entity whether as a subsidiary, business unit or otherwise will not constitute Good Reason.

4.7     **Termination by Mutual Agreement.**  This Agreement may be terminated by the mutual agreement of both Parties, in writing, at any time.

4.8     **Services Upon Termination.**  In the event of termination of this Agreement without cause by Employee, at Employer's sole discretion, Employee shall continue to perform

the Services as directed by Employer during the Notice Period. In the event of termination of this Agreement for any other reason, Employer shall have the option to demand that Employee immediately cease providing the Services, *provided, however*, that the Company shall be required to compensate Employee through the date of termination of Employee's employment, as applicable.

4.9    **Compensation Upon Termination.** Upon termination of Employee's employment hereunder, Employee shall be entitled to receive compensation earned and accrued, but unpaid, through the effective date of termination, and shall not be entitled to additional compensation, except as expressly provided for in this Addendum.

**5.    Employee Representations and Warranties.** Employee represents and warrants to Employer that:

5.1    **Validity and Enforceability**. Employee has the legal right to enter into the Agreement and this Addendum and to perform the Services in accordance with the terms of the Agreement and this Addendum.

5.2    **No Conflict**. Employee is not subject to or bound by any contractual obligations (such as any non-compete, non-disclosure or other restrictive covenant), governmental orders or other restrictions that would impede with or interfere in the performance of the Services in accordance with the terms of the Agreement and this Addendum.

5.3    **No Exclusion**. Employee represents and warrants to Employer that he or she has not:

5.3.1   Been convicted of a criminal offense in connection with the delivery of a healthcare item or service or with respect to any act or omission in a state or federal healthcare program relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct, or otherwise sanctioned by the Office of Inspector General of HHS or other enforcement agency;

5.3.2   Been suspended or excluded from participation in, or otherwise sanctioned, under any federal healthcare program or the healthcare program of any state;

5.3.3   Been convicted of a criminal offense in connection with the making or causing to be made of a false statement or representation or a false claim for the purpose of securing a benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized under a state or federal healthcare program;

5.3.4   Been convicted of a criminal offense in connection with the offer, inducement, solicitation, payment or receipt of any unlawful remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a healthcare entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a state or federal healthcare program, or in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a state or federal healthcare program;

DocuSign Envelope ID: 78AFF205-3570-49AF-38D9-1C896C2F7DF1

5.3.5  Had a direct or indirect ownership or control interest of five percent (5%) or more in, and is not, and in the past has not been, an officer, director, or managing employee or partner of, any business enterprise that has been convicted of any criminal offense described in this Section 5.3; or

5.3.6  Had a direct or indirect ownership or control interest of five percent (5%) or more in, and is not, and in the past has not been, an officer, director, or managing employee or partner of, any business enterprise that has been suspended or excluded from participation in, or otherwise sanctioned, under any federal healthcare program or the healthcare program of any state.

Employee hereby agrees to immediately notify Employer of any threatened, proposed or actual exclusion from any federally or state funded healthcare program, including Medicare and Medicaid.  In the event that Employee is excluded from participation in any federally or state funded healthcare program during the term of the Agreement, or if at any time after the Effective Date of the Agreement it is determined that Employee is in breach of this **Section 5.3**, the Agreement shall, as of the effective date of such exclusion or breach, automatically terminate. Employee shall indemnify Employer for any and all damages incurred by the Company that result from Employee's exclusion from any federally or state funded healthcare program, including Medicare and Medicaid.

5.4    **Compliance with Law**.  Employee shall perform his or her obligations under the Agreement and this Addendum in compliance with all applicable federal and state laws and regulations, as well as all compliance guidance published by federal or state agencies, including, without limitation, the Health Insurance Portability and Accountability Act ("HIPAA"), the Medicare and Medicaid anti-kickback law, the Stark self-referral prohibition, Section 1128G of the Social Security Act enacted pursuant to Section 6002 of the Affordable Care Act (the "Sunshine Act") and the rules issued thereunder by HHS and compliance guidance published by the Office of the Inspector General or HHS related to any of the foregoing. Employee acknowledges that Employee understands these requirements, shall remain educated and informed regarding the applicable federal and state laws and regulations, and shall participate in all compliance programs adopted by the Company.  In the event Employee knows or suspects that any activities of Employee, the Company, any personnel or contractor of the Company, or any client of the Company implicates any such requirements or guidance, Employee shall immediately inform the Company in writing.

5.5    **No Payment of Remuneration or Solicitation of Patients.**  To the extent that Employee is employed as a sales and marketing representative to provide marketing, business development and related services and duties, in addition to complying with Employer's policies, procedures, and protocols relating to marketing, business development, and related services, Employee agrees not to:

5.5.1    Directly solicit patients, by telephone, computer, in-person, or otherwise;

5.5.2    Offer, induce, solicit, pay or receive any unlawful remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for the referral of an individual to a healthcare entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a state or federal healthcare program, or in return for purchasing, leasing, ordering, or arranging for or

recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a state or federal healthcare program.

**6.** **Compensation and Benefits.** During the Term of the Agreement, as set forth in this Addendum, Employer shall pay to Employee, and Employee agrees to accept from Employer, as payment for the Services performed by Employee under the terms of the Agreement and this Addendum, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing ("Compensation Schedule").

**7.** **Change in Control Benefits.**

7.1 **Stimwave Technologies Incorporated.** In the event of a Change in Control (as hereinafter defined) of the Company that occurs while Employee is employed by the Company, 100% of any Equity Awards (as hereinafter defined) held by Employee as of the Closing (as hereinafter defined) shall vest and become fully exercisable as of the Closing. With respect to Equity Awards granted on or after the Effective Date, but granted prior to the Closing, the same vesting acceleration provisions provided in the prior sentence will apply to such Equity Awards except to the extent provided in the applicable equity award agreement by explicit reference to this Addendum to the Agreement. For purposes of this **Section 7.1**, the following definitions shall apply:

7.1.1 **Change in Control.** "Change in Control" means: (i) any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becoming the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) having the right to vote for the election of members of the Board (other than in connection with a bona fide equity financing for capital raising purposes); (ii) any reorganization, merger or consolidation of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity), other than a transaction or series of related transactions in which the holders of the voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity) or such other surviving or resulting entity (other than in connection with a bona fide equity financing for capital raising purposes); or (iii) a sale or other disposition of all or substantially all of the assets of the Company (or with respect to any Affiliated Entity of the Company, such Affiliated Entity).

7.1.2 **Closing.** "Closing" means the closing of the first transaction constituting a Change in Control that occurs on or following the Effective Date.

7.1.3 **Equity Award.** "Equity Award" means any equity interests issued or granted by the Company to Employee as compensation and any equity interest in an Affiliated Entity of the Company, as applicable.

7.2 **Affiliated Entities.** In the event of a Change in Control of an Affiliated Entity of the Company, to or for which Employee provides services, that occurs while Employee is

employed by the Company, 100% of any Equity Awards in such Affiliated Entity held by Employee as of the Closing shall vest and become fully exercisable as of the Closing.  With respect to Equity Awards in such Affiliated Entity granted on or after the Effective Date, but granted prior to the Closing, the same vesting acceleration provisions provided in the prior sentence will apply to such Equity Awards in such Affiliated Entity except to the extent provided in the applicable equity award agreement by explicit reference to this Addendum to the Agreement.

## 8.    Conditions to Receipt of Severance.

8.1    **Separation Agreement and Release of Claims.** The payment of any severance set forth in **Section 5.4 of the Compensation Schedule** is contingent upon Employee signing and not revoking the Company's standard separation and release of claims agreement upon Employee's cessation of employment and such agreement becoming effective no later than sixty (60) days following Employee's employment cessation date (such deadline, the "Release Deadline").  In no event will severance payments be paid or provided until the release actually becomes effective. Any severance payments or benefits under this Addendum to the Agreement will be paid on, or, in the case of installments, will not commence until, the sixtieth (60th) day following Employee's separation from service, or if later, such time as required by **Section 5.4 of the Compensation Schedule**.  Except as required by **Section 10**, any installment payments that would have been made to Employee during the sixty (60) day period immediately following Employee's separation from service but for the preceding sentence will be paid to Employee on the sixtieth (60th) day following Employee's separation from service and the remaining payments will be made as provided in the Agreement or this Addendum to the Agreement.

8.2    **Section 409A.**

8.2.1    Notwithstanding anything to the contrary in this Addendum, no severance pay or benefits payable upon separation that are payable to Employee, if any, pursuant to this Addendum, when considered together with any other severance payments or separation benefits that are considered deferred compensation (together, the "Deferred Payments") under Section 409A of the Internal Revenue Code, as amended (the "Code") and the final regulations and official guidance thereunder ("Section 409A") will be payable until such time as Employee has a "separation from service" within the meaning of Section 409A.

8.2.2    Notwithstanding anything to the contrary in this Addendum, if Employee is a "specified employee" within the meaning of Section 409A at the time of Employee's termination (other than due to death), then the Deferred Payments, if any, that are payable within the first six (6) months following Employee's separation from service will become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the date of Employee's separation from service. All subsequent Deferred Payments, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit.  Notwithstanding anything herein to the contrary, if Employee dies following Employee's separation from service, but prior to the six (6) month anniversary of the separation from service, then any payments delayed in accordance with this **Section 8.2.2** will be payable in a lump sum as soon as administratively practicable after the date of Employee's death, and all other Deferred Payments

will be payable in accordance with the payment schedule applicable to each payment or benefit. Each payment, installment and benefit payable under this Addendum is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

8.2.3    Any severance payment that satisfies the requirements of the "short-term deferral" rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations shall not constitute Deferred Payments for purposes hereof.  Any amount paid under the Agreement that qualifies as a payment made as a result of an involuntary separation from service pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations, which does not exceed the Section 409A Limit (as defined below), will not constitute Deferred Payments for purposes hereof.

8.2.4    For purposes of this Addendum "Section 409A Limit" means the lesser of two (2) times: (x) Employee's annualized compensation based upon the annual rate of pay paid to Employee during the tax year preceding the date of Employee's termination of employment, as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any Internal Revenue Service guidance issued with respect thereto; or (y) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Code for the year in which Employee's employment is terminated.

8.2.5    The foregoing provisions are intended to comply with or be exempt from the requirements of Section 409A so that none of the severance payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply.  Employee and the Company agree to work together in good faith to consider amendments to this Addendum and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition under Section 409A prior to actual payment of severance benefits to Employee.

**9.**     **No Duty to Mitigate.**  In the event that Employee becomes employed elsewhere during the period Employee is receiving severance payments from Company pursuant to **Section 5.4 of the Compensation Schedule**, Employee shall be entitled to continue to receive such severance payments and shall not be required to mitigate the amount of any payments contemplated by this Addendum, nor will any earnings that Employee may receive from any other source reduce any such payments.

**10.**    **Limitation on Payments.**

10.1    In the event that the severance benefits provided for in this Addendum or otherwise payable to Employee: (i) constitute "parachute payments" within the meaning of Section 280G of the Code; and (ii) but for this **Section 10** would be subject to the excise tax imposed by Section 4999 of the Code, then Employee's severance benefits under **Section 5.4 of the Compensation Schedule** will be either:

10.1.1  Delivered in full;

10.1.2 Delivered to such lesser extent as would result in no portion of such severance benefits being subject to excise tax under Section 4999 of the Code,

whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the excise tax imposed by Section 4999, results in the receipt by Employee on an after-tax basis, of the greatest amount of severance benefits, notwithstanding that all or some portion of such severance benefits may be taxable under Section 4999 of the Code. If a reduction in severance and other benefits constituting "parachute payments" is necessary so that benefits are delivered to a lesser extent, reduction will occur in the following order: (i) reduction of cash payments, which shall occur in reverse chronological order such that the cash payment owed on the latest date following the occurrence of the event triggering such excise tax will be the first cash payment to be reduced; (ii) reduction of acceleration of vesting of Equity Awards, which shall occur in the reverse order of the date of grant for such Equity Awards (i.e., the vesting of the most recently granted Equity Awards will be reduced first); and (iii) reduction of other benefits paid or provided to Employee, which shall occur in reverse chronological order such that the benefit owed on the latest date following the occurrence of the event triggering such excise tax will be the first benefit to be reduced. If more than one Equity Award was made to Employee on the same date of grant, all such Equity Awards shall have their acceleration of vesting reduced pro rata. In no event shall Employee have any discretion with respect to the ordering of payment reductions.

10.2    Unless the Company and Employee otherwise agree in writing, any determination required under this **Section 10** will be made in writing by a nationally recognized firm of independent public accountants selected by the Company (the "Accountants"), whose determination will be conclusive and binding upon Employee and the Company for all purposes. For purposes of making the calculations required by this **Section 10**, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Sections 280G and 4999 of the Code. The Company and Employee will furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this Section. The Company will bear all reasonable expenses incurred in connection with any calculations contemplated by this **Section 10**, including reasonable accounting fees charged by the Accountants.

IN WITNESS WHEREOF, this Key and Equity Employees' Addendum to Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**                                          **WITNESS:**

Signature: _Elizabeth Greene_                         Signature: _Graham Greene_

Print Name: Elizabeth Greene                          Print Name: Graham Greene

**EMPLOYER: Stimwave Technologies Incorporated**

Signature: _Laura Tyler Perryman_
By: Laura Tyler Perryman
Title: CEO

## COMPENSATION SCHEDULE

**1. Base Salary.** For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $180,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2. Commission.** Employer shall pay Employee a commission on sales, if applicable, in accordance with the Sales Compensation Leadership Plan.

