# EXHIBIT "J"

**STIMWAVE TECHNOLOGIES INCORPORATED**
**AMENDED AND RESTATED**
**SERIES D PREFERRED STOCK PURCHASE AGREEMENT**

This Amended and Restated Series D Preferred Stock Purchase Agreement (this "*Agreement*") is dated as of July 17, 2018 and is between Stimwave Technologies Incorporated, a Delaware corporation (the "*Company*"), and the persons and entities (each, an "*Investor*" and collectively, the "*Investors*") listed on the Schedule of Investors attached as <u>Exhibit A</u> (the "*Schedule of Investors*").

WHEREAS, the Company and the Investor that participated in the Initial Closing (as defined below) entered into a Series D Preferred Stock Purchase Agreement as of April 20, 2018 (the "*Prior Agreement*");

WHEREAS, as of the date hereof, no other Investors have joined the Prior Agreement;

WHEREAS, the Company and the Investor that participated in the Initial Closing constitute all of the parties to the Prior Agreement, and such parties desire to amend and restate the Prior Agreement in its entirety as set forth herein.

NOW, THEREFORE, the Prior Agreement is hereby amended and restated in its entirety, and the parties to this Agreement further agree as follows:

## SECTION 1

## AUTHORIZATION, SALE AND ISSUANCE

1.1    <u>**Authorization**</u>.  The Company, prior to the Initial Closing authorized (a) the sale and issuance of up to 2,948,428 shares (the "*Shares*") of the Company's Series D Preferred Stock, par value $0.01 per share (the "*Series D Preferred*"), having the rights, privileges, preferences and restrictions set forth in the amended and restated certificate of incorporation of the Company, in substantially the form of <u>Exhibit B-1</u> (the "*Prior Restated Certificate*") and (b) the reservation of shares of Common Stock for issuance upon conversion of the Shares (the "*Conversion Shares*").  Prior to the Co-Investor Closing, the Company will file another amended and restated certificate of incorporation of the Company, in substantially the form of <u>Exhibit B-2</u> (the "*Restated Certificate*") and the Shares will have the rights, privileges, preferences and restrictions set forth in the Restated Certificate.

1.2    <u>**Sale and Issuance of Shares**</u>.  Subject to the terms and conditions of this Agreement, each Investor agrees, severally and not jointly, to purchase, and the Company agrees to sell and issue to each Investor at the applicable Closing (as defined below), the number of Shares set forth in the column designated "Number of Series D Shares" opposite such Investor's name on the Schedule of Investors, at a cash purchase price of $21.51 per share (the "*Purchase Price*").  The Company's agreement with each Investor is a separate agreement, and the sale and issuance of the Shares to each Investor is a separate sale and issuance.

1.3    <u>**Conversion of SAFEs**</u>.  Certain Investors hold Simple Agreements for Future Equity (each a "*SAFE*") issued pursuant to certain separate Subscription Agreements, by and between the Company and such Investors (the "*Subscription Agreements*").  Each Investor holding a SAFE hereby acknowledges and agrees: (A) that the Investment Amount (as defined in the applicable SAFE) under the SAFE held by such Investor referenced on <u>Exhibit A</u> (collectively, the "*SAFEs*") shall

CONFIDENTIAL

automatically convert into the number of Shares at the Co-Investor Closing as set forth on Exhibit A, at a conversion price per share equal to the Purchase Price; (B) that, notwithstanding anything to the contrary in any SAFE, Subscription Agreement or otherwise, such Investor is entitled to receive only such Shares reflected in Exhibit A hereto with respect to each such SAFE and Subscription Agreement; (C) to return the original SAFE held by such Investor to the Company; (D) that upon such conversion of the SAFE into Shares pursuant to the terms of this Agreement, neither such SAFE nor the applicable Subscription Agreement shall be of further force or effect, whether or not the SAFE is delivered for cancellation, and such Investor shall not thereafter have any outstanding rights under such SAFE, the applicable Subscription Agreement or any side letters entered into in connection with the issuance of such SAFE; and (E) that such Investor waives and forever discharges the Company from any and all payment or other obligations arising under such SAFE (including without limitation the payment of any Contingent Conversion Payment Amount (as defined in each applicable SAFE), including the Subscription Agreement and any side letters related thereto, other than the conversion of such SAFE into the Shares reflected on Exhibit A. The Company and each Investor purchasing Shares through the conversion of the SAFEs hereby agree that effective upon the conversion of the SAFEs in accordance herewith, the SAFE, the Subscription Agreement pursuant to which such SAFEs were sold and issued by the Company and any side letters related thereto are hereby terminated in their entirety and of no further force and effect.

## SECTION 2

## CLOSING DATES AND DELIVERY

2.1    **Closings**.  The purchase, sale and issuance of the Shares shall take place at one or more closings (each of which is referred to in this Agreement as a "***Closing***") as described below:

(a)    The initial Closing (the "***Initial Closing***") took place remotely via the exchange of documents and signatures on April 25, 2018 as agreed upon between the Company and Echo Vibration Limited and/or its affiliates (individually or together as "***Orchid***"). At the Initial Closing, subject to the terms and conditions of this Agreement, the Company sold and issued to Orchid, and Orchid purchased from the Company, 232,450 Shares at the Purchase Price.

(b)    Subject to the terms and conditions of this Agreement (including the satisfaction or waiver of the conditions to such Closing set forth in Section 5 and Section 6) and that each of Fund VI, L.P. and SV Life Sciences Strategic Fund VI, L.P. shall have paid its respective purchase price in accordance with Section 2.2 hereof, the Company shall sell and issue to Orchid, and Orchid shall purchase from the Company, 232,427 Shares at the Purchase Price (the "***Second Closing***"). The Second Closing shall take place on July 25, 2018.

(c)    Subject to the terms and conditions of this Agreement (including the satisfaction or waiver of the conditions to such Closing set forth in Section 5 and Section 6), Orchid shall have the right, at its sole and absolute discretion, to purchase from the Company 278,964 Shares at the Purchase Price (the "***Third Closing***"). The Third Closing shall take place on September 28, 2018. In the event that Orchid does not purchase 278,964 Shares at the Third Closing then the Company may, at one or more Closings, on or before December 28, 2018, issue and sell up to 278,964 Shares at the Purchase Price to such persons or entities as may be approved by the Company's Board of Directors.

2

(d)     On the date hereof, subject to the terms and conditions of this Agreement (including the satisfaction or waiver of the conditions to such Closing set forth in Section 5 and Section 6), the Company shall sell and issue to the Investors listed on Exhibit A for the Co-Investor Closing (each, a "*Co-Investor*"), and each Co-Investor shall purchase from the Company (including through the conversion of the SAFEs), 1,006,274 Shares at the Purchase Price at one closing (the "*Co-Investor Closing*").

(e)     [Reserved.]

(f)     In addition, the Company shall deliver to Orchid and SV Funds the consolidated financial statements (including balance sheet, income statement and statement cash flows) of the Company (including its Subsidiaries (as defined in Section 3.2) as of the Initial Closing), for the period ending December 31, 2018, prepared in accordance with GAAP (as defined in Section 3.12 below) and audited by Deloitte, EY, PwC, KPMG, Grant Thornton or BDO (the "*2018 Audit Report*"). Within fifteen (15) Business Days after Orchid's receipt of the 2018 Audit Report, Orchid shall have the right, at its sole and absolute discretion, subject to the terms and conditions of this Agreement, to purchase either exactly 139,470 additional Shares or exactly 883,311 additional Shares (but not both) at the Purchase Price (the "*Final Closing*"); *provided that* if Orchid makes a binding commitment (including as to the number of Shares) to purchase Shares at the Final Closing within such fifteen (15) Business Day period, then Orchid shall have an additional fifteen (15) calendar days to hold the Final Closing. "*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banking institutions in New York and the Hong Kong Special Administrative Region of the People's Republic of China are authorized or required by law or executive order to close.

(g)     If, at the Final Closing, Orchid purchases 139,470 Shares, or the Final Closing does not occur within the fifteen (15) calendar day period set forth in Section 2.1(f), then subject to the terms and conditions of this Agreement (including the satisfaction or waiver of the conditions to such Closing set forth in Section 5 and Section 6), SV Funds shall have the right (at its sole and absolute discretion) to purchase up to one half of the Maximum Amount of Additional Shares. "*Maximum Amount of Additional Shares*" means 883,311 Shares minus the number of Shares (if any) purchased by Orchid pursuant to Section 2.1(f) (the "*SV Closing*"). The Company shall give fifteen (15) Business Days' notice of its right to purchase additional Shares immediately after Orchid is no longer entitled to purchase additional shares pursuant to Section 2.1(f) and SV Funds shall have fifteen (15) Business days to purchase up to one half of the Maximum Amount of Additional Shares *provided that* if SV Funds make a binding commitment (including as to the number of Shares) to purchase Shares at the SV Closing within such fifteen (15) Business Day period, then SV Funds shall have an additional fifteen (15) calendar days to hold the SV Closing. Subject to Section 2.1(c), the Company may sell and issue at one or more subsequent closings (each, a "*Remainder Closing*"), within ninety (90) days after the expiration of the fifteen (15) calendar day period set forth in this Section 2.1(g), any remaining authorized but unsold Shares minus 315,000 Shares, at the Purchase Price to such persons or entities as may be approved by the Company's Board of Directors.

(h)     Any purchase, sale and issuance in a Remainder Closing shall be on the same terms and conditions as those contained herein, and such persons or entities shall, upon execution and delivery of the relevant signature pages, become parties to, and be bound by, this Agreement, the Second Amended and Restated Investors' Rights Agreement in substantially the form of Exhibit C (the "*Rights Agreement*"), the Second Amended and Restated Voting Agreement in substantially the form of Exhibit D (the "*Voting Agreement*"), and the Second Amended and Restated Right of First Refusal and Co-Sale Agreement in substantially the form of Exhibit E (the "*Right of First Refusal and Co-*

3

STIMADV_00001286

*Sale Agreement*" and together with this Agreement, the Rights Agreement and the Voting Agreement, the "*Transaction Agreements*"), without the need for an amendment to any of the Transaction Agreements except to add such person's or entity's name to the appropriate exhibit to such Agreements, and shall have the rights and obligations hereunder and thereunder, in each case as of the date of the applicable Closing.

(i)    Immediately after each Closing, the Schedule of Investors will be amended to list the Investors purchasing Shares hereunder and the number of Shares issued to each Investor hereunder at each such Closing. The Company will furnish to each Investor copies of the amendments to the Schedule of Investors referred to in the preceding sentence.

2.2    **Delivery**.  At each Closing, the Company will deliver to each Investor in such Closing (a) a certificate registered in such Investor's name representing the number of Shares that such Investor is purchasing in such Closing against payment of the purchase price therefor as set forth in the column designated "Purchase Price" opposite such Investor's name on the Schedule of Investors, by (i) check payable to the Company, (ii) wire transfer in accordance with the Company's instructions, (iii) conversion of SAFEs in accordance with Section 1.3, or (iv) any combination of the foregoing, and (b) all other items required at such Closing under Section 5.  Notwithstanding the preceding sentence, SV Life Sciences Fund VI, L.P. and SV Life Sciences Strategic Fund VI, L.P. shall each pay its respective purchase price by delivery at the Co-Investor Closing of payments by wire transfer in the respective amounts set forth opposite its name on the Schedule of Investors identified as the "Co-Investor Closing Payment Amount" together with its unconditional obligation to pay the balance of the purchase price on or before July 25, 2018. Subject to the payment of the purchase price for 232,427 Shares by Orchid at the Second Closing, each of SV Life Sciences Fund VI, L.P. and SV Life Sciences Strategic Fund VI, L.P. hereby unconditionally covenants to deliver by wire transfer in accordance with the Company's instructions the unpaid balance of such Investor's respective purchase price on or before July 25, 2018.  The delivery of such balances by SV Life Sciences Fund VI, L.P. and SV Life Sciences Strategic Fund VI, L.P. shall be held in escrow by the Company until the Company has received from Orchid the payment for the Second Closing purchase price and shall be returned to the respective SV Funds if the Company does not timely receive from Orchid the payment for the Second Closing purchase price.

2.3    **Use of Proceeds**.  The Company will use the proceeds from the sale of the Shares in accordance with a budget approved by the Company's Board of Directors, as it shall be constituted in accordance with the Voting Agreement, which shall include the approval of the Orchid Designee (as defined in the Voting Agreement) (which shall not be unreasonably withheld), so long as Orchid is entitled to and has appointed the Orchid Designee pursuant to the Voting Agreement.  The Company shall use that portion of the proceeds from the Co-Investor Closing as necessary to repay the BSC Notes (as defined below).

2.4    **Obligations Post Co-Investor Closing**.  As soon as practicable after the Co-Investor Closing, the Company shall take all actions reasonably necessary to cause the Company's Restated Certificate to be amended or amended and restated to remove the authorization of the Series C Preferred Stock.

4

CONFIDENTIAL

STIMADV_00001287

## SECTION 3

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

A Schedule of Exceptions, attached as <u>Exhibit F</u> (each, a "***Schedule of Exceptions***"), shall be delivered to the Investors in connection with each Closing.  Except as set forth on the Schedule of Exceptions delivered to the Investors at the applicable Closing, the Company hereby represents and warrants to the Investors participating in such Closing, as follows:

3.1    **Organization, Good Standing and Qualification**.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  The Company has the requisite corporate power and authority to own and operate its properties and assets, to carry on its business as presently conducted and as currently proposed to be conducted, to execute and deliver the Transaction Agreements, to issue and sell the Shares and the Conversion Shares and to perform its obligations pursuant to the Transaction Agreements and the Restated Certificate.  The Company is presently qualified to do business as a foreign corporation in each jurisdiction and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing could not reasonably be expected to have a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, prospects or results of operations of the Company or any of its Subsidiaries (as defined in <u>Section 3.2</u> below) (a "***Material Adverse Effect***").

3.2    **Subsidiaries**.  <u>Section 3.2(a)</u> of the Schedule of Exceptions sets forth (a) the name of each Subsidiary, and, with respect to each Subsidiary, the jurisdiction in which it is incorporated or organized and (b) a corporate structure of the Group (as defined in <u>Section 3.5</u> below) which shall include the names of all stockholders or other equity owners of each Group Company and the shareholding percentage of each stockholder or equity owner in such Group Company.  Each Subsidiary is a duly organized and validly existing corporation, partnership or other entity in good standing under the laws of the jurisdiction of its incorporation or organization and is duly qualified or authorized to do business as a foreign corporation or entity and is in good standing under the laws of each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing has not had and would not reasonably be expected to have a Material Adverse Effect.  Each Subsidiary has all requisite corporate or entity power and authority to own its properties and carry on its business as presently conducted and as currently proposed to be conducted.  The outstanding shares of capital stock or equity interests of each Subsidiary are validly issued, fully paid and non-assessable and were not issued in violation of any purchase or call option, right of first refusal, subscription right, pre-emptive right or any similar right.  All such shares or other equity interests represented as being owned by the Company or any of the Subsidiaries are owned by them free and clear of any and all liens or encumbrances.  No shares of capital stock are held by any Subsidiary as treasury stock.  There is no existing option, warrant, call, right or contract to which any Subsidiary is a party requiring, and there are no convertible securities of any Subsidiary outstanding which upon conversion would require, the issuance of any shares of capital stock or other equity interests of any Subsidiary or other securities convertible into shares of capital stock or other equity interests of any Subsidiary.  The Company does not own, directly or indirectly, any capital stock or equity securities of any person other than the Subsidiaries.  There are no material restrictions on the ability of the Subsidiaries to make distributions of cash to their respective equity holders.  "***Subsidiary***" means any person of which (i) a majority of the outstanding share capital, voting securities or other equity interests are owned, directly or

5

STIMADV_00001288

indirectly, by the Company or (ii) the Company is entitled, directly or indirectly, to appoint a majority of the board of directors, board of managers or comparable body of such person, provided however, for the avoidance of doubt, Micron Devices LLC shall not be deemed to be a Subsidiary of the Company.

      3.3    **Capitalization**.