**3. Bonuses.** Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**4. Equity.** Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. Employee will also be eligible to receive Equity Awards pursuant to any plans or arrangements that an Affiliated Entity of the Company may have in effect from time to time. The Board or the Committee (or with respect to an Affiliated Entity of the Company, the respective board of directors or compensation committee of such Affiliated Entity) will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**5. Employee Benefits.** In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **4** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 5.4** below, shall terminate upon the cessation of Employee's employment:

5.1 **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof. Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

5.2 **Vacation.**   Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

5.3 **Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

5.4 **Severance.** If the Company terminates Employee's employment with the Company without cause or if Employee resigns from such employment for Good Reason, and, in each case, Employee signs and does not revoke a standard release of claims with the Company in a form acceptable to the Company and subject to **Sections 8** and **10** of the Addendum, then Employee will receive, in addition to Employee's salary payable through the date of termination of employment and any other employee benefits earned and unpaid through the date of termination, continuing payments of severance pay at a rate equal to Employee's Base Salary rate, as then in effect, for twelve (12) months from the date of such termination in accordance with the Company's normal payroll policies.

## EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP

Identifying Number or
Title                                        Date                        Brief Description

Date: _____        _____

May 30, 2019                                Employee's Signature

                                            Elizabeth Greene
                                            _____

                                            Print Name of Employee

**EXHIBIT B**

**STIMWAVE LLC TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:
_____
_____
_____

Date: _____          _____
                                                 Employee's Signature

                                                 _____
                                                 Print Name of Employee

## EXHIBIT C

### STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

## EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT

This Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 22nd day of April, 2019 (the "Effective Date") by and between Stimwave LLC ("Employer" or "the Company") and Nathaniel Darkins  ("Employee") (each party individually a "Party" and collectively the "Parties").

### RECITALS:

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement (referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.    **Definitions.**

     1.1    **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by Stimwave LLC and/or its subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

1.2     **Competitive Business.**  "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company.

1.3     **Customer.**  "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

1.4     **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company.

1.5     **Electronic Media Equipment.** "Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

1.6     **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

1.7     **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company.

1.8     **Person.**  "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

1.9     **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

2.     **Terms and Termination.**

2.1     **Employment "At-Will" Relationship.**  Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's

employment relationship with the Company at any time, with or without cause and with or without notice.

2.2 **Full-Time Best Efforts.** Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company.

2.3 **Compensation and Benefits.** For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

**3. Duties and Obligations of Employee.**

3.1 **Duty of Loyalty.** Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2 **Conflict of Interest.** Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions. Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

3.3 **Compliance with Laws.** Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States

Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA").  Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.      Restrictive Covenants.**

**4.1      Covenant Not to Compete.**

**4.1.1      Competitive Business.** Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

**4.1.2      Same or Similar Services.** Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods provided by, the Company (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

**4.1.3      Continuation for Violation.** In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's last competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

**4.2      Covenant Not to Solicit.**

**4.2.1      Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work

for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

        4.2.2   **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company  and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

        4.2.3   **Continuation for Violation.** In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's last solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

## 5.    Confidential Information.

      5.1   **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

      5.2   **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is

learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

     5.3    **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

     5.4    **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical

expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

5.5    **Third-Party Information.**  Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

5.6    **Non-Confidential Information.** The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7    **Former Employer Confidential Information.** Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other

person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

**6.    Inventions.**

6.1    **Inventions Retained and Licensed.** Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.** Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention.  Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while

employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3    **Moral Rights.**  Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4    **Maintenance of Records.**  Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5    **Patent, Trademark and Copyright Registrations.**  Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement  and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

7.    **Acknowledgements.**  Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1     The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2     Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3     The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4     The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5     This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.     Survival and Remedies.** Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.     Return of Company Property.**

9.1 **Return of Company Property.** All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2 **Termination Certificate.** Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3 **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4 **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information). Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5 **No Expectation of Privacy in Company Property.** Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for

Company purposes. Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9** and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10. **Audit.** Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

11. **Setoff.** Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck, including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

12.     **No Conflicting Agreements or Improper Use of Third-Party Information.**  During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

13.     **Duty to Disclose Subsequent Employment.**  During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

14.     **Arbitration.**

14.1     **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF**

**EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2    **Procedure.**  Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator. The arbitrator shall be selected in the manner provided in the AHLA Rules. The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law.  The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3    **Method of Selection.** Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4    **Notice in Connection with Arbitration.**  All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5    **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6    **Satisfaction of Award.**  If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the

maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7    **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8    **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9    **Administrative Relief.** EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

## 15.    General Provisions.

15.1    **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2    **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives)

and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3    **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company.  The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4    **Waiver.**  The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5    **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6    **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8    **Further Assurances.** Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9    **Title, Headings and Gender.** The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement. Throughout this Agreement, where such meanings would be

DocuSign Envelope ID: 8B1028A4-63B1-4E9B-9F55-1667F107C7A5

appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10  **Attorney's Fees.** Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11  **Notices.** All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:        Stimwave LLC
                    Attention: Laura Tyler Perryman, CEO
                    1310 Park Central Blvd South
                    Pompano Beach, Florida 33064

To Employee:        Nathaniel Darkins
                    7245 E Pioneer Ln
                    Prescott Valley, AZ 86314

15.12  **No Third-party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee. It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13  **Invalid Provisions.**  If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement will be construed and enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect.  Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

15.14  **Representations and Warranties.**  Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under,

constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15  **Representation of Attorney.** Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16  **Voluntary Agreement.**  Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**                                               **WITNESS:**

Signature: _____               Signature: _____

Print Name: Nathaniel Darkins                          Print Name:  Elizabeth Greene

**EMPLOYER:**

**Stimwave L**

Signature: _____

By: Laura Tyler Perryman

Title: CEO

     Representative with authority to bind

     Stimwave LLC

## COMPENSATION SCHEDULE

**1.      Base Salary.**  For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $50,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2.      Bonuses.**  Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**3.      Equity.**  Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. The Board or the Committee will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**4.      Employee Benefits.**  In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **3** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 4.4** below, shall terminate upon the cessation of Employee's employment:

4.1      **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof.  Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

4.2      **Vacation.** Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

4.3 **Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP**

Identifying Number or
Title                                              Date                          Brief Description

_____ No inventions or improvements

_____ Additional Sheets Attached

Date: _May 6, 2019_____

_____
Employee's Signature

_Nate Darkins_____
Print Name of Employee

# **EXHIBIT B**

## **STIMWAVE LLC TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:

_____

_____

_____

Date: _____        _____

                                             Employee's Signature

                                             _____

                                             Print Name of Employee

## EXHIBIT C

## STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

# EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT

This Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 13th day of November, 2019 (the "Effective Date") by and between Stimwave LLC ("Employer" or "the Company") and Luis Fernandez ("Employee") (each party individually a "Party" and collectively the "Parties").

## RECITALS:

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement (referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.      **Definitions.**

        1.1     **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by Stimwave LLC and/or its subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

1.2 **Competitive Business.** "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company.

1.3 **Customer.** "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

1.4 **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company.

1.5 **Electronic Media Equipment.** "Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

1.6 **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

1.7 **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company.

1.8 **Person.** "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

1.9 **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

2. **Terms and Termination.**

2.1 **Employment "At-Will" Relationship.** Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's

employment relationship with the Company at any time, with or without cause and with or without notice.

2.2    **Full-Time Best Efforts.**  Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company.

2.3    **Compensation and Benefits.**  For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

**3.    Duties and Obligations of Employee.**

3.1    **Duty of Loyalty.**  Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2    **Conflict of Interest.**  Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions.  Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

3.3    **Compliance with Laws.**  Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States

Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA").  Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.      Restrictive Covenants.**

      4.1     **Covenant Not to Compete.**

            4.1.1     **Competitive Business.** Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

            4.1.2     **Same or Similar Services.** Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods provided by, the Company (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

            4.1.3     **Continuation for Violation.** In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's last competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

      4.2     **Covenant Not to Solicit.**

            4.2.1     **Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work

DocuSign Envelope ID: 046CFB22-5ZEC-1A6C-4BC8-A3314D4858F

for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

> 4.2.2 **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

> 4.2.3 **Continuation for Violation.** In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's last solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

## 5. Confidential Information.

5.1 **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

5.2 **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is

learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

5.3    **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

5.4    **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical

DocuSign Envelope ID: 046CFB22-5ZFSG1A6G48C8-AB334D4BB58F

expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

5.5    **Third-Party Information.**  Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

5.6    **Non-Confidential Information.** The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7    **Former Employer Confidential Information.** Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other

person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

## 6.    Inventions.

6.1    **Inventions Retained and Licensed.** Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.** Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention.  Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while

employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3    **Moral Rights.**  Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4    **Maintenance of Records.**  Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5    **Patent, Trademark and Copyright Registrations.**  Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement  and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

**7.**    **Acknowledgements.**  Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1    The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2    Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3    The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4    The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5    This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.    Survival and Remedies.** Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.    Return of Company Property.**

9.1     **Return of Company Property.** All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2     **Termination Certificate.**  Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3     **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4     **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information).  Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5     **No Expectation of Privacy in Company Property.** Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for

Company purposes. Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9** and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10.    **Audit.** Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

11.    **Setoff.** Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck, including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

**12.    No Conflicting Agreements or Improper Use of Third-Party Information.**  During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

**13.    Duty to Disclose Subsequent Employment.**  During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

**14.    Arbitration.**

14.1    **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF**

**EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2    **Procedure.** Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator. The arbitrator shall be selected in the manner provided in the AHLA Rules. The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law. The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3    **Method of Selection.** Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4    **Notice in Connection with Arbitration.** All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5    **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6    **Satisfaction of Award.** If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the

maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7    **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8    **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9    **Administrative Relief.** EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

## 15.    **General Provisions.**

15.1    **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2    **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives)

and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3    **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company.  The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4    **Waiver.** The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5    **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6    **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8    **Further Assurances.** Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9    **Title, Headings and Gender.** The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement. Throughout this Agreement, where such meanings would be

appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10  **Attorney's Fees.** Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11  **Notices.** All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:      Stimwave LLC
                  Attention: Laura Tyler Perryman, CEO
                  1310 Park Central Blvd South
                  Pompano Beach, Florida 33064

To Employee:      Luis Fernandez
                  2951 SW 116th Avenue Apt 107
                  Miramar, FL 33025

15.12  **No Third-party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee. It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13  **Invalid Provisions.**  If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement will be construed and enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect.  Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

15.14  **Representations and Warranties.**  Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under,

constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15   **Representation of Attorney.** Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16   **Voluntary Agreement.**   Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**                                              **WITNESS:**

Signature: _Luis Fernandez_ _____         Signature: _Elizabeth Greene_ _____

Print Name: Luis Fernandez                             Print Name:  Elizabeth Greene

**EMPLOYER:**

**Stimwave LLC**

Signature: _Laura Tyler Perryman_ _

By: Laura Tyler Perryman
Title: CEO
        Representative with authority to bind
        Stimwave LLC

## <u>COMPENSATION SCHEDULE</u>

**1.    Base Salary.**  For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $95,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2.    Bonuses.**  Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**3.    Equity.**  Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. The Board or the Committee will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**4.    Employee Benefits.**  In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **3** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 4.4** below, shall terminate upon the cessation of Employee's employment:

     4.1    **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof.  Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

     4.2    **Vacation.** Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

   4.3 **Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP**

Identifying Number or
<u>Title</u>                                            <u>Date</u>                                    <u>Brief Description</u>

_____ No inventions or improvements

_____Additional Sheets Attached

Date: Nov 13, 2019
_____

_____
Employee's Signature

Luis Fernandez
_____
Print Name of Employee

## EXHIBIT B

### STIMWAVE LLC TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:

_____

_____

_____

Date: _____

_____
Employee's Signature

_____
Print Name of Employee

## EXHIBIT C

## STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

## EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT

This Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 28th day of October, 2019 (the "Effective Date") by and between Stimwave LLC ("Employer" or "the Company") and Maryam Amiri ("Employee") (each party individually a "Party" and collectively the "Parties").

### RECITALS:

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement (referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.    **Definitions.**

    1.1    **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by Stimwave LLC and/or its subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

1.2 **Competitive Business.** "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company.

1.3 **Customer.** "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

1.4 **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company.

1.5 **Electronic Media Equipment.** "Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

1.6 **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

1.7 **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company.

1.8 **Person.** "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

1.9 **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

2. **Terms and Termination.**

2.1 **Employment "At-Will" Relationship.** Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's

employment relationship with the Company at any time, with or without cause and with or without notice.

2.2    **Full-Time Best Efforts.**  Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company.