      (a)    Immediately prior to the Initial Closing, the authorized capital stock of the Company consisted of:

      (i)    20,497,492 shares of Common Stock, of which 2,391,178 shares were issued and outstanding and

      (ii)    17,130,760 shares of Preferred Stock, of which:

      (1)    1,499,999 were designated Series A Preferred, 1,499,999 of which were issued and outstanding,

      (2)    1,015,699 were designated Series A-2 Preferred, 1,015,699 of which were issued and outstanding,

      (3)    722,075 were designated Series B Preferred, 722,075 of which were issued and outstanding,

      (4)    944,559 were designated Series B-2 Preferred, 944,559 of which were issued and outstanding,

      (5)    10,000,000 were designated Series C Preferred, none of which were issued and outstanding, and

      (6)    2,948,428 were designated Series D Preferred, none of which were issued and outstanding.

The Common Stock and the Preferred Stock shall have the rights, preferences, privileges and restrictions set forth in the Restated Certificate.

      (b)    Immediately prior to the Co-Investor Closing, the authorized capital stock of the Company will consist of:

      (i)    20,497,492 shares of Common Stock, of which 2,529,682 shares are issued and outstanding and

      (ii)    17,130,760 shares of Preferred Stock, of which:

      (1)    1,499,999 are designated Series A Preferred, 1,499,999 of which are issued and outstanding,

      (2)    1,015,699 are designated Series A-2 Preferred, 1,015,699 of which are issued and outstanding,

6

STIMADV_00001289

(3)     722,075 are designated Series B Preferred, 722,075 of which are issued and outstanding,

(4)     944,559 are designated Series B-2 Preferred, 944,559 of which are issued and outstanding,

(5)     10,000,000 are designated Series C Preferred, none of which are issued and outstanding, and

(6)     2,948,428 are designated Series D Preferred, 232,450 of which are issued and outstanding.

(c)     The outstanding shares of Common Stock and Preferred Stock of the Company have been duly authorized and validly issued in compliance with applicable laws, and are fully paid and nonassessable, and were not issued in violation of any purchase or call option, right of first refusal, subscription right, preemptive right or any similar rights.

(d)     The Company has reserved:

(i)     the Shares for issuance pursuant to this Agreement;

(ii)    shares of Common Stock (as may be adjusted in accordance with the provisions of the Restated Certificate) for issuance upon conversion of the Shares; and

(iii)   533,633 shares of Common Stock authorized for issuance to employees, consultants and directors pursuant to its 2011 Equity Incentive Plan (the "*Option Plan*"), under which options to purchase 400,000 shares are issued and outstanding as of the date of this Agreement.

Except for options issued under the Option Plan (the "*Company Options*") there is no existing option, warrant, call, right or contract to which the Company is a party requiring, and there are no securities of the Company outstanding which upon conversion or exchange would require, the issuance, sale or transfer of any additional shares of capital stock or other equity securities of the Company or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase shares of capital stock or other equity securities of the Company. Except as set forth in Section 3.3(d) of the Schedule of Exceptions, (1) there are no obligations, contingent or otherwise, of the Company or any Subsidiary to (A) repurchase, redeem or otherwise acquire any shares of Common Stock, Preferred Stock or the capital stock or other equity interests of any Subsidiary, or (B) provide material funds to, or make any material investment in (in the form of a loan, capital contribution or otherwise), or provide any guarantee with respect to the obligations of, any person; (2) there are no outstanding stock appreciation, phantom stock, profit participation or similar rights with respect to the Company or any of the Subsidiaries; (3) there are no bonds, debentures, notes or other indebtedness of the Company or the Subsidiaries having the right to vote or consent (or, convertible into, or exchangeable for, securities having the right to vote or consent) on any matters on which stockholders (or other equityholders) of the Company or the Subsidiaries may vote; and (4) there are no voting trusts, irrevocable proxies or other contracts or understandings to which the Company or any Subsidiary is a party or is bound with respect to the voting or consent of any shares of Common Stock, Preferred Stock or the equity interests of any Subsidiary. All of the SAFEs shall convert into Series D Preferred Stock at the Co-Investor Closing. The notes issued pursuant to that certain Loan Agreement,

7

dated April 23, 2014, by and between Boston Scientific Neuromodulation Corporation and the Company (the "**BSC Notes**"), shall be paid in full immediately after receipt by the Company of the balance of SV Funds' aggregate purchase price with respect to the Co-Investor Closing, pursuant to Section 2.2.

(e)    The Shares, when issued and delivered and paid for in compliance with the provisions of this Agreement, will be validly issued, fully paid and nonassessable. The Conversion Shares have been duly and validly reserved and, when issued in compliance with the provisions of this Agreement, the Restated Certificate and applicable law, will be validly issued, fully paid and nonassessable. The Shares and the Conversion Shares will be free of any liens or encumbrances, other than any liens or encumbrances created by or imposed upon the Investor with respect to Shares or Conversion Shares held by such Investor; *provided, however*, that the Shares and the Conversion Shares are subject to restrictions on transfer under U.S. state and/or federal securities laws and as set forth herein and in the Rights Agreement. The Shares and the Conversion Shares are not subject to any preemptive rights or rights of first refusal.

(f)    Except for the conversion privileges of the Preferred Stock, the rights provided pursuant to the Rights Agreement and the Right of First Refusal and Co-Sale Agreement or as otherwise described in this Agreement, there are no options, warrants or other rights to purchase any of the Company's authorized and unissued capital stock. The Company has not made any representations regarding equity incentives to any officer, employee, director, consultant or other person or entity that are inconsistent with the share amounts and terms set forth in the Schedule of Exceptions.

(g)    The capitalization table of the Company set forth on Section 3.3(f) of the Schedule of Exceptions to the Initial Closing sets forth the ownership structure of the Company as of the Initial Closing, immediately prior to the Initial Closing, and immediately after the Initial Closing, the Second Closing and the Third Closing, without taking into consideration investment by the Co-Investor(s). The capitalization table of the Company set forth on Section 3.3(g) of the Schedule of Exceptions to the Co-Investor Closing sets forth the ownership structure of the Company as of the date hereof, immediately prior to the Co-Investor Closing, and immediately after the Co-Investor Closing, the Second Closing and the Third Closing, assuming the Co-Investor Closing, the Second Closing, and the Third Closing all occur in that order and without taking into account any capitalization events.

3.4    **Authorization**. All corporate action on the part of the Company and its directors, officers and stockholders necessary for the authorization, execution and delivery of the Transaction Agreements by the Company, the authorization, sale, issuance and delivery of the Shares and the Conversion Shares, and the performance of all of the Company's obligations under the Transaction Agreements, has been taken or will be taken prior to the applicable Closing. The Transaction Agreements, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company, enforceable in accordance with their terms, except (i) as limited by laws of general application relating to bankruptcy, insolvency and the relief of debtors, (ii) as limited by rules of law governing specific performance, injunctive relief or other equitable remedies and by general principles of equity, and (iii) to the extent the indemnification provisions contained in the Rights Agreement may further be limited by applicable laws and principles of public policy.

3.5    **Material Contracts**.

8

(a)    Except for the agreements explicitly contemplated hereby, there are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company or any of its Subsidiaries (each, a "*Group Company*" and collectively, the "*Group Companies*" or "*Group*") is a party or by which it is bound which may involve (i) obligations of, or payments to, any Group Company in excess of $100,000 (other than obligations of, or payments to, the Group Company arising from purchase or sale agreements entered into in the ordinary course of business), (ii) the license of any Intellectual Property (as defined in Section 3.6 below) to or from any Group Company, (iii) the grant of rights to manufacture, produce, assemble, license, market or sell any Group Company's products or affect any Group Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (iv) indemnification by any Group Company with respect to infringement of Intellectual Property (each, a "*Material Contract*", collectively the "*Material Contracts*").  All of the Material Contracts are valid, binding and in full force and effect in all material respects with respect to any Group Company which is a party thereto, and with respect to the other parties thereto enforceable against each of them in accordance with its terms and, upon consummation of the transactions contemplated by this Agreement, shall continue in full force and effect without penalty or other adverse consequence (each case subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors and rules of law governing specific performance, injunctive relief or other equitable remedies and to general principles of equity).  No Group Company is, nor, to the Company's knowledge, is any other party to the Material Contracts in material default under any of such Material Contracts, and no event has occurred that with lapse of time or the giving of notice or both would constitute a breach or default on any Group Company or any other party thereunder.

(b)    The Company has not (i) declared or paid any dividends or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred any indebtedness for money borrowed or any other liabilities individually in excess of $100,000 or, in a series of transactions, in excess of $200,000 in the aggregate, (iii) made any loans or advances to any person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business.

(c)    No Group Company is a guarantor or indemnitor of any indebtedness of any other person.

(d)    Except as set forth on Section 3.5(d) of the Schedule of Exceptions to the Co-Investor Closing, neither Orchid nor, to the knowledge of the Company, any Affiliate of Orchid is a party to any agreement with the Company or any Subsidiary of the Company or to the Company's knowledge any other entity in which the Company has any equity.

3.6    **Intellectual Property**.

(a)    The following terms shall be construed to have the meanings set forth below:

(i)    "*Intellectual Property*" means all of the following whether arising under the laws of the United States (or any state or other jurisdiction thereof) or of any other foreign or multinational jurisdiction: (1) Patents, (2) Trademarks, (3) Copyrights, (4) Know-How, and (v) any other intellectual property rights arising from or in respect of any Know-How.

(ii)    "*Patent*" means all patents, patent applications (including patents issued thereon) and statutory invention registrations, including reissues, divisions, continuations,

9

 STIMADV_00001292

continuations in part, substitutions, renewals, extensions and reexamination of any of the foregoing, and all rights in any of the foregoing provided by international treaties or conventions.

(iii) "*Trademarks*" means all trademarks, service marks, trade names, service names, trade dress, logos, Internet domain names, and other source or business identifiers, including all goodwill associated with any of the foregoing, and any and all common law rights in and to any of the foregoing, registrations and applications for registration of any of the foregoing, all rights in and to any of the foregoing provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing.

(iv) "*Copyrights*" means all copyrightable works, copyrights, moral rights, mask work rights, database rights and design rights, in each case whether or not registered, and all registrations and applications for registration of any of the foregoing, and all rights in and to any of the foregoing provided by international treaties or conventions.

(v) "*Know-How*" means information, know-how, inventions, discoveries, compositions, formulations, formulas, practices, procedures, processes, methods, knowledge, trade secrets, technology, techniques, designs, drawings, data, results, computer programs, physical, chemical and biological materials and compounds, and the like, in each case in any written, electronic, oral or other tangible or intangible form.

(b) The Group owns or otherwise possesses sufficient legal rights to all Intellectual Property used in or necessary to the business of the Group as presently conducted and as currently proposed to be conducted, without any known conflict with, or infringement of, the rights of others.

(c) As used herein, "*Company Intellectual Property*" means the Intellectual Property that are owned or possessed by the Group. Section 3.6(c) to the Schedule of Exceptions contains a complete and accurate list of all (i) Patents included in the Company Intellectual Property, (ii) registered or material Trademarks, or material Copyrights included in the Company Intellectual Property, (iii) licenses, sublicenses or other agreements under which any third party has granted to the Group any rights to any Company Intellectual Property that is not owned by the Group (the "*In-License Agreements*") (other than licenses for generally commercially available software), and (iv) licenses, sublicenses or other agreements under which the Group has granted to any third party any rights to any Company Intellectual Property. Except for(i) agreements with its own employees or consultants, standard end-user license agreements, and support/maintenance agreements entered in the ordinary course of the Group Company's business and (ii) the agreements set forth on Section 3.6(c) to the Schedule of Exceptions, there are no outstanding options, licenses or agreements relating to the Intellectual Property, and the Company is not bound by or a party to any options, licenses or agreements with respect to the Intellectual Property of any other person or entity.

(d) The Group is (i) the sole and exclusive owner of any Company Intellectual Property that is not subject to an In-License Agreement, (ii) the sole and exclusive licensee in the applicable field of any Company Intellectual Property that is subject to an exclusive In-License Agreement (other than licenses to generally commercially available software), and (iii) licensee of any Company Intellectual Property that is subject to a nonexclusive In-License Agreement (other than licenses to generally commercially available software), in each case free and clear of any liens or encumbrances or any reversion or similar rights of any third party (other than a right of reversion upon termination as expressly provided in the applicable In-License Agreement). Each In-License Agreement is legal, valid, binding, enforceable and in full force and effect, and except as reflected on

STIMADV_00001293

<u>Section 3.6(c)</u> to the Schedule of Exceptions, there have not been any amendments, modifications or supplements to the terms of any In-License Agreement. Neither the Group nor, to the Company's knowledge, any other party to any In-License Agreement is in default or breach of any provision of any In-License Agreement. To the Company's knowledge, no event has occurred under any In-License Agreement that would (with or without the passage of time) permit any party thereto (other than the Group) to terminate such In-License Agreement or any license granted to the Group thereunder.

(e)    With respect to any Patent that is Company Intellectual Property that is not subject to an In-License Agreement, and, to the Company's knowledge, with respect to any Patent that is subject to an In-License Agreement, that is, or is the subject of, a registration or application for registration with the U.S. Patent and Trademark Office or any similar office or agency anywhere in the world, the Group (or other party responsible for prosecution and maintenance) is currently in compliance with, or is diligently completing, applicable requirements for such registration or application (including as to payment of filing, examination, maintenance, registration and renewal fees, inventor declarations and assignments, proofs of working or use, timely pre-registration and/or post-registration filing of declarations or affidavits of use and incontestability, and renewal applications), and all such Company Intellectual Property is subsisting and has not been abandoned and is not expected to be abandoned. All Company Intellectual Property is valid, enforceable and in full force and effect and has not been used or enforced, or failed to be used or enforced, in a manner that would result in the abandonment, cancellation or unenforceability thereof.

(f)    No Patent included in the Company Intellectual Property or, to the Company's knowledge, the subject of an In-License Agreement, has been or is now involved in any interference, reissue, re-examination, revocation or opposition proceeding before the United States Patent and Trademark Office or any similar office or agency anywhere in the world, and to the Company's knowledge, there is no patent or patent application of any third party that is involved in an interference proceeding before any such office or agency with any Patent included in the Company Intellectual Property. There is no currently pending inventorship investigation or dispute with respect to any Patent contained in the Company Intellectual Property.

(g)    To the Company's knowledge, neither the research, development, manufacture or commercialization of any Group products or product candidates, nor any development, use or other exploitation of any Company Intellectual Property, infringes, violates or constitutes a misappropriation of (or has infringed, violated or constituted a misappropriation of or will infringe, violate or constitute a misappropriation of) any Intellectual Property of any third party.

(h)    There are no pending or, to the Company's knowledge, threatened claims against any Group Company alleging that such Group Company infringes, violates or constitutes a misappropriation of (or has infringed, violated or constituted a misappropriation of, or will infringe, violate or constitute a misappropriation of) any Intellectual Property of any third party or that any Company Intellectual Property or Intellectual Property that is the subject of an In-License Agreement is invalid or unenforceable.

(i)    In each case where a Patent that is Company Intellectual Property is owned by the Group Company by assignment (whether pursuant to Propriety Information and Invention Agreements (as defined in <u>Section 3.7</u> below) or otherwise), or exclusively licensed by the Group Company, the applicable assignment has been executed by all inventors and duly recorded, or is in the process of being recorded, with the U.S. Patent and Trademark Office or any similar office or agency anywhere in the world to the extent required by such office or agency.

11

STIMADV_00001294

(j)    To the Company's knowledge, there is no, nor has there been any, infringement, violation or misappropriation by any third party of any of Company Intellectual Property or Intellectual Property that is the subject of an In-License Agreement.

(k)    The Group has obtained and possesses valid licenses to use all of the software programs present on the computers and other software-enabled electronic devices that it owns or leases or that it has otherwise provided to its employees for their use in connection with the Group's business as now conducted and as presently proposed to be conducted.