2.3    **Compensation and Benefits.**  For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

## 3.    **Duties and Obligations of Employee.**

3.1    **Duty of Loyalty.** Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2    **Conflict of Interest.**  Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions.  Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

3.3    **Compliance with Laws.**  Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States

Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA"). Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.      Restrictive Covenants.**

      4.1      **Covenant Not to Compete.**

      4.1.1      **Competitive Business.** Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

      4.1.2      **Same or Similar Services.** Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods provided by, the Company (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

      4.1.3      **Continuation for Violation.** In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's last competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

      4.2      **Covenant Not to Solicit.**

      4.2.1      **Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work

for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

        4.2.2 **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

        4.2.3 **Continuation for Violation.** In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's last solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

## 5. Confidential Information.

        5.1 **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

        5.2 **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is

learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

     5.3    **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

     5.4    **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical

expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

5.5 **Third-Party Information.** Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

5.6 **Non-Confidential Information.** The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7 **Former Employer Confidential Information.** Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other

person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

## 6.    Inventions.

6.1    **Inventions Retained and Licensed.** Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.** Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention.  Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while

employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3     **Moral Rights.**  Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4     **Maintenance of Records.**  Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5     **Patent, Trademark and Copyright Registrations.**  Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement  and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

7.     **Acknowledgements.**  Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1     The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2     Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3     The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4     The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5     This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.     Survival and Remedies.** Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.     Return of Company Property.**

9.1    **Return of Company Property.** All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2    **Termination Certificate.**  Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3    **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4    **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information).  Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5    **No Expectation of Privacy in Company Property.** Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for

Company purposes. Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9** and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10.    **Audit.**  Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

11.    **Setoff.**  Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck, including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

**12.    No Conflicting Agreements or Improper Use of Third-Party Information.**  During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

**13.    Duty to Disclose Subsequent Employment.**  During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

**14.    Arbitration.**

14.1    **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF**

**EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2    **Procedure.**  Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator. The arbitrator shall be selected in the manner provided in the AHLA Rules. The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law.  The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3    **Method of Selection.** Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4    **Notice in Connection with Arbitration.**  All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5    **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6    **Satisfaction of Award.**  If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the

maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7    **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8    **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9    **Administrative Relief.** EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

## 15.    General Provisions.

15.1    **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2    **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives)

and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3    **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company.  The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4    **Waiver.** The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5    **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6    **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8    **Further Assurances.** Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9    **Title, Headings and Gender.** The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement. Throughout this Agreement, where such meanings would be

appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10  **Attorney's Fees.** Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11  **Notices.** All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:       Stimwave LLC
                   Attention: Laura Tyler Perryman, CEO
                   1310 Park Central Blvd South
                   Pompano Beach, Florida 33064

To Employee:       Maryam Amiri
                   20972 Shady Vista Ln
                   Boca Raton, FL 33428

15.12  **No Third-party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee. It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13  **Invalid Provisions.**  If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement will be construed and enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect.  Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

15.14  **Representations and Warranties.**  Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under,

constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15    **Representation of Attorney.**  Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16    **Voluntary Agreement.**  Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _____

Print Name: Maryam Amiri

**WITNESS:**

Signature: _____

Print Name:  Elizabeth Greene

**EMPLOYER:**

**Stimwave LLC**

Signature: _____

By: Laura Tyler Perryman

Title: CEO

  Representative with authority to bind
  Stimwave LLC

## COMPENSATION SCHEDULE

**1.      Base Salary.**  For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of 110,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2.      Bonuses.**  Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**3.      Equity.**  Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. The Board or the Committee will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**4.      Employee Benefits.**  In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **3** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 4.4** below, shall terminate upon the cessation of Employee's employment:

      4.1      **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof.  Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

      4.2      **Vacation.** Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

4.3  **Expenses.**  The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS**
**AND ORIGINAL WORKS OF AUTHORSHIP**

Identifying Number or
Title                                    Date                    Brief Description

 No inventions or improvements

_____Additional Sheets Attached

Date: ___Oct 28, 2019_____


_____
Employee's Signature

Maryam Amiri
_____
Print Name of Employee

**<u>EXHIBIT B</u>**

**STIMWAVE LLC TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:

_____

_____

_____

Date: _____         _____
                                       Employee's Signature

                                       _____
                                       Print Name of Employee

## EXHIBIT C

## STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

# EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT

This Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 16th day of July, 2019 (the "Effective Date") by and between Stimwave LLC ("Employer" or "the Company") and Novell McGloster ("Employee") (each party individually a "Party" and collectively the "Parties").

## RECITALS:

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement (referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto:

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.      **Definitions.**

        1.1      **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by Stimwave LLC and/or its subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

    1.2    **Competitive Business.** "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company.

    1.3    **Customer.** "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

    1.4    **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company.

    1.5    **Electronic Media Equipment.** "Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

    1.6    **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

    1.7    **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company.

    1.8    **Person.** "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

    1.9    **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

**2.**    **Terms and Termination.**

    2.1    **Employment "At-Will" Relationship.** Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's

employment relationship with the Company at any time, with or without cause and with or without notice.

2.2    **Full-Time Best Efforts.**  Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company.

2.3    **Compensation and Benefits.** For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

## 3.    **Duties and Obligations of Employee.**

3.1    **Duty of Loyalty.** Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2    **Conflict of Interest.**  Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions.  Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

3.3    **Compliance with Laws.**  Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States

Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA").  Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

## 4.    Restrictive Covenants.

### 4.1    Covenant Not to Compete.

**4.1.1    Competitive Business.** Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

**4.1.2    Same or Similar Services.** Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods provided by, the Company (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

**4.1.3    Continuation for Violation.** In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's last competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

### 4.2    Covenant Not to Solicit.

**4.2.1    Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work

for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

4.2.2    **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company  and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

4.2.3    **Continuation for Violation.** In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's last solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

## 5.    Confidential Information.

5.1    **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

5.2    **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is

learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

     5.3    **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

     5.4    **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical

expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

5.5 **Third-Party Information.** Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

5.6 **Non-Confidential Information.** The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7 **Former Employer Confidential Information.** Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other

person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

**6.    Inventions.**

6.1    **Inventions Retained and Licensed.** Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.** Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention. Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while

employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

      6.3    **Moral Rights.**  Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

      6.4    **Maintenance of Records.**  Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

      6.5    **Patent, Trademark and Copyright Registrations.**  Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement  and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

**7.**    **Acknowledgements.**  Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1    The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2    Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3    The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4    The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5    This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.    Survival and Remedies.** Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.    Return of Company Property.**

9.1    **Return of Company Property.** All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2    **Termination Certificate.** Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3    **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4    **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information). Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5    **No Expectation of Privacy in Company Property.** Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for

Company purposes. Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9** and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10.    **Audit.** Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

11.    **Setoff.** Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck, including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

**12.    No Conflicting Agreements or Improper Use of Third-Party Information.**  During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

**13.    Duty to Disclose Subsequent Employment.**  During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

**14.    Arbitration.**

**14.1    Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF**

**EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2 **Procedure.** Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator. The arbitrator shall be selected in the manner provided in the AHLA Rules. The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law. The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3 **Method of Selection.** Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4 **Notice in Connection with Arbitration.** All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5 **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6 **Satisfaction of Award.** If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the

maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7    **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8    **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9    **Administrative Relief.** EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

## 15.    General Provisions.

15.1    **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2    **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives)

and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3    **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company.  The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4    **Waiver.**  The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5    **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6    **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8    **Further Assurances.** Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9    **Title, Headings and Gender.** The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement. Throughout this Agreement, where such meanings would be

appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10    **Attorney's Fees.** Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11    **Notices.** All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:        Stimwave LLC
                    Attention: Laura Tyler Perryman, CEO
                    1310 Park Central Blvd South
                    Pompano Beach, Florida 33064

To Employee:        Novell McGloster
                    306 North Lakeside Ct # A1
                    West Palm Beach, Florida 33407

15.12    **No Third-party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee. It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13    **Invalid Provisions.**  If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement will be construed and enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect.  Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

15.14    **Representations and Warranties.**  Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under,

constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

15.15   **Representation of Attorney.** Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

15.16   **Voluntary Agreement.**  Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.


[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _____

Print Name: Novell McGloster

**WITNESS:**

Signature: _____

Print Name:  Elizabeth Greene

**EMPLOYER:**

**Stimwave LLC**

Signature: _____

By: Laura Tyler Perryman
Title: CEO
      Representative with authority to bind
      Stimwave LLC

## COMPENSATION SCHEDULE

**1.    Base Salary.**  For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $80,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2.    Bonuses.**  Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**3.    Equity.**  Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. The Board or the Committee will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**4.    Employee Benefits.**  In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **3** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 4.4** below, shall terminate upon the cessation of Employee's employment:

4.1    **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof.  Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

4.2    **Vacation.** Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

    4.3    **Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS**
**AND ORIGINAL WORKS OF AUTHORSHIP**

Identifying Number or
Title                                    Date                    Brief Description

_____ No inventions or improvements

_____ Additional Sheets Attached

Date: _____ Jul 30, 2019 _____          _____
                                                 Employee's Signature

                                                 Novell McGloster
                                                 _____
                                                 Print Name of Employee

DocuSign Envelope ID: F562CD95-9B29-420F-BEBD-23D7F451D550

## **EXHIBIT B**

### **STIMWAVE LLC TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:

_____

_____

_____

Date: _____          _____

                                              Employee's Signature

                                              _____

                                              Print Name of Employee

## EXHIBIT C

## STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

## STIMWAVE LLC

## CONSULTING AGREEMENT

This Consulting Agreement (this "**Agreement**") is made and entered into as of 16th of October 2019 (the "**Effective Date**") by and between Stimwave LLC, a Nevada corporation with its principal place of business at 1310 Park Central Blvd South, Pompano Beach, Florida 33064 (the "**Company**"), and Harold Kravatsky ("**Consultant**") (each herein referred to individually as a "**Party**," or collectively as the "**Parties**").

The Company desires to retain Consultant as an independent contractor to perform consulting services for the Company, and Consultant is willing to perform such services, on the terms described below.  In consideration of the mutual promises contained herein, the Parties agree as follows:

1.     **Services and Compensation**

Consultant shall perform the services described in **Exhibit A** (the "**Services**") for the Company (or its designee), and the Company agrees to pay Consultant the compensation described in **Exhibit A** for Consultant's performance of the Services.

2.     **Applicability to Past Activities**

Consultant agrees that if and to the extent that Consultant provided any services or made efforts on behalf of or for the benefit of Company, or related to the current or prospective business of Company in anticipation of Consultant's involvement with the Company, that would have been "Services" if performed during the term of this Agreement (the "**Prior Consulting Period**") and to the extent that during the Prior Consulting Period: (i) Consultant received access to any information from or on behalf of Company that would have been "Confidential Information" (as defined below) if Consultant received access to such information during the term of this Agreement; or (ii) Consultant conceived, created, authored, invented, developed or reduced to practice any item (including any intellectual property rights with respect thereto) on behalf of or for the benefit of Company, or related to the current or prospective business of Company in anticipation of Consultant's involvement with Company, that would have been an "Invention" (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement; then any such information shall be deemed "Confidential Information" hereunder and any such item shall be deemed an "Invention" hereunder, and this Agreement shall apply to such activities, information or item as if disclosed, conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement. Consultant further acknowledges that Consultant has been fully compensated for all services provided during any such Prior Consulting Period.

3.     **Confidentiality**

A.     **Definition of Confidential Information.** "**Confidential Information**" means any non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, its affiliates or subsidiaries, or to the Company's, its affiliates' or subsidiaries' technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's, its affiliates' or subsidiaries' products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on whom Consultant called or with whom Consultant became acquainted during the term of this Agreement), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information

disclosed by the Company, its affiliates or subsidiaries, either directly or indirectly, in writing, orally or by drawings or inspection of premises, parts, equipment, or other property of Company, its affiliates or subsidiaries. Notwithstanding the foregoing, Confidential Information shall not include any such information which Consultant can establish (i) was publicly known or made generally available prior to the time of disclosure to Consultant; (ii) becomes publicly known or made generally available after disclosure to Consultant through no wrongful action or inaction of Consultant; or (iii) is in the rightful possession of Consultant, without confidentiality obligations, at the time of disclosure as shown by Consultant's then-contemporaneous written records.

B.      ***Nonuse and Nondisclosure.*** During and after the term of this Agreement, Consultant will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Confidential Information, and Consultant will not (i) use the Confidential Information for any purpose whatsoever other than as necessary for the performance of the Services on behalf of the Company, or (ii) disclose the Confidential Information to any third party without the prior written consent of an authorized representative of Company. Consultant may disclose Confidential Information to the extent compelled by applicable law; *provided however*, prior to such disclosure, Consultant shall provide prior written notice to Company and seek a protective order or such similar confidential protection as may be available under applicable law. Consultant agrees that no ownership of Confidential Information is conveyed to the Consultant. Without limiting the foregoing, Consultant shall not use or disclose any Company property, intellectual property rights, trade secrets or other proprietary know-how of the Company to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design identical or substantially similar designs as those developed under this Agreement for any third party. Without the Company's prior written approval, Consultant shall not directly or indirectly disclose to anyone the existence of this Agreement or the fact that Consultant has this arrangement with the Company. Consultant agrees that Consultant's obligations under this Section 3.B shall continue after the termination of this Agreement.

C.      ***Other Client Confidential Information.*** Consultant agrees that Consultant will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former or concurrent employer of Consultant or other person or entity with which Consultant has an obligation to keep in confidence. Consultant also agrees that Consultant will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D.      ***Third Party Confidential Information.*** Consultant recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Consultant agrees that at all times during the term of this Agreement and thereafter, Consultant owes the Company and such third parties a duty to hold all such confidential or proprietary information in the strictest confidence and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out the Services for the Company consistent with the Company's agreement with such third party.

4.      **Ownership**

A.      ***Assignment of Inventions.*** Consultant agrees that all right, title, and interest in and to any copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by Consultant, solely or in collaboration with others, during the term of this

Agreement and arising out of, or in connection with, performing the Services under this Agreement and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing (collectively, "***Inventions***"), are owned by both Parties, with an assignment in perpetuity to the Company. Consultant also agrees to promptly make full written disclosure to the Company of any Inventions and to deliver and assign (or cause to be assigned) and hereby irrevocably assigns fully to the Company all right, title and interest in and to the Inventions.

        B.     ***Pre-Existing Materials***. Subject to Section 4.A, Consultant agrees that if, in the course of performing the Services, Consultant incorporates into any Invention or utilizes in the performance of the Services any pre-existing invention, discovery, original works of authorship, development, improvements, trade secret, concept, or other proprietary information or intellectual property right owned by Consultant or in which Consultant has an interest ("***Prior Inventions***"), (i) Consultant will provide the Company with prior written notice and (ii) the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable, worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. Consultant will not incorporate any invention, improvement, development, concept, discovery, work of authorship or other proprietary information owned by any third party into any Invention without Company's prior written permission.

        C.     ***Moral Rights***. Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "***Moral Rights***"). To the extent that Moral Rights cannot be assigned under applicable law, Consultant hereby waives and agrees not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

        D.     ***Maintenance of Records***. Consultant agrees to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by Consultant (solely or jointly with others) during the term of this Agreement, and for a period of three (3) years thereafter. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that is customary in the industry and/or otherwise specified by the Company. Such records are and remain the sole property of the Company at all times and upon Company's request, Consultant shall deliver (or cause to be delivered) the same.