(l)    The Group has taken reasonable security measures to protect the secrecy, confidentiality and value of all material Know-How and other material confidential and proprietary information owned or controlled by the Group or used by the Group in the Group's business as now conducted or proposed to be conducted, including by requiring each person with access to such material Know-How or other material confidential or proprietary information to execute a written confidentiality agreement, and to the Company's knowledge, no such person is in breach of any such agreement.

(m)    For purposes of this Section 3.6, the Company shall be deemed to have knowledge of a patent right if the Company has actual knowledge of the patent right or would be found to be on notice of such patent right as determined by reference to United States patent laws.

(n)    Within ninety days after the Co-Investor Closing (or, if such day is not a Business Day, then the next Business Day): the Company shall:

(i)    cause StimRelieve LLC, an international business company organized under the laws of The Bahamas, to have assigned to the Company all of its rights pursuant to that certain License Agreement, dated October 1, 2013, by and between Micron Devices LLC and StimRelieve LLC;

(ii)    [Reserved.]

(iii)    use its best efforts to cause Micron Devices LLC to have assigned to the Company all of its rights pursuant to that certain Manufacturing, Development and License Agreement, dated April 15, 2014, by and between Epimed International, Inc. and Micron Devices LLC; and

(iv)    have amended that certain Amended and Restated Exclusive Mutual License Agreement, dated January 15, 2014, and amended August 13, 2016, by and between Micron Devices LLC and the Company to change the "Stimwave Field" (as defined therein) to include additional nerve targets.

3.7    **Proprietary Information and Invention Assignment**.  Each current and former employee, consultant and officer of a Group Company has executed an agreement with such Group Company regarding confidential information, non-competition and non-solicitation and providing for such Group Company's ownership of any Intellectual Property developed by such person in connection with performing services for such Group Company (the "***Proprietary Information and Invention Agreements***"). No current or former employee is precluded from assigning his or her inventions that were developed during his or her employment with the Group Company pursuant to such employee's Proprietary Information and Invention Agreement or any other agreement with the Group Company or

12

any third party. To the Company's knowledge, no person is in violation of any terms of any Proprietary Information and Invention Agreement. Each of the Proprietary Information and Invention Agreements includes a present assignment of any future interest and an assignment of all priority rights. Except as set forth on Section 3.7 of the Schedule of Exceptions to the Co-Investor Closing, no current or former employee or consultant has excluded any work or invention related to the any of the Group Company's business as now conducted and as presently proposed to be conducted from his or her assignment of inventions.

3.8    **Title to Properties and Assets; Liens**. Each Group Company has good and marketable title to its properties and assets, and has good title to all its leasehold interests, in each case subject to no material mortgage, pledge, lien, lease, encumbrance or charge, other than (i) liens for current taxes not yet due and payable, (ii) liens imposed by law and incurred in the ordinary course of business for obligations not past due, (iii) liens in respect of pledges or deposits under workers' compensation laws or similar legislation, and (iv) liens, encumbrances and defects in title which do not in any case materially detract from the value of the property subject thereto or have a Material Adverse Effect, and which have not arisen otherwise than in the ordinary course of business. With respect to the property and assets it leases, each Group Company is in compliance with such leases in all material respects and, to its knowledge, holds a valid leasehold interest free of any liens, claims or encumbrances, subject to clauses (i)-(iv) above.

3.9    **Compliance with Other Instruments**. Each Group Company is not in violation of any term of its certificate of incorporation or bylaws, each as amended to date, or, in any material respect of any term or provision of any mortgage, indebtedness, indenture, contract, agreement, instrument, judgment, order or decree to which it is party or by which it is bound which would have a Material Adverse Effect. Each Group Company is not in violation of any federal or state statute, rule or regulation applicable to the Group Company the violation of which would have a Material Adverse Effect. The execution and delivery of the Transaction Agreements by the Company and any other agreements executed and delivered by the Company in connection with the sale of the Shares, the performance by the Company of its obligations pursuant to such agreements, and the issuance of the Shares and the Conversion Shares, will not (a) result in any violation of, or conflict with, or constitute a default under, (i) any Group Company's certificate of incorporation or bylaws or comparable constitutional documents, each as amended to date, (ii) any agreements or Permits (as defined in Section 3.15 below) to which it is a party or by which any of the properties or assets of the Group Company are bound, (iii) any order applicable to the Group Company or the properties and assets of the Group Company or (iv) any applicable law, (b) be subject to any purchase or call option, right of first refusal, subscription right, pre-emptive right, right of consent, or any similar right of any third party expect for those set forth in the Transaction Agreements, or (c) result in the creation of any material mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Group Company.

3.10    **Litigation**. There are no claims, actions, suits, proceedings, arbitrations, complaints, charges or investigations pending or, to the Company's knowledge, currently threatened (i) against the Group or any officer, director or employee of the Group; or (ii) that questions the validity of the Transaction Agreements, or the right of the Company to enter into them, or to consummate the transactions contemplated by the Transaction Agreements; or (iii) to the Company's knowledge, that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. Neither the Group nor, to the Company's knowledge, any of its officers, directors or employees, is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers, directors or employees,

13

STIMADV_00001296

such as would affect a Group Company). There are no actions, suits, proceedings or investigations by the Group pending or which the Group intends to initiate. The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened in writing involving the prior employment of any of the Group's employees, their services provided in connection with the Group's business, or any information or techniques allegedly proprietary to any of their former employers, or their obligations under any agreements with prior employers.

3.11   **Certain Transactions**. Each Group Company is not indebted, directly or indirectly, to any of its directors, officers or employees or to their respective spouses or children or to any Affiliate (as defined below) of any of the foregoing, other than in connection with expenses or advances of expenses incurred in the ordinary course of business or employee relocation expenses and for other customary employee benefits made generally available to all employees. None of the Group Company's directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing (i) are, directly or indirectly, indebted to the Group Company or, (ii) to the Company's knowledge, have any direct or indirect ownership interest in any firm or corporation with which the Group Company is affiliated or with which the Group Company has a business relationship (whether as a stockholder, licensee/licensor, landlord/tenant, or otherwise), or any firm or corporation which competes with the Group Company. There are no agreements, understandings or proposed transactions between the Group Company and any of its respective officers, directors, stockholders, employees or Affiliates, or any Affiliate or Family Member (as defined below) thereof other than with respect to the Group Company's officers and employees (A) for payment of salary for services rendered as an employee and (B) reimbursement for reasonable expenses incurred on behalf of the Group Company. To the Company's knowledge, none of the Group Company's employees or directors or their Family Members or any Affiliate of any of the foregoing are, directly or indirectly, interested in any material contract with the Group Company. None of the directors or officers, or any members of their Family Members, or, to the Company's knowledge, any Affiliate of any of the foregoing, has any material commercial, industrial, banking, consulting, legal, accounting, charitable or familial relationship with any of the Group Company's customers, suppliers, service providers, joint venture partners, licensees and competitors. "*Affiliate*" means, with respect to a Group Company or any other specified person, any person directly or indirectly controlling, controlled by or under direct or indirect common control with such Group Company or such other specified person. "*Family Member*" means, with respect to any individual, such individual's parents, spouse, and descendants (whether natural or adopted) and any trust or other vehicle formed for the benefit of any one or more of them.

3.12   **Financial Statements**. The Company has delivered to (1) the Investors its audited, consolidated balance sheet, income statement and statement of cash flows for the Company as of and for the fiscal year ended December 31, 2016 and its unaudited, consolidated balance sheet, income statement and statement of cash flows for the Company as of and for the fiscal year ended December 31, 2017 (the "*Balance Sheet Date*") and (2) the Investors participating in the Co-Investor Closing, its audited, consolidated balance sheet, income statement and statement of cash flows for the Company as of and for the fiscal year ended December 31, 2017 and unaudited, consolidated balance sheet, income statement and statement of cash flows for the Company as of and for the five months ended May 31, 2018 (collectively, the items in (1) and (2), "*Financial Statements*"). The Financial Statements are correct and complete, in all material respects, and have been prepared in accordance with United States generally accepted accounting principles ("*GAAP*") applied on a consistent basis throughout the periods indicated, except that the unaudited Financial Statements may not contain all footnotes required by GAAP, and may be subject to normal year-end adjustments. Except as set forth in the unaudited balance sheet of the Company as of the Balance Sheet Date that was delivered to the Investors, as of the date hereof there are no liabilities or obligations of the Company, whether asserted

14

or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due, including any liability or obligation for taxes and any liability under any guaranty or indemnification arrangement, other than (i) performance obligations under contracts incurred in the ordinary course of business and identified in the Schedule of Exceptions, (ii) liabilities or obligations that are not required under GAAP to be reflected on such balance sheet, and (iii) liabilities incurred in the ordinary course of business since the Balance Sheet Date which are consistent with the representations and warranties contained herein and the Company's budget, which, in all such cases, individually and in the aggregate do not exceed $500,000. The Company maintains and will continue to maintain a standard system of accounting established and administered in accordance with GAAP.

      3.13   **Changes**.  Since the Balance Sheet Date, there has not been:

      (a)   any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financial Statements, except changes in the ordinary course of business that have not caused, in the aggregate, a Material Adverse Effect;

      (b)   any damage, destruction or loss, whether or not covered by insurance, that would have a Material Adverse Effect;

      (c)   any waiver or compromise by the Group Company of a valuable right or of a material debt owed to it;

      (d)   any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Group Company, except in the ordinary course of business and the satisfaction or discharge of which would not have a Material Adverse Effect;

      (e)   any material change to a material contract or agreement by which the Group Company or any of its assets is bound or subject;

      (f)   any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder of the Group Company;

      (g)   any resignation or termination of employment of any officer or senior executive (department-level head or higher) of the Group Company;

      (h)   any mortgage, pledge, transfer of a security interest in, or lien, created by the Group Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Group Company's ownership or use of such property or assets;

      (i)   any loans or guarantees made by the Group Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

      (j)   any declaration, setting aside or payment or other distribution in respect of any of the Group Company's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by the Group Company;

CONFIDENTIAL

(k)     any sale, assignment or transfer of any Intellectual Property of the Group Company that could reasonably be expected to result in a Material Adverse Effect;

(l)     receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Group Company;

(m)     to the Company's knowledge, any other event or condition of any character, other than events affecting the economy or the Group Company's industry generally, that could reasonably be expected to result in a Material Adverse Effect; or

(n)     any arrangement or commitment by the Group Company to do any of the things described in this Section 3.13.

3.14    **Employee Matters**.

(a)     No Group Company is delinquent in payments to any of its employees, consultants, or independent contractors for any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees, consultants, or independent contractors. The Group Company has complied in all material respects with all applicable state and federal equal employment opportunity laws and with other laws related to employment, including those related to wages, hours, worker classification, and collective bargaining. The Group Company has withheld and paid to the applicable governmental entity or is holding for payment not yet due to such governmental entity all amounts required to be withheld from employees and consultants of the Group Company and is not liable for any arrears of wages, taxes, penalties, or other sums for failure to comply with any of the foregoing.

(b)     To the Company's knowledge, no employee intends to terminate employment with the Group Company or is otherwise likely to become unavailable to continue as an employee, nor does the Group Company have a present intention to terminate the employment of any of the foregoing. The employment of each employee of the Group Company is terminable at the will of the Group Company.

(c)     Section 3.14(c) of the Schedule of Exceptions sets forth each employee benefit plan maintained, established or sponsored by the Group Company or which the Group Company participates in or contributes to, which is subject to the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*") and each other plan, program, arrangement or agreement that provides bonuses, incentive compensation, vacation pay, severance pay, insurance or any other perquisite or benefit to officers, employees or consultants of the Group Company other than the Option Plan. The Group Company has made all required contributions on a timely basis and has no liability to any such employee benefit plan, other than liability for health plan continuation coverage described in Part 6 of Title I(B) of ERISA, and has complied in all material respects with all applicable laws for any such employee benefit plan.

(d)     Each Group Company is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or, to the knowledge of the Company, has sought to represent any of the employees, representatives or agents of the Group Company. There is no strike or other labor dispute involving the Group Company pending, or to the

16

Company's knowledge, threatened, nor is the Company aware of any labor organization activity involving the employees of any Group Company.

(e)     To the Company's knowledge, none of the Group Company's directors, officers, employees or consultants is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that restricts or will restrict the right of any such director, officer, employee or consultant to be employed or engaged by the Group Company or that interferes or will interfere with such director's, officer's, employee's or consultant's efforts to promote the interests of the Group Company or that conflicts or will conflict with the Group Company's business as currently conducted or as currently proposed to be conducted.  To the Company's knowledge, neither the execution nor delivery of this Agreement, nor the carrying on of the Group Company's business by the directors, officers, employees and consultants of the Group Company, nor the conduct of the Group Company's business as now conducted or as currently proposed to be conducted, will conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, or cause the acceleration of, any contract, covenant or instrument under which any of such directors, officers, employees or consultants is now obligated.  It is not, and will not be, necessary to utilize any invention of any of the Group Company's employees, consultants or advisors (or those it currently intends to hire or engage) made prior to their employment or engagement by the Group Company, which have not been duly assigned or licensed to the Group Company.

(f)     To the Company's knowledge, each full-time employee of the Group Company is currently devoting 100% of his or her business time to the conduct of the business of the Group Company.  To the Company's knowledge, no officer or employee of the Group Company is currently working or plans to work for a competitive enterprise, whether or not such officer or employee is or will be compensated by such enterprise.

3.15    **Regulatory Matters; FDA**.

(a)     The Group has obtained all applicable approvals, clearances, authorizations, licenses and registrations required by the United States Federal government or its agencies and all approvals, clearances, authorizations, licenses and registrations required by any other federal, state or local or foreign governmental authority, to permit all activities (including without limitation, pre-clinical testing) undertaken by the Group to date (the "*Activities to Date*") in jurisdictions where the Group currently conducts or in the past has conducted such activities (collectively, the "*Regulatory Licenses*").

(b)     The Group is in material compliance with all terms and conditions of each Regulatory License and with all applicable laws, rules and regulations pertaining to the Activities to Date including, without limitation, (i) requirements governing investigational drugs and devices under the U.S. Federal Food, Drug, and Cosmetic Act and regulations issued thereunder, and (ii) the U.S. Animal Welfare Act, the regulations issued thereunder, and any similar federal and state statutes and regulations. The Group is in material compliance with all applicable reporting requirements for all Regulatory Licenses and under applicable laws.  Neither the Group nor, to the Company's knowledge, any of its current or former officers, employees or agents (or any other person who has performed activities with respect to the Group's products or product candidates) has committed any act, made any statement or failed to make any statement that would breach the FDA's policy with respect to statements or submissions made to the FDA if any, or any similar laws, rules, regulations or policies

17

under the jurisdiction of any other regulatory authority with respect to statements or submissions made to any other regulatory authority.

(c)    There is no pending, or to the Company's knowledge, threatened claim, suit, proceeding, hearing, enforcement, audit, investigation, arbitration or other action from the U.S. Food and Drug Administration (the "*FDA*") or any other federal, state or local or foreign governmental authority exercising comparable authority or court alleging any violation of any laws, rules or regulations by the Group in connection with the Activities to Date.

(d)    Except as set forth on Section 3.15 of the Schedule of Exceptions, the Group has not initiated, conducted or sponsored any human clinical trials.

(e)    The studies, non-clinical laboratory studies, tests, preclinical trials, and clinical trials, if any, conducted by or on behalf of, or (if applicable) sponsored by, the Group, were and, to the extent still pending, are being, conducted in accordance with established protocols and procedures pursuant to, where applicable, accepted professional scientific research procedures and controls and all applicable laws. The Group has not received any written notices or other written correspondence from the FDA or any other governmental authority exercising comparable authority or court requiring or requesting the hold, termination, suspension or material modification of any such study, test or trial. The Company has no actual knowledge of any other studies or tests the results of which are materially inconsistent with or otherwise are materially different than the results of the above referenced tests. The Group has operated and currently is in material compliance with all applicable FDA rules and regulations or any other applicable U.S. federal, state and local and foreign laws, rules, and regulations and the Group has not received any notices or other correspondence from the FDA or any other governmental agency or court requiring the hold, termination, suspension or material modification of any of the above referenced laboratory studies, pre-clinical or clinical studies or tests. The Company has provided, or made available to the Investors, true and correct copies of all written (including electronic) correspondence between the Group and the FDA or any other governmental authority exercising comparable authority, other than immaterial cover letters and similar immaterial correspondence.