        E.     ***Further Assurances***. Consultant agrees to assist Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments that the Company may deem necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns and nominees the sole and exclusive right, title, and interest in and to all Inventions and testifying in a suit or other proceeding relating to such Inventions. Consultant further agrees that Consultant's obligations under this Section 4.E shall continue after the termination of this Agreement.

        F.     ***Attorney-in-Fact***. Consultant agrees that, if the Company is unable because of Consultant's unavailability, dissolution, mental or physical incapacity, or for any other reason, to secure Consultant's signature with respect to any Inventions, including, without limitation, for the purpose of

applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to the Company in Section 4.A, then Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agent and attorney-in-fact, to act for and on Consultant's behalf to execute and file any papers and oaths and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by Consultant. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

### 5.    Conflicting Obligations

A.    Consultant represents and warrants that Consultant has no agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, Consultant's obligations to the Company under this Agreement, and/or Consultant's ability to perform the Services. Consultant will not enter into any such conflicting agreement during the term of this Agreement.

B.    In light of the unique and specialized nature of Consultant's services, Consultant shall have the right to subcontract the performance of any Services only with the prior written permission of the Company. In the event the Company authorizes Consultant to subcontract the performance of any Services, Consultant shall require all Consultant's employees, contractors, or other third-parties performing Services under this Agreement to execute a customary Confidential Information and Assignment Agreement in form and substance acceptable to the Company, in its sole and absolute discretion.   Consultant's violation of this Article 5 will be considered a material breach under Section 8.B.

### 6.    Return of Company Materials

Upon the termination of this Agreement, or upon Company's earlier request, Consultant will immediately deliver to the Company, and will not keep in Consultant's possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Confidential Information, tangible embodiments of the Inventions, all devices and equipment belonging to the Company, all electronically-stored information and passwords to access such property, those records maintained pursuant to Section 4.D and any reproductions of any of the foregoing items that Consultant may have in Consultant's possession or control.

### 7.    Reports

Consultant agrees that Consultant will periodically keep the Company advised as to Consultant's progress in performing the Services under this Agreement. Consultant further agrees that Consultant will, as requested by the Company, prepare written reports with respect to such progress. The Company and Consultant agree that the reasonable time expended in preparing such written reports will be considered time devoted to the performance of the Services.

### 8.    Term and Termination

A.    *Term.* The term of this Agreement will begin on the Effective Date of this Agreement and will continue until the earlier of (i) final completion of the Services or (ii) termination as provided in Section 8.B.

DocuSign Envelope ID: DFFB98E2-98F4-4EF5-9B40-B3717301CA28

B.      ***Termination.*** The Company may terminate this Agreement upon giving Consultant fourteen (14) days prior written notice of such termination pursuant to Section 13.G of this Agreement. The Company may terminate this Agreement immediately and without prior notice if Consultant refuses to or is unable to perform the Services or is in breach of any material provision of this Agreement.

C.      ***Survival.*** Upon any termination, all rights and duties of the Company and Consultant toward each other shall cease except:

(1)      The Company will pay, within thirty (30) days after the effective date of termination, all amounts owing to Consultant for Services completed and accepted by the Company prior to the termination date and related reimbursable expenses, if any, submitted in accordance with the Company's policies and in accordance with the provisions of Article 1 of this Agreement; and

(2)      Article 3 (Confidentiality), Article 4 (Ownership), Section 5.B (Conflicting Obligations), Article 6 (Return of Company Materials), Article 8 (Term and Termination), Article 9 (Independent Contractor; Benefits), Article 10 (Noninterference), Article 11 (Limitation of Liability), Article 12 (Arbitration and Equitable Relief), and Article 13 (Miscellaneous) will survive termination or expiration of this Agreement in accordance with their terms.

**9.      Independent Contractor; Benefits**

A.      ***Independent Contractor.*** It is the express intention of the Company and Consultant that Consultant perform the Services as an independent contractor to the Company. Nothing in this Agreement shall in any way be construed to constitute Consultant as an agent, employee or representative of the Company. Without limiting the generality of the foregoing, Consultant is not authorized to bind the Company to any liability or obligation or to represent that Consultant has any such authority. Consultant agrees to furnish (or reimburse the Company for) all tools and materials necessary to accomplish this Agreement and shall incur all expenses associated with performance, except as expressly provided in **Exhibit A**. Consultant acknowledges and agrees that Consultant is obligated to report as income all compensation received by Consultant pursuant to this Agreement. Consultant agrees to and acknowledges the obligation to pay all self-employment and other taxes on such income.

B.      ***Benefits.*** The Company and Consultant agree that Consultant will receive no Company-sponsored benefits from the Company where benefits include, but are not limited to, paid vacation, sick leave, medical insurance and 401k participation. If Consultant is reclassified by a state or federal agency or court as the Company's employee, Consultant will become a reclassified employee and will receive no benefits from the Company, except those mandated by state or federal law, even if by the terms of the Company's benefit plans or programs of the Company in effect at the time of such reclassification, Consultant would otherwise be eligible for such benefits.

**10.      Nonsolicitation**

To the fullest extent permitted under applicable law, from the date of this Agreement until twelve (12) months after the termination of this Agreement for any reason (the "***Restricted Period***"), Consultant will not, without the Company's prior written consent, directly or indirectly, solicit any of the Company's employees to leave their employment, or attempt to solicit employees of the Company, either for Consultant or for any other person or entity. Consultant agrees that nothing in this Article 10 shall affect Consultant's continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, Consultant's obligations under Article 3.

11.    **Limitation of Liability**

IN NO EVENT SHALL COMPANY BE LIABLE TO CONSULTANT OR TO ANY OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORY OF LIABILITY, REGARDLESS OF WHETHER COMPANY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. IN NO EVENT SHALL COMPANY'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE AMOUNTS PAID BY COMPANY TO CONSULTANT UNDER THIS AGREEMENT FOR THE SERVICES, DELIVERABLES OR INVENTION GIVING RISE TO SUCH LIABILITY.

12.    **Arbitration and Equitable Relief**

A.    ***Arbitration.*** IN CONSIDERATION OF CONSULTANT'S CONSULTING RELATIONSHIP WITH COMPANY, ITS PROMISE TO ARBITRATE ALL DISPUTES RELATED TO CONSULTANT'S CONSULTING RELATIONSHIP WITH THE COMPANY AND CONSULTANT'S RECEIPT OF THE COMPENSATION AND OTHER BENEFITS PAID TO CONSULTANT BY COMPANY, AT PRESENT AND IN THE FUTURE, CONSULTANT AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE), WHETHER BROUGHT ON AN INDIVIDUAL, GROUP, OR CLASS BASIS, ARISING OUT OF, RELATING TO, OR RESULTING FROM CONSULTANT'S CONSULTING RELATIONSHIP WITH THE COMPANY OR THE TERMINATION OF CONSULTANT'S CONSULTING RELATIONSHIP WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1280 THROUGH 1294.2, INCLUDING SECTION 1281.8 (THE "***ACT***") AND PURSUANT TO CALIFORNIA LAW. THE FEDERAL ARBITRATION ACT SHALL CONTINUE TO APPLY WITH FULL FORCE AND EFFECT NOTWITHSTANDING THE APPLICATION OF PROCEDURAL RULES SET FORTH IN THE ACT. **DISPUTES WHICH CONSULTANT AGREES TO ARBITRATE, AND THEREBY AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE CALIFORNIA FAMILY RIGHTS ACT, THE CALIFORNIA LABOR CODE, CLAIMS OF HARASSMENT, DISCRIMINATION AND WRONGFUL TERMINATION AND ANY STATUTORY OR COMMON LAW CLAIMS.** CONSULTANT FURTHER UNDERSTANDS THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH CONSULTANT.

B.    ***Procedure.*** CONSULTANT AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("***JAMS***") PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE "***JAMS RULES***"). CONSULTANT AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO

DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS, PRIOR TO ANY ARBITRATION HEARING. CONSULTANT AGREES THAT THE ARBITRATOR SHALL ISSUE A WRITTEN DECISION ON THE MERITS. CONSULTANT ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, EXCEPT AS PROHIBITED BY LAW. CONSULTANT AGREES THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF. CONSULTANT AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH CALIFORNIA LAW, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL CALIFORNIA LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH CALIFORNIA LAW, CALIFORNIA LAW SHALL TAKE PRECEDENCE. CONSULTANT FURTHER AGREES THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN SANTA CLARA, CALIFORNIA.

C.     *Remedy*. EXCEPT AS PROVIDED BY THE ACT AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE, AND FINAL REMEDY FOR ANY DISPUTE BETWEEN CONSULTANT AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE ACT AND THIS AGREEMENT, NEITHER CONSULTANT NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

D.     *Availability of Injunctive Relief*. IN ACCORDANCE WITH RULE 1281.8 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE, THE PARTIES AGREE THAT ANY PARTY MAY ALSO PETITION THE COURT FOR INJUNCTIVE RELIEF WHERE EITHER PARTY ALLEGES OR CLAIMS A VIOLATION OF ANY AGREEMENT REGARDING INTELLECTUAL PROPERTY, CONFIDENTIAL INFORMATION OR NONINTERFERENCE. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

E.     *Administrative Relief*. CONSULTANT UNDERSTANDS THAT EXCEPT AS PERMITTED BY LAW THIS AGREEMENT DOES NOT PROHIBIT CONSULTANT FROM PURSUING CERTAIN ADMINISTRATIVE CLAIMS WITH LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODIES OR GOVERNMENT AGENCIES SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE CONSULTANT FROM BRINGING ANY ALLEGED WAGE CLAIMS WITH THE DEPARTMENT OF LABOR STANDARDS ENFORCEMENT. LIKEWISE, THIS AGREEMENT DOES PRECLUDE CONSULTANT FROM PURSUING COURT ACTION REGARDING ANY ADMINISTRATIVE CLAIMS, EXCEPT AS PERMITTED BY LAW.

F.     *Voluntary Nature of Agreement*. CONSULTANT ACKNOWLEDGES AND AGREES THAT HE/SHE IS EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. CONSULTANT FURTHER ACKNOWLEDGES AND AGREES THAT HE/SHE HAS CAREFULLY READ THIS AGREEMENT AND THAT CONSULTANT HAS ASKED ANY QUESTIONS NEEDED FOR

CONSULTANT TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *CONSULTANT IS WAIVING HIS/HER RIGHT TO A JURY TRIAL*. FINALLY, CONSULTANT AGREES THAT HE/SHE HAS BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF CONSULTANT'S CHOICE BEFORE SIGNING THIS AGREEMENT.

### 13.    Miscellaneous

A.    *Governing Law; Consent to Personal Jurisdiction.* This Agreement shall be governed by the laws of the State of California without regard to the conflicts of law provisions of any jurisdiction. To the extent that any lawsuit is permitted under this Agreement, the Parties hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in California.

B.    *Assignability.* This Agreement will be binding upon Consultant's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as expressly stated. Except as may otherwise be provided in this Agreement, Consultant may not sell, assign or delegate any rights or obligations under this Agreement. Notwithstanding anything to the contrary herein, Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

C.    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties, including that certain Nondisclosure Agreement between the Company and Consultant, dated January 3rd, 2012. Consultant represents and warrants that he/she is not relying on any statement or representation not contained in this Agreement.  To the extent any terms set forth in any exhibit or schedule conflict with the terms set forth in this Agreement, the terms of this Agreement shall control unless otherwise expressly agreed by the Parties in such exhibit or schedule.

D.    *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E.    *Severability.* If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F.    *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the Parties. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.    *Notices.* Any notice or other communication required or permitted by this Agreement to be given to a Party shall be in writing and shall be deemed given (i) if delivered personally or by commercial messenger or courier service, (ii) when sent by confirmed facsimile, or (iii) if mailed by U.S. registered or certified mail (return receipt requested), to the Party at the Party's address written

below or at such other address as the Party may have previously specified by like notice. If by mail, delivery shall be deemed effective three business days after mailing in accordance with this Section 13.G.

       (1)      If to the Company, to:
                1310 Park Central Blvd South
                Pompano Beach, FL 33064
                Attention: President

       (2)      If to Consultant, to the address for notice on the signature page to this Agreement or, if no such address is provided, to the last address of Consultant provided by Consultant to the Company.

       H.     ***Attorneys' Fees.*** In any court action at law or equity that is brought by one of the Parties to this Agreement to enforce or interpret the provisions of this Agreement, the prevailing Party will be entitled to reasonable attorneys' fees, in addition to any other relief to which that Party may be entitled.

       I.     ***Signatures.*** This Agreement may be signed in two counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

*(signature page follows)*

      IN WITNESS WHEREOF, the Parties hereto have executed this Consulting Agreement as of the date first written above.

**CONSULTANT**

By: __H Kravatsky__
    FDCA2F28A072472...

Name: Harold Kravatsky

Title: Prject RF Engineer

Address for Notice:

   1440 Coral Ridge Drive

   Coral Springs FL 33071

**STIM WAVE LLC**

By: __Laura Tyler Perryman__
    8C090690DB4C4D3...

Name: Laura Perryman

Title: CEO

**EXHIBIT A**

**SERVICES AND COMPENSATION**

1.      *Contact*. Consultant's principal Company contact:

Name: Harold Kravatsky

Title: Principle RF Engineer

Email: harold.kravatsky@gmail.com

Phone: 954-753-3000

2.      *Services*.  The Services will include, but will not be limited to, the following:

Design and coordination of fabrication of analog/RF transceiver boards

Perform mechanical and electrical testing of materials, assembled components, and prototype transmitters.

Provide documentation that can be readily transferred to specifications and prototype manufacturing compliant with regulatory standards and design history files.

Provide training and technical support as required to facilitate the introduction of new processes.

Perform expert-level engineering analyses such as stress, basic failure analysis, tolerance stack, material selection, and FMEA.