3.16    **Governmental Consent**.    No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Shares and the Conversion Shares, or the consummation of any other transaction contemplated by this Agreement, except (i) filing of the Restated Certificate with the office of the Secretary of State of the State of Delaware, (ii) the filing of such notices as may be required under the Securities Act of 1933, as amended (the "*Securities Act*") and (iii) such filings as may be required under applicable state securities laws. The Company will make all such required filings on a timely basis.

3.17    **Permits**.    Each Group Company has all franchises, permits, licenses, and any similar authority (the "*Permits*") necessary for the conduct of its business as now being conducted by it, the lack of which would have a Material Adverse Effect, and believes it can obtain, without undue burden or expense, any similar authority for the conduct of its business as presently planned to be conducted. No Group Company is in default in any material respect under any of such Permits.

3.18    **Offering**.    Subject to the accuracy of the Investors' representations and warranties in Section 4, the offer, sale and issuance of the Shares to be issued in conformity with the terms of this

18

Agreement and the issuance of the Conversion Shares, constitute transactions exempt from the registration requirements of Section 5 of the Securities Act.

3.19    **No "Bad Actor" Disqualification**.  The Company has exercised reasonable care, in accordance with SEC rules and guidance, to determine whether any Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act ("***Disqualification Events***").  To the Company's knowledge, no Covered Person is subject to a Disqualification Event, except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3) under the Securities Act.  The Company has complied, to the extent applicable, with any disclosure obligations under Rule 506(e) under the Securities Act. "***Covered Persons***" are those persons specified in Rule 506(d)(1) under the Securities Act, including the Company; any predecessor or affiliate of the Company; any director, executive officer, other officer participating in the offering, general partner or managing member of the Company; any beneficial owner of 20% or more of the Company's outstanding voting equity securities, calculated on the basis of voting power; any promoter (as defined in Rule 405 under the Securities Act) connected with the Company in any capacity at the time of the sale of the Shares; and any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of the Shares (a "***Solicitor***"), any general partner or managing member of any Solicitor, and any director, executive officer or other officer participating in the offering of any Solicitor or general partner or managing member of any Solicitor.

3.20    **Registration and Voting Rights**.  Except as set forth in the Rights Agreement, the Company is presently not under any obligation and has not granted any rights to register under the Securities Act any of its presently outstanding securities or any of its securities that may hereafter be issued.  To the Company's knowledge, except as contemplated in the Voting Agreement, no stockholder of the Company has entered into any agreements with respect to the voting of capital shares of the Company.

3.21    **Brokers or Finders**.  The Company has not incurred, and will not incur, directly or indirectly, as a result of any action taken by the Company, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or any of the transactions contemplated hereby.

3.22    **Tax Returns and Payments**.  Each Group Company has timely filed all tax returns required to be filed by it with appropriate federal, state and local governmental agencies and there are in effect no waivers of applicable statute of limitations with respect to taxes for any years.  These returns and reports are true and correct in all material respects. All taxes shown to be due and payable on such returns, any assessments imposed, and, to the Company's knowledge, all other taxes due and payable by the Group Company have been paid or will be paid prior to the time they become delinquent. The Group Company has not been advised in writing (i) that any of its returns have been or are being audited as of the date hereof, or (ii) of any deficiency in assessment or proposed judgment with respect to its federal, state or local taxes.

3.23    **Insurance**.  The Company has in full force and effect general commercial, product liability, fire and casualty, directors and officers and term "key person" insurance policies with coverage customary for companies similarly situated to the Company.  To the knowledge of the Company, no event has occurred, including the failure by the Company to give any notice or information or the Group Company giving any inaccurate or erroneous notice or information, which limits or impairs the rights of the Company under any such insurance policies.

19

STIMADV_00001302

3.24 **Foreign Corrupt Practices Act**.  Neither the Company nor any of the Company's directors, officers, employees or agents have, directly or indirectly, made, offered, promised or authorized any payment or gift of any money or anything of value to or for the benefit of any "foreign official" (as such term is defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "*FCPA*")), foreign political party or official thereof or candidate for foreign political office for the purpose of (i) influencing any official act or decision of such official, party or candidate, (ii) inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, or (iii) securing any improper advantage, in the case of (i), (ii) and (iii) above in order to assist the Company or any of its affiliates in obtaining or retaining business for or with, or directing business to, any person.  Neither the Company nor any of its directors, officers, employees or agents have made or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in violation of any law, rule or regulation. The Company further represents that it has maintained, and has caused each of its subsidiaries and affiliates to maintain, systems of internal controls (including, but not limited to, accounting systems, purchasing systems and billing systems) to ensure compliance with the FCPA or any other applicable anti-bribery or anti-corruption law. Neither the Company, or, to the Company's knowledge, any of its officers, directors or employees are the subject of any allegation, voluntary disclosure, investigation, prosecution or other enforcement action related to the FCPA or any other anti-corruption law.

3.25 **Data Privacy**. In connection with its collection, storage, transfer (including any transfer across national borders) or use of any personally identifiable information from any individuals, including any employees or study subjects (collectively "*Personal Information*"), to the Company's knowledge, it is and has been in compliance with all applicable laws in all relevant jurisdictions, the Group's privacy policies and the requirements of any contract or codes of conduct to which the Group is a party. The Group has physical, technical, organizational and administrative security measures and policies in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use and/or disclosure. The Group is and has been in compliance in all material respects with all laws relating to data loss, theft and breach of security notification obligations.

3.26 **409A**.  With respect to the Co-Investor Closing and each Closing thereafter, the Company believes in good faith that any "nonqualified deferred compensation plan" (as such term is defined under Section 409A(d)(1) of the Internal Revenue Code of 1986, as amended (the "*Code*") and the guidance thereunder) under which the Company makes, is obligated to make or promises to make, payments (each, a "*409A Plan*") complies in all material respects, in both form and operation, with the requirements of Section 409A of the Code and the guidance thereunder. To the knowledge of the Company, no payment to be made under any 409A Plan is, or will be, subject to the penalties of Section 409A(a)(1) of the Code. To the knowledge of the Company, the deferment of any salary and/or bonus payments is not subject to the penalties of Section 409A(a)(1) of the Code.

3.27 **Disclosure**.  With respect to the Co-Investor Closing and each Closing thereafter, the Company has made available to Investors all the information reasonably available to the Company that the Investors have requested for deciding whether to acquire the Shares.  With respect to the Co-Investor Closing and each Closing thereafter, no representation or warranty of the Company contained in this Agreement, as qualified by the applicable Schedule of Exceptions, and no certificate furnished or to be furnished to an Investor at any such Closing contains any untrue statement of a material fact or, to the Company's knowledge, omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. It is understood that this representation is qualified by the fact that the Company has

not delivered to the Investors, and has not been requested to deliver, a private placement or similar memorandum.

## SECTION 4

## REPRESENTATIONS AND WARRANTIES OF THE INVESTORS

Each Investor hereby, severally and not jointly, represents and warrants to the Company as follows:

4.1    **No Registration**.  The Investor understands that the Shares and the Conversion Shares, have not been, and will not be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Investor's representations as expressed herein or otherwise made pursuant hereto.

4.2    **Investment Intent**.  The Investor is acquiring the Shares, and the Conversion Shares, for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof, and that the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same.  The Investor further represents that it does not have any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or grant participation to such person or entity or to any third person or entity with respect to any of the Shares or the Conversion Shares.

4.3    **Investment Experience**.  The Investor has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company and acknowledges that the Investor, can protect its own interests.  The Investor has such knowledge and experience in financial and business matters so that the Investor is capable of evaluating the merits and risks of its investment in the Company.

4.4    **Speculative Nature of Investment**.  The Investor understands and acknowledges that the Company has a limited financial and operating history and that an investment in the Company is highly speculative and involves substantial risks.  The Investor can bear the economic risk of the Investor's investment and is able, without impairing the Investor's financial condition, to hold the Shares and the Conversion Shares for an indefinite period of time and to suffer a complete loss of the Investor's investment.

4.5    **Access to Data**.  The Investor has had an opportunity to ask questions of, and receive answers from, the officers of the Company concerning the Transaction Agreements, the exhibits and schedules attached hereto and thereto and the transactions contemplated by the Transaction Agreements, as well as the Company's business, management and financial affairs, which questions were answered to its satisfaction.  The Investor believes that it has received all the information the Investor considers necessary or appropriate for deciding whether to purchase the Shares and the Conversion Shares.  The Investor acknowledges that any business plans prepared by the Company have been, and continue to be, subject to change and that any projections included in such business plans or otherwise are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results.  The Investor also acknowledges that it is relying solely on its own counsel and not on any statements or representations of the Company or its agents for legal advice with respect to this

21

STIMADV_00001304

investment or the transactions contemplated by the Transaction Agreements. This <u>Section 4.5</u>, however, does not limit or modify the representations and warranties of the Company in <u>Section 3</u> of this Agreement or the right of the Investor to rely thereon.

4.6     <u>**Accredited Investor**</u>. The Investor is (i) an "accredited investor" within the meaning of Regulation D, Rule 501(a) and/or (ii) is not a "U.S. person" within the meaning of Regulation S and is acquiring the Shares in an offshore transaction under Rule 903 of Regulations S, each case of (i) and (ii), promulgated by the Securities and Exchange Commission under the Securities Act, and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company. The Investor has furnished or made available any and all information requested by the Company or otherwise necessary to satisfy any applicable verification requirements as to "accredited investor" status or "non-U.S. person" status. Any such information is true, correct, timely and complete.

4.7     <u>**No Public Market**</u>. The Investor understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

4.8     <u>**Authorization**</u>.

(a)     The Investor has all requisite power and authority to execute and deliver the Transaction Agreements, to purchase the Shares hereunder and to carry out and perform its obligations under the terms of the Transaction Agreements. All action on the part of the Investor necessary for the authorization, execution, delivery and performance of the Transaction Agreements, and the performance of all of the Investor's obligations under the Transaction Agreements, has been taken or will be taken prior to the Closing.

(b)     The Transaction Agreements, when executed and delivered by the Investor, will constitute valid and legally binding obligations of the Investor, enforceable in accordance with their terms except: (i) to the extent that the indemnification provisions contained in the Rights Agreement may be limited by applicable law and principles of public policy, (ii) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (iii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies or by general principles of equity.

(c)     No consent, approval, authorization, order, filing, registration or qualification of or with any court, governmental authority or third person is required to be obtained by the Investor in connection with the execution and delivery of the Transaction Agreements by the Investor or the performance of the Investor's obligations hereunder or thereunder.

4.9     <u>**Brokers or Finders**</u>. The Investor has not engaged any brokers, finders or agents, and neither the Company nor any other Investor has, nor will, incur, directly or indirectly, as a result of any action taken by the Investor, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the Transaction Agreements.

4.10     <u>**Legends**</u>. The Investor understands and agrees that the certificates evidencing the Shares or the Conversion Shares, or any other securities issued in respect of the Shares or the Conversion Shares upon any stock split, stock dividend, recapitalization, merger, consolidation or

22

STIMADV_00001305

similar event, shall bear the following legend (in addition to any legend required by the Rights Agreement or under applicable state securities laws):

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER SUCH ACT AND/OR APPLICABLE STATE SECURITIES LAWS, OR UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL OR OTHER EVIDENCE, REASONABLY SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT SUCH REGISTRATION IS NOT REQUIRED.

4.11    **No "Bad Actor" Disqualification Events**.  Neither (i) the Investor, (ii) any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members, nor (iii) any beneficial owner of the Company's voting equity securities (in accordance with Rule 506(d) of the Securities Act) held by the Investor is subject to any Disqualification Event (as defined in <u>Section 3.19</u>), except for Disqualification Events covered by Rule 506(d)(2) or (d)(3) under the Securities Act and disclosed reasonably in advance of the Closing in writing in reasonable detail to the Company.

4.12    **Representations by Non-United States Persons**.  If an Investor is not a United States person, the Investor hereby represents that the Investor is satisfied as to the full observance of the laws of the Investor's jurisdiction in connection with any invitation to subscribe for the Shares and the Conversion Shares or any use of the Transaction Agreements, including (i) the legal requirements within the Investor's jurisdiction for the purchase of the Shares and the Conversion Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of such securities.  The Investor's subscription and payment for, and the Investor's continued beneficial ownership of, the Shares and the Conversion Shares will not violate any applicable securities or other laws of the Investor's jurisdiction.

4.1    **Exculpation Among Investors**. Such Investor acknowledges that it is not relying upon any person or entity, other than the Company and its officers and directors, in making its investment or decision to invest in the Company. Such Investor agrees that neither any Investor nor the respective controlling persons, officers, directors, partners, agents, or employees of any Investor shall be liable to any other Investor for any action heretofore taken or omitted to be taken by any of them in connection with the purchase of the Shares.

## SECTION 5

## CONDITIONS TO INVESTORS' OBLIGATIONS TO CLOSE

5.1    **Conditions Precedent to Each Closing**. Each Investor's obligation to purchase the Shares at each Closing is subject to the fulfillment on or before such Closing of each of the following conditions, unless waived by the applicable Investor purchasing the Shares in such Closing:

(a)    **Representations and Warranties**.  Except as set forth in or modified by the applicable Schedule of Exceptions, the representations and warranties made by the Company in

STIMADV_00001306

Section 3 (disregarding any Material Adverse Effect, "material" or "in all material respects" qualifications) shall be true and correct in all material respects as of the date of such Closing (other than the Co-Investor Closing). Except as set forth in or modified by the Schedule of Exceptions delivered at the Co-Investor Closing, the representations and warranties made by the Company in Section 3 shall be true and correct in all respects as of the date of the Co-Investor Closing..

      (b)    **Covenants**. The Company shall have performed or complied with all covenants, agreements and conditions contained in this Agreement to be performed or complied with by the Company on or prior to the Closing in all respects.

      (c)    **Blue Sky**. The Company shall have obtained all necessary Blue Sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Shares and the Conversion Shares.

      (d)    **Proceedings and Documents**. All corporate and other proceedings required to carry out the transactions contemplated by this Agreement, and all instruments and other documents relating to such transactions, shall be reasonably satisfactory in form and substance to the Investor, and the Investor shall have been furnished with such instruments and documents as it shall have reasonably requested.

      (e)    **Restated Certificate**. With respect to the Initial Closing, the Prior Certificate shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of Delaware. With respect to the Co-Investor Closing and each Closing thereafter, the Restated Certificate shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of Delaware.

      (f)    **Rights Agreement**. The Company and the Investors (each as defined in the Rights Agreement) shall have executed and delivered to each other the Rights Agreement.

      (g)    **Voting Agreement**. The Company, the Key Holders, and the Investors (each as defined in the Voting Agreement) shall have executed and delivered the Voting Agreement.

      (h)    **Right of First Refusal and Co-Sale Agreement**. The Company, the Key Holders, and the Investors (each as defined in the Right of First Refusal and Co-Sale Agreement) shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

      (i)    **Closing Certificate**. The Investors shall have received a certificate executed by the Chief Executive Officer, President or Chief Financial Officer of the Company on behalf of the Company, in substantially the form of Exhibit G, certifying the satisfaction of the conditions to closing listed in Section 5.1(a) and 5.1(b).

      (j)    **Secretary's Certificate**. The Secretary or any Assistant Secretary of the Company shall have delivered to the Purchasers at the Closing a certificate certifying (i) the Bylaws of the Company, (ii) resolutions of the Board of Directors of the Company approving the Transaction Agreements and the transactions contemplated under the Transaction Agreements, and (iii) resolutions of the stockholders of the Company approving the Restated Certificate.

      (k)    **Certificate of Good Standing**. The Company shall have delivered to counsel to the Investors a certificate of the Secretary of State of the State of Delaware, dated as of a date (x) with

24

STIMADV_00001307

respect to the Initial Closing, after April 1, 2018, or (y) with respect to other Closings, within ten days of the date of such Closing, with respect to the good standing of the Company.