Develop and execute advanced test protocols, perform advanced analyses, interpret results, provide recommendations, and publish associated reports

Troubleshoot equipment/process problems to root cause, and implement permanent solutions.

Work independently and collaborate closely with colleagues and strategic suppliers

3.      *Compensation.*

A.      The Company will pay Consultant <u>$100 per hourly basis</u>. Consulting hours for other consulting services under this agreement will be estimated and provided to the Company for express written authorization in advance.

B.      The Company will reimburse Consultant, in accordance with Company policy, for all reasonable expenses incurred by Consultant in performing the Services pursuant to this Agreement, if Consultant receives written consent from an authorized agent of the Company prior to incurring such expenses and submits receipts for such expenses to the Company in accordance with Company policy.

Every month, Consultant shall submit an hourly time sheet for approval of the contact person listed above or other designated agent of the company. Every month, consultant shall submit to the

company a written invoice for services and expenses, and such statement shall be subject to the approval of the contact person listed above or other designated agent of the Company

This **Exhibit A** is accepted and agreed upon as of 16th of October 2019.

**CONSULTANT**

By: _____

Name: Harold Kravatsky

Title: Project RF Engineer

**STIM WAVE LLC**

By: _____

Name: Laura Perryman

Title: CEO

## MUTUAL NON-DISCLOSURE AND NON-USE AGREEMENT

**THIS MUTUAL NON-DISCLOSURE AND NON-USE AGREEMENT** (this **"Agreement"**) is effective as of the last date signed below (the **"Effective Date"**) by and between **Stimwave Technologies Incorporated**, a company duly incorporated under the laws of Delaware, with its principal address located at 1310 Park Central Blvd S, Pompano Beach, FL 33064 (**"Stimwave"**) and the party listed in the signature block below (the **"Company"**).

WHEREAS, in connection with the consideration of a potential business relationship (the **"Possible Transaction"**) between Stimwave and the Company (each, a **"party"** and collectively, the **"parties"**), each party may receive "Confidential Information" (as hereinafter defined) (in such capacity, the **"Receiving Party"**) from the other party (in such capacity, the **"Disclosing Party"**).

NOW, THEREFORE, each of Stimwave and the Company, in its capacity as the Receiving Party, hereby undertakes and agrees, as a material condition for any disclosure of any Confidential Information to be made from the Disclosing Party or on its behalf to the Receiving Party, to strictly abide by the terms and conditions set forth below:

1.      **Definition of Confidential Information**. For purposes hereof, **"Confidential Information"** shall include all and any information of a confidential or proprietary nature relating to the Disclosing Party and its Affiliates, including the business thereof, whether or not patentable that has been or will be disclosed to the Receiving Party by the Disclosing Party or any person or entity on its behalf, whether in tangible form (including, without limitation, electronic form) or non-tangible form. Confidential Information shall include without limitation (subject to the terms above in this Section 1), any technical, commercial and financial information, forecasts, projections, strategic plans, conceptions, developments, ideas, discoveries, improvement, inventions, know how, innovations, technology, trade secrets, professional secrets, copyrights and any other intellectual property, whether communicated orally or written or on disk or by electronic media or in any other media, way or method (including, but not limited to, documentation, drawings, reports, surveys, correspondence, formula, data, specification, materials, processes, models, prototypes, drawings, blueprints, designs, manuals, specification documents, documentation, source or object codes, tape discs and other storage media, letters, notes, notebooks, reports, and all other materials or devices, or the like). Confidential Information also includes any information that Disclosing Party has received from a third party that Disclosing Party is obligated to treat as confidential or proprietary. The Disclosing Party shall determine in its sole discretion what information and materials it shall disclose to the Receiving Party. "Affiliate" shall mean any corporation, company, or other entity, which: (i) is Controlled by a party hereto; or (ii) Controls a party hereto; or (iii) is under common Control with a party hereto, for so long as such Control exists. For this purpose "Control" means that more than fifty percent (50%) of the controlled entity's shares or ownership interest representing the right to make decisions for such entity are owned or controlled, directly or indirectly, by the controlling entity. Confidential Information so received hereunder by an Affiliate of either party shall be considered as Confidential Information received by such party itself and be subject to the terms and conditions of this Agreement.

2.      **Exclusions from Confidential Information**. For the purpose of this Agreement, Confidential Information shall not include any information which: (a) is in the public domain at the Effective Date or which becomes part of the public domain thereafter, other than through the Receiving Party's or any of its Authorized Transferees' (as defined below) breach of this Agreement; or (b) was readily available to the Receiving Party on a non-confidential basis prior to its disclosure to the Receiving Party, as evidenced by written records; or (c) was already lawfully in the Receiving Party's possession as of the Effective Date, as evidenced by written records; or (d) becomes available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party, provided such source is not itself bound by any confidentiality agreement with the Disclosing Party; or (e) was independently developed by the Receiving Party without any use or reference to the Confidential Information of the Disclosing Party; or (f) is required to be disclosed by law, statute (including any securities laws) or a valid order of a court or other governmental body having jurisdiction; *provided, that*, the Receiving Party provides the Disclosing Party with reasonable prior written notice of such disclosure and makes a reasonable effort to obtain, or to assist the Disclosing Party in obtaining, a protective order preventing or limiting the disclosure and/or requiring

1

that the Confidential Information so disclosed be used only for the purposes for which the law or statute required, or for which the order was issued.

3.    **Duty of Confidentiality and Non Use**.  Receiving Party agrees to treat as confidential and secret all Confidential Information that has been or may hereafter be disclosed, directly or indirectly, to Receiving Party, either orally, in writing or through inspection.  Subject to Section 2 and Section 9 hereof, Receiving Party agrees that at all times and notwithstanding any termination or expiration of this Agreement, it  shall: (a) use the Confidential Information solely and exclusively for the purpose of evaluating the Possible Transaction between the parties hereto and for fulfilling its obligations under any agreement signed between the parties with respect thereto (the **"Purpose"**); (b) treat and maintain all Confidential Information in strict confidence, using a reasonable degree of care the Receiving Party uses to protect its own confidential information; (c) not make, have made, use or sell for any purpose any product or other item using, incorporating or derived from any Confidential Information; (d) not disclose or transfer, directly or indirectly, the Confidential Information or any part thereof, or any document or other material (in any medium), which contains, summarizes or embodies the Confidential Information or any part thereof, to any person, firm, corporation or any other entity, at any time without the prior, express consent of the Disclosing Party; provided notwithstanding, that the Receiving Party may disclose Confidential Information to its employees, officers, directors, agents and professional advisers (the **"Authorized Transferees"**) who: (i) reasonably need to know the Confidential Information for the Purpose; and (ii) are under a duty of confidentiality substantially similar in scope to the provisions regarding confidentiality herein.  Receiving Party will promptly notify Disclosing Party upon discovery of any loss or unauthorized disclosure of the Confidential Information.

4.    **Return of Confidential Information**.  Upon the first request of the Disclosing Party or upon the termination or expiration of this Agreement, whichever is earlier, the Receiving Party shall promptly destroy or deliver to the Disclosing Party any and all originals and copies of all documents and any and all materials (in any medium), which contain, summarize or embody the Confidential Information or any part thereof, which are then in the possession of the Receiving Party, its Authorized Transferees, or under any of their control; provided, however, that the Receiving Party may retain one complete copy of the written Confidential Information and certain electronic copies of the same in its legal archives, pursuant to its records retention policies - which such  copies shall remain subject to the terms and conditions regarding confidentiality provided herein. Any such retained copies may solely be used (a) for records retention purposes, (b) in connection with any dispute with the Disclosing Party, including, without limitation, for the purpose of demonstrating that the Receiving Party has abided with its obligations under this Agreement, (c) any dispute between the parties with respect to agreements which may be entered into between the parties in connection with the Purpose, or (d) the Receiving Party's compliance with its obligations under Section 2(f) above. Any reproduction of any Confidential Information will remain the property of the Disclosing Party and will contain any and all confidential or proprietary notices or legends that appear on the original.

5.    **Rights in Confidential Information**.  All Confidential Information shall at all times remain the property of Disclosing Party.  The Receiving Party shall not acquire any intellectual property or other rights in the Confidential Information and this Agreement shall not be construed in any way to grant the Receiving Party any right or license with respect to Confidential Information other than the right to use Confidential Information strictly in accordance with the terms of this Agreement and solely for the Purpose. To the extent that any Confidential Information includes materials subject to the attorney-client privilege or any similar protection or privilege, the Disclosing Party and its Affiliates are not waiving and shall not be deemed to have waived or diminished their attorney work-product protections, attorney-client privileges or similar protections or privileges as a result of disclosing any Confidential Information (including Confidential Information related to pending or threatened litigation).

6.    **No Warranty**.    ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS".  EACH PARTY MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY, COMPLETENESS OR FITNESS FOR A PARTICULAR PURPOSE.

7.    **No Obligations**.  Nothing herein shall be construed as an obligation of a party to enter into any transaction of any kind with the other party and/or to disclose any Confidential Information.

8. **Existence of Agreement; Discussions between the Parties**. Unless the Receiving Party receives prior written consent from the Disclosing Party, the Receiving Party will not, and will direct its Authorized Transferees not to, disclose to any person, firm, corporation or any other entity (including, without limitation, any governmental agency, authority or official or any third party) (a) the fact that the Confidential Information has been made available or furnished, (b) the fact that this Agreement exists or the terms hereof, (c) the fact that investigations, discussions or negotiations are taking place concerning the Possible Transaction or (d) any of the terms, conditions or other facts with respect to the Possible Transaction, including the status thereof (the information described in the foregoing clauses (a) through (d), **"Transaction Information"**); provided, however, that the Receiving Party may make any such disclosure if it determines (based on the written advice of outside legal counsel) that such disclosure is required by law or statute (including any securities laws) (but only after notice and consultation with the Disclosing Party).

9. **Term and Termination**. This Agreement will terminate two (2) years after the Effective Date, or may be terminated by either party at any time upon thirty (30) days written notice to the other party. The Receiving Party's obligations under this Agreement will survive termination of this Agreement and will be binding upon the Receiving Party's heirs, successors, and assigns. All obligations of confidentiality, limited use and nondisclosure hereunder with respect to any item of Confidential Information shall expire five (5) years from the date of disclosure.

10. **Trading in Securities and Material Non-Public Information**. The Receiving Party acknowledges that it is aware, and agrees to advise its Authorized Transferees, that securities laws prohibit the purchase or sale of securities by any person who is aware of material, non-public information concerning the securities or the issuer of the securities, or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

11. **Miscellaneous**. This Agreement may not be modified except by written instrument signed by a duly authorized representative of each party hereto. This Agreement or any part thereof may not be assigned by the parties hereto. This Agreement consists of the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior written or oral agreements with respect hereto. Any failure by the Disclosing Party to enforce strict performance by the Receiving Party of any provision herein shall not constitute a waiver of the right to subsequently enforce such provision or any other provision of this Agreement. Titles, sections and section headings are included solely for convenient reference and are not intended to be descriptions of the contents hereof.

12. **Notices**. Any notice required or desired to be given under this Agreement by one party to the other shall be in writing and shall be deemed to have been duly given: (a) if manually delivered, on the same business day of delivery; or (b) if mailed by registered or certified mail, postage prepaid, after five (5) days from the date of mailing; or (c) if by electronic transmission (.PDF included but facsimile excluded) which gives the sender proof of delivery, on the first business day after such transmission; to the respective party's address as set forth above or to such other address of which notice has been given in the manner above provided.

13. **Law and Venue**. This Agreement shall be governed by and construed in accordance with the laws of the State of California (without regard to principles of conflicts of laws) and shall be binding on the parties hereto in the United States and worldwide. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to seek reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled. In the event that any disputes either by the parties concerning this agreement (including their affiliates, subsidiaries, and sister companies), shall be governed by and construed in accordance with the laws of the State of California without regard for conflicts- of-law law and the parties waive the defense of forum non-conveniens. Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be resolved by arbitration administered by AAA (American Arbitration Association) and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The venue of said arbitration would be located in California or nearby area.

3

14. **Remedies**. Receiving Party agrees that its obligations hereunder are necessary and reasonable in order to protect Disclosing Party and its business, and expressly agrees that monetary damages would be inadequate to compensate Disclosing Party for any breach of any covenant or agreement set forth herein. Accordingly, Receiving Party agrees and acknowledges that any such violation or threatened violation will cause irreparable injury to Disclosing Party and that, in addition to any other remedies that may be available, in law, in equity or otherwise, Disclosing Party shall be entitled to seek and obtain injunctive relief (without the need to post bond or other security) against the threatened breach of this Agreement or the continuation of any such breach, without the necessity of proving actual damages.

15. **Severability**. If any provision of this Agreement is found by a proper authority to be unenforceable or invalid, such unenforceability or invalidity will not render this Agreement unenforceable or invalid as a whole and, in such event, such provision will be changed and interpreted so as to best accomplish the objectives of such unenforceable or invalid provision within the limits of applicable law or applicable court decisions.

16. **Counterparts**. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together is deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail (PDF format included) or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**IN WITNESS WHEREOF,** each party hereto has executed this Agreement by a representative duly authorized, effective as of the date set forth above.

STIMWAVE TECHNOLOGIES INC.                    RF RADIOCOM, INC.

By: _Laura Tyler Perryman_                    By: _Kravatsky_

Name: Laura Tyler Perryman                    Name: HAROLD KRAVATSKY

Title: CEO                                    Title: PRESIDENT

Date: Oct 21, 2019                            Date: OCTOBER 17TH, 2019

## EMPLOYMENT, NON-COMPETE, NON-SOLICITATION, CONFIDENTIAL INFORMATION, INVENTIONS AND ARBITRATION AGREEMENT

This Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement ("Agreement") is made and entered into on the 1st day of August, 2019 (the "Effective Date") by and between Stimwave LLC ("Employer" or "the Company") and Marlene Peña ("Employee") (each party individually a "Party" and collectively the "Parties").