(l)    **Budget**.    The Investors shall have received a budget approved by the Company's Board of Directors, which shall be form and substance satisfactory to the Investors.

5.2    **Additional Conditions Precedent to the Initial Closing and Subsequent Closing**. Solely with respect to the Initial Closing and Subsequent Closing, each Investor's obligation to purchase the Shares at the applicable Closing is subject to the fulfillment on or before such Closing of the following condition, unless waived by the applicable Investor purchasing the Shares in such Closing:

(a)    **Legal Opinion**.    The Investors shall have received an opinion from DLA Piper LLP (US), counsel to the Company, dated as of the Closing, in substantially the form of Exhibit H.

5.3    **Additional Conditions Precedent to the Initial Closing**.    Solely with respect to the Initial Closing, Orchid's obligation to purchase the Shares at the Initial Closing is subject to the fulfillment on or before such Closing of the following condition, unless waived by Orchid:

(a)    **Board of Directors**.    Effective upon the Initial Closing, the authorized size of the Board of Directors of the Company shall be set at seven (7) members, and shall consist of Laura Tyler Perryman, Gary Perryman, Robert K. Anderson, Jeffrey Goldberg and Richard Chen Mao, and two seats shall be vacant.

5.4    **Additional Conditions Precedent to the Co-Investor Closing**.    Solely with respect to the Co-Investor Closing, the obligation of SV Life Sciences Fund VI, L.P. and SV Life Sciences Strategic Fund VI, L.P. (collectively, "*SV Funds*") to purchase the Shares at the Co-Investor Closing is subject to the fulfillment on or before such Closing of the following conditions, unless waived by SV Funds:

(a)    **Conversion of SAFEs**.    Each holder of an outstanding SAFE shall have executed and delivered this Agreement and the other Transaction Agreements.

(b)    **Repayment of BSC Notes**.    Boston Scientific Neuromodulation Corporation and the Company shall have executed a pay off letter in a form satisfactory to SV Funds.

(c)    **Management Rights**.    A management rights letter in form reasonably acceptable to SV Funds shall have been executed by the Company and delivered to SV Funds.

(d)    **Indemnification Agreement**.    The Company shall have executed and delivered an Indemnification Agreement indemnifying the director designated by SV Funds pursuant to the Voting Agreement and SV Funds in form reasonably acceptable to SV Funds.

(e)    **Board of Directors**.    Effective upon the Co-Investor Closing, the authorized size of the Board of Directors of the Company shall be set at seven (7) members, and shall consist of Laura Tyler Perryman, Gary Perryman, Robert K. Anderson, Jeffrey Goldberg, Richard Chen Mao and Paul LaViolette, and one seat shall be vacant.

25

STIMADV_00001308

## SECTION 6

## CONDITIONS TO COMPANY'S OBLIGATION TO CLOSE

The Company's obligation to sell and issue the Shares at each Closing is subject to the fulfillment on or before such Closing of the following conditions, unless waived by the Company:

6.1    **Representations and Warranties**.  The representations and warranties made by the Investors in such Closing in Section 4 shall be true and correct in all material respects when made and shall be true and correct in all material respects as of the date of such Closing.

6.2    **Covenants**.  The Investors shall have performed or complied with all covenants, agreements and conditions contained in the Transaction Agreements to be performed or complied with by the Investors on or prior to the date of such Closing in all material respects.

6.3    **Compliance with Securities Laws**.  The Company shall be satisfied that the offer and sale of the Shares and the Conversion Shares shall be qualified or exempt from registration or qualification under all applicable federal and state securities laws (including receipt by the Company of all necessary blue sky law permits and qualifications required by any state, if any).

6.4    **Restated Certificate**.  With respect to the Initial Closing, the Prior Certificate shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of Delaware. With respect to the Co-Investor Closing and each Closing thereafter, the Restated Certificate shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of Delaware.

6.5    **Rights Agreement**.  The Company and the Investors (each as defined in the Rights Agreement) shall have executed and delivered the Rights Agreement.

6.6    **Voting Agreement**.  The Company, the Key Holders and the Investors (each as defined in the Voting Agreement) shall have executed and delivered the Voting Agreement.

6.7    **Right of First Refusal and Co-Sale Agreement**.  The Company, the Key Holders and the Investors (each as defined in the Right of First Refusal and Co-Sale Agreement) shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

## SECTION 7

## MISCELLANEOUS

7.1    **Amendment**.  Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by the Company and the Investors holding a majority of the Common Stock issued or issuable upon conversion of the Shares issued pursuant to this Agreement (excluding any of such shares that have been sold to the public or pursuant to Rule 144); *provided, however*, that Investors purchasing shares in a Closing after the Co-Investor Closing may become parties to this Agreement in accordance with Section 2.1 without any amendment of this Agreement pursuant to this paragraph or any consent or approval of any other Investor; and *provided, further*, that if any amendment, waiver, discharge or termination operates in a manner that treats any Investor

26

STIMADV_00001309

different from other Investors, the consent of such Investor shall also be required for such amendment, waiver, discharge or termination. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding (including securities into which such securities have been converted or exchanged or for which such securities have been exercised) and each future holder of all such securities.

7.2    **Notices**.  All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail (if to an Investor or any other holder of Company securities) or otherwise delivered by hand, messenger or courier service addressed:

(a)    if to an Investor, to the Investor's address, facsimile number or electronic mail address as shown in the Company's records, as may be updated in accordance with the provisions hereof;

(b)    if to any other holder of any Shares or Conversion Shares, to such address, facsimile number or electronic mail address as shown in the Company's records, or, until any such holder so furnishes an address, facsimile number or electronic mail address to the Company, then to the address of the last holder of such Shares or Conversion Shares for which the Company has contact information in its records; or

(c)    if to the Company, to the attention of the Chief Executive Officer or Chief Financial Officer of the Company at 1310 Park Central Boulevard South, Pompano Beach, Florida 33064, or at such other current address as the Company shall have furnished to the Investors, with a copy (which shall not constitute notice) to Michael J. Brown, Esq., DLA Piper LLP (US), 4365 Executive Drive, Suite 1100, San Diego, California 92121.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent via a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent via mail, at the earlier of its receipt or five days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent via facsimile, upon confirmation of facsimile transfer or, if sent via electronic mail, upon confirmation of delivery when directed to the relevant electronic mail address, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.

Subject to the limitations set forth in Delaware General Corporation Law §232(e), each Investor or other security holder consents to the delivery of any notice to stockholders given by the Company under the Delaware General Corporation Law or the Company's certificate of incorporation or bylaws by (i) facsimile telecommunication to the facsimile number set forth on Exhibit A (or to any other facsimile number for the Investor or other security holder in the Company's records), (ii) electronic mail to the electronic mail address set forth on Exhibit A (or to any other electronic mail address for the Investor or other security holder in the Company's records), (iii) posting on an electronic network together with separate notice to the Investor or other security holder of such specific posting or (iv) any other form of electronic transmission (as defined in the Delaware General Corporation Law) directed to the Investor or other security holder. This consent may be revoked by

27

CONFIDENTIAL

STIMADV_00001310

an Investor or other security holder by written notice to the Company and may be deemed revoked in the circumstances specified in Delaware General Corporation Law §232.

7.3 **Governing Law**. This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.

7.4 **Brokers or Finders**. The Company shall indemnify and hold harmless each Investor from any liability for any commission or compensation in the nature of a brokerage or finder's fee or agent's commission (and the costs and expenses of defending against such liability or asserted liability) for which such Investor or any of its constituent partners, members, officers, directors, employees or representatives is responsible to the extent such liability is attributable to any inaccuracy or breach of the representations and warranties contained in Section 3.21, and each Investor agrees to indemnify and hold harmless the Company and each other Investor from any liability for any commission or compensation in the nature of a brokerage or finder's fee or agent's commission (and the costs and expenses of defending against such liability or asserted liability) for which the Company, any other Investor or any of their constituent partners, members, officers, directors, employees or representatives is responsible to the extent such liability is attributable to any inaccuracy or breach of the representations and warranties made by such Investor contained in Section 4.9.

7.5 **Expenses**. The Company and the Investors shall each pay their own expenses in connection with the transactions contemplated by this Agreement; *provided*, *however*, that on the date of the Initial Closing, the Company shall reimburse Orchid the reasonable documented fees and expenses that Orchid incurs in connection with legal, financial and other due diligence activities associated with the transactions contemplated hereby, such amount not to exceed $300,000; provided further, that promptly after the Co-Investor Closing, the Company shall reimburse SV Funds the reasonable documented fees and expenses that SV Funds incur in connection with legal, financial, intellectual property and other due diligence activities associated with the transactions contemplated hereby, such amount not to exceed $200,000. The Company and each of the Investors acknowledge that BRL Law Group LLC represents SV Funds only and no other Investor.

7.6 **Survival**. The representations, warranties, covenants and agreements made in this Agreement shall survive any investigation made by any party hereto and the closing of the transactions contemplated hereby for two years from the date of the applicable Closing; provided however, that the representations and warranties made to each Investor in Sections 3.1, 3.2, 3.3, 3.4, 3.6 and 3.15 hereof shall survive as to each Investor for so long as such Investor (or its Affiliates) holds Shares or Conversion Shares.

7.7 **Termination**. The rights described herein, including, notwithstanding Section 7.6, all representations and warranties hereunder, shall terminate and be of no further force or effect upon the earlier of (a) the consummation of the sale of the Company's securities pursuant to a registration statement filed by the Company under the Securities Act of 1933, as amended, in connection with the firm commitment underwritten offering of its securities to the general public; or (b) a Liquidation Event of the Company (as defined in the Restated Certificate).

7.8 **Successors and Assigns**. This Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any Investor without the prior written consent of the Company, not to be unreasonably withheld; provided that an Investor may transfer its rights to an Affiliate of such Investor. Any attempt by an Investor without such permission

28

STIMADV_00001311

to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void.  Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

7.9    **Entire Agreement**.  This Agreement and the other Transaction Agreements (including the exhibits and schedules attached hereto and thereto), constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof.  No party shall be liable or bound to any other party in any manner with regard to the subjects hereof or thereof by any warranties, representations or covenants except as specifically set forth herein or therein.

7.10    **Delays or Omissions**.  Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any party to this Agreement, shall be cumulative and not alternative.

7.11    **California Corporate Securities Law**.  THE SALE OF THE SECURITIES THAT ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102, OR 25105 OF THE CALIFORNIA CORPORATIONS CODE.  THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

7.12    **Severability**.  If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision.  The balance of this Agreement shall be enforceable in accordance with its terms.

7.13    **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

7.14    **Electronic Execution and Delivery**.  A facsimile or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen.  Such execution and delivery shall be considered valid, binding and effective for all

29

STIMADV_00001312

purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile or other reproduction hereof.

7.15    **Jurisdiction; Venue**.  Each of the parties hereto hereby submits and consents irrevocably to the exclusive jurisdiction of the courts of the State of Delaware and the United States District Court for the District of Delaware for the interpretation and enforcement of the provisions of this Agreement.

7.16    **Further Assurances**.  Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to more fully effectuate this Agreement.

7.17    **Attorney's Fees**.  In the event that any suit or action is instituted to enforce any provisions in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

7.18    **Jury Trial**.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THIS AGREEMENT.

7.19    **Interpretation**.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.  As used in this Agreement, the phrase "***to the Company's knowledge***" means the knowledge after due inquiry of any of the Company's chief executive officer, chief regulatory officer and chief compliance officer.

*[Remainder of page intentionally left blank; signature pages follow]*

CONFIDENTIAL                                                                        STIMADV_00001313

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

COMPANY:

STIMWAVE TECHNOLOGIES INCORPORATED

By: *Laura Tyler Perryman* _____

Name: Laura Tyler Perryman
Title: Chief Executive Officer

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

ECHO VIBRATION LIMITED

By: _____

Name: Gabriel Li
Title: Authorized Representative

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

SV LIFE SCIENCES FUND VI, L.P.

By:     SV Life Sciences Fund VI (GP), L.P.,
        its sole General Partner

By:     SVLSF VI, LLC, its sole general partner


By:     _____
Name:   Brent M. Faduski

Title:  Officer


SV LIFE SCIENCES STRATEGIC FUND VI, L.P.

By:     SV Life Sciences Fund VI (GP), L.P.
        Its: Sole General Partner

By:     SVLSF VI, LLC
        Its: Sole General Partner


By:     _____
Name:   Brent M. Faduski

Title:  Officer


*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

ACORN CAMPUS TAIWAN, L.P.

By: _____

Name: RUEI MING JAMP

Title: General Partner

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

ACORN CAMPUS TAIWAN II, L.P.

By: _____

Name: _RUGIMING JAMP_

Title: _General Partner_

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

STIMADV_00001318

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

*Robert Anderson*

Robert K. Anderson

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

BRIGHT STONE HOLDINGS LIMITED

By:       _____
Name:   _____
Title:         director

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

TSINGYUAN VENTURES

*Michael Jin*

By: _____

Name: Michael Jin

Title: Managing Partner

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

STIMADV_00001321

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

*Robert Brownell*

_____

Robert Brownell

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

CASCADE CAPITAL MANAGEMENT LLC

By: _WuFu Chen_____

Name:_____

Title: _Manager_____

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

CONFIDENTIAL

STIMADV_00001323

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

GRAHAM FAMILY INVESTMENTS LLC

By: _____ *Michael Graham* _____

Name: ___Michael Graham_____

Title: ___Manager_____

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

_____

Akiva Y. Gross

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

STIMADV_00001325

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

*Stephen Hochschuler*

Stephen Hochschuler

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

INNORICH VENTURE CAPITAL CORP.

By: _____

Name: _Lilian Lee._

Title: _Senior Manager._

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

LIFE SCIENCE ANGEL INVESTORS VII, L.L.C.

By: _Allan May_ _____

Name: Allan May _____

Title: Chairman _____

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

STIMADV_00001328

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Series D Preferred Stock Purchase Agreement as of the date first written above.