### RECITALS:

WHEREAS, Employer researches, develops, manufactures, supports, and provides services for highly specialized medical devices throughout the world; and

WHEREAS, Employer desires to engage Employee under the terms and conditions as hereinafter defined, or, if Employee is already employed by Employer, Employer desires to continue the employment of Employee, on and subject to the terms and conditions contained herein; and

WHEREAS, Employee desires to perform services for Employer in a position that will allow Employee access to various trade secrets and confidential information belonging to the Employer; that will require extraordinary and specialized training in the design, use and operation of Employer's products; that will cause Employee to develop contacts and relationships with other persons and entities, including but not limited to healthcare professionals, physicians, the Company's referral base, customers, potential customers and other employees of such entities; and that will require Employee to perform services of a unique and special nature; and

WHEREAS, if Employee and Company have previously entered into an employment agreement, or if Employee has entered into an employment agreement or a consulting agreement (referred to herein as the "Prior Agreements"), Employee and Company desire to amend and restate the Prior Agreements, to describe their relationship as provided solely in this Agreement and any addenda hereto;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby agree as follows:

1.      **Definitions.**

        1.1      **Affiliates and Affiliated Entities.** "Affiliates" and "Affiliated Entities" means: (i) all persons or entities directly controlling, controlled by or under common control with the Company; and (ii) all other corporations, partnerships, limited liability companies, joint ventures or other entities of which an aggregate of twenty five percent (25%) or more of the issued and outstanding capital stock or other equity interests are now or hereafter owned of record or beneficially, directly or indirectly, by Stimwave LLC and/or its subsidiaries. For purposes of this definition, the term "controlling, controlled by or under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or the policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

1.2 **Competitive Business.** "Competitive Business" means (i) any person (including Employee), entity or organization which is engaged in or about to become engaged in research on, design of, consulting regarding, or development, production, manufacture, promotion, marketing or selling of any product, process, technology, device, invention or service which resembles, competes with or is intended to resemble or compete with a product, process, technology, device, invention or service of the Company; or (ii) any other line of business that was conducted or proposed to be conducted by the Company or any Affiliate, successor or related entity at any time during the term of Employee's employment with the Company.

1.3 **Customer.** "Customer" means a person or entity with which Employee had contact or about whom Employee gained information while an Employee of the Company, and to which the Company was selling or providing products or services, was in active negotiations for the sale of its products or services, or was otherwise doing business as of the date of the cessation of Employee's employment with the Company or with whom the Company had otherwise done business within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company.

1.4 **Business Associates.** "Business Associates" means prospective or existing referral sources, Customers, clients, suppliers, employees, agents, funding sources, and other business relationships of the Company.

1.5 **Electronic Media Equipment.** "Electronic Media Equipment" means computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and all other electronic media devices.

1.6 **Electronic Media Systems.** "Electronic Media Systems" means computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for use directly by the Company or by third-party providers on behalf of the Company.

1.7 **Inventions.** "Inventions" means any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks (and all associated goodwill), mask works, or trade secrets, whether or not they may be patented or registered under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during Employee's employment by the Company.

1.8 **Person.** "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, or any other entity or organization.

1.9 **Restricted Period.** "Restricted Period" means the two (2) years immediately following the cessation of his or her employment (regardless of the reason for or circumstances of the cessation of Employee's employment) with the Company.

2. **Terms and Termination.**

2.1 **Employment "At-Will" Relationship.** Employee is employed on an "at-will" basis, which means that the Company or Employee has the right to terminate Employee's

DocuSign Envelope ID: 50523F64-6232-4EA2-89B0-B9551DA46190

employment relationship with the Company at any time, with or without cause and with or without notice.

2.2 **Full-Time Best Efforts.** Employee agrees to devote Employee's full professional time and attention to the business of the Company (and its subsidiaries, Affiliates, or related entities) and the performance of Employee's obligations under this Agreement, and will at all times faithfully, industriously and to the best of Employee's ability, experience and talent, perform all of Employee's obligations hereunder. Employee shall not, at any time during Employee's employment by the Company, directly or indirectly, act as a partner, officer, director, employee, consultant, or provide services in any other capacity to any other business enterprise without the prior written consent and approval of an officer of or other individual with authority from the Company.

2.3 **Compensation and Benefits.** For the performance of Employee's obligations hereunder, Employer shall pay to Employee, and Employee agrees to accept from Employer, the compensation set forth in the compensation schedule that is attached hereto and made a part hereof, as it may be amended from time to time in writing (the "**Compensation Schedule**").

## 3. **Duties and Obligations of Employee.**

3.1 **Duty of Loyalty.** Employee acknowledges that during Employee's employment with the Company, Employee has participated in and will participate in relationships with existing and prospective clients, Customers, partners, suppliers, service providers and vendors of the Company that are essential elements of the Company's goodwill. The Parties acknowledge that Employee owes the Company a fiduciary duty to conduct all affairs of the Company in accordance with all applicable laws and the highest standards of good faith, trust, confidence and candor, and to endeavor, to the best of Employee's ability, to promote the best interests of the Company.

3.2 **Conflict of Interest.** Employee agrees that while employed by the Company, and except with the advance written consent of a duly authorized officer of the Company, Employee will not enter into, on behalf of the Company, or cause the Company or any of its Affiliates to enter into, directly or indirectly, any transactions with any business organization in which Employee or any member of Employee's immediate family may be interested as a shareholder, partner, member, trustee, director, officer, employee, consultant, lender or guarantor or otherwise; provided, however, that nothing in this Agreement shall restrict transactions between the Company and any company whose stock is listed on a national securities exchange or actively traded in the over-the-counter market and over which Employee does not have the ability to control or significantly influence policy decisions. Employee further agrees to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines, (a current copy of which is attached to this Agreement as **Exhibit C**) as may be amended or revised from time to time during his or her employment.

3.3 **Compliance with Laws.** Employee agrees that the Parties each intend for this Agreement to comply with all applicable federal and state statutes, laws and regulations, including, but not limited to, the federal anti-kickback law, the federal physician self-referral law, and all federal and state laws governing the confidentiality and privacy of protected health information including, without limitation, the privacy and security regulations issued by the United States

Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 ("HIPAA").  Employee further agrees to diligently adhere to all policies of the Company with regard to such federal and state statutes, laws and regulations as may be amended or revised from time to time during his or her employment.

**4.      Restrictive Covenants.**

    4.1      **Covenant Not to Compete.**

        4.1.1      **Competitive Business.** Employee agrees that during the course of employment with the Company and during the Restricted Period Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any person or business entity, or as an officer, director, manager, member or stockholder of a company) without written consent of an officer of or other individual with authority from the Company, directly or indirectly, engage in any Competitive Business; assist others, including but not limited to employees of the Company, to engage in any Competitive Business; or own, purchase, finance, organize or take preparatory steps to own, purchase, finance, or organize a Competitive Business anywhere in the United States or in any foreign country in which Employer or Employer's Affiliates are then marketing or selling any of Employer's or Employer's Affiliates products or services.

        4.1.2      **Same or Similar Services.** Employee further agrees that during the course of employment with the Company and during the Restricted Period, Employee shall not compete with, or enter into any business arrangement with a Person that provides services or goods that are the same as or similar to the services or goods provided by, the Company (or any of its parents, subsidiaries, joint venturers, partners, limited partners, trustees or Affiliates) at any time, even if Employee was not engaged in providing the same or similar services or goods, and even if Employee's scope of work with the Company was unrelated to the provision of such same or similar services or goods.

        4.1.3      **Continuation for Violation.** In the event Employee violates this **Section 4.1** at any time and for any reason, this obligation will continue for two (2) years following Employee's last competitive action against the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company, and that Employee may provide services from remote locations, there are no geographical limitations on the enforcement of this covenant.

    4.2      **Covenant Not to Solicit.**

        4.2.1      **Non-Solicitation of Employees and Others.** During the course of employment with the Company and during the Restricted Period, Employee shall not, directly or indirectly, solicit, recruit, induce, employ, or contract with or attempt to solicit, recruit, induce, employ, or contract with any employee, consultant, independent contractor, vendor, supplier, or agent to (a) terminate or otherwise adversely affect his or her employment or other business relationship (or prospective employment or business relationship) with the Company, or (b) work

for Employee or any other person or entity, other than the Company or its Affiliates or related entities.

        4.2.2  **Non-Solicitation of Business Associates and Customers.** Upon hiring and during the course of Employee's employment with the Company, the Company may reveal to Employee significant information about Business Associates in addition to other Company assets and information. During the course of employment Employee may develop relationships with the Company's actual and potential referral sources, Customers, and other Business Associates. Employee acknowledges that but for his or her agreement to comply with the terms and conditions of this Agreement, Employee would not be employed by the Company, and the Company would not otherwise reveal this information to Employee or assist Employee in developing these relationships. Accordingly, Employee hereby agrees that during the course of employment with the Company  and during the Restricted Period, Employee shall not (either as an individual on his or her own account, or as a partner or joint venturer, or as an employee, contractor, consultant or agent, or under the authority of any Person, or as an officer, director, manager, member or stockholder of a company) directly or indirectly solicit or contact for any business-related purpose any Business Associate of the Company, especially actual and potential referral sources and actual and potential Customers, without the specific, prior written consent of an officer of or other individual with authority from the Company.

        4.2.3  **Continuation for Violation.** In the event Employee violates this **Section 4.2** at any time and for any reason, this obligation will continue for two (2) years following Employee's last solicitation or employment of a Business Associate or Customer of the Company that is in violation of this Agreement. Employee understands that given the nature of Employee's work with the Company and that Company's employees and Customers are located throughout the country and abroad, there are no geographical limitations on the enforcement of this covenant.

## 5.  Confidential Information.

        5.1  **Company Information**. The Company (including its Affiliates, related entities, parent companies, subsidiaries, and successor entities) possesses and will continue to possess information, whether written or verbal, or in any other medium or expression, which has value and is treated by the Company as confidential ("Company Information"). Company Information may be written, stored in a computer, merged with other information, or simply memorized. Just because it is memorized, however, does not in any way reduce its confidentiality or its proprietary nature. While some of the Company Information may be in the public domain, its compilation in a form useful to the Company makes it unique and valuable. Company Information includes information created, discovered or developed by Employee during the period of or arising out of Employee's employment by the Company, whether before or after the Effective Date of this Agreement.

        5.2  **Definition of Confidential Information.** Other than as set forth in **Section 5.6** of this Agreement, all Company Information shall constitute Confidential Information which is defined as follows: "Confidential Information" means information of any kind, nature, or description, that (i) relates to Employer's business or the business of Employer's Affiliates or Business Associates; (ii) provides Employer, Employer's Affiliates or Business Associates economic value or any business advantage; (iii) is not generally known to the public; and (iv) is

learned or developed by Employee as a direct or indirect result of or during the course of Employee's employment with Employer. Confidential Information includes, but is not limited to, Employer's trade secrets, Employer's Affiliates' trade secrets, Employer's Business Associates' trade secrets, Inventions, improvements and other intellectual property, products, product lines, new product design, systems, seminars, programs, procedures, manuals, guides, confidential reports, forecasts, designs, processes, formulae, communications, equipment, computer or other digital media, video and audio tapes, files, proposals, lists, correspondence, letters, notes, notebooks, reports, memoranda and other documents; fax, voice-mail and e-mail messages generated, received or transmitted through the use of the Company's computer and/or telecommunications equipment, hardware, software, software design and development or related code, and search engine optimization. Confidential Information also includes, without limitation, information relating to any of the Company's past, current or prospective Customers (including but not limited to lists, names, addresses, phone numbers, purchase history, accounts receivable concerning Company's Customers, customer preferences, and other financial information and any protected health information), business, merchandise, or marketing procedures, processes and services, research, marketing, developments, design, purchasing, finances and financial affairs, accounting, regulatory affairs, legal affairs, merchandising, selling, engineering, employees, training, business practices, acquisitions, potential acquisitions, vendor lists, supplier lists, pricing, pricing agreement, regulatory affairs, legal affairs, merchandise resources, supply resources, service resources, procedures manuals, policies, the prices Employer or Employer's Affiliates obtain or have obtained or at which they sell or have sold their services or products, the name of Employer's or Employer's Affiliates' personnel and those to whom the personnel report, and any other confidential information obtained during Employee's employment or affiliation with the Company.

      5.3     **Nondisclosure of Confidential Information.** At all times, both during Employee's employment by the Company and thereafter, Employee shall keep in the strictest confidence and trust all Confidential Information. Employee may use Confidential Information only as required in the performance of Employee's duties for the Company, so long as (i) any disclosure that may occur in connection with the performance of Employee's duties occurs only on a "need to know" basis, (ii) any such use is only for the benefit of the Company, and (iii) any such use will not result in any detriment or harm to the Company, its Affiliates or Business Associates, or its or their ability to maintain the information as Confidential or as a trade secret. Other than as expressly provided in this Agreement, Employee shall not directly or indirectly, in one or a series of transactions, disclose or reveal to any person or organization, or use, divulge, publish, report, transfer, or otherwise exploit for his, her or its own or anyone's else's benefit any of the Confidential Information without the express written consent of an officer of or other individual with authority from the Company.