INVESTOR:

_____

Ralph Rashbaum

*[Signature Page to Amended and Restated Series D Preferred Stock Purchase Agreement]*

CONFIDENTIAL

STIMADV_00001329

**EXHIBIT A**

**SCHEDULE OF INVESTORS**

Initial Closing: April 25, 2018

| Name and Address | Purchase Price | Number of Series D Shares |
|---|---|---|
| **Echo Vibration Limited**<br>Vistra Corporate Services Centre<br>Wickhams Cay II<br>Road Town, Tortola, VG1110<br>British Virgin Islands<br>Attn: Gabriel Li<br>Fax: +852 2115 8120<br>Email: gli@orchidasia.com | $4,999,999.50 | 232,450 |
| **Initial Closing Total:** | **$4,999,999.50** | **232,450** |

Co-Investor Closing:  July 17, 2018

| Name and Address | Purchase Price (Conversion) | Purchase Price (Cash) | Number of Series D Shares |
|---|---|---|---|
| **SV Life Sciences Fund VI, L.P.**<br>c/o SV Health Investors<br>One Boston Place<br>201 Washington Street, Suite 3900<br>Boston, Massachusetts 02108<br>Attn: Paul LaViolette and Denise Marks<br>Fax:  1 617 367 1590<br>E-mail: PLaviolette@svhealthinvestors.com<br>      DMarks@svhealthinvestors.com | $0 | $14,503,440.15<br><br>Co-Investor<br>Closing Payment<br>Amount:<br>$1,933,813.53 | 674,265 |
| **SV Life Sciences Fund VI Strategic Partners, L.P.**<br>c/o SV Health Investors<br>One Boston Place<br>201 Washington Street, Suite 3900<br>Boston, Massachusetts 02108<br>Attn: Paul LaViolette and Denise Marks<br>Fax:  1 617 367 1590<br>E-mail: PLaviolette@svhealthinvestors.com<br>      DMarks@svhealthinvestors.com | $0 | $496,558.35<br><br>Co-Investor<br>Closing Payment<br>Amount:<br>$66,207.78 | 23,085 |

STIMADV_00001330

| Name and Address | Purchase Price (Conversion) | Purchase Price (Cash) | Number of Series D Shares |
|---|---|---|---|
| **Acorn Campus Taiwan, L.P.** <br> A209, No. 18, Siyuan St., Zhongzheng District <br> Taipei City, 10087, Taiwan (R.O.C.) <br> Email: rayjamp@gmail.com | $100,000.00 | $0 | 4,649 |
| **Acorn Campus Taiwan II, L.P.** <br> A209, No. 18, Siyuan St., Zhongzheng District <br> Taipei City, 10087, Taiwan (R.O.C.) <br> Email: rayjamp@gmail.com | $1,000,000.00 | $0 | 46,490 |
| **Robert K. Anderson** <br> 7262 Old Post Road <br> Boulder, CO 80301 <br> Email: ande433@gmail.com | $100,000.00 | $0 | 4,649 |
| **Bright Stone Holdings Limited** <br> 631F, Bank of China Tower <br> 1 Garden Road, Central <br> Hong Kong | $4,000,000.00 | $0 | 185,960 |
| **Robert Brownell** <br> 1132 Sawyers Bar Road <br> Etna, CA 96027 <br> Email: rbrownell@empllp.com | $35,000.00 | $0 | 1,627 |
| **Cascade Capital Management LLC** <br> Building A, Room 209, No. 18, Siyuan St. <br> Taipei City, 10087, Taiwan <br> Email: chen5fu@gmail.com | $500,000.00 | $0 | 23,245 |
| **Graham Family Investments LLC** <br> 60 E. Monroe Street, Unit 5901 <br> Chicago, IL 60603 <br> Email: grahampartners@aol.com | $100,000.00 | $0 | 4,649 |
| **Akiva Y. Gross** <br> 6506 Clarington Road <br> Baltimore, MD 21209 <br> Fax: 410-773-9448 <br> Email: agross@aygrosslaw.com | $100,000.00 | $0 | 4,649 |
| **Stephen Hochschuler** <br> 4240 Prescott Ave., Unit 2F <br> Dallas, TX 75219 <br> Email: shochschulertbi@aol.com | $50,000.00 | $0 | 2,324 |
| **Innorich Venture Capital Corp.** <br> 6F, No. 2, Ln. 116, Sec. 2 <br> Zhongshan North Road, Taipei, 10449, Taiwan <br> Fax: 866-2-2562-6257 <br> Email: max@birchvc.com | $500,000.00 | $0 | 23,245 |

STIMADV_00001331

| Name and Address | Purchase Price (Conversion) | Purchase Price (Cash) | Number of Series D Shares |
|---|---|---|---|
| **Life Science Angel Investors VII, L.L.C.** 1230 Bordeaux Drive Sunnyvale, CA 94089 Email: dkaplan@lifescienceangels.org | $110,000.00 | $0 | 5,113 |
| **Ralph Rashbaum** 3508 Twin Lakes Way Plano, TX 75093 Fax: 972-608-5020 Email: rrashbaum@texasback.com | $50,000.00 | $0 | 2,324 |
| **Co-Investor Closing Total:** | **$6,645,000.00** | **$14,999,998.50** | **1,006,274** |

| Name and Address | Purchase Price (Conversion) | Purchase Price | Number of Series D Shares |
|---|---|---|---|
| **TOTAL (All Closings to date):** | **$6,645,000.00** | **$19,999,998.00** | **1,238,724** |

STIMADV_00001332

**EXHIBIT B-1**

**PRIOR CERTIFICATE**

STIMADV_00001333

## EXHIBIT B-2

### RESTATED CERTIFICATE

STIMADV_00001334

**EXHIBIT C**

**RIGHTS AGREEMENT**

CONFIDENTIAL

**EXHIBIT D**

**VOTING AGREEMENT**

CONFIDENTIAL

## EXHIBIT E

### RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT

EXHIBIT F

STIMWAVE TECHNOLOGIES INCORPORATED

SCHEDULE OF EXCEPTIONS

INITIAL CLOSING

This Schedule of Exceptions is made and given pursuant to Section 3 of the Series D Preferred Stock Purchase Agreement, dated as of April 20, 2018 (the "*Agreement*"), between Stimwave Technologies Incorporated (the "*Company*") and the Investors listed on Exhibit A thereto. All capitalized terms used but not defined herein shall have the meanings as defined in the Agreement, unless otherwise provided.  The section numbers below correspond to the section numbers of the representations and warranties in the Agreement; *provided, however*, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated into any other section number under the Agreement where such disclosure would be appropriate.

Nothing in this Schedule of Exceptions is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant.  Inclusion of any item in this Schedule of Exceptions (1) does not represent a determination that such item is material or establish a standard of materiality, (2) does not represent a determination that such item did not arise in the ordinary course of business, (3) does not represent a determination that the transactions contemplated by the Agreement require the consent of third parties, and (4) shall not constitute, or be deemed to be, an admission to any third party concerning such item.

## EXHIBIT G

## CLOSING CERTIFICATE

CONFIDENTIAL

**EXHIBIT H**

**OPINION OF COUNSEL TO THE COMPANY**

STIMADV_00001340

## EXHIBIT F

## STIMWAVE TECHNOLOGIES INCORPORATED

## SCHEDULE OF EXCEPTIONS

## CO-INVESTOR CLOSING

This Schedule of Exceptions is made and given pursuant to Section 3 of the Amended and Restated Series D Preferred Stock Purchase Agreement, dated as of July 17, 2018 (the "**Agreement**"), between Stimwave Technologies Incorporated (the "**Company**") and the Investors listed on Exhibit A thereto. All capitalized terms used but not defined herein shall have the meanings as defined in the Agreement, unless otherwise provided. The section numbers below correspond to the section numbers of the representations and warranties in the Agreement; *provided, however*, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated into any other section number under the Agreement where such disclosure would be appropriate and reasonably apparent.

Nothing in this Schedule of Exceptions is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant. Inclusion of any item in this Schedule of Exceptions (1) does not represent a determination that such item is material or establish a standard of materiality, (2) does not represent a determination that such item did not arise in the ordinary course of business, (3) does not represent a determination that the transactions contemplated by the Agreement require the consent of third parties, and (4) shall not constitute, or be deemed to be, an admission to any third party concerning such item.

Tables referenced herein are set forth in the Appendix at the end of this Schedule of Exceptions.

CONFIDENTIAL

**Section 3.2**
**Subsidiaries**

1.    List of subsidiaries and description of organizational structure.

    1.1.    Stimwave Technologies Incorporated, a Delaware corporation (Table 3.2(b)-1 which lists the equity holders, is hereby incorporated by reference herein).

    1.2.    Stimwave LLC, a Nevada limited liability company (the Company is the sole member).

    1.3.    Freedom Neuromodulation LLC, an international business company organized under the laws of the Commonwealth of The Bahamas (the Company is the sole shareholder).

    1.4.    Stimwave Medical Pty Ltd, an Australian proprietary company limited by shares (wholly-owned by Freedom Neuromodulation LLC).

    1.5.    Stimwave Freedom Neuro LP, an exempted limited partnership formed under the laws of the Commonwealth of The Bahamas (each of the Company and Freedom Neuromodulation LLC holds a 50% limited partner interest).

    1.6.    Freedom Neuro Coöperatief U.A., registered under the laws of the Netherlands (wholly-owned by Stimwave Freedom Neuro LP).

    1.7.    Freedom Neuro B.V., a private limited liability company incorporated under the laws of the Netherlands (wholly-owned by Freedom Neuro Coöperatief U.A.).

    1.8.    StimQ Medical LLC, registered under the laws of the Commonwealth of The Bahamas (Table 3.2(b)-2, which lists the equity holders, is hereby incorporated by reference herein).

    1.9.    StimRelieve LLC, registered under the laws of the Commonwealth of The Bahamas (Table 3.2(b)-3, which lists the equity holders, and Table 3.2(b)-4, which lists the convertible security holders, are hereby incorporated by reference herein).

2.    The Company holds a 5% non-voting interest in Micron Devices LLC.

2

CONFIDENTIAL    STIMADV_00001342

**Section 3.3**
**Capitalization**

(d)(iii)

1.  Loan Agreement, dated April 23, 2014, by and between Boston Scientific Neuromodulation Corporation and the Company, as amended by Amendment No. 1 to Loan Agreement, dated May 23, 2014, by and between the Company and Boston Scientific Neuromodulation Corporation, and Consent Agreement and Amendment No. 2 to Loan Agreement and Amendment to Security Agreements, dated October 15, 2015, by and among the Company, Micron Devices LLC, Freedom Neuromodulation LLC, and Boston Scientific Neuromodulation Corporation, and solely with respect to Section 11 therein, Stimwave Freedom Neuro LP (the "*BSC Amendment*") (as amended, the "*BSC Loan Agreement*").

2.  Senior Secured Convertible Promissory Note and Guaranty, dated July 2, 2014, by and among Boston Scientific Neuromodulation Corporation, the Company and Freedom Neuromodulation LLC, as Guarantor; Senior Secured Convertible Promissory Note and Guaranty, dated October 30, 2014, by and among Boston Scientific Neuromodulation Corporation, the Company and Freedom Neuromodulation LLC, as Guarantor (the "*BSC Notes*").

3.  Patent Security Agreement, dated as of July 2, 2014, by and among Micron Devices LLC, Freedom Neuromodulation LLC and Boston Scientific Neuromodulation Corporation.

4.  Patent Security Agreement, dated as of July 2, 2014, between the Company and Boston Scientific Neuromodulation Corporation.

5.  Security Agreement, effective as of July 2, 2014, by and among Micron Devices LLC, Freedom Neuromodulation LLC and Boston Scientific Neuromodulation Corporation, as amended by the BSC Amendment.

6.  Security Agreement, dated as of July 2, 2014, between the Company and Boston Scientific Neuromodulation Corporation, as amended by the BSC Amendment.

7.  Simple Agreements for Future Equity issued in connection with the Company's 2017 bridge financing in the aggregate amount of $6,645,000 (the "*SAFEs*"):

    7.1.  Simple Agreement for Future Equity, dated October 27, 2017, issued by the Company to Acorn Campus Taiwan II, L.P in the amount of $1,000,000.00.

    7.2.  Simple Agreement for Future Equity, dated November 21, 2017, issued by the Company to Cascade Capital Management LLC in the amount of $500,000.00.

    7.3.  Simple Agreement for Future Equity, dated October 20, 2017, issued by the Company to Robert K. Anderson in the amount of $100,000.00.

    7.4.  Simple Agreement for Future Equity, dated October 10, 2017, issued by the Company to Robert Brownell in the amount of $35,000.00.

    7.5.  Simple Agreement for Future Equity, dated October 16, 2017, issued by the Company to Stephen Hochschuler in the amount of $50,000.00.

    7.6.  Simple Agreement for Future Equity, dated December 7, 2017, issued by the Company to Bright Stone Holdings Limited in the amount of $4,000,000.00,.

WEST\282312015.5

CONFIDENTIAL

STIMADV_00001343

7.7.   Simple Agreement for Future Equity, dated October 2, 2017, issued by the Company to Graham Family Investments LLC in the amount of $100,000.00.

7.8.   Simple Agreement for Future Equity, dated November 3, 2017, issued by the Company to Innorich in the amount of $500,000.00.

7.9.   Simple Agreement for Future Equity, dated November 9, 2017, issued by the Company to Life Science Angel Investors VII, L.L.C. in the amount of $110,000.00.

7.10.  Simple Agreement for Future Equity, dated October 4, 2017, issued by the Company to Akiva Y. Gross in the amount of $100,000.00.

7.11.  Simple Agreement for Future Equity, dated November 21, 2017, issued by the Company to Acorn Campus Taiwan, L.P. in the amount of $100,000.00.

7.12.  Simple Agreement for Future Equity, dated October 24, 2017, issued by the Company to Ralph Rashbaum in the amount of $50,000.00.

8.   Outstanding Convertible Promissory Notes issued by StimRelieve LLC in the aggregate amount of $1,090,000:

8.1.   Convertible Promissory Note, dated January 14, 2014, issued by StimRelieve LLC to Adnan Al-Kaisey in the amount of $250,000.00.

8.2.   Convertible Promissory Note, dated January 14, 2014, issued by StimRelieve LLC to Mark Coleman in the amount of $50,000.00.

8.3.   Convertible Promissory Note, dated January 10, 2014, issued by StimRelieve LLC to Ali El Mohandes in the amount of $50,000.00.

8.4.   Convertible Promissory Note, dated January 13, 2014, issued by StimRelieve LLC to Robert Green in the amount of $25,000.00.

8.5.   Convertible Promissory Note, dated January 28, 2014, issued by StimRelieve LLC to Richard Guyer in the amount of $50,000.00.

8.6.   Convertible Promissory Note, dated January 21, 2014, issued by StimRelieve LLC to Marc Hungerford in the amount of $25,000.00.

8.7.   Convertible Promissory Note, dated January 21, 2014, issued by StimRelieve LLC to Jay and Roma Khanna in the amount of $25,000.00.

8.8.   Convertible Promissory Note, dated January 31, 2014, issued by StimRelieve LLC to Life Science Angel Investors, VII LLC in the amount of $105,000.00.

8.9.   Convertible Promissory Note, dated January 7, 2014, issued by StimRelieve LLC to Mayrock Investments Inc. in the amount of $100,000.00.

8.10.  Convertible Promissory Note, dated January 22, 2014, issued by StimRelieve LLC to Sunil Panchal in the amount of $50,000.00.

8.11.  Convertible Promissory Note, dated February 7, 2014, issued by StimRelieve LLC to Ralph Rashbaum in the amount of $35,000.00.

8.12.  Convertible Promissory Note, dated February 10, 2014, issued by StimRelieve LLC to Marc Russo in the amount of $50,000.00.

8.13.  Convertible Promissory Note, dated January 17, 2014, issued by StimRelieve LLC to Aneesh Singla in the amount of $75,000.00.

WEST\282312015.5

CONFIDENTIAL

STIMADV_00001344

8.14.   Convertible Promissory Note, dated February 6, 2014, issued by StimRelieve LLC to Richard Weiner in the amount of $150,000.00.

8.15.   Convertible Promissory Note, dated January 30, 2014, issued by StimRelieve LLC to Jack Zigler in the amount of $50,000.00.

9.   Letter Agreement dated August 18, 2016, by and among StimQ Medical LLC, the Company, Micron Devices LLC, Freedom Neuromodulation LLC, Stimwave Freedom Neuro LP, and Stryker Corporation.

10.   Investors Rights Agreement, dated as of August 18, 2016, by and among StimQ Medical LLC and Stryker Corporation.

11.   Co-Sale Agreement, dated as of August 18, 2016, by and among StimQ Medical LLC, Stryker Corporation, and Common Holders set forth therein.

12.   The Company anticipates that it will issue stock options for 75,000 shares to the Chief Commercialization Officer, for 50,000 shares to the Independent Board Director, and for 2,500 shares to Thomas Osypka as soon as practicable.

13.   Put Option Agreement, dated as of April 21, 2018, by and between the Company and Echo Vibration Limited.

14.   Stock Option Agreement, dated October 1, 2015, between the Company and Scott Olson expired.

15.   As of July 17, 2018, there are 390,000 options outstanding under the Option Plan.

16.   The following holders of SAFEs have not executed the Agreement, and their SAFEs will not convert into Shares of the Series D Preferred Stock at the Co-Investor Closing:

16.1.   Acorn Campus Taiwan, L.P.

16.2.   Acorn Campus Taiwan II, L.P.

16.3.   Cascade Capital Management LLC

16.4.   Innorich

(e)

1.   The Consulting Agreements disclosed under Section 3.14(c) of this Schedule of Exceptions are hereby incorporated by reference herein.

2.   Table 3.3(g)-1 (option holders) is hereby incorporated by reference herein.

(f)

1.   Warrant No. W-02 to Purchase 138,490 Shares Common Stock of the Company, issued to Echo Vibration Limited, dated April 24, 2018.

2.   Warrant No. W-03 to Purchase 166,218 Shares Common Stock of the Company, issued to Echo Vibration Limited, dated April 24, 2018.