      5.4     **Duty to Safeguard Company Information.** Employee shall take all reasonable safeguards to prevent unauthorized disclosure, replication or reproduction of Confidential Information and shall not permit any person or entity to photocopy, transcribe, or otherwise reproduce or disclose Confidential Information without the express written authorization of an officer of or other individual with authority from Company. To the extent any such authorized disclosure or use of the Confidential Information occurs, Employee shall inform all recipients of such information that the Confidential Information is confidential and proprietary to the Company. Employee shall affix, or shall cause to be fixed, appropriate notices or warnings to all physical

expressions of Confidential Information describing the Company's proprietary rights thereto. Employee shall (i) notify the Company immediately of any unauthorized possession, use or knowledge of the Confidential Information, (ii) promptly furnish full details of such possession, use or knowledge to the Company, and (iii) cooperate with the Company in any litigation or arbitration concerning such unauthorized possession, use or knowledge as may be deemed necessary by the Company to protect its proprietary rights in the Confidential Information. Except as may be expressly authorized by the Company or as is consistent with Employee's obligations with respect to the Confidential Information as set forth in this Agreement, Employee shall not (i) develop any product or service that is based in whole or in part on the Confidential Information, or (ii) modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, or copy the Confidential Information or any portion thereof.

5.5 **Third-Party Information.** Employee recognizes that the Company has received, and in the future may receive, from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold such confidential or proprietary information of third-parties in the strictest confidence and not to disclose it to any Person, other employees or another entity or to use it except as necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third-party.

5.6 **Non-Confidential Information.** The obligations of Employee set forth in **Section 5** of this Agreement shall not apply to information which (i) is generally known to the public, or which may later become generally known to the public, except where such knowledge is the result of an unauthorized disclosure by Employee or another person or entity; (ii) is lawfully and in good faith made available to Employee by a third-party who, to Employee's knowledge after inquiry, did not derive it from the Company and who imposed no obligation of confidence on Employee; (iii) is developed by Employee independent of any Confidential Information owned by the Company, as verified and evidenced by the prior written records of Employee; or (iv) is required to be disclosed in a judicial or administrative proceeding, or is otherwise required to be disclosed by law, in any such case after all reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the Company as much advance notice of the possibility of such disclosure as practical so that the Company may attempt to stop such disclosure or obtain a protective order concerning such disclosure. Employee shall provide the Company with written notice no less than ten (10) business days prior to the disclosure of any Confidential Information that may be required by law. For the purpose of this Section, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by more general information in the public domain or in the possession of Employee. In addition, any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the possession of Employee, but only if the combination itself is in the public domain or in the possession of Employee. If Employee is not sure whether certain information is Confidential Information, Employee shall treat that information as Confidential unless Employee is informed by the Company in writing to the contrary.

5.7 **Former Employer Confidential Information.** Employee agrees that during his or her employment with the Company, he or she will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other

DocuSign Envelope ID: 50523F64-6232-4FA2-89B0-B0551DA46100

person or entity to which Employee has an obligation to keep in confidence. Employee further agrees that he or she will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such former employer unless disclosure to, and use by, the Company has been consented to in writing by such former employer.

**6.    Inventions.**

6.1    **Inventions Retained and Licensed.** Attached as **Exhibit A** is a list entitled "List of Prior Inventions and Original Works of Authorship" describing all inventions and information created, discovered or developed by Employee, whether or not patentable or registrable under patent, copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or with others before Employee's employment with the Company ("Prior Inventions"), which belong in whole or in part to Employee, and which are not being assigned by Employee to the Company. Employee represents that Exhibit A is complete and contains no confidential or proprietary information belonging to a person or entity other than Employee. Employee acknowledges and agrees that Employee has no rights in any Inventions other than the Prior Inventions listed on Exhibit A. If there is nothing identified on Exhibit A, Employee represents that there are no Prior Inventions as of the time of signing this Agreement. Employee shall not incorporate, or permit to be incorporated, any Prior Invention owned by Employee or in which he or she has an interest in a Company product, process or machine without the Company's prior written consent. Employee shall also not incorporate, or permit to be incorporated any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third-party into any Invention without the Company's prior written permission.

Notwithstanding the foregoing, if, in the course of Employee's employment with the Company, Employee directly or indirectly incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, use, create derivative works from and sell such Prior Invention as part of or in connection with such product, process or machine.

6.2    **Assignment of Inventions.** Employee shall promptly make full, written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby irrevocably transfers and assigns, and agrees to transfer and assign, to the Company, or its designee, all his or her right, title and interest in and to the Inventions. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of his or her employment with the Company and which may be protected by copyright are "Works Made For Hire" as that term is defined by the United States Copyright Act. Employee understands and agrees that the decision whether to commercialize or market any Invention developed by Employee solely or jointly with others is within the Company's sole discretion and the Company's sole benefit and that no royalty will be due to Employee as a result of the Company's efforts to commercialize or market any such Invention.  Employee recognizes that Inventions relating to his or her activities while working for the Company and conceived or made by Employee, whether alone or with others, within one (1) year after cessation of Employee's employment, may have been conceived in significant part while

employed by the Company. Accordingly, Employee acknowledges and agrees that such Inventions shall be presumed to have been conceived during Employee's employment with the Company and are to be, and hereby are, assigned to the Company unless and until Employee has established the contrary.

6.3 **Moral Rights.** Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, Employee agrees to waive and not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

6.4 **Maintenance of Records.** Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during his or her employment with the Company. The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

6.5 **Patent, Trademark and Copyright Registrations.** Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights in any and all countries relating thereto, including, but not limited to, the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments the Company deems necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Inventions, and any copyrights, patents, trademarks, service marks, mask works, or any other intellectual property rights relating thereto.

Employee further agrees that his or her obligation to execute or cause to be executed, when it is in his or her power to do so, any such instrument or paper shall continue after termination or expiration of this Agreement  and after the cessation of his or her employment with the Company. If the Company is unable, due to Employee's mental or physical incapacity or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents, trademarks or copyright registrations covering Inventions or original works of authorship assigned to the Company as described above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and in his or her behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters, patent, trademarks or copyright registrations thereon with the same legal force and effect as if executed by Employee; this power of attorney shall be a durable power of attorney which shall come into existence upon Employee's mental or physical incapacity.

7. **Acknowledgements.** Employee has carefully read and considered the provisions and obligations contained in **Sections 4**, **5** and **6** of this Agreement and acknowledges and agrees that:

7.1    The geographic and duration restrictions contained in this Agreement are fair, reasonable, and necessary to protect the Company's legitimate business interests, operations and trade secrets, given the geographic scope of the Company's business operations, the competitive nature of the Company's business, and the nature of Employee's position with the Company;

7.2    Employee's employment creates a relationship of confidence and trust between Employee and the Company with respect to the Confidential Information, and Employee will have access to Confidential Information (including but not limited to trade secrets) that would be valuable or useful to the Company's competitors;

7.3    The Company Information is a valuable asset of the Company, and any violation of the restrictions set forth in this Agreement would cause damage and substantial injury to the Company that will be significant, material and difficult or impossible to adequately measure;

7.4    The restrictions contained in this Agreement will not unreasonably impair or infringe upon Employee's right to work or earn a living after Employee's employment with the Company ends, but Employee is prepared for the possibility that his or her standard of living may be reduced during the Restricted Period and assumes and accepts any risk associated with that possibility; and

7.5    This Agreement is a contract for the protection of trade secrets under applicable law and is intended to protect the Confidential Information (including trade secrets) identified above.

**8.    Survival and Remedies.** Employee's obligations of nondisclosure, non-solicitation, non-competition, confidentiality and protection of Inventions contained in **Sections 4**, **5** and **6** of this Agreement shall survive the cessation of Employee's employment with the Company and shall remain enforceable. In addition, any provision of this Agreement that requires or might require performance after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Further, Employee acknowledges that upon a breach or threatened breach of any obligation of nondisclosure, non-solicitation, noncompetition, confidentiality or protection of Inventions of this Agreement, the Company will suffer irreparable harm and damage for which money alone cannot fully compensate the Company. Employee therefore agrees that upon such breach or threat of imminent breach of any such obligation, the Company shall be entitled to seek a temporary restraining order, preliminary injunction, permanent injunction or other injunctive relief, without posting any bond or other security, barring Employee from violating any such provision. This Section shall not be construed as an election of any remedy, or as a waiver of any right available to the Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement and the right to require Employee to account for and pay over to the Company all profits or other benefits derived or received by Employee as the result of such a breach. The existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any covenant contained in this Agreement.

**9.    Return of Company Property.**

9.1    **Return of Company Property.** All Company Confidential Information, associated third-party confidential information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation those records maintained pursuant to **Section 6.3** above, or other recorded matter, whether in hard copy, magnetic media or otherwise (including all copies or reproductions made or maintained, whether on the Company's premises or otherwise), pertaining to Employee's work for the Company, or relating to the Company or the Company's Confidential Information, whether created or developed by Employee alone or jointly during his or her employment with the Company, are the exclusive property of the Company. Employee shall surrender the same (as well as any other property of the Company) to the Company upon its request or promptly upon the cessation of employment.

9.2    **Termination Certificate.**  Upon the separation of Employee's employment, he or she agrees to sign and deliver the "Termination Certificate" attached as **Exhibit B**, which shall detail all Company property that is surrendered upon separation of employment.

9.3    **Return of Company Information on Company Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that he or she will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon any Company Electronic Media Equipment before Employee returns the information to the Company.

9.4    **Return of Company Information on Personal Electronic Media Equipment.** In connection with Employee's obligation to return information to the Company, Employee agrees that if he or she has used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, Employee agrees to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information. If Employee locates any such information, Employee agrees to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company Information from that equipment and/or those systems within three (3) business days. Employee further agrees to cooperate with the Company to verify that the necessary copying is completed (including, upon request, to provide a sworn declaration confirming the return of property and deletion of information).  Upon confirmation of compliance by the Company, Employee agrees to delete and expunge all Company Information.

9.5    **No Expectation of Privacy in Company Property.** Employee understands and agrees that he or she has no expectation of privacy in Company property, and further agrees that any Company property situated on Company premises or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. Employee also understands and agrees that as it relates to the Company's desire to protect its Confidential Information, Employee has no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that Employee has used for

Company purposes. Employee further agrees that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company Information from such equipment or systems. Employee also consents to an exit interview and an audit to confirm his or her compliance with this **Section 9** and will certify in writing that he or she has complied with the requirements of this **Section 9**.

10. **Audit.** Employee understands and agrees that he or she has no expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to Employee, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes, as determined by the Company in its sole discretion. Employee understands and agrees that he or she is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that Employee shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. Employee further understands and agrees that it is Employee's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which he or she will have access in connection with his or her employment.

Employee is aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system Employee may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to Employee and/or in Employee's absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by Employee), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information Employee has downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

11. **Setoff.** Employee agrees that, in addition to any other rights that the Company may have, the Company shall have the right to set off against any commission payment or paycheck, including Employee's final paycheck, the amount of any interim or final payment due to Employee, the amount of any loans, advances, goods or services, and equipment or property provided by the Company to Employee; any amounts necessary to cover the replacement cost of a shortage due to theft by Employee; and any deduction that is authorized by Employee if the authorization is revocable, including but not limited to deductions for hospitalization and medical insurance, other insurance, savings plans, stock purchases, voluntary pension plans, charities, and deposits to financial institutions.

**12.** **No Conflicting Agreements or Improper Use of Third-Party Information.** During his or her employment with the Company, Employee shall not improperly use or disclose any proprietary information or trade secrets of any third-party or other person or entity, and Employee shall not bring on to the premises of the Company any unpublished document or proprietary information belonging to any such third-party or other person or entity, unless consented to in writing by the third-party or other person or entity. Employee represents that he or she has not improperly used or disclosed any proprietary information or trade secrets of any other person or entity during the application process or while employed or affiliated with the Company. Employee also acknowledges and agrees that he or she is not subject to any contract, agreement, or understanding that would prevent Employee from performing his or her duties for the Company or otherwise complying with this Agreement. To the extent Employee violates this provision, or his or her employment with the Company constitutes a breach or threatened breach of any contract, agreement, or obligation to any third-party, Employee shall indemnify and hold the Company harmless from all damages, expenses, costs (including reasonable attorneys' fees) and liabilities incurred in connection with, or resulting from, any such violation or threatened violation.

**13.** **Duty to Disclose Subsequent Employment.** During the Restricted Period, Employee shall promptly provide the Company with written notice identifying Employee's new employer (or third-party or entity for whom Employee might be performing services), and shall provide a general description in reasonable detail of Employee's duties and responsibilities sufficient to inform the Company of whether there is a breach of this Agreement or a need to request a court order to enforce the restrictive covenants contained in this Agreement. During the Restricted Period, Employee shall notify his or her new employer (or person or entity for whom Employee provides goods or services) about Employee's nondisclosure, non-solicitation and non-competition obligations under this Agreement.

**14.** **Arbitration.**

    14.1 **Binding Arbitration. EMPLOYEE UNDERSTANDS AND AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF HIS OR HER EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. EMPLOYEE AGREES TO ARBITRATE, AND THEREBY <u>AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY</u>, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, AND THE FAIR LABOR STANDARDS ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY OTHER STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, EMPLOYEE UNDERSTANDS THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF**

DocuSign Envelope ID: 50523F64-6232-4EA2-89B0-B9551DA46190

**EMPLOYEE'S RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.**

14.2 **Procedure.** Disputes shall be resolved by binding arbitration, conducted on a confidential basis under the rules of the American Health Lawyers' Association Alternative Dispute Resolution Service ("AHLA Rules") before a single arbitrator. The arbitrator shall be selected in the manner provided in the AHLA Rules. The arbitration shall be conducted in Broward County, Florida, or at another location mutually agreed by the Parties, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator shall be deemed to possess the powers to decide any motions brought by any Party to the arbitration, including motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, issue mandatory orders and restraining orders in connection with such arbitration; provided, however, that nothing in this **Section 14** shall be construed so as to deny the Company the right and power to seek and obtain injunctive relief in a court of equity for a breach or threatened breach by any Party of **Sections 4**, **5** and **6** of this Agreement as more fully set forth in **Section 8** of this Agreement.