3.   The Company anticipates granting a stock option to purchase [10,000] shares pursuant to the Option Plan to Dr. Andrea Trescot in connection with her service as Chief Medical Officer.

WEST\282312015.5

CONFIDENTIAL

STIMADV_00001345

4.  The Company anticipates granting stock options to purchase an aggregate of 50,000 shares pursuant to the Option Plan to its five regional vice presidents.

5.  The Company anticipates granting a stock option to purchase 50,000 shares pursuant to the Option Plan to Jeffrey Goldberg in connection with his service as a director.

6.  The Company anticipates granting a stock option to purchase 75,000 shares pursuant to the Option Plan to Jim Surek in connection with his service as an officer.

7.  The Company anticipates granting a stock option to purchase 50,000 shares pursuant to the Option Plan to Steven Amelio in connection with his service as an officer.

(g)

1.  As of the date hereof and immediately prior to the Co-Investor Closing. Table 3.2(b)-1 is hereby incorporated by reference herein.

2.  After Co-Investor Closing (the values in this table and the other pro forma capitalization tables in this section are based on the assumption that all outstanding SAFEs would convert to shares of the Series D Preferred Stock at the Co-Investor Closing)

| Class of Security | Shares (Fully Diluted) | % Owned (Fully Diluted) |
|---|---|---|
| COMMON STOCK | 2,529,682 | 28.04% |
| SERIES A PREFERRED STOCK | 1,499,999 | 16.63% |
| SERIES A-2 PREFERRED STOCK | 1,015,699 | 11.26% |
| SERIES B PREFERRED STOCK | 722,075 | 8.00% |
| SERIES B-2 PREFERRED STOCK | 944,559 | 10.47% |
| SERIES D PREFERRED STOCK | 1,238,724 | 13.73% |
| *Total Outstanding Stock:* | 7,950,738 | 88.13% |
| RIGHTS TO ACQUIRE EQUITY | | |
| Outstanding Options and Warrants | 927,148 | 10.28% |
| Available Plan Options | 143,633 | 1.59% |
| *Total Options and Warrants:* | 1,070,781 | 11.87% |
| **Total Diluted Shares:** | 9,021,519 | 100.00% |

3.  After Second Closing

| Class of Security | Shares (Fully Diluted) | % Owned (Fully Diluted) |
|---|---|---|
| COMMON STOCK | 2,529,682 | 27.34% |
| SERIES A PREFERRED STOCK | 1,499,999 | 16.21% |
| SERIES A-2 PREFERRED STOCK | 1,015,699 | 10.98% |
| SERIES B PREFERRED STOCK | 722,075 | 7.80% |
| SERIES B-2 PREFERRED STOCK | 944,559 | 10.21% |
| SERIES D PREFERRED STOCK | 1,471,151 | 15.90% |
| *Total Outstanding Stock :* | 8,183,165 | 88.43% |
| RIGHTS TO ACQUIRE EQUITY | | |
| Outstanding Options and Warrants | 927,148 | 10.02% |
| Available Plan Options | 143,633 | 1.55% |
| *Total Options and Warrants:* | 1,070,781 | 11.57% |
| **Total Diluted Shares:** | 9,253,946 | 100.00% |

WEST\282312015.5

CONFIDENTIAL

STIMADV_00001346

4.    After Third Closing

| Class of Security | Shares (Fully Diluted) | % Owned (Fully Diluted) |
|---|---|---|
| COMMON STOCK | 2,529,682 | 26.54% |
| SERIES A PREFERRED STOCK | 1,499,999 | 15.73% |
| SERIES A-2 PREFERRED STOCK | 1,015,699 | 10.65% |
| SERIES B PREFERRED STOCK | 722,075 | 7.57% |
| SERIES B-2 PREFERRED STOCK | 944,559 | 9.91% |
| SERIES D PREFERRED STOCK | 1,750,115 | 18.36% |
| *Total Outstanding Stock :* | 8,462,129 | 88.77% |
| RIGHTS TO ACQUIRE EQUITY | | |
| Outstanding Options and Warrants | 927,148 | 9.73% |
| Available Plan Options | 143,633 | 1.51% |
| *Total Options and Warrants:* | 1,070,781 | 11.23% |
| **Total Diluted Shares:** | 9,532,910 | 100.00% |

WEST\282312015.5

CONFIDENTIAL

STIMADV_00001347

## Section 3.5
## Material Contracts

(a)(i)

1.    The BSC Loan Agreement.

2.    The BSC Notes.

3.    The SAFEs.

4.    Exclusive Start-Up Company License Agreement, effective March 5, 2012, by and between Wisconsin Alumni Research Foundation and the Company (the "*WARF License*"). The Company has reached a verbal agreement to amend this to provide for a fixed annual $60,000 royalty.

5.    Settlement Agreement and Mutual Release, dated June 11, 2014, by and among Laura Perryman, the Company, Neural Diabetes LLC, Micron Devices LLC, Core Ventures III, LLC, WaveCore LLC, ElectroCore LLC, John L. Cleary, II., Joseph P. Errico, Peter Staats, MD, and Robert Sawicki (the "*Core Settlement Agreement*").

6.    Sublease Agreement, dated April 6, 2017, by and between Duvekot Corporation and the Company.

7.    Contract, dated October 20, 2014, by and between Glodow-Nead Communications, LLC and Stimwave LLC.

8.    Letter of Agreement, effective December 1, 2017, by and between the Company and Charlie Johnson Consulting Associates, LLC.

9.    Micron Devices LLC Master Services Agreement, effective August 1, 2015, by and between Micron Devices LLC and Freedom Neuro BV.

10.   Micron Devices LLC Master Services Agreement, effective January 1, 2015 and amended January 2, 2015, by and between Micron Devices LLC and StimQ Medical LLC.

11.   Master Services Agreement, effective April 1, 2014, by and between Micron Devices LLC and the Company.

12.   Exclusive Distribution Agreement, effective as of August 1, 2015, by and between Stimwave LLC and the Company.

13.   Agreement to Share Costs and Risks of Intangibles Development, effective August 1, 2015, by and between the Company and Stimwave Freedom Neuro LP.

14.   Exclusive Distribution Agreement, effective March 15, 2016, by and between the Company and StimQ Medical LLC.

15.   Promissory Note, dated August 1, 2015, issued by Stimwave Freedom Neuro LP to the Company.

16.   Sales and Marketing Intercompany Services Agreement, effective July 15, 2015, by and between Freedom Neuro B.V. and Stimwave Freedom Neuro LP.

17.   Letter Agreement, dated March 25, 2018, between Merrill Lynch, Pierce, Fenner & Smith Incorporated and the Company, Freedom Neuromodulation LLC and StimQ Medical LLC.

WEST\282312015.5

CONFIDENTIAL

STIMADV_00001348

18.  Letter Agreement, dated May 15, 2015, between Canaccord Genuity Inc. and the Company. The Company sent a termination notice to Canaccord Genuity Inc. on April 30, 2018.

19.  Letter Agreement, dated May 22, 2015, between Canaccord Genuity Inc. and StimQ LLC. The Company sent a termination notice to Canaccord Genuity Inc. on April 30, 2018.

20.  Put Option Agreement dated as of April 21, 2018, by and between the Company and Echo Vibration Limited.

(a)(ii)

1.  The WARF License.

2.  Amended and Restated Exclusive Mutual License Agreement, effective January 15, 2014 and amended August 13, 2016, by and between Micron Devices LLC and the Company.

3.  License Agreement, effective October 1, 2013, by and between Micron Devices LLC and StimQ LLC, assigned to StimQ Medical LLC October 1, 2014.

4.  License Agreement, dated October 1, 2013, by and between Micron Devices, LLC and StimRelieve LLC.

5.  Patent Security Agreement, dated as of July 2, 2014, by and among Micron Devices LLC, Freedom Neuromodulation LLC and Boston Scientific Neuromodulation Corporation.

6.  Patent Security Agreement, dated as of July 2, 2014, between the Company and Boston Scientific Neuromodulation Corporation.

7.  Security Agreement, effective as of July 2, 2014, by and among Micron Devices LLC, Freedom Neuromodulation LLC and Boston Scientific Neuromodulation Corporation, as amended by the BSC Amendment.

8.  Security Agreement, dated as of July 2, 2014, between the Company and Boston Scientific Neuromodulation Corporation, as amended by the BSC Amendment.

9.  Stimwave License Agreement, effective as of August 1, 2015, by and between the Company and Stimwave Freedom Neuro LP.

10.  Stimwave Freedom Neuro LP License Agreement, effective as of October 7, 2015, by and between Stimwave Freedom Neuro LP and Freedom Neuro B.V.

11.  Licensed rights pursuant to the WARF License to U.S. Patent No. 7,765,013 B2, issued July 27, 2010, titled Nano- and micro-scale wireless stimulating probe.

(a)(iii)

1.  Development and Manufacturing Agreement, effective September 24, 2015, by and between the Company and Oscor, Inc. Oscor has recently threatened (in SMS messages) to terminate the agreement due to nonpayment of the Company's outstanding balance.

2.  Exclusive Distribution Agreement, effective March 15, 2016, by and between the Company and StimQ Medical LLC.

WEST\282312015.5

CONFIDENTIAL

STIMADV_00001349

3.   Sales and Marketing Intercompany Services Agreement, effective July 15, 2015, by and between Freedom Neuro B.V. and Stimwave Freedom Neuro LP.

4.   Exclusive Distribution Agreement, effective as of August 1, 2015, by and between Stimwave LLC and the Company.

(a)(iv)

1.   Agreement for Neurostimulation Products, effective February 1, 2016, by and between KP Select, LLC and Stimwave LLC.

2.   Amendment to Product Purchasing Agreement, effective March 2, 2016, by and between The Johns Hopkins Health System Corporation and the Company (amending the Product Purchasing Term Sheet dated October 21, 2015).

3.   Blanket Agreement No. 1219180, effective September 1, 2016, by and between Mercy Health Medical Center, Inc. and Stimwave LLC.

4.   Pricing Agreement, effective August 1, 2017, by and between Stimwave LLC and Saint Francis Medical Center.


(b)(ii)

1.   The Company has an outstanding balance of approximately $1,127,917 to Oscor, Inc.

2.   The Company has an outstanding balance of approximately $134,000 to Compeq Manufacturing Co. Ltd.

3.   The Company has an outstanding balance of approximately $90,000 to American Express.

4.   The Company has an outstanding balance of approximately $720,000 to Boston Scientific Neuromodulation Corporation, representing accrued interest under the BSC Notes.

5.   The Company has an outstanding balance of approximately $362,450 to Micron Devices LLC for patent development fees payable to Fish and Richardson.

6.   The Company has an outstanding balance of approximately $825,000 to DLA Piper LLP (US).

7.   The Company has an outstanding balance of approximately $103,658 to Resonetics, LLC.

8.   See Item 1 under Section 3.14(a) of this Schedule.

(c)

1.   Promissory Note, dated August 1, 2015, issued by Stimwave Freedom Neuro LP to the Company in the amount of $5,900,000.00.

2.   The BSC Notes.

(d)

1.   Put Option Agreement by and between the Company and Echo Vibration Limited, dated April 21, 2018.

2.   Letter Agreement Regarding Purchase of Shares of Series D Preferred Stock from the Company to Echo Vibration Limited, dated April 21, 2018.

WEST\282312015.5

CONFIDENTIAL    STIMADV_00001350

3.    Closing Letter Agreement from the Company to Echo Vibration Limited, dated April 25, 2018.

4.    Limited Liability Company Agreement of Micron Devices LLC.

5.    Amendment No. 1 to Limited Liability Company Agreement of Micron Devices LLC.

6.    Letter Agreement Regarding Issuance of Class A Units from Micron Devices LLC to Echo Vibration Limited, dated April 21, 2018.

WEST\282312015.5

CONFIDENTIAL                                                         STIMADV_00001351

**Section 3.6**
**Intellectual Property**

(c)

(ii)     Trademarks.

1.       Freedom SCS System.

2.       Freedom-8.

3.       Freedom-4.

4.       Miniwave.

5.       Paddlewave.

6.       Unwire.

7.       Malibu (or Malibu TX).

8.       Microflex.

9.       Sharktooth.

10.     Microstim.

11.     CPT.

12.     "wireless pain relief" slogan.

13.     Stimwave.


(iii)    In-License Agreements.

1.       Licensed rights pursuant to the WARF License to U.S. Patent No. 7,765,013 B2, issued July 27, 2010, titled Nano- and micro-scale wireless stimulating probe.

2.       Amended and Restated Exclusive Mutual License Agreement, dated January 15, 2014, as amended August 13, 2016, by and between Micron Devices LLC and the Company.


(iv)

1.       Amended and Restated Exclusive Mutual License Agreement, effective January 15, 2014 and amended August 13, 2016, by and between Micron Devices LLC and the Company.

2.       Micron Devices LLC Master Services Agreement, effective August 1, 2015, by and between Micron Devices LLC and Freedom Neuro BV.

3.       Micron Devices LLC Master Services Agreement, effective January 1, 2015 and amended January 2, 2015, by and between Micron Devices LLC and StimQ Medical LLC.

4.       Master Services Agreement, effective April 1, 2014, by and between Micron Devices LLC and the Company.

WEST\282312015.5

CONFIDENTIAL                    STIMADV_00001352

5.  License Agreement, effective October 1, 2013, by and between Micron Devices LLC and StimQ LLC, assigned to StimQ Medical LLC October 1, 2014.

6.  License Agreement, dated October 1, 2013, by and between Micron Devices, LLC and StimRelieve LLC.

7.  Patent Security Agreement, dated as of July 2, 2014, by and among Micron Devices LLC, Freedom Neuromodulation LLC and Boston Scientific Neuromodulation Corporation.

8.  Patent Security Agreement, dated as of July 2, 2014, between the Company and Boston Scientific Neuromodulation Corporation.

9.  Security Agreement, effective as of July 2, 2014, by and among Micron Devices LLC, Freedom Neuromodulation LLC and Boston Scientific Neuromodulation Corporation, as amended by the BSC Amendment.

10. Security Agreement, dated as of July 2, 2014, between the Company and Boston Scientific Neuromodulation Corporation, as amended by the BSC Amendment.

11. Stimwave License Agreement, effective as of August 1, 2015, by and between the Company and Stimwave Freedom Neuro LP.

12. Stimwave Freedom Neuro LP License Agreement, effective as of October 7, 2015, by and between Stimwave Freedom Neuro LP and Freedom Neuro B.V.

WEST\282312015.5

CONFIDENTIAL                                                                 STIMADV_00001353

## Section 3.7
## Proprietary Information and Invention Assignment

1.  Carley Gillen, a former employee of the Company, may have violated her Proprietary Information and Invention Agreement following her separation from the Company.

2.  In her Proprietary Information and Invention Agreement, Laura Perryman has excluded prior inventions and original works of authorship, which are not related to the business of the Company and are not used by the Company.

14

WEST\282312015.5

CONFIDENTIAL

STIMADV_00001354

## Section 3.8
## Title to Properties and Assets

1.    The BSC Loan Agreement.

2.    Patent Security Agreement, dated as of July 2, 2014, by and among Micron Devices LLC, Freedom Neuromodulation LLC and Boston Scientific Neuromodulation Corporation.

3.    Patent Security Agreement, dated as of July 2, 2014, between the Company and Boston Scientific Neuromodulation Corporation.

4.    Security Agreement, effective as of July 2, 2014, by and among Micron Devices LLC, Freedom Neuromodulation LLC and Boston Scientific Neuromodulation Corporation, as amended by the BSC Amendment.

5.    Security Agreement, dated as of July 2, 2014, between the Company and Boston Scientific Neuromodulation Corporation, as amended by the BSC Amendment.

15

CONFIDENTIAL

**Section 3.9**
**Compliance with Other Instruments**

1.    The BSC Loan Agreement.

2.    The BSC Notes.

3.    Patent Security Agreement, dated as of July 2, 2014, by and among Micron Devices LLC, Freedom Neuromodulation LLC and Boston Scientific Neuromodulation Corporation.