The arbitrator shall issue a written decision on the merits (the "Final Determination") applying the standards set forth under the Florida Rules of Civil Procedure. The arbitrator shall have the power to award any remedies available under applicable law. The arbitrator shall administer and conduct any arbitration in accordance with Florida law, including the Florida Rules of Civil Procedure and the Florida Evidence Code. The arbitrator shall apply substantive and procedural Florida law to any dispute or claim, without reference to rules of conflict of law. To the extent that the AHLA Rules conflict with Florida law, Florida law shall take precedence.

14.3 **Method of Selection.** Within fifteen (15) days after a claim for arbitration is filed, the Parties will exchange lists of proposed arbitrators and reach agreement on which arbitrator to appoint. If the Parties fail to appoint the arbitrator within fifteen (15) days, the AHLA Administrator will appoint a single arbitrator pursuant to the process set forth in Rule 3.2 of the AHLA Rules of Procedure for Arbitration.

14.4 **Notice in Connection with Arbitration.** All written communications regarding the proceeding sent to the Arbitrator shall be sent simultaneously to each Party or its counsel, with a copy to the Persons required to receive copies of notices under the Agreement (the "Additional Notice Parties"). Oral communications between any of the Parties or their counsel and the Arbitrator shall be conducted only when all Parties or their counsel are present and participating in the conversation.

14.5 **Costs of Arbitration.** As part of the Final Determination, the Arbitrator shall determine the allocation of the costs and expenses of the arbitration, including the Arbitrator's fee and both Parties' attorneys' fees and expenses, based upon the extent to which each Party prevailed in the arbitration. In the event that any relief which is awarded is non-monetary, then such costs and expenses shall be allocated in any manner as may be determined by the Arbitrator.

14.6 **Satisfaction of Award.** If any Party fails to pay the amount of the award, if any, assessed against such Party within thirty (30) days after the delivery to such Party of the Final Determination, the unpaid amount shall bear interest from the date of such delivery at the

maximum rate permitted by applicable law. In addition, such Party shall promptly reimburse the other Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable attorney's fees) reasonably incurred in seeking to collect such award or to enforce any Final Determination.

14.7    **Confidentiality of Proceedings.** The Parties hereto agree that all of the arbitration proceedings provided for herein, including any notice of claim, the Notice of Arbitration, the submissions of the Parties, and the Final Determination issued by the Arbitrator, shall be confidential and shall not be disclosed at any time to any Person, other than the Parties hereto, their representatives, the Arbitrator and the Additional Notice Parties; provided that this provision shall not prevent the Party prevailing in the arbitration from submitting the Final Determination to a court for the purpose of enforcing the award, subject to comparable confidentiality protections if the court agrees; and provided further that the foregoing shall not prohibit disclosure to the minimum extent reasonably necessary to comply with (i) applicable law (or requirement having the force of law), court order, judgment or decree, including, without limitation, disclosures which may be required pursuant to applicable securities laws, and (ii) the terms of contractual arrangements (such as financing arrangements) to which the Company or any Additional Notice Party may be subject so long as such contractual arrangements were not entered into for the primary purpose of permitting disclosure which would otherwise be prohibited hereunder.

14.8    **Exclusive Remedy.** Except as otherwise provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by this Agreement, neither Employee nor the Company will be permitted to pursue or participate in court action regarding claims that are subject to arbitration.

14.9    **Administrative Relief.** EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT HIM OR HER FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE FLORIDA DEPARTMENT OF LABOR/AGENCY FOR WORKFORCE INNOVATION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE EMPLOYEE FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

## 15.    General Provisions.

15.1    **Governing Law; Consent to Personal Jurisdiction and Venue.** It is the intention of the Parties that the laws of the State of Florida govern this Agreement without regard to conflict of laws principles. To the extent that any lawsuit is permitted under this Agreement, Employee hereby consents to the personal jurisdiction of the state and federal courts located in the State of Florida. Exclusive venue shall lie in Broward County, Florida.

15.2    **Entire Agreement.** This Agreement sets forth the entire agreement between the Company (and any of its related or Affiliated Entities, officers, agents, owners or representatives)

and Employee relating to the subject matter herein, specifically including the terms and conditions of Employee's employment and compensation by the Company and/or Affiliated Entities, and supersedes any and all prior discussions and agreements, whether written or oral, including the Prior Agreements, on the subject matter hereof. To the extent that this Agreement may conflict with the terms of another written agreement between Employee and the Company, or Employee and an Affiliated Entity, other than an Addendum to this Agreement, the terms of this Agreement will control.

15.3  **Modification.** No modification of or amendment to this Agreement will be effective unless in writing and signed by Employee and an officer of or other individual with authority from Company.  The parties understand and agree that email correspondence shall not constitute a "writing" to this Agreement unless expressly included herein.

15.4  **Waiver.** The Company's failure to enforce any provision of this Agreement shall not act as a waiver of its ability to enforce that provision or any other provision. The Company's failure to enforce any breach of this Agreement shall not act as a waiver of that breach or any future breach. No waiver of any of the Company's rights under this Agreement will be effective unless in writing. Any such written waiver shall not be deemed a continuing waiver unless specifically stated, and shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

15.5  **Successors and Assigns.** This Agreement will be binding upon Employee's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or equity, or otherwise. Employee shall not have the right to assign his or her rights or obligations under this Agreement.

15.6  **Construction without Presumption.** The language used in this Agreement will be deemed to be language chosen by Employee and the Company to express their mutual intent, and no rules of strict construction or presumption regarding ambiguities will be applied against either Party.

15.7  **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement. Signatures of the Parties that are transmitted in person or by facsimile or e-mail shall be accepted as originals.

15.8  **Further Assurances.** Employee agrees to execute any proper oath or verify any document required to carry out the terms of this Agreement.

15.9  **Title, Headings and Gender.** The titles, captions and headings of this Agreement are included for ease of reference only and do not affect in any way the meaning, interpretation or construction of this Agreement. Throughout this Agreement, where such meanings would be

appropriate: (a) the masculine gender shall be deemed to include the feminine and the neuter and vice versa, and (b) the singular shall be deemed to include the plural and vice versa.

15.10   **Attorney's Fees.** Except as otherwise specifically provided in **Section 14.4** of this Agreement, in the event of any litigation or arbitration brought to enforce the terms and covenants of this Agreement, the prevailing Party shall have the right to recover all costs, expenses and reasonable attorneys' fees incurred by the prevailing Party, including, without limitation, those incurred through any trial, appeal or appearance in federal bankruptcy or reorganization proceedings, or in connection with enforcing or collecting upon any final judgment.

15.11   **Notices.** All notices and communications that are required or permitted to be given under this Agreement shall be in writing and shall be sufficient in all respects if given and delivered in person, by overnight courier, or by certified mail, postage prepaid, return receipt requested, to the receiving Party at the addresses shown below or to such other address as such Party may have given to the other by notice pursuant to this Section. Notice shall be deemed given (i) on the date of delivery in the case of personal delivery, or (ii) on the delivery or refusal date as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

To Employer:      Stimwave LLC
                  Attention: Laura Tyler Perryman, CEO
                  1310 Park Central Blvd South
                  Pompano Beach, Florida 33064

To Employee:      Marlene Peña
                  587 Lakeside Circle
                  Sunrise, FL 33326

15.12   **No Third-party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of the Company and Employee. It is not the intention of the Parties to confer third-party beneficiary rights upon any other person or entity.

15.13   **Invalid Provisions.** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement shall be construed and enforced without such illegal, invalid or unenforceable provision, and the remainder of this Agreement will continue in full force and effect.   Furthermore, such illegal, invalid or unenforceable provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties.

15.14   **Representations and Warranties.**  Employee represents and warrants that he or she has full, complete, and unrestricted authority to execute the Agreement and bind himself or herself to the terms and commitments herein. Further, Employee represents and warrants that, by executing and performing this Agreement, he or she does not and shall not violate any applicable law, regulation, judgment, injunction, order, decree or third-party right, or pre-existing covenant not to compete or other restrictive covenant. Employee represents and warrants that execution of the Agreement does not require any notice or consent or other action by any person under,

constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Employee, or to a loss of any benefit to which Employee is entitled under, any agreement or other instrument binding upon Employee or any license, franchise, permit or other similar authorization held by Employee.

      15.15   **Representation of Attorney.** Employee acknowledges that he or she had the opportunity to consult an attorney of his or her choice regarding the terms of this Agreement.

      15.16   **Voluntary Agreement.** Employee acknowledges that he or she is executing this Agreement voluntarily and without duress or undue influence by the Company or anyone else, and that Employee has carefully read this Agreement and fully understands the terms, consequences, and binding effect of this Agreement including that EMPLOYEE IS WAIVING HIS OR HER RIGNT TO A JURY TRIAL.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement has been signed and executed by each of the Parties as of the date first above written.

**EMPLOYEE:**

Signature: _Marlene Pena_ _____

Print Name: Marlene Peña

**WITNESS:**

Signature: _Elizabeth Greene_ _____

Print Name: Elizabeth Greene

**EMPLOYER:**

**Stimwave LLC**

Signature: _Laura Tyler Perryman_ ___

By: Laura Tyler Perryman

Title: CEO

      Representative with authority to bind Stimwave LLC

## COMPENSATION SCHEDULE

**1.      Base Salary.**  For Services performed by Employee for Employer during the Term of the Agreement, Employer shall pay Employee a base salary of $78,000 per year, payable in accordance with Employer's regular payroll practices and subject to any applicable tax and payroll deductions (the "Base Salary"). As a full-time employee, Employee is expected to work a minimum of 40 hours per week. Employer shall withhold from each salary payment made to Employee the customary withholding and other employment related taxes, as well as any benefits to which Employee makes a contribution.

**2.      Bonuses.**  Employee is eligible to participate in any bonus plans or programs maintained from time to time by the Company on such terms and conditions as determined by the Board or its compensation committee (the "Committee"). Any earned bonus will be paid in the next regular payroll period after the Board or the Committee determines that it has been earned, but in no event shall the bonus be paid after the later of: (i) the fifteenth (15th) day of the third (3rd) month following the close of the Company's fiscal year in which the bonus is earned; or (ii) March 15 of the year following the calendar year in which the bonus is earned.

**3.      Equity.**  Employee will be eligible to receive Equity Awards pursuant to any plans or arrangements the Company may have in effect from time to time. The Board or the Committee will determine in its discretion whether Employee will be granted any such Equity Awards and the terms of any such Equity Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

**4.      Employee Benefits.**  In addition to the compensation to be paid to Employee pursuant to **Sections 1** through **3** hereto, Employee shall also be entitled to the following benefits, *provided, however*, that Employer's obligation to provide such benefits, other than the severance set forth in **Section 4.4** below, shall terminate upon the cessation of Employee's employment:

4.1      **Participation in Plans.** During the Term of the Agreement, Employee shall be entitled to participate in benefit plans, if any, maintained in force by Employer in its sole discretion from time to time, including any 401(k), profit sharing or other retirement plans, disability, group medical, dental, vision, group life insurance, supplemental life insurance coverage, business travel insurance, sick leave, flexible-spending account plans, and other similar retirement and welfare benefit plans, programs and arrangements, provided that he or she qualifies for participation in such plans, programs and arrangements pursuant to the terms thereof.  Employer reserves the right to amend or terminate such benefit plans or related programs at any time and from time to time, including amending eligibility criteria and benefits thereunder.

4.2      **Vacation.** Employee will be entitled to receive paid annual vacation in accordance with Company policy for other key and equity employees. During the first partial calendar year of employment and the first five (5) full calendar years of employment, full-time employees accrue up to ten (10) days of vacation per year. Vacation is accrued on a pro-rata basis throughout the year. Thereafter, full-time employees accrue up to fifteen (15) days of vacation per year. The maximum vacation entitlement for part-time employees is pro-rated based on hours worked.

4.3  **Expenses.** The Company shall pay or reimburse Employee upon a proper accounting, for approved, reasonable business related expenses and disbursements incurred by him or her in the course of the performance of his or her duties under the Agreement, in accordance with the Company's expense reimbursement policy as in effect from time to time.

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS**
**AND ORIGINAL WORKS OF AUTHORSHIP**

Identifying Number or
<u>Title</u>                                    <u>Date</u>                    <u>Brief Description</u>

_MP_ ___ No inventions or improvements

_____Additional Sheets Attached

Date: Aug 6, 2019
_____                    _____

                                                    Employee's Signature

                                                    Marlene Pena
                                                    _____
                                                    Print Name of Employee

## EXHIBIT B

## STIMWAVE LLC TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Stimwave LLC, its subsidiaries, affiliates, successors or assigns (together, "the Company").

I further certify that I have complied with all the terms of the Company's Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement signed by me, including the reporting of any Inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for two (2) years from this date, I will abide by my non-competition and non-solicitation obligations contained in **Section 4** of the Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this two (2) year period, including, without limitation, my obligations under **Section 5** (Confidentiality) and **Section 6** (Inventions) thereof.

After leaving the Company's employment, I will be employed by _____ at its address of_____ in the position of _____.

My address for notifications is:

_____

_____

_____

Date: _____

_____

Employee's Signature

_____

Print Name of Employee

## EXHIBIT C

## STIMWAVE LLC CONFLICT OF INTEREST GUIDELINES

It is the policy of Stimwave LLC to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain or harm to the Company is intended. (The Amended and Restated Employment, Non-Compete, Non-Solicitation, Confidential Information, Inventions and Arbitration Agreement elaborates on this principle and is a binding agreement.)
2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.
3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.
4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.
5. Initiating or approving any form of personal or social harassment of employees.
6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.
7. Borrowing from or lending to employees, customers, or suppliers.
8. Acquiring real estate of interest to the Company.
9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.
10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.
11. Making any unlawful agreement with distributors with respect to prices.
12. Improperly using or authorizing the use of any Inventions that are the subject of patent claims of any other person or entity.
13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.