4.    Patent Security Agreement, dated as of July 2, 2014, between the Company and Boston Scientific Neuromodulation Corporation.

5.    Security Agreement, effective as of July 2, 2014, by and among Micron Devices LLC, Freedom Neuromodulation LLC and Boston Scientific Neuromodulation Corporation, as amended by the BSC Amendment.

6.    Security Agreement, dated as of July 2, 2014, between the Company and Boston Scientific Neuromodulation Corporation, as amended by the BSC Amendment.

WEST\282312015.5

CONFIDENTIAL                                                                  STIMADV_00001356

**Section 3.10**
**Litigation**

1.    Adorno v. Xia, No. 2017 L3404 (Ill. filed April 4, 2017) (Case Management Order, dated June 4, 2018, states that the Plaintiff represents that the case will be dismissed after Plaintiff's attorney substitutes deceased Plaintiff's beneficiaries as Plaintiffs due to Plaintiff's death.)

WEST\282312015.5

CONFIDENTIAL

STIMADV_00001357

**Section 3.11**
**Certain Transactions**

1.    Certain stockholders, directors, officers, and employees of the Company hold equity interests in, Micron Devices LLC, StimRelieve LLC, and StimQ Medical LLC.

WEST\282312015.5

CONFIDENTIAL                                                                    STIMADV_00001358

**Section 3.12**
**Financial Statements**

1.    The unaudited Financial Statements for the year ended December 31, 2017 include the accounts of the Company, Stimwave LLC, StimQ Medical LLC, and Freedom Neuro BV.

2.    The audited Financial Statements for the year ended December 31, 2016 include the accounts for the entities as stated therein.

WEST\282312015.5

CONFIDENTIAL

STIMADV_00001359

**Section 3.13**
**Changes**

(g)

1.      The Company terminated the employment of P. Tompkins on January 4, 2018.

2.      S. Olson resigned his employment April 19, 2018.


(j)

1.      The Company acquired all of the shares of Freedom Neuromodulation LLC.

2.      The Company acquired an interest of approximately 66.5% in StimQ Medical LLC.

3.      The Company acquired an interest of approximately 100% in StimRelieve LLC.


(n)

1.      The Company anticipates granting a stock option to purchase 50,000 shares pursuant to the Option Plan to Jeffrey Goldberg in connection with his service as a director.

2.      The Company anticipates granting a stock option to purchase 75,000 shares pursuant to the Option Plan to Jim Surek in connection with his service as an officer.

3.      The Company anticipates granting a stock option to purchase 50,000 shares pursuant to the Option Plan to Steven Amelio in connection with his service as an officer.

WEST\282312015.5

CONFIDENTIAL                                                                 STIMADV_00001360

**Section 3.14**
**Employee Benefit Plans**

(a)

1.    The Company owes approximately $325,000 in performance related compensation to sales personnel.

(c)

1.    Consulting Agreement, effective October 1, 2016, by and between Stimwave LLC and Andrea Trescot.

2.    Consulting Agreement, effective June 1, 2017, by and between Stimwave LLC and Dr. George Arcos.

3.    Consulting Agreement, effective July 1, 2017, by and between Stimwave LLC and Dr. Doohi Lee.

4.    Employment Agreement, effective February 25, 2014, by and between the Company and Laura Perryman.

5.    Open-Ended Employment Agreement, dated June 2, 2015 between Freedom Neuro B.V. and Geert Hertecant.

6.    Open-Ended Employment Agreement, dated June 2, 2015 between Freedom Neuro B.V. and Niek Vanquathem.

7.    Employment agreements and offer letters between Stimwave LLC and its employees.

8.    2018 Benefits Package, as described in the ADP Plan Comparison.

9.    Employee handbook.

10.   Consulting Agreement, effective April 1, 2015, by and between StimQ LLC and Sunil Panchal.

11.   Consulting Agreement, effective April 1, 2015, by and between StimQ LLC and Sanjay Gupta.

12.   Consulting Agreement, effective September 1, 2013, by and between StimQ Medical LLC and David Kloth, MD.

13.   Consulting Agreement, effective January 1, 2015, by and between StimQ Medical LLC and Nick Vanquathem.

14.   Consulting Agreement, effective January 1, 2016, by and between StimQ Medical LLC and Richard North.

15.   Consulting Agreement, effective December 1, 2013, by and between StimQ Medical LLC and Marc Russo.

16.   Consulting Agreement, effective January 1, 2014, by and between StimQ LLC and Michael Stanton-Hicks.

17.   Sales Representative Compensation Plan.

WEST\282312015.5

CONFIDENTIAL

STIMADV_00001361

**Section 3.15**
**Regulatory Matters; FDA**

(c)

1.    The Company is conducting a number of registered clinical trials as denoted on www.clinicaltrials.gov, including:

    1.1.    "SURF" Study: Multi-center, Prospective, Randomized, Controlled Clinical Trial of Wireless High Frequency Spinal Cord Stimulation to Demonstrate Non-Inferiority in the Treatment of Chronic Pain as Compared to Traditional Stimulation. Protocol Number: 30-00113 Rev 9, US IDE Number: G150086

    1.2.    "FREEDOM" Study: A Prospective, Post-Marketing Study of the Clinical Outcomes of Wireless Neuromodulation via the Freedom Spinal Cord Stimulation (SCS) System for the Management of Chronic Back and Leg Pain. Protocol Number: 05-0071 Revision 12.

    1.3.    "HF DRG" Study. Prospective, Clinical Pilot Study of High Frequency Wireless Spinal Cord Stimulation (SCS) in the Treatment of Chronic Pain with the Freedom Spinal Cord Stimulator System . Protocol Number: 30-00178-4.

    1.4.    "TSUNAMI" Study: A European, Multi-Center, Double-Blind, Randomized, Controlled, Clinical Trial Investigating the Effects of High Frequency Wireless Spinal Cord Stimulation (SCS) over Exiting Nerve Roots in the Treatment of Chronic Back Pain. Protocol Number: 30-00460 Rev. 1.

    1.5.    Miscellaneous prospective studies of 6-10 patients or less over the last 5 years.

WEST\282312015.5

CONFIDENTIAL                                                                                    STIMADV_00001362

**Section 3.21**
**Brokers or Finders**

1.    The Company will have a finders' fee obligation with Frank Ng in connection with the Orchid investment.

23

WEST\282312015.5

CONFIDENTIAL                                                                    STIMADV_00001363

**Appendix**

**Table 3.2(b)-1**
**Stockholders of Stimwave Technologies Incorporated**

| Stockholder | Shareholding Percentage |
|---|---|
| Perryman, Laura | 27.6% |
| Echo Vibration Limited | 8.8% |
| Life Science Angel Investors VII, L.L.C. | 4.9% |
| Anderson, Robert K. | 3.2% |
| Emergent Medical Partners, L.P. | 2.8% |
| Yeung Family Trust | 2.7% |
| Yu, Rong | 2.6% |
| Hochschuler, Stephen | 2.4% |
| BioPacific Investments I, LLC | 2.2% |
| Essig, Stuart | 2.1% |
| Research Corporation Technologies, Inc. | 2.0% |
| Taube Investment Partners, LP | 1.9% |
| North, Tatyana Shine | 1.7% |
| Larson, Patrick | 1.5% |
| Wilmington Investor Network, LLC | 1.4% |
| Auth, David | 1.4% |
| Auth, Nancy L. | 1.4% |
| Hansen A. Yuan Irrevocable Trust | 1.3% |
| NeuroStim LLC | 1.3% |
| Russo, Mark | 1.3% |
| Green, Robert | 1.2% |
| BioAccel | 1.0% |
| Jacobson Family Trust | 0.9% |
| Life Science Angels Investors VIII, L.L.C. | 0.9% |
| Hunan Xinhangruikang Biotechnology Co., Ltd. | 0.9% |
| Tsingyuan Ventures I LP | 0.9% |
| Xuan, Zhou | 0.9% |
| Loev, Marc | 0.8% |
| Zuckerman, Les | 0.8% |
| Mohler, David | 0.8% |
| Panchal, Sunil | 0.8% |
| Emergent Medical Associates, L.P. | 0.7% |
| Gardner Management LP | 0.7% |
| Andersen, Chad | 0.7% |
| Greene, Elizabeth | 0.7% |
| Speck, Ben | 0.7% |
| Singla, Aneesh | 0.6% |
| Hungerford, Marc | 0.6% |
| Haider, Thomas | 0.6% |
| El-Mohandes, Ali | 0.6% |
| Coleman, Mark | 0.5% |
| Lanman, Todd | 0.5% |

24

CONFIDENTIAL

| | |
|---|---|
| Yue, James J. | 0.4% |
| Fayyazi, Amir H. | 0.4% |
| Chase, Andy | 0.4% |
| Daly, Michael | 0.3% |
| Hertecant, Geert | 0.3% |
| WS Investment Company, LLC (2011A) | 0.3% |
| King, Gary | 0.3% |
| WS Investment Company, LLC (2012A) | 0.3% |
| Khanna, Akhil Jay and Roma | 0.3% |
| Soudan, Abdul Shaheed | 0.3% |
| The RRG No. 1 Family Limited Partnership | 0.3% |
| WJZ Family Partners, Ltd. | 0.3% |
| Greene, Graham | 0.3% |
| Panchal, Ajay | 0.3% |
| Weiner, Richard L. | 0.3% |
| Ralph Rashbaum 5x5 Trust | 0.3% |
| Khanna, Akhil Jay | 0.2% |
| Maine, David | 0.2% |
| Graham Family Investments LLC | 0.2% |
| Sherali, Shauket | 0.2% |
| BioAccelerator Fund I, LLC | 0.1% |
| Helm Family Trust | 0.1% |
| Kumar, Anil | 0.1% |
| Wang, Xi | 0.1% |
| McGlynn, J. Casey | 0.1% |
| Baja, Michael | 0.1% |
| Bakkaloglu, Bertan | 0.1% |
| Boyd, Eric | 0.1% |
| Calodney, Aaron | 0.1% |
| Corbett, Al | 0.1% |
| Kloth, David | 0.1% |
| LeBaron, Richard | 0.1% |
| Simeunovic, Andrej | 0.1% |
| Slavin, Konstantin V. | 0.1% |
| Vanquathem, Niek | 0.1% |
| Closson, Carey-Walter | 0.1% |
| Green, Jeffrey | 0.1% |
| NBK Innovation XIII LLC | 0.1% |
| Chahlavi, Ali | 0.1% |
| Chhabra, Abhinav | 0.1% |
| Conway, James E. | 0.1% |
| Garonzik, Ira | 0.1% |
| Gross, Akiva Yavin | 0.1% |
| Khanna, Surinder | 0.1% |
| Petersen, Kurt | 0.1% |
| Singla, Usha | 0.1% |
| Patel, Anish Sharad | 0.1% |

WEST\282312015.5

CONFIDENTIAL

STIMADV_00001365

**Table 3.2(b)-2**
**Stockholders of StimQ Medical LLC**

| Shareholder | Shareholding Percentage |
|---|---|
| Stimwave Technologies Incorporated | 66.74% |
| Micron Medical LLC | 0.01% |
| Russo Properties Pty Ltd | 2.50% |
| David Kloth | 2.50% |
| Chad Andresen | 1.00% |
| Patrick Larson | 1.00% |
| Elizabeth Greene | 1.00% |
| Graham Greene | 1.00% |
| Ben Speck | 1.00% |
| Niek Vanquathem | 1.00% |
| Geert Herchant | 1.00% |
| Richard North | 1.00% |
| Richard LeBaron | 0.50% |
| Al Corbett | 0.25% |
| Bertan Bakkaloglu | 0.50% |
| Life Science Angels | 0.32% |
| Taube Investments | 0.23% |
| Ali Chahlavi | 0.18% |
| Aneesh Singla | 0.23% |
| Mark Coleman | 0.23% |
| Sunil Panchal | 0.45% |
| Lester Zuckerman | 0.45% |
| Marc Loev | 0.45% |
| Jeffery Green | 0.34% |
| Ali El Mohandes | 0.23% |
| Robert Green | 0.34% |
| David Maine | 0.09% |
| Yeung Family Trust | 0.45% |
| Amir Fayyazi | 0.11% |
| Jacobson Family Trust | 0.09% |
| John Salmon | 0.23% |
| Gabor Racz | 0.90% |
| Krishna Singh | 2.25% |
| Sanjay Gupta | 0.90% |
| Darius Nariek | 0.23% |
| Standiford Helm | 0.34% |
| Stryker Corporation | 10.00% |

**Table 3.2(b)-3**
**Stockholders of StimRelieve LLC**

| Shareholder | Shareholding Percentage |
|---|---|
| Stimwave Technologies Incorporated | 100.00% |

**Table 3.2(b)-4**
**Holders of Convertible Securities of StimRelieve LLC**

| Note Holder | Face Value |
|---|---|
| Adnan Al-Kaisy | 250,000 |
| Mark Coleman | 50,000 |
| Ali El Mohandes | 50,000 |
| Robert Green | 25,000 |
| Mayrock Investments, Inc. | 100,000 |
| Sunil Panchal | 50,000 |
| Aneesh Singla | 75,000 |
| Richard Guyer | 50,000 |
| Jay and Roma Khanna | 25,000 |
| Marc Hungerford | 25,000 |
| Life Science Angel Investors, VII LLC | 105,000 |
| Jack Zigler | 50,000 |
| Richard Weiner | 150,000 |
| Ralph Rashbaum | 35,000 |
| Marc Russo | 50,000 |
| **Total** | 1,090,000 |

WEST\282312015.5

CONFIDENTIAL

STIMADV_00001367

### Table 3.3(g)-1
### Option Holders of the Company

| | Grant Date | Shares | Vesting Schedule 3/31/18 | | |
| | | | Amount | Price | Vested |
|---|---|---|---|---|---|
| **Stock Option Plan** | | | | | |
| Patrick Larson | | 115,000 | | | |
| | 2/15/11 | | 10,000 | 0.01 | 10,000 |
| | 10/1/13 | | 20,000 | 0.78 | 20,000 |
| | 3/1/14 | | 25,000 | 0.78 | 25,000 |
| | 3/1/15 | | 60,000 | 0.78 | 45,000 |
| Chad Andersen | | 50,000 | | | |
| | 8/1/11 | | 25,000 | 0.23 | 25,000 |
| | 7/1/13 | | 25,000 | 0.78 | 25,000 |
| Ben Speck | | 50,000 | | | |
| | 12/1/11 | | 10,000 | 0.23 | 10,000 |
| | 7/1/13 | | 15,000 | 0.78 | 15,000 |
| | 7/1/16 | | 25,000 | 3.26 | 10,937 |
| Elizabeth Greene | | 50,000 | | | |
| | 4/1/12 | | 10,000 | 0.23 | 10,000 |
| | 7/1/13 | | 15,000 | 0.78 | 15,000 |
| Graham Greene | | 20,000 | | | |
| | 2/1/14 | | 10,000 | 0.78 | 10,000 |
| | 7/1/16 | | 10,000 | 3.26 | 8,750 |
| Bertan Bakkaloglu | 2/1/14 | 10,000 | 10,000 | 0.78 | 10,000 |
| Richard LeBaron | 3/1/14 | 10,000 | 10,000 | 0.78 | 10,000 |
| Niek Vanquathem | 6/1/14 | 10,000 | 10,000 | 0.78 | 10,000 |
| Geert Hertecant | 6/1/14 | 25,000 | 25,000 | 0.78 | 25,000 |
| David Kloth | 10/1/15 | 10,000 | 10,000 | 3.26 | 6,250 |
| Michael Baja | 10/1/16 | 10,000 | 10,000 | 3.26 | 3,750 |
| Aaron Calodney | 11/1/16 | 10,000 | 10,000 | 3.26 | 3,542 |
| Al Corbett | 10/1/16 | 10,000 | 10,000 | 3.26 | 3,750 |
| Konstantin Slavin | 11/1/17 | 10,000 | 10,000 | 3.26 | - |
| Total Outstanding | | 390,000 | 390,000 | | 301,979 |

28

CONFIDENTIAL                                                                 STIMADV_00001368