# EXHIBIT "N"

**LIMITED LIABILITY COMPANY AGREEMENT**

**FOR**

**MICRON DEVICES LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

**THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS.  SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED.  ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.**

## TABLE OF CONTENTS

PAGE

**ARTICLE I** DEFINITIONS ................................................................................................1

| | | |
|---|---|---|
| 1.1 | Act | 1 |
| 1.2 | Additional Member | 1 |
| 1.3 | Adjusted Capital Account Deficit | 1 |
| 1.4 | Affiliate | 1 |
| 1.5 | Agreement | 2 |
| 1.6 | Board of Directors | 2 |
| 1.7 | Capital Account | 2 |
| 1.8 | Capital Contribution | 2 |
| 1.9 | Certificate | 2 |
| 1.10 | Class A Director | 2 |
| 1.11 | Class A Member | 2 |
| 1.12 | Class A Unit | 2 |
| 1.13 | Class B Director | 2 |
| 1.14 | Class B Member | 2 |
| 1.15 | Class B Unit | 2 |
| 1.16 | Class C Member | 3 |
| 1.17 | Class C Unit | 3 |
| 1.18 | Code | 3 |
| 1.19 | Company | 3 |
| 1.20 | Company Notice | 3 |
| 1.21 | Director | 3 |
| 1.22 | Distributable Cash | 3 |
| 1.23 | Fiscal Year | 3 |
| 1.24 | Industry Directors | 3 |
| 1.25 | Interest | 3 |
| 1.26 | Liquidation Event | 3 |
| 1.27 | Majority Interest | 4 |
| 1.28 | Meetings | 4 |
| 1.29 | Member | 4 |
| 1.30 | Other Member | 4 |
| 1.31 | Other Member Notice | 4 |
| 1.32 | Percentage Interest | 4 |
| 1.33 | Person | 4 |
| 1.34 | Profits and Losses | 4 |
| 1.35 | Proposed Transfer | 5 |
| 1.36 | Proposed Transfer Notice | 5 |
| 1.37 | Prospective Transferee | 5 |
| 1.38 | Proxy | 5 |
| 1.39 | Right of Co-Sale | 5 |
| 1.40 | Right of First Refusal | 5 |

1.41    Secondary Notice .................................................................................5
1.42    Secondary Refusal Right..........................................................................5
1.43    Selling Member.......................................................................................6
1.44    Service Provider......................................................................................6
1.45    Super Majority Interest ...........................................................................6
1.46    Tax Matters Partner.................................................................................6
1.47    Transfer Units .........................................................................................6
1.48    Treasury Regulations ..............................................................................6
1.49    Under Subscription Notice ......................................................................6
1.50    Unit .........................................................................................................6
1.51    WBCA .....................................................................................................6

**ARTICLE II** ORGANIZATIONAL MATTERS.................................................6

2.1    Formation .................................................................................................6
2.2    Name ........................................................................................................6
2.3    Term .........................................................................................................6
2.4    Office and Agent.......................................................................................7
2.5    Names and Addresses of the Members and the Directors .........................7
2.6    Purpose and Business of the Company ......................................................7
2.7    Title to Company Property.........................................................................7
2.8    Failure to Observe Formalities..................................................................7
2.9    No Partnership Intended for Nontax Purposes...........................................7
2.10   Liability of Members and Directors to Third Parties; Reliance by Third-Party
Creditors.............................................................................................................7
2.11   Relationship with Stimwave Technologies Incorporated ..........................8

**ARTICLE III** CAPITAL CONTRIBUTIONS ...................................................8

3.1    Authorization and Issuance of Units .........................................................8
3.2    Profits Interests ........................................................................................9
3.3    Initial Capital Contributions .....................................................................9
3.4    Additional Capital Contributions ..............................................................9
3.5    Capital Accounts .......................................................................................9
3.6    Book-Up of Company Assets...................................................................10
3.7    Schedules ................................................................................................10
3.8    Rights Regarding Capital Contributions..................................................10
3.9    Deficit Capital Accounts .........................................................................10

**ARTICLE IV** MEMBERS ...............................................................................11

4.1    Procedures for Admission .......................................................................11
4.2    Limited Liability .....................................................................................11
4.3    Withdrawals or Resignations ...................................................................11
4.4    Competing Activities ...............................................................................11
4.5    Transactions with the Company................................................................11
4.6    Remuneration to Members.......................................................................11

4.7      Members are not Agents ......................................................................12
4.8      Voting Rights ........................................................................................12
4.9      Certificate of Units ..............................................................................12
4.10    Cancellation and Replacement of Certificates ...................................12
4.11    Meetings of and Voting by Members ..................................................13

**ARTICLE V** MANAGEMENT AND CONTROL OF THE COMPANY ....................13

5.1      Management of the Company by Manager ..........................................13
5.2      Board of Directors ................................................................................14
5.3      Election of Directors ............................................................................15
5.4      Powers of Manager ..............................................................................16
5.5      Performance of Duties; Liability of Directors; Fiduciary Standard ....17
5.6      Devotion of Time .................................................................................17
5.7      Transactions between the Company and the Directors .......................17
5.8      Liability of Director Limited to Director's Assets ..............................18
5.9      Limited Liability ..................................................................................18
5.10    Officers ................................................................................................18
5.11    Tax Matters Partner .............................................................................20

**ARTICLE VI** ALLOCATIONS OF PROFITS AND LOSSES AND DISTRIBUTIONS ..........20

6.1      Allocations of Profits and Losses ........................................................20
6.2      Special Allocations ..............................................................................21
6.3      Curative Allocations ............................................................................21
6.4      Tax Elections .......................................................................................21
6.5      Transfer or Issuance of Units During Fiscal Year .............................21
6.6      Tax Allocations ....................................................................................22
6.7      Distributions by the Company. ...........................................................22

**ARTICLE VII** TRANSFER AND ASSIGNMENT OF INTERESTS ......................................23

7.1      Transfer and Assignment of Interests .................................................23
7.2      Transfer in Violation of Agreement ....................................................23
7.3      Right of First Refusal ..........................................................................24
7.4      Right of Co-Sale ..................................................................................25
7.5      Deadline ...............................................................................................26
7.6      Permitted Transfers .............................................................................26
7.7      Additional Requirement of Transferors and Transferees ....................26
7.8      Failure to Comply ...............................................................................27

**ARTICLE VIII** ACCOUNTING, RECORDS, REPORTING BY MEMBERS .........................27

8.1      Books and Records ..............................................................................27
8.2      Reports .................................................................................................28
8.3      Bank Accounts .....................................................................................28

**ARTICLE IX** DISSOLUTION AND WINDING UP .............................................................28

CONFIDENTIAL

| | | |
|---|---|---|
| 9.1 | Dissolution | 28 |
| 9.2 | Certificate of Dissolution | 28 |
| 9.3 | Winding Up | 29 |
| 9.4 | Order of Payment Upon Dissolution | 29 |
| 9.5 | Limitations on Payments Made in Dissolution | 29 |
| 9.6 | Distributions in Kind | 29 |
| 9.7 | Certificate of Cancellation | 29 |

**ARTICLE X** INDEMNIFICATION AND INSURANCE ........................................................29

| | | |
|---|---|---|
| 10.1 | Limitation of Liability | 29 |
| 10.2 | Indemnification | 30 |
| 10.3 | Insurance | 30 |

**ARTICLE XI** CONVERSION TO CORPORATION .............................................................30

| | | |
|---|---|---|
| 11.1 | Conversion to Corporation | 30 |
| 11.2 | Initial Public Offering Prior to Conversion to Corporation | 31 |

**ARTICLE XII** INVESTMENT REPRESENTATIONS ...........................................................32

| | | |
|---|---|---|
| 12.1 | Preexisting Relationship or Experience | 32 |
| 12.2 | Investment Intent | 32 |
| 12.3 | Accredited Investor | 32 |
| 12.4 | Purpose of Entity | 32 |
| 12.5 | Economic Risk | 32 |
| 12.6 | No Registration of Units | 32 |
| 12.7 | Investment in Restricted Security | 32 |
| 12.8 | No Obligations to Register | 33 |
| 12.9 | No Disposition in Violation of Law | 33 |
| 12.10 | Investment Risk | 33 |
| 12.11 | Investment Experience | 33 |
| 12.12 | Restrictions on Transferability | 33 |
| 12.13 | Information Reviewed | 33 |
| 12.14 | Tax Consequences | 33 |
| 12.15 | No Assurance of Tax Benefits | 33 |
| 12.16 | Indemnity | 34 |

**ARTICLE XIII** MISCELLANEOUS ...................................................................................34

| | | |
|---|---|---|
| 13.1 | Counsel to the Company | 34 |
| 13.2 | Complete Agreement | 34 |
| 13.3 | Binding Effect | 34 |
| 13.4 | Parties in Interest | 35 |
| 13.5 | Pronouns; Statutory References | 35 |
| 13.6 | Headings | 35 |
| 13.7 | Interpretation | 35 |
| 13.8 | References to this Agreement | 35 |

CONFIDENTIAL

| | | |
|---|---|---|
| 13.9 | Jurisdiction | 35 |
| 13.10 | Exhibits | 35 |
| 13.11 | Severability | 35 |
| 13.12 | Additional Documents and Acts | 35 |
| 13.13 | Notices | 36 |
| 13.14 | Amendments | 36 |
| 13.15 | Confidentiality | 36 |
| 13.16 | Reliance on Authority of Person Signing Agreement | 36 |
| 13.17 | No Interest in Company Property; Waiver of Action for Partition | 36 |
| 13.18 | Multiple Counterparts | 37 |
| 13.19 | Remedies Cumulative | 37 |

CONFIDENTIAL

**LIMITED LIABILITY COMPANY AGREEMENT
FOR
MICRON DEVICES LLC
A DELAWARE LIMITED LIABILITY COMPANY**

This Limited Liability Company Agreement is made as of July 31st, 2013, by and among the parties listed on the signature pages hereof, and such other Persons that may be admitted from time to time to the Company and as parties to this Agreement, with reference to the following facts:

A.      On July 12, 2013, a Certificate of Formation for Micron Devices LLC (the "Company"), a limited liability company organized under the laws of the State of Delaware, was filed with the Delaware Secretary of State.

B.      The Members now desire to execute this Agreement to provide terms to govern the Company.

NOW, THEREFORE, the parties by this Agreement set forth the operating agreement for the Company under the laws of the State of Delaware upon the terms and subject to the conditions of this Agreement.

## ARTICLE I
## DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

1.1 Act shall mean the Delaware Limited Liability Company Act, as the same may be amended from time to time, and the provisions of succeeding law.

1.2 Additional Member means a Person admitted to the Company as an additional Member pursuant to Section 4.1 and shown as a Member on the books and records of the Company.

1.3 Adjusted Capital Account Deficit means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of any Fiscal Year (i) crediting such Capital Account with any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5), and (ii) debiting such Capital Account with the adjustments, allocations and distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

1.4 Affiliate of a Member or Director shall mean any director, officer, shareholder, member, partner, employer, employee or agent of such Member or Director or any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member or Director, as applicable. The term "control," as used in the

CONFIDENTIAL

immediately preceding sentence, shall mean with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.5 <u>Agreement</u> shall mean this Limited Liability Company Agreement, as originally executed and as amended from time to time.

1.6 <u>Board of Directors</u> shall mean the collective group of Directors designated or elected by the Members pursuant to Section 5.3 hereof.

1.7 <u>Capital Account</u> shall mean, with respect to any Member, the capital account which the Company establishes and maintains for such Member pursuant to Section 3.5.

1.8 <u>Capital Contribution</u> shall mean any contribution by a Member of cash or property in-kind to the capital of the Company.  If the value of any such contributed amount is ever disputed and/or redetermined by the IRS to be greater or less than originally documented, then the accounts of the Company shall be adjusted to reflect any such finally determined or agreed amount accordingly (the "Capital Contribution Adjustment"), provided however, that any adjustment under this provision shall not entitle any such contributing Member to any claim or claims regarding any action, distribution, redemption, and any similar acts, that occurred before such Capital Contribution Adjustment was determined.

1.9 <u>Certificate</u> shall mean the Certificate of Formation for the Company originally filed with the Delaware Secretary of State and as amended from time to time.

1.10  <u>Class A Director</u> shall have the meaning set forth in Section 5.3(a).

1.11  <u>Class A Member</u> shall mean each Person (i) holding a Class A Unit and (ii) admitted to the Company as a Member.

1.12  <u>Class A Unit</u> shall mean a Unit designated on the date of issuance as a "Class A Unit."  Class A Units are voting interests in the Company.

1.13  <u>Class B Director</u> shall have the meaning set forth in Section 5.3(a).

1.14  <u>Class B Member</u> shall mean each Person (i) holding a Class B Unit and (ii) admitted to the Company as a Member.

1.15  <u>Class B Unit</u> shall mean a Unit designated on the date of issuance as a "Class B Unit."  Class B Units are voting interests in the Company.

CONFIDENTIAL

1.16   Class C Member shall mean each Person holding a Class C Unit.

1.17   Class C Unit shall mean a Unit designated on the date of issuance as a "Class C Unit."  Class C Units are non-voting interests in the Company and entitle a Class C Member to proceeds only upon a sale of substantially all of the assets of the Company.

1.18   Code shall mean the Internal Revenue Code of 1986, as amended from time to time (and corresponding provisions of succeeding law).

1.19   Company shall mean Micron Devices LLC, a Delaware limited liability company.

1.20   Company Notice means written notice from the Company notifying the Selling Members that it intends to exercise its Right of First Refusal as to some or all of the Transfer Units with respect to any Proposed Transfer.

1.21   Director shall mean each of the Directors elected by the Members and the Industry Directors elected by the Members, in each case pursuant to Section 5.3 hereof, or any other individuals that succeed him or her as a Director of the Company. Notwithstanding the foregoing, as of the Effective Date, each Director will already have been appointed.

1.22   Distributable Cash shall mean the amount of cash which the Board of Directors deems available for distribution to the Members, taking into account all debts, liabilities, and obligations of the Company then due, and working capital and other amounts which the Board of Directors deems necessary for the Company's business or to place into reserves for customary and usual claims with respect to such business.

1.23   Fiscal Year shall mean the Company's fiscal year, ending on each December 31, or such other taxable year as shall be required under the Code.

1.24   Industry Directors shall have the meaning set forth in Section 5.3(a).

1.25   Interest means the entire ownership interest (designated as any class of Units in the Company) of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all the terms and provisions of this Agreement.

1.26   Liquidation Event shall mean:

(a) a liquidation, dissolution or winding up of the Company;

(b) a sale of all or substantially all of the assets of the Company; or

(c) a merger or consolidation of the Company into another entity in which the Members of the Company retain less than a majority of the voting control of the surviving entity;

provided, that (1) a consolidation with a wholly-owned subsidiary of the Company; (2) a merger effected exclusively to change the domicile or corporate form of the Company, or (3) an equity

CONFIDENTIAL

financing in which the Company is the surviving corporation, will be deemed not to be a "Liquidation Event" for purposes of the foregoing.

1.27    Majority Interest shall mean, with respect to any vote, approval, consent or other action in respect of a particular matter, greater than fifty percent (50%) of the Percentage Interests of the class or classes of Units entitled to vote or act on such matter, voting as a single class.

1.28    Meetings shall have the meaning set forth in Section 4.12.

1.29    Member shall mean each Person who is an initial signatory to this Agreement or has been admitted to the Company as a Member in accordance with the Certificate or this Agreement.

1.30    Other Member means a Member that is not a Selling Member.

1.31    Other Member Notice means written notice from an Other Member notifying the Company and the Selling Member that such Other Member intends to exercise its Secondary Refusal Right as to a portion of the Transfer Units with respect to any Proposed Transfer.

1.32    Percentage Interest means, with respect to any Member of a particular class or classes of Units on a particular date, the fraction, expressed as a percentage, the numerator of which is the number of Units of such class or classes held by such Member and the denominator of which is the total number of Units of such class or classes outstanding on such date.

1.33    Person shall mean an individual, partnership, limited partnership, limited liability company, corporation, trust, estate, association or any other entity.

1.34    Profits and Losses shall mean for each Fiscal Year or other period, the taxable income or taxable loss of the Company for such period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), with the following adjustments:

(a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or taxable loss;

(b) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses, shall be subtracted from such taxable income or taxable loss;

(c) in lieu of any depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or taxable loss, the Company shall compute such deductions based on the book value of the Company property, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3);

CONFIDENTIAL

(d) gain or loss resulting from a taxable disposition of Company property shall be computed by reference to the book value of such item of Company property disposed of, notwithstanding that the adjusted tax basis of such item of Company property differs from its book value;

(e) in the event that the book value of any Company property is adjusted to equal the fair market value of such Company property, pursuant to Section 3.6, the amount of any increase or decrease in such book value attributable to such adjustment will be taken into account as gain or loss from the disposition of such item of Company property for purposes of computing Profits and Losses;

(f) in the event that any item of Company property is distributed in-kind to a Member, the difference between the fair market value of such item of Company property and the adjusted tax basis of the Company in such item of Company property will be taken into account as gain or loss from the disposition of such item of Company property for purposes of computing Profits and Losses; and

(g) any income, gain, loss, or deduction specially allocated to the Members under Sections 6.2 or Section 6.3 shall not be taken into account in computing Profits or Losses.

1.35    Proposed Transfer means any proposed transfer or encumbering by a Selling Member of all or any portion of its Interests to any Person.

1.36    Proposed Transfer Notice means written notice from a Selling Member setting forth the terms and conditions of a Proposed Transfer.

1.37    Prospective Transferee means any Person to whom a Member proposes to make a Proposed Transfer.

1.38    Proxy shall have the meaning set forth in Section 4.12.

1.39    Right of Co-Sale means the right, but not an obligation, of an Other Member holding Units of the same class subject to the Proposed Transfer, to participate in a Proposed Transfer on the terms and conditions specified in the Proposed Transfer Notice.

1.40    Right of First Refusal means the right, but not an obligation, of the Company, or its permitted transferees or assigns, to purchase some or all of the Transfer Units with respect to a Proposed Transfer, on the terms and conditions specified in the Proposed Transfer Notice.

1.41    Secondary Notice means written notice from the Company notifying the Other Members and the Selling Member that the Company does not intend to exercise its Right of First Refusal as to all of the Transfer Units with respect to any Proposed Transfer.

1.42    Secondary Refusal Right means the right, but not an obligation, of each Other Member to purchase up to its pro rata portion (based upon the total number of Units then held by all Other Members) of any Transfer Units not purchased pursuant to the Right of First Refusal, on the terms and conditions specified in the Proposed Transfer Notice.

CONFIDENTIAL

1.43    Selling Member means any Member who proposes to make a Proposed Transfer.

1.44    Service Provider means any Director, officer, employee, consultant, independent contractor or other Person that provides services to or for the benefit of the Company, as determined by the Board of Directors in their sole and absolute discretion.

1.45    Super Majority Interest shall mean, with respect to any vote, approval, consent or other action in respect of a particular matter, greater than sixty-six percent (66%) of the Percentage Interests of the of the class or classes of Units entitled to vote or act on such matter, voting as a single class.

1.46    Tax Matters Partner means the Person designated as the "tax matters partner" of the Company pursuant to Section 5.11.

1.47    Transfer Units means Units subject to a Proposed Transfer.

1.48    Treasury Regulations means the income tax regulations promulgated under the Code, as such income tax regulations are amended from time to time (and corresponding provisions of succeeding regulations).

1.49    Under Subscription Notice means written notice from an Other Member notifying the Company and the Selling Member that such Other Member intends to exercise its option to purchase a portion of the Transfer Units not purchased or subscribed for pursuant to the Right of First Refusal or the Secondary Refusal Right.

1.50    Unit means that undivided Interest in the Company owned by a Member, including, without limitation, such Member's rights to Profits, Losses and distributions of the Company.

1.51    WBCA shall mean the Delaware Business Corporations Act, as amended from time to time, and the provisions of succeeding law.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1 Formation.  The Members have formed a Delaware limited liability company under the laws of the State of Delaware by filing the Certificate with the Delaware Secretary of State and entering into this Agreement.  The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement.  To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2 Name.  The name of the Company shall be Micron Devices LLC.  The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Board of Directors deems appropriate or advisable.

2.3 Term.  The term of the Company shall be perpetual, unless earlier dissolved or terminated pursuant to law or the provisions of this Agreement.

CONFIDENTIAL

2.4 <u>Office and Agent</u>. The Company shall continuously maintain an office and registered agent in the State of Delaware. The principal office of the Company shall be located at such place as the Board of Directors may determine. The Company may also have such offices, anywhere within and without the State of Delaware, as the Board of Directors may determine from time to time, or the business of the Company may require. The registered agent shall be as stated in the Certificate or as otherwise determined by the Board of Directors.

2.5 <u>Names and Addresses of the Members and the Directors</u>. The names and addresses of the Class A Members are set forth on <u>Exhibit A</u>. The names and addresses of the Class B Members are set forth on <u>Exhibit B</u>. The names and addresses of the Class C Members, as may be additionally established from time to time, are and will be set forth on <u>Exhibit C</u>. The names and address of the Directors are set forth on <u>Exhibit D</u>. A Member or Director may change its address upon notice thereof to the Company.

2.6 <u>Purpose and Business of the Company</u>. The Company has been formed for the purpose of (a) developing, enhancing, modifying, and otherwise increasing the value of and exploiting the assets of the Company via license, sale of rights, sale of products manufactured based on such rights, and any such other way that the Company may derive value or revenue from its assets, and (b) conducting any business that may lawfully be conducted by a limited liability company formed under the Act. The Company shall have all of the powers granted to a limited liability company under the laws of the State of Delaware.

2.7 <u>Title to Company Property</u>. All property owned by the Company shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in any such property.

2.8 <u>Failure to Observe Formalities</u>. A failure to observe any formalities or requirements of this Agreement, the Certificate or the Act shall not be grounds for imposing personal liability on the Members or the Directors for liabilities of the Company.

2.9 <u>No Partnership Intended for Nontax Purposes</u>. The Members intend that for state and federal law purposes nothing herein is intended to suggest that the Company be treated as a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member, and that this Agreement not be construed to suggest otherwise, provided, however, that the Company shall, solely for federal and state tax law purposes, be considered a partnership under the Internal Revenue Code and similar state tax law provisions.

2.10 <u>Liability of Members and Directors to Third Parties; Reliance by Third-Party Creditors.</u>

(a) Except as otherwise provided in the Act, no Member or Director shall be personally liable for any debt, obligation or liability of the Company, whether arising in contract or otherwise, by reason of being a Member or acting as a Director of the Company.

(b) This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assigns. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other

CONFIDENTIAL

Person.  Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Agreement or any agreement between the Company and any Member with respect to any contributions or otherwise.

      2.11   Relationship with Stimwave Technologies Incorporated.

The Company and the Members acknowledge and agree that the Stimwave holds all Spinal Cord Stimulation ("SCS") rights to any and all intellectual property currently or hereafter created by the Company with applications to Spinal Cord Stimulation.  In the event that, in connection with the closing of a merger, sale of all or substantially all of ownership interest or assets of Stimwave to a third party, the Company hereby agrees to take any actions reasonably required to effectuate conditions as may be agreed upon by the Company, Stimwave, and such third parties in relation to SCS rights.

# ARTICLE III
## CAPITAL CONTRIBUTIONS

      3.1 Authorization and Issuance of Units.

      (a) The Company shall be authorized to issue one or more classes of Units. Initially, the Company shall have three (3) classes of Units as follows:

| Class of Units | Number of Units Authorized |
|---|---|
| Class A Units | 5,960,005 [80%, fully diluted] |
| Class B Units | 1,117,500 [15%, fully-diluted] |
| Class C Units | 372,495 [5%, fully diluted] |
| Total Units Authorized | 7,450,000 |

      (b) The holders of each class of Units shall be entitled to the rights, subject to the obligations set forth herein, ascribed to such class. Any holder of a class of Units shall be referred to as a Member of such class of Units (e.g., a holder of Class A Units shall be referred to as a Class A Member).  Any holder of more than one class of Units shall have separate rights under this Agreement with respect to each class of Unit held by such Member.  For example, a holder of Class A Units, Class B Units and Class C Units shall be referred to and shall be treated separately in his, her or its separate capacities as a Class A Member, a Class B Member and a Class C Member. Issuance of Class C Units shall dilute Class A and Class B Units proportionately.

      (c) Subject to the consent of the Members authorized to vote, the Board of Directors, at their sole discretion, shall have the power to issue the authorized Units on the terms and conditions determined by the Board of Directors without the amendment of this Agreement, and any additional issuances of Units may be dilutive proportionately to all Members. The Company shall not issue additional classes of Units or issue Units in excess of the authorized number without the written consent of a Majority Interest of all outstanding Class A Units and Class B Units.

      CONFIDENTIAL

4814-1837-3141.5

3.2 <u>Profits Interests</u>. The Company may issue Units that are intended to constitute "profits interests" for U.S. federal income tax purposes received for the provision of services to or for the benefit of the Company, in a Service Provider's capacity as a member of the Company or in anticipation of being a member of the Company, within the meaning of IRS Revenue Procedure 93-27, 1993-1 C.B. 343. A portion of the Class B Units issued to the Class B Members upon formation of the Company are intended to be treated as "profits interests" to the extent such Units are not issued in exchange for such Class B Members' initial Capital Contributions to the Company as set forth on <u>Exhibit B</u>. The terms, conditions and other provisions of this Agreement and any applicable award agreement with respect to Units intended to be treated as "profits interests" will be interpreted in a manner that is consistent with the requirements of IRS Revenue Procedure 93-27, 1993-1 C.B. 343. Unless otherwise in the best interest of the intended recipient of such Units due to amendments to the Code or other changes in law, a Service Provider who is issued such Units will not be obligated or required to make any Capital Contribution with respect to such Units, and the initial Capital Account of a Service Provider with respect to such Units will be zero (0) unless cash or property of value was contributed in exchange for any such Units.

3.3 <u>Initial Capital Contributions</u>. Each Class A Member commits to contribute such amount in cash as set forth on <u>Exhibit A</u> as its initial Capital Contribution as soon as reasonably practicable upon or after execution of this Agreement, and will hold the number of Class A Units as set forth on <u>Exhibit A</u>. To the extent that such Class A Member fails to make such initial Capital Contribution, the Company shall hold the number of Class A Units assigned to such Member as set forth on <u>Exhibit A</u> until the end of the business day on March 16, 2015, at which time such Class A Units shall be forfeited to the Company for no consideration, except as otherwise determined in the sole discretion of the Board of Directors.  Each Class B Member shall contribute such amount of cash or property as set forth on <u>Exhibit B</u> as its initial Capital Contribution, and will hold the number of Class B Units as set forth on <u>Exhibit B</u>.  Each Class C Member shall contribute such amount of cash or property as set forth on <u>Exhibit C</u> as its initial Capital Contribution, and will hold the number of Class C Units as set forth on <u>Exhibit C</u>.

3.4 <u>Additional Capital Contributions</u>. Additional Capital Contributions shall be made only with the approval of the Board of Directors.

3.5 <u>Capital Accounts</u>. The Company shall establish and maintain an individual Capital Account for each Member in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).  If a Member transfers all or a part of its Units in accordance with this Agreement, such Member's Capital Account attributable to the transferred Units shall carry over to the new owner of such Units pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(l).

The initial Capital Account balances of the Members (on an aggregate basis by class of Members) shall be as follows:

| Class | Aggregate Capital Account Balance |
|---|---|
| Class A Members | $59,600.05, Cash contributions by Class A Members for 80% interest at $.01/Unit. |

CONFIDENTIAL

| Class B Members | $3,725.00, Agreed-upon value of IP contributed by Class B Members for initial 5% vested interest; remaining 10% interest subject to continued IP development over a four year period. |
| Class C Member | $3,724.95, Agreed-upon value of IP contributed by Class C Member for 5% interest. |

3.6 <u>Book-Up of Company Assets</u>. The book value of all Company assets will be adjusted, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f), to equal their respective gross fair market values, as determined in good faith by the majority of the Board of Directors, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the issuance of any Class B Units, in compliance with the requirements of applicable IRS Revenue Procedure 93-27, 1993-1 C.B. 343; (iii) the distribution by the Company to a Member of more than a de minimis amount of money or Company property as consideration for an interest in the Company; and (iv) the "liquidation" of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g).

3.7 <u>Schedules</u>. The Board of Directors shall be authorized, with the prior consent of a Majority of the Members entitled to vote, to update <u>Exhibit A</u>, <u>Exhibit B</u>, <u>Exhibit C</u> and <u>Exhibit D</u> to this Agreement or to add additional exhibits from time to time to reflect the issuance of additional Units to the Members or Additional Members or the creation of an additional class. However, there shall be no updates made to Exhibit A or Exhibit D before January 1, 2015 without full consent of the Board of Directors.

3.8 <u>Rights Regarding Capital Contributions</u>. No Member shall be entitled to interest on any Capital Contribution, and no Member shall have the right to withdraw or to demand the return of all or any part of its Capital Contribution, except as specifically provided in this Agreement.

(a) Under circumstances requiring a return of any Capital Contribution, no Member shall have the right to receive property, other than cash, except as may be specifically provided herein.

(b) No Member shall have personal liability for the repayment of the Capital Contribution of any Member or any obligation to make loans or advances to the Company, including restoration of a deficit Capital Account as provided in Section 3.9.

3.9 <u>Deficit Capital Accounts</u>. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that any Member's Capital Account has a deficit balance upon the "liquidation" of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

CONFIDENTIAL

## ARTICLE IV
### MEMBERS

4.1 <u>Procedures for Admission</u>. To effect the admission of a Member (including any Additional Member) to the Company, the Board of Directors shall require the Person to be so admitted to the Company to execute and deliver a counterpart signature page to this Agreement specifying the date of admission, such Person's name and address, such Person's Capital Contribution (if any) and the number and series of Units acquired thereby. The Board of Directors shall attach such counterpart signature page as a signature page to this Agreement.

4.2 <u>Limited Liability</u>.  Except as required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

4.3 <u>Withdrawals or Resignations</u>. So long as a Member continues to own or hold any Units, such Member shall not have the ability to resign or withdrawal as a Member prior to the dissolution and winding up of the Company and any such resignation, withdrawal or attempted resignation or withdrawal by a Member prior to the dissolution or winding up of the Company shall be null and void.  As soon as any person who is a Member ceases to own or hold any Units, such Person shall no longer be a Member.

4.4 <u>Competing Activities</u>. The Members and their Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company.  Neither the Company nor any other Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Members, in their capacities as such, shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Members shall have the right to hold any investment opportunity or prospective economic advantage for their own account or to recommend such opportunity to Persons other than the Company. Each Member acknowledges that the other Members and their Affiliates conduct other businesses, including businesses that may compete with the Company and for the Members' time. Each Member hereby waives any and all rights and claims that they may otherwise have against the other Members and their Affiliates as a result of any of such activities.  Notwithstanding the foregoing or any other provision of this agreement, each Member acknowledges and agrees that it shall remain bound by any non-disclosure agreement or confidentiality agreement entered into with the company, pursuant to the terms of such agreements.

4.5 <u>Transactions with the Company</u>.  With the prior approval of the Board of Directors, a Member may lend money to and transact other business with the Company. Subject to applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

4.6 <u>Remuneration to Members</u>.  No Member is entitled to remuneration for acting in the Company business.

CONFIDENTIAL

4.7 <u>Members are not Agents</u>. Pursuant to Section 5.1 and the Certificate, the management of the Company is vested in the Manager, with advice and consent of the Board of Directors as set forth in this Agreement.  The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Certificate and except as expressly required by the Act.  No Member, acting solely in the capacity of a Member, is an agent of the Company nor does any Member, unless expressly and duly authorized in writing to do so by the Manager or the Board of Directors, have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, to execute any instrument on its behalf or to render it liable for any purpose.

4.8 <u>Voting Rights</u>. Except as expressly provided in this Agreement, Members shall have no voting, approval or consent rights.  Class A Units and Class B Units shall be voting, provided that the right to vote with respect to any particular matter or act shall only be as provided for herein.  For purposes of determining the voting interest of a Member, a Member's voting power shall be based upon the number of Units held (of the applicable class or classes entitled to vote or act on such matter).

4.9 <u>Certificate of Units</u>. Upon the issuance of Units, which shall occur solely within the discretion of the Company unless otherwise required herein, the Company may, and upon the request of any Member shall at the cost of such Member, issue one or more Certificates, in such form as the Board of Directors may approve from time to time, in the name of each Member certifying that the Member named therein is a Member, stating the number and type of Units owned by such Member, and endorsed, with the following legends:

(a) "NEITHER THESE UNITS NOR ANY INTEREST THEREIN MAY BE SOLD, ASSIGNED OR TRANSFERRED UNLESS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, SHALL BE IN EFFECT WITH REGARD THERETO, OR UNLESS AN OPINION COUNSEL ACCEPTABLE TO THE COMPANY SHALL BE RENDERED THAT SUCH DISPOSITION WOULD NOT CONSTITUTE A VIOLATION OF ANY RELEVANT FEDERAL OR STATE SECURITIES LAWS."

(b) "THIS CERTIFICATE AND THE UNITS REPRESENTED THEREBY ARE SUBJECT TO RESTRICTIONS ON TRANSFER, INCLUDING RIGHTS OF FIRST REFUSAL AND CO-SALES RIGHTS, SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY.  THE COMPANY WILL FURNISH A COPY OF SAID AGREEMENT TO THE HOLDER OF THIS CERTIFICATE UPON WRITTEN REQUEST AND WITHOUT CHARGE THEREFOR."

4.10    <u>Cancellation and Replacement of Certificates</u>. Except as herein provided in this Section 4.10 with respect to lost, stolen, or destroyed certificates, no new certificates of membership shall be issued in lieu of previously issued certificates of membership until such previously issued certificates of membership shall have been surrendered and cancelled. All certificates of membership surrendered to the Company for transfer shall be cancelled.

(a) <u>Replacement of Lost, Stolen, or Destroyed Certificate</u>.  Any Member claiming that its certificate of membership is lost, stolen, or destroyed may make an affidavit or

CONFIDENTIAL

affirmation of that fact and request a new certificate.  Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Board of Directors, a new certificate may be issued at the cost of the requesting Member of the same tenor and representing the same membership as was represented by the certificate alleged to be lost, stolen, or destroyed.

4.11    <u>Meetings of and Voting by Members</u>. A meeting of the Members entitled to vote may be called at any time by the Board of Directors, the Manager(s) or by Members holding at least a Majority Interest of all outstanding Units entitled to vote.  Meetings of the Members may be held upon three (3) days' notice by first-class mail or 48 hours' notice given personally or by telephone, telegraph, facsimile, telex, e-mail, or other similar means of communication. Any such notice shall be addressed or delivered to each Member entitled to vote at such Member's address as it is shown upon the records of the Company.  Notice by mail shall be deemed to have been given at the time a written notice is deposited in the United States mails, postage prepaid. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or is delivered to a common carrier for transmission, or actually transmitted by the person giving the notice by electronic means, to the recipient.  Oral notice shall be deemed to have been given at the time it is communicated, in person or by telephone or wireless, to the recipient or to a person at the office of the recipient who the person giving the notice has reason to believe will promptly communicate it to the receiver.

(a) Members may participate in a meeting through use of conference telephone, electronic video screen communication, or other communications equipment, so long as all members participating in such meeting can hear one another.

(b) Any action required or permitted to be taken by the Members, individually or collectively, may be taken without a meeting or a consent in writing, if either (i) the action is taken by all Members entitled to vote on the action, or (ii) the action is taken by Members holding of record or otherwise entitled to vote in the aggregate no less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote on the action were present and voted.  Such action by written consent shall have the same force and effect as a vote of the Members at a meeting.  A consent in writing may be provided by any Member to the Company by any of the methods set forth in Section 12.13 below, including without limitation by facsimile or email, and such consent may be evidenced by the delivery of a signed consent or a writing via facsimile or email reflecting such Member's approval of the consent or action.

## ARTICLE V
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1 <u>Management of the Company by Manager</u>. The Company is a manager-managed limited liability company, and the business, property and affairs of the Company shall be managed and all powers of the Company shall be exercised by or under the direction as such, in and by one (1) manager (the "<u>Manager</u>"), and the Manager shall have full and complete authority, power, and discretion to manage and control the business, affairs, and properties of the Company, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business.  The initial Manager of the Company shall be Laura Perryman. The Manager's management of the Company

CONFIDENTIAL

shall be subject to the advice and consent of the Board of Directors in the case of Significant Matters and Decisions as set forth in Section 5.4 and further subject to the provisions of this Agreement relating to actions required to be approved by any Members.

5.2 Board of Directors. Meetings of the Board of Directors may be called by any Director or by the Chairperson, Chief Executive Officer, Manager, President or the Secretary, as may be appointed from time to time.  All meetings shall be held upon at least two (2) business days' notice delivered personally or by telephone, telegraph, facsimile, telex, e-mail, or other similar means of communication.  A notice need not specify the purpose of any meeting.  Notice of a meeting need not be given to any Director who signs a waiver of notice or a consent to holding the meeting (which waiver or consent need not specify the purpose of the meeting) or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior to its commencement, the lack of notice to such Director. All such waivers, consents and approvals shall be filed with the Company records or made a part of the minutes of the meeting.  A majority of the Directors present, whether or not a quorum is present, may adjourn any meeting to another time and place with the consent of the Manager. If the meeting is adjourned for more than twenty-four (24) hours, notice of any adjournment shall be given prior to the time of the adjourned meeting to the Directors who are not present at the time of the adjournment. Meetings of the Board of Directors may be held at any place within or without the State of Delaware which has been designated in the notice of the meeting or at such place as may be approved by the Board of Directors. Directors may participate in a meeting through use of conference telephone or similar communications equipment, so long as all Directors participating in such meeting can hear one another.  Participation in a meeting in such manner constitutes a presence in person at such meeting.  A majority of the Directors then serving on the Board of Directors constitutes a quorum of the Board of Directors for the transaction of business. Except to the extent that this Agreement expressly requires the approval of all Directors, every act or decision done or made by a majority of the Directors present at a meeting duly held at which a quorum is present is the act of the Board of Directors.  A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of Directors, if any action taken is approved by at least a majority of the required quorum for such meeting.

Any action required or permitted to be taken by the Board of Directors may be taken by the Board of Directors without a meeting, if all of the Directors individually or collectively consent in writing to such action.  Such action by written consent shall have the same force and effect if taken at a meeting of the Board of Directors. A consent in writing may be provided by any Director to the Company by any of the methods set forth in Section 13.13 below, including without limitation by facsimile or email, and such consent may be evidenced by the delivery of a signed consent or a writing via facsimile or email reflecting such Director's approval of the consent or action.

The provisions of this Section 5.2 govern meetings of the Board of Directors if the Directors elect, in their discretion, to hold meetings.  However, nothing in this Section 5.2 or in this Agreement is intended to require that meetings of Board of Directors be held, it being the intent of the Members that meetings of Directors are not required.

CONFIDENTIAL

5.3 <u>Election of Directors</u>.

(a) <u>Number, Term, and Qualifications</u>. The Board of Directors of the Company shall be comprised of up to 5 directors, three (3) Class A Directors, one (1) Class B Director, and one (1) Industry Director.  So long as 75% of the outstanding Class A Units as of the Effective Date remain outstanding, a Majority Interest of the Members holding Class A Units shall be entitled to elect three (3) members of the Company's Board of Directors (the "<u>Class A Directors</u>"). So long as 75% of Class B Units as of the Effective Date shall remain outstanding, a Majority Interest of the Members holding Class B Units shall be entitled to elect one (1) member of the Company's Board of Directors (the "<u>Class B Director</u>").  Members holding a Majority Interest of all outstanding Class A Units and Class B Units shall be entitled to elect one (1) member of the Company's Board of Directors, which director shall have reasonable experience related to the Company's industry as determined by the Members holding a Majority Interest of all outstanding Class A Units and Class B Units in their sole discretion (the "<u>Industry Director</u>"). In the event the Class A Members or Class B Members are no longer entitled to elect as a class the relevant Directors, respectively, such director shall be elected by a Majority Interest of all outstanding Class A Units and Class B Units.

Each Director shall serve until the earlier of (i) the election of such Director's successor, (ii) the removal of such Director in accordance with this Agreement, (iii) such Director's resignation and (iv) such Director's death.  A Director may, but need not be, a Member.

(b) <u>Resignation</u>.  Any Director may resign at any time by giving written notice to the Company.  The resignation of any Director shall take effect upon receipt of that notice or at such later time as shall be specified in the notice.  Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.

(c) <u>Removal</u>.  So long as the Members holding Class A Units are entitled to elect as a class the Class A Directors, a Class A Director may only be removed by a Majority Interest of the Members holding Class A Units, subject to the restrictions listed in Section 5.3(a). So long as the Members holding Class B Units are entitled to elect as a class the Class B Director, the Class B Director may only be removed by a Majority Interest of the Members holding Class B Units. The Industry Directors may only be removed by Members holding a Majority Interest of all outstanding Units entitled to vote. Subject to the foregoing sentences, any Class A Director or Industry Director may be removed at any time, with or without cause, subject to the restrictions listed in Section 5.3(a). Such removal may be at a meeting expressly for that purpose or by written consent of a Majority Interest of the outstanding Units of applicable class or classes.

(d) <u>Vacancies</u>.  Subject to the restrictions listed in Section 5.3(a), so long as the Members holding Class A Units are entitled to elect as a class the Class A Directors, any vacancy in the Class A Directors occurring for any reason on the Board of Directors may be filled by a Majority Interest of the Members holding Class A Units.  So long as the Members holding Class B Units are entitled to elect as a class the Class B Directors, any vacancy in the Class B Directors occurring for any reason on the Board of Directors may be filled by a Majority Interest of the Members holding Class B Units.  Any vacancy in an Industry Director occurring for any reason on the Board of Directors may be filled by a Majority Interest of all outstanding Class A Units and Class B Units.  Any other vacancy occurring for any reason on the Board of

CONFIDENTIAL

Directors shall be filled by a Majority Interest of all outstanding Class A Units and Class B Units, each voting separately as a Class. Any such action may be at a meeting called expressly for that purpose or by the written consent of a Majority Interest of the outstanding Units of applicable class or classes.

5.4 <u>Powers of Manager</u>. Without limiting the generality of Section 5.1, but subject to Section 5.4 and to the express limitations set forth elsewhere in this Agreement, the Manager shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in the Act.

(a) <u>Significant Acts and Matters</u>. The Manager shall not perform any of the following acts (each a "<u>Significant Act and Matter</u>") without the prior consent of the Board of Directors:

(i)    make, or permit any subsidiary to make, any loan or advance to any person or entity, including, without limitation, any employee or director of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee stock or option plan approved by the Board of Directors;

(ii)    guarantee, directly or indirectly, or permit any subsidiary to guarantee, directly or indirectly, any indebtedness except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

(iii)    incur any aggregate indebtedness in excess of $25,000 that is not already included in a budget approved by the Board of Directors, other than trade credit incurred in the ordinary course of business; and

(iv)    enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $50,000.

(b) <u>Voting Rights of the Members</u>.

(i)    Notwithstanding any other provisions of this Agreement, so long as at least an aggregate of 75% of the Class A Units are outstanding, neither the Manager nor the Board of Directors shall have the authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of a Majority Interest of the outstanding Class A Units, voting together as a separate class:

(1) To amend the Agreement in a manner that would materially and adversely alter or change the rights, preferences or privileges of the Members holding Class A Units; <u>provided</u>, that the amendment of the Agreement to issue additional units of a different class on a parity or junior basis with the Class A Units, or the approval of any matter for which a Majority Interest is required pursuant to clause (ii) of this Section 5.4(b), shall not be considered to be amendments that would materially and adversely alter or change the rights, preferences or privileges of the Class A Members;

CONFIDENTIAL

(2) To authorize the issuance of a class of units having a preference over the Class A Units; provided, that the granting of a distribution preference to a new class of units with respect to specific property or assets contributed by the holders of such units to the Company in connection with the issuance of such units shall not be considered to be the authorization of the issuance of a class of units having a preference over the Class B Units; and

(3) To increase or decrease the number of authorized Class A Units (other than a decrease to eliminate authorized but unissued Class A Units).

(ii)    Notwithstanding any other provisions of this Agreement, neither the Manager nor the Board of Directors shall have authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of a Majority Interest of the outstanding Units, voting together as a single class:

(1) To take any action that would constitute a Liquidation Event;

(2) To redeem, purchase or otherwise acquire (or pay into or set aside for a sinking fund for such purpose) any Unit.

(c) Creation of Committees.  The Manager may create committees to assist the Board of Directors and the officers in the governance of areas of importance to the Company. Subject to the terms of this Agreement, such committees shall have such powers and perform such duties as may be prescribed by the resolutions creating such committees.

5.5 Performance of Duties; Liability of Directors; Fiduciary Standard. A Director shall not be liable in such capacity to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law by the Director. The Directors shall perform their managerial duties in good faith, in a manner they reasonably believe to be in the best interests of the Company and its Members, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. The Members agree that the fiduciary duties of a Director to the Company and its Members shall be those of a director to a corporation and its shareholders under the WBCA and not those of a partner to a partnership and its partners. Any Director who performs the duties of Director in compliance with this Section 5.5 shall not have any liability by reason of being or having been a Director of the Company.

5.6 Devotion of Time. Except for Directors who are full time employees of the Company, Directors are not obligated to devote all of their time or business efforts to the affairs of the Company. The Directors shall devote whatever time, effort, and skill as they deem appropriate for the operation of the Company.

5.7 Transactions between the Company and the Directors. Notwithstanding that it may constitute a conflict of interest, the Directors may, and may cause their Affiliates to, engage in any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as (i) such transaction is not expressly

CONFIDENTIAL

prohibited by this Agreement and the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arm's length and (ii) such transaction has been consented to in writing by a Majority Interest of the outstanding Units.

5.8 <u>Liability of Director Limited to Director's Assets</u>.  Under no circumstances will any Affiliate of any Director have any personal responsibility for any liability or obligation of the Director (whether on a theory of alter ego, piercing the corporate veil, or otherwise), and any recourse permitted under this Agreement or otherwise of the Members, any former Member or the Company against a Director will be limited to the assets of the Director as they may exist from time to time.

5.9 <u>Limited Liability</u>.  No entity or person who is a Director or officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Director or officer of the Company.

5.10    <u>Officers</u>.  Except as otherwise provided in this Section 5.10, the officers of the Company shall be appointed by the Board of Directors and shall consist of a Chief Executive Officer, President and a Secretary.  The Board of Directors may also appoint a Chief Financial Officer or Treasurer, a Chief Operating Officer, and one or more Vice Presidents or Assistant Secretaries.  Any number of offices may be held by the same person.  The Manager may appoint such other officers and agents as it shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Manager, with the advice and consent, such consent not to be unreasonably withheld, of the Board of Directors.  The salaries of all officers and agents of the Company shall be fixed by or in the manner prescribed by the Board of Directors.  The officers of the Company shall hold office until their successors are chosen and qualified. Except as otherwise provided in this Section 5.10, any officer appointed by the Board of Directors may be removed at any time, with or without cause, by the Board of Directors. Except as otherwise provided in this Section 5.10, any vacancy occurring in any office of the Company shall be filled by the Board of Directors.

(a) <u>Chief Executive Officer</u>.  The Chief Executive Officer of the Company shall, subject to the control of the Board of Directors, have general supervision, direction and control of the business and affairs of the Company.  The Chief Executive Officer shall preside at all meetings of the Members, unless the Manager shall have appointed another person to so preside and such person is present.  The Chief Executive Officer shall perform other duties commonly incident to a chief executive officer of a Delaware corporation and shall also perform such other duties and have such other powers as the Board of Directors shall designate from time to time. The Chief Executive Officer is authorized to make expenditures except:  (i) where required or permitted by law to be otherwise signed and executed, and (ii) where signing and execution thereof shall be expressly delegated by the Manager to some other officer or agent of the Company.  Laura Perryman will be the initial Chief Executive Officer.

CONFIDENTIAL

(b) <u>President</u>.  The President may assume and perform the duties of the Chief Executive Officer in the absence or disability of the Chief Executive Officer or whenever the office of Chief Executive Officer is vacant. The President shall perform such other duties commonly incident to a President of a Delaware corporation and shall perform such other duties and have such other powers as the Board of Directors shall designate from time to time.

(c) <u>Chief Operating Officer</u>.  In the absence of the President or in the event of the President's inability to act, the Chief Operating Officer, if any, shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President.  The Chief Operating Officer shall perform such other duties commonly incident to a Chief Operating Officer of a Delaware corporation and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

(d) <u>Vice Presidents</u>. In the absence of the President and the Chief Operating Officer or in the event of the President's and Chief Operating Officer's inability to act, the Vice President, if any (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board of Directors, or in the absence of any designation, then in the order of their election), shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President.  The Vice Presidents, if any, shall perform such other duties commonly incident to a vice president of a Delaware corporation and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

(e) <u>Secretary and Assistant Secretary</u>. The Secretary shall be responsible for filing legal documents and maintaining records for the Company.  The Secretary shall attend all meetings of the Board of Directors and all meetings of the Members, if any, and record all the proceedings of the meetings of the Company and of the Board of Directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required.  The Secretary shall give, or cause to be given, notice of all meetings of the Members, if any, and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or the President, under whose supervision the Secretary shall serve.  The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Manager (or if there be no such determination, then in order of their election), shall, in the absence of the Secretary or in the event of the Secretary's inability to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Manager may from time to time prescribe.

(f) <u>Chief Financial Officer or Treasurer</u>. The Chief Financial Officer or Treasurer shall be responsible for ensuring that appropriate custodial arrangements are maintained with respect to the corporate funds and securities of the Company. The Chief Financial Officer or Treasurer shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all monies and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Manager. The Chief Financial Officer or Treasurer shall disburse the funds of the Company as may be ordered by the Manager, taking proper vouchers for such disbursements, and shall render to the Chief Executive Officer and to the Manager, at its regular meetings or when the Manager so requires, an account of all of the Chief Financial Officer's and Treasurer's transactions and of the financial condition

CONFIDENTIAL

of the Company. The Chief Financial Officer or Treasurer shall perform other duties commonly incident to the office of Chief Financial Officer or Treasurer in a Delaware corporation and shall also perform such other duties and have such other powers as the Manager or Chief Executive Officer shall designate from time to time.

(g) Officers as Agents. The officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Board of Directors not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of the officers taken in accordance with such powers shall bind the Company.

5.11    Tax Matters Partner. The Manager shall be the Tax Matters Partner of the Company as provided in the Treasury Regulations pursuant to Code Section 6231(a)(7), and shall be indemnified and reimbursed for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with its serving in that capacity. Notwithstanding the preceding sentence, the Tax Matters Partner shall not be entitled to indemnification for such costs and expenses if such party has not acted in good faith. The Tax Matters Partner shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company's funds for professional services and costs associated therewith.

## ARTICLE VI
## ALLOCATIONS OF PROFITS AND LOSSES AND DISTRIBUTIONS

6.1 Allocations of Profits and Losses. Subject to Section 6.2 and Section 6.3, the Profits and Losses of the Company for each Fiscal Year shall be allocated among the Members as follows:

(a) Profits shall be allocated in the following order and priority:

(i)    First, to the Class A Members and the Class B Members in an amount equal to the excess, if any, of (x) the cumulative Losses allocated pursuant to Section 6.1(b)(iii) for all prior Fiscal Years, over (y) the cumulative Profits allocated pursuant to this Section 6.1(a)(i) for all prior Fiscal Years, pro rata in proportion to their respective shares of the cumulative Losses allocated pursuant to Section 6.1(b)(iii); and

(ii)    Thereafter, to the Class A Members and the Class B Members, pro rata in proportion to their respective Units held, provided, however, in the case of a sale of all or substantially all of the assets of the Company, to the Class A Members, the Class B Members and the Class C Members, pro rata in proportion to their respective Units held.

(b) Losses shall be allocated in the following order and priority:

(i)    First, to the Class A Members and the Class B Members, in an amount equal to the excess, if any, of (x) the cumulative Profits allocated pursuant to Section 6.1(a)(ii) for all prior Fiscal Years over (y) the cumulative Losses allocated pursuant to this Section 6.1(b)(i) for all prior Fiscal Years, pro rata in proportion to respective shares of the cumulative Profits allocated pursuant to Section 6.1(a)(ii); and

CONFIDENTIAL

(ii)    Thereafter, to the Class A Members and the Class B Members pro rata in proportion to their respective Units held, provided, however, in the case of a sale of all or substantially all of the assets of the Company, to the Class A Members, the Class B Members and the Class C Members, pro rata in proportion to their respective Units held.

6.2 Special Allocations.  Notwithstanding Section 6.1(b) to the contrary, no allocation of Loss, or item of loss or deduction, will be made to a Member for any Fiscal Year if such allocation would cause or increase an Adjusted Capital Account Deficit with respect to such Member as of the end of such Fiscal Year.  Losses, and items of loss or deduction, that must be reallocated pursuant to the preceding sentence will be allocated (i) first, in the manner determined by the Board of Directors that allocates the maximum permissible Losses, and items of loss and deduction, to each Member, as permitted by Treasury Regulations Section 1.704-1(b)(2)(ii)(d) ; and (ii) second, to the Members in proportion to their respective holdings of the Units.  Notwithstanding Section 6.1 to the contrary, the allocations of Profit and Loss, and items of income, gain, loss and deduction, set forth in Section 6.1 will be subject to the following special allocations: a "qualified income offset" provision (within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)), a "partnership minimum gain chargeback" provision (within the meaning of Treasury Regulations Sections 1.704-2(f) and 1.704-2(g)(2)), a "partner minimum gain chargeback" provision (within the meaning of Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(i)(5)), a provision allocating "nonrecourse deductions" (within the meaning of Treasury Regulations Section 1.704-2(b)(1)) to the Members in accordance with their respective holdings of the Units and a provision allocating "partner nonrecourse deductions" (within the meaning of Treasury Regulations Section 1.704-2(i)) to the Member who bears the economic risk of loss with respect to the related "partner nonrecourse debt".

6.3 Curative Allocations.  The allocations set forth in Section 6.2 are intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated under Code Section 704(b).  To the extent possible, any allocations made under Section 6.2 will be offset either with other allocations under Section 6.2 or with special allocations of other items of Company income, gain, loss and deduction pursuant to this Section 6.3.  Accordingly, the Board of Directors will make offsetting allocations of Company income, gain, loss and deduction pursuant to this Section 6.4, in whatever amount and manner that the Board of Directors determines to be appropriate, such that after taking into account such offsetting allocations, the Capital Accounts of the Members are equal, to the extent possible, to the Capital Accounts that the Members would have had if the allocations set forth in Section 6.2 were not part of this Agreement and all Profit and Losses, and items of income, gain, loss and deduction, were allocated pursuant to Section 6.1.

6.4 Tax Elections.  The Board of Directors will have the sole and absolute discretion to make any and all elections for U.S. federal, state and local tax purposes, including any election to adjust the tax basis of any Company assets pursuant to Code Section 754, or comparable provisions of state or local law; provided, however, that the Company will not file an election pursuant to Treasury Regulations Section 301.7701-3(c) to be classified as an association taxable as a corporation for U.S. federal income tax purposes without the consent of all of the Members.

6.5 Transfer or Issuance of Units During Fiscal Year.  In the case of the transfer of a Member's Units, the addition of an additional Member or the issuance of additional Units at any

time other than the end of a Fiscal Year, the distributive share of the various items of income, gain, loss, deduction, credit or allowance of the Company shall be allocated among the Members to take into account the varying interests of the Members during the Fiscal Year in accordance with Code Section 706, using such method as is determined by the Board of Directors.

6.6 <u>Tax Allocations</u>. In accordance with Code Section 704(c) and the Treasury Regulations promulgated under Code Section 704(c), income, gain, loss and deduction with respect to any property contributed in-kind to the Company as a Capital Contribution, and with respect to any property that is revalued on the books of the Company pursuant to Section 3.6, will be allocated, solely for U.S. federal income tax purposes, to the Members so as to take into account any variation between the tax basis of such contributed or revalued property and such contributed or revalued property's fair market value at the time of contribution or revaluation. Any elections or decisions related to the method or manner in which allocations of income, gain, loss and deduction are made pursuant to Code Section 704(c), or the Treasury Regulations promulgated under Code Section 704(c), will be made by the Board of Directors.  Except as otherwise provided in this Agreement, all items of Company income, gain, loss or deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits and Losses, as the case may be.

6.7 <u>Distributions by the Company</u>.

(a) Subject to applicable law and the other provisions of this Section 6.7, the Board of Directors may elect from time to time to distribute Distributable Cash to the Class A Members and the Class B Members, pro rata in proportion to their respective Units held, <u>provided</u>, <u>however</u>, in the case of a sale of all or substantially all of the assets of the Company, to the Class A Members, the Class B Members and the Class C Members, pro rata in proportion to their respective Units held.

(b) Notwithstanding Section 6.7(a) to the contrary, the Company shall distribute cash to each Class A Member and Class B Member in an amount equal to the sum of: (i) the product of (A) the Company's net taxable ordinary income and net taxable short-term capital gain allocated pursuant to Article VI to such Member for such ended Fiscal Year multiplied by (B) the highest marginal U.S. federal ordinary income tax rate applicable to individuals plus (ii) the product of (A) the Company's net taxable long-term capital gain allocated pursuant to Article VI to such Class A Member or Class B Member for such ended Fiscal Year multiplied by (B) the highest U.S. federal long-term capital gains tax rate applicable to individuals; <u>provided</u>, <u>however</u>, that no such distribution shall be made to the extent that the Board of Directors determines, in its sole discretion, that funds are not reasonably available for such distribution by virtue of applicable law, contractual obligation or current or future needs of the Company. Such distribution to each Class A Member and Class B Member may occur on a pro rata quarterly basis, but shall be made no later than the first day of the fourth month following the end of the Fiscal Year of the Company with respect to which such distribution is made.  Distributions made pursuant to this Section 6.7(b) shall be applied against amounts otherwise distributable to the Class A Members and Class B Members pursuant to Section 6.7(a)(i).

(c) To the extent that the Company is required by law to withhold or to make tax or other payments on behalf of or with respect to any Member, the Company shall withhold such

4814-1837-3141.5

amounts from any distribution and make such payments as so required. For purposes of this Agreement, any such payments or withholdings shall be treated as a distribution to the Member on behalf of whom the withholding or payment was made.

(d) All distributions shall be made only to the Member who, according to the books and records of the Company, is the holder of record of the Units in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Director shall incur any liability for making distributions in accordance with this Section 6.7.

(e) Notwithstanding Section 6.7(a) to the contrary, distributions of proceeds of liquidation shall be made to the Members pursuant to Section 9.4.

## ARTICLE VII
## TRANSFER AND ASSIGNMENT OF INTERESTS

7.1 <u>Transfer and Assignment of Interests</u>. Except as expressly provided in this Agreement, a Member shall not transfer any part of the Member's Interest in the Company, whether now owned or later acquired, unless such transfer has been approved in writing by the Board of Directors and, if the Board of Directors determines appropriate, the Board of Directors approves the transferee's admission to the Company as a Member upon such transfer. No Member may encumber or permit or suffer any encumbrance of all or any part of the Member's Interest in the Company unless such encumbrance has been approved in writing by the Board of Directors. Any such approvals may be granted or withheld in the Board of Director's sole discretion. For purposes of this agreement, "<u>transfer</u>", "<u>encumber</u>" and similar terms (whether used as nouns or verbs) shall be interpreted broadly and shall include, without limitation, any direct or indirect sale, assignment, transfer, award, confirmation, distribution, bequeath, donation, trust, exchange or other disposition of all or any part of an interest, whether or not for value and whether voluntarily, involuntarily, by operation of law or otherwise, any agreement or transaction through which any Person would or would reasonably be expected to acquire an economic or beneficial interest in the Company or all or any part of an interest, and any pledge, encumbrance, mortgage, or granting of a security interest, foreclosure, replevin action or other realization procedures.

7.2 <u>Transfer in Violation of Agreement</u>. Any transfer or encumbrance that is not made in accordance with the terms of this Agreement shall be null and void ab initio, and shall not be recognized by the Company. Each party hereto acknowledges and agrees that any breach of this Agreement would result in substantial harm to the other parties hereto for which monetary damages alone could not adequately compensate. Therefore, the parties hereto unconditionally and irrevocably agree that any non-breaching party hereto shall be entitled to seek protective orders, injunctive relief and other remedies available at law or in equity (including, without limitation, seeking specific performance or the rescission of purchases, sales and other transfers of Interests not made in strict compliance with this Agreement). Notwithstanding the foregoing, if by operation of law or otherwise a transfer is effective despite this Section, then each Person that succeeds to any part of such Interest (a) shall be deemed to be an assignee of such Interest, (b) shall possess only the economic rights associated with such Interest, and (c) shall not be a Member or have any voting rights or other rights of a Member unless admitted as a Member in accordance with this Agreement.

CONFIDENTIAL
4814-1837-3141.5

7.3 <u>Right of First Refusal</u>.  Any Proposed Transfer, and the admission of the Prospective Transferee as a Member of the Company, must be approved by the Board of Directors in accordance with Section 7.1 and this Agreement.  In addition, any Proposed Transfer shall be subject to rights of the Company and the Other members as set forth in this Section 7.3 as follows:

(a) <u>Grant of Right of First Refusal to the Company</u>.  Each Member hereby unconditionally and irrevocably grants to the Company a Right of First Refusal to purchase all or any portion of Transfer Units that such Member may propose to transfer in a Proposed Transfer, at the same price and on the same terms and conditions as those offered to the Prospective Transferee.

(b) <u>Notice</u>.  Each Member proposing to make a Proposed Transfer must deliver a Proposed Transfer Notice to the Company not later than sixty (60) days prior to the consummation of such Proposed Transfer.  Such Proposed Transfer Notice shall contain the material terms and conditions of the Proposed Transfer (including without limitation the price, form of consideration and proposed closing date) and the identity of the Prospective Transferee. The Company must exercise its Right of First Refusal by giving a Company Notice to the Selling Member within ten (10) days after delivery of the Proposed Transfer Notice.

(c) <u>Grant of Secondary Refusal Right to Other Members</u>. Each Member hereby unconditionally and irrevocably grants to the Other Members a Secondary Refusal Right to purchase all or any portion of the Transfer Units not purchased by the Company pursuant to the Right of First Refusal.  If the Company does not intend to exercise its Right of Refusal with respect to all Transfer Units subject to a Proposed Transfer, the Company must deliver a Secondary Notice, and a copy of the Proposed Transfer Notice delivered to the Company, to each Other Member to that effect no later than fifteen (15) days after the Selling Member delivers the Proposed Transfer Notice to the Company.  To exercise its Secondary Refusal Right, an Other Member must deliver an Other Member Notice to the selling Member and the Company within ten (10) days after the deadline for delivery of the Secondary Notice.

(d) <u>Under Subscription of Transfer Units</u>. If options to purchase have been exercised by the Company and the Other Members with respect to some but not all of the Transfer Units by the end of the 10-day period specified in the last sentence of the preceding clause (the "<u>Other Member Notice Period</u>"), then the Company shall, immediately after the expiration of the Other Member Notice Period, send written notice to those Other Members who fully exercised their options within the Other Member Notice Period (the "<u>Exercising Other Members</u>").  Each Exercising Other Member shall have an additional option to purchase all or any part of the balance of any such remaining unsubscribed Transfer Units on the terms and conditions set forth in the Proposed Transfer Notice.  To exercise such option, an Other Member must deliver an Under Subscription Notice to the Selling Member and the Company within ten (10) days after the expiration of the Other Member Notice Period specifying the additional amount of Units such Other members desires to purchase (the "<u>Under Subscription Deadline</u>"). In the event there are two or more such Other Members that deliver Under Subscription Notices for an aggregate number of Units in excess of the number available, the remaining Units available for purchase shall be allocated to such Other Members pro rata based on the number of Units such Other Members have elected to purchase. The Company shall notify all of the

CONFIDENTIAL

Exercising Other Members of the amount of shares each shall be entitled to purchase within 10 days of the Under Subscription Deadline.

(e) <u>Consideration; Closing</u>. If the consideration proposed to be paid for the Transfer Units is in property, services or other non-cash consideration, the fair market value of the consideration shall be determined in good faith by the Company's Board of Directors. If the Company or any Other Member cannot for any reason pay for the Transfer Units in the same form of non-cash consideration, the Company or such Other Member may pay the cash value equivalent thereof, as determined by the Board of Directors. The closing of the purchase of Transfer Units by the Company and the Other Members shall take place, and all payments from the Company and the Other Members shall have been delivered to the selling Member, by the later of (i) the date specified in the Proposed Transfer Notice as the intended date of the Proposed Transfer and (ii) sixty (60) days after delivery of the Proposed Transfer Notice.

7.4 <u>Right of Co-Sale Notice and Exercise</u>. If any Transfer Units subject to a Proposed Transfer is not purchased pursuant to Section 7.3(a) above and thereafter is to be sold to a Prospective Transferee, each respective Other Member holding Units of the same class as the Units subject to the Proposed Transfer may elect to exercise its Right of Co-Sale and participate on a pro-rata basis in the Proposed Transfer on the same terms and conditions specified in the Proposed Transfer Notice. Each such Other Member who desires to exercise its Right of Co-Sale must give the Selling Member and the Company written notice to that effect (a "<u>Co-Sale Notice</u>") within ten (10) days after the deadline for delivery of the Secondary Notice described above, and upon giving such notice such Other Member (a "<u>Co-Selling Member</u>") shall be deemed to have effectively exercised the Right of Co-Sale. No Other Member who has exercised Secondary Refusal Rights pursuant to Section 7.3(c) with respect to a particular Proposed Transfer shall be permitted to exercise any Right of Co-Sale with respect to the same Proposed Transfer.

(b) <u>Calculation</u>. Each Co-Selling Member who timely exercises his, her or its Right of Co-Sale by delivering a Co-Sale Notice may include in the Proposed Transfer an amount of Units of the class subject to the Proposed Transfer equal to the product obtained by multiplying (i) the aggregate number of Units remaining subject to the Proposed Transfer (after subtracting the Units to be purchased by the Company or the Other Members pursuant to the Right of First Refusal or the Secondary Refusal Right) by (ii) a fraction, the numerator of which is the number of Units of the class subject to the Proposed Transfer owned by such Co-Selling Member immediately before consummation of the Proposed Transfer and the denominator of which is the total number of outstanding Units of the class subject to the Proposed Transfer owned by all other Co-Selling Members <u>plus</u> the number of Units of the class subject to the Proposed Transfer held by the Selling Member. To the extent one or more of the Other Members exercise its Right of Co-Sale, the number of Units that the Selling Member may sell in the Proposed Transfer shall be correspondingly reduced. The Company shall notify each Co-Selling Member and the Selling Member of the number of Units each shall be entitled to transfer as part of the Proposed Transfer within 10 days of the Under Subscription Deadline.

(c) <u>Participation</u>.

CONFIDENTIAL

(i)        Each Co-Selling Member shall effect its participation in the Proposed Transfer by promptly delivering to the Selling Member, no later than ten (10) days after it has been notified of the number of Units it shall be entitled to transfer as part of its exercise of the Right of Co-Sale, one or more Certificates, properly endorsed for transfer to the Prospective Transferee, representing the number of Units that such Other Member is permitted to include in the Proposed Transfer.  The Company agrees to cooperate to subdivide and issue new Certificates as necessary to effectuate the foregoing.

(ii)       Each Certificate a Co-Selling Member delivers to the Selling Member pursuant to subparagraph (i) above will be transferred to the Prospective Transferee against payment therefor in consummation of the sale of the Transfer Units pursuant to the terms and conditions specified in the Proposed Transfer Notice and the purchase and sale agreement, and the Selling Member shall concurrently therewith remit to each Co-Selling Member the portion of the sale proceeds to which such Co-Selling Member is entitled by reason of its participation in such sale.  If any Prospective Transferee refuse(s) to purchase securities subject to the Right of Co-Sale from any Co-Selling Member exercising its Right of Co-Sale hereunder, no Selling Member may consummate and transfer to such Prospective Transferee unless and until, simultaneously with such transfer, such Selling Member purchases all securities subject to the Right of Co-Sale from such Co-Selling Member.

7.5 Deadline.  If any Proposed Transfer is not consummated within one hundred and twenty (120) days after receipt of the Proposed Transfer Notice by the Company, the Member proposing the Proposed Transfer may not transfer any Interest unless it again complies in full with each provision of this Article VII.  The exercise or election not to exercise any right by any Other Member hereunder shall not adversely affect its right to participate in any other sales of Transfer Units subject to Section 7.3.

7.6 Permitted Transfers.  Notwithstanding any other provision of this Agreement to the contrary, the provisions of Section 7.3 and Section 7.4 shall not apply: (i) in the case of a Member that is an entity, to a transfer approved by the Board of Directors by such Member to its stockholders, members, partners or other equity holders, (ii) to a repurchase of Units from a Member by the Company pursuant to an agreement containing vesting and/or repurchase provisions approved by the Board of Directors, or (iii) in the case of a Member that is a natural person, (x) to a transfer to a revocable trust created for the benefit of the Member, or any combination between or among the Member, the Member's spouse, and the Member's immediate family; provided that the Member retains a beneficial interest in the trust and all of the voting Interest included in such Interest; or (y) to a transfer of Interests by such Member, either during his or her lifetime with the approval of the Board of Directors or upon such Member's death by will or intestacy to his or her siblings, children, grandchildren, or spouse or any other relatives, or any custodian or trustee for the account of a Member or a Member's siblings, children, grandchildren or spouse, provided, that the transferee(s) shall possess only the economic rights associated with such Interest, and shall not be a Member or have any voting rights or other rights of a Member unless admitted as a Member in accordance with this Agreement.

7.7 Additional Requirement of Transferors and Transferees.  In addition to any other requirements set forth in this Agreement or required by law, any transfer or encumbrance of a

Member's Interests shall require (a) compliance by the Member and transferee with all terms of this Agreement and applicable law, including applicable securities laws and blue sky laws, and (b) payment by the Member and transferee, jointly and severally, of all reasonable costs and expenses incurred by the Company in connection with the transfer or encumbrance or proposed transfer or encumbrance, including any legal expenses, as the Board of Directors may determine. If the Board concludes that a transfer or encumbrance would (i) result in a violation of applicable securities laws, (ii) cause the Company to become subject to registration under the Federal Investment Company Act of 1940, as amended, (iii) result in the "termination" of the Company as a partnership for U.S. federal income tax purposes pursuant to Code Section 708(b), (iv) cause the Company to be classified as a "publicly traded partnership" (as that term is defined in Code Section 7704(b)); or (v) be an event that would constitute a violation or breach (or with the giving of notice or passage of time would constitute a violation or breach) of the Certificate of Formation, this Agreement, or the Act, the Member engaging in the transfer or encumbrance shall be liable to the Company and each other Member for any taxes, fines, penalties, damages, losses, and expenses (including attorneys' fees) that may be due from or suffered by the Company or any other Member to the extent of such adverse impact.

7.8 <u>Failure to Comply</u>. If any Member becomes obligated to sell any Units to the Company under this Agreement and fails to deliver such Units in accordance with the terms of this Agreement, the Company may, at its option, in addition to all other remedies it may have, send to such Member the purchase price for such Units as is herein specified and cancel on its books the certificate or certificates representing the Units to be sold.

# ARTICLE VIII
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1 <u>Books and Records</u>. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with GAAP and the accounting methods followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in Miami Beach, Florida all of the following:

(a) A current list of the full name and last known business or residence address of each Member and set forth in alphabetical order, together with the Capital Contributions, Capital Account and Units held by each Member;

(b) A current list of the full names and addresses of each Director;

(c) A copy of the Certificate and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Certificate or any amendments thereto have been executed;

(d) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent Fiscal Years;

CONFIDENTIAL

4814-1837-3141.5

(e) A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

(f) Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

(g) The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

8.2 Reports. The Company shall cause to be filed, in accordance with the Act, all reports and documents required to be filed with any governmental agency. The Company shall cause to be prepared at least annually information concerning the Company's operations necessary for the completion of the Members' federal and state income tax returns. The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each Fiscal Year (A) such information as is necessary to complete the Members' federal and state income tax or information returns and (B) a copy of the Company's federal, state, and local income tax or information returns for the year. In addition, the Company shall provide all Members with unaudited quarterly financial statements prepared in accordance with GAAP.

8.3 Bank Accounts. The funds of the Company shall be maintained in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

## ARTICLE IX
## DISSOLUTION AND WINDING UP

9.1 Dissolution. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(a) The happening of any event of dissolution specified in the Certificate;

(b) The entry of a decree of judicial dissolution;

(c) The vote of a Majority Interest of the outstanding Units, voting together as a single class; or

(d) The sale of all or substantially all of the assets of the Company.

9.2 Certificate of Dissolution. As soon as possible following the occurrence of any of the events specified in Section 9.1, the Directors who have not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the Delaware Secretary of State and file the Certificate as required by the Act. Dissolution of the Company shall be effective on the date which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Certificate shall have been cancelled and the assets of the Company shall have been distributed as provided herein.

CONFIDENTIAL

Case 20-23359-LMI    Doc 234-14    Filed 04/01/21    Page 36 of 50


9.3 <u>Winding Up</u>.  Upon the dissolution of the Company, the Company's assets shall be disposed of and its affairs wound up.  The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

9.4 <u>Order of Payment Upon Dissolution</u>.  The assets and proceeds on liquidation shall be applied in the following order:

(a)  To creditors, including Members who are creditors, to the extent permitted by law and in accordance with their relative rights of priority, if any; and

(b)  To the Members pro rata in proportion to their respective positive Capital Account balances, as determined after taking into account all Capital Account adjustments for all periods.

9.5 <u>Limitations on Payments Made in Dissolution</u>.  Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of the Company for the return of its positive Capital Account balance and shall have no recourse for its Capital Contribution and/or share of income or gain of the Company (upon dissolution or otherwise) against the Directors or any other Member.

9.6 <u>Distributions in Kind</u>. The Board of Directors may make dissolution distributions to the Members in cash or distribute Company assets in kind, and the distribution of any such assets in kind shall be made on the basis of the fair market value of each such asset as of the date of distribution, as determined by the Board of Directors in good faith.

9.7 <u>Certificate of Cancellation</u>. The Board of Directors or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the Delaware Secretary of State, a Certificate of Cancellation of the Certificate upon the completion of the winding up of the affairs of the Company.

<h1 style="text-align:center"><b>ARTICLE X<br>INDEMNIFICATION AND INSURANCE</b></h1>

10.1 <u>Limitation of Liability</u>.  No Member, Director, or officer of the Company (each, an "<u>Indemnified Person</u>") shall have liability to the Company or the Members for monetary damages for conduct as a Member, Director, or officer of the Company, except for acts or omissions that involve a breach of this Agreement, intentional misconduct, a knowing violation of law, conduct violating relevant Delaware law, or for any transaction from which the Indemnified Person has personally received a benefit in money, property or services to which the Indemnified Person was not legally entitled. If the Act is hereafter amended to authorize Company action further limiting the Personal liability of members and Directors of limited liability companies, then the liability of each Indemnified Person shall be eliminated or limited to the full extent permitted by the Act, as so amended.  No repeal or modification of the Act or this Section 10.1 shall adversely affect any right or protection of an Indemnified Person existing at the time of such repeal or modification for or with respect to an act or omission of such Indemnified Person occurring prior to such repeal or modification.

CONFIDENTIAL

4814-1837-3141.5

10.2    Indemnification. The Company shall indemnify each Indemnified Person to the fullest extent allowed under relevant Delaware law.  The right to indemnification and payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section 10.2 shall not be exclusive of any other right any Indemnified Person may have or hereafter acquire under any statute, this Agreement, vote of the Board of Directors or the Members or otherwise.  No repeal or modification of the Act or this Section 10.2 shall adversely affect any right of an Indemnified Person to indemnification existing at the time of such repeal or modification for or with respect to indemnification related to an act or omission of such Indemnified Person occurring prior to such repeal or modification.  The Board of Directors shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Board of Directors deems appropriate in their business judgment.

10.3    Insurance. The Company shall, to the extent commercially reasonable (as determined by the Board of Directors), purchase and maintain insurance on behalf of any Indemnified Person against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 10.2 or under applicable law.

## ARTICLE XI
## CONVERSION TO CORPORATION

11.1    Conversion to Corporation.  With the approval of a Majority Interest all Class A Units and Class B Units, voting together as a single class, the Board of Directors may, on at least ten (10) days' prior written notice given to all Members, cause the Company to convert to one or more corporations (individually, a "Continuing Corporation" and collectively, the "Continuing Corporations"), by such means (including, without limitation, merger or consolidation or other business combination, transfer of all or a part of the Company's assets and/or transfer of the Members' respective Units) as the Board of Directors may reasonably select.  Upon such conversion:

(a) All Class A Units and Class B Units shall be exchanged for, or otherwise converted into, shares of capital stock (which may be non-voting if the Units are non-voting) of the Continuing Corporation representing an equity interest therein substantially equivalent to the equity interest in the Company represented by such Unit (including, without limitation but only to the extent reasonably practicable, having the same transfer rights, co-sale rights, rights of first refusal and voting rights). All Class C Units shall be exchanged for, or otherwise converted into, options to acquire a class of shares of capital stock of the Continuing Corporation which entitle such holders to value only upon the occurrence of a sale, merger, liquidation, sale of substantially all assets, or initial public offering of the Continuing Corporation. The Board of Directors and the Company shall use reasonable efforts to structure such conversion so that the holders' ownership of their Units (or equity interest therein, in the case of assignees who possess only the economic rights associated with an Interest) will be "tacked" to their ownership of the shares of the Continuing Corporation's capital stock for the purposes of determining such holders' compliance with the requirements of Rule 144 of the Securities Act.

CONFIDENTIAL

(b) The stockholders of the Continuing Corporation, and the Continuing Corporation, in the event of such a conversion other than in connection with a public offering, shall enter into:

(i) a stockholders' agreement on terms substantially equivalent to those contained in this Agreement, such agreement to be in a form reasonably acceptable to the Board of Directors, and

(ii) such other documents and instruments as are customarily entered into by stockholders of corporations entering into venture capital or similar transactions, in each case in the form customarily used for documents and instruments of similar nature in such transactions and otherwise reasonably acceptable to the Board of Directors.

(c) Power of Attorney.  Each Person which now or hereafter is a Member or other holder of the economic rights associated with an Interest, or serves as a Director of the Company, by execution of this Agreement, an amendment hereto or an instrument acknowledging that such person is bound hereby, irrevocably constitutes and appoints the Board of Directors and any person designated by the Board of Directors to act on that Person's behalf for the purposes of this Section 11.1, and each of them acting singly, such Person's true and lawful agent and attorney-in-fact with full power and authority in such Person's name, place and stead to execute, acknowledge, deliver, swear to, file and record at the appropriate public offices any and all agreements, instruments and other documents (including, without limitation, the organizational documents of the Continuing Corporation as contemplated by this Section 11.1, the agreements among the stockholders of the Continuing Corporation and/or the Continuing Corporation referred to in this Section 11.1, and instruments of assignment and transfer assigning the assets of the Company or the Members' respective Units or the holders' respective economic rights associated with an Interest, as the case may be, to the Continuing Corporation in order to effectuate such conversion as contemplated by Section 11.1) as are necessary or appropriate, in the reasonable opinion of the Board of Directors or such Person designated by it, to implement and effectuate the provisions of this Section 11.1, which power of attorney is hereby agreed and acknowledged to be irrevocable and coupled with an interest, in recognition of the fact that the Board of Directors will be relying upon the power of the Board of Directors or such Person designated by it to act as contemplated by this Section 11.1 in connection with the conversion of the Company into the Continuing Corporation and the other matters contemplated by this Section 11.1, and shall survive any death, retirement, resignation, withdrawal, expulsion, removal, bankruptcy, dissolution or adjudication of incompetence or insanity of any Member or holder of the economic rights associated with an Interest or Director until such time as the provisions of this Section 11.1 have been implemented and effectuated to the reasonable satisfaction of the Board of Directors or its relevant designee.

11.2    Initial Public Offering Prior to Conversion to Corporation.  Notwithstanding the foregoing provisions of Section 11.1, in the event that, the Company proposes to file a registration statement with the SEC for an initial public offering, then prior to the closing of such initial public offering and immediately prior to any conversion of the Company to one or more corporations as outlined in Section 11.1, all then-outstanding Units and economic rights associated with an Interest will, as determined by the Board of Directors, be exchanged for

CONFIDENTIAL

Common Stock or substantially equivalent securities in the Continuing Corporation in accordance with Section 11.1 as far in advance of such initial public offering as is practicable.

## ARTICLE XII
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Directors, the other Members, and the Company as follows:

12.1    Preexisting Relationship or Experience.  By reason of his, her or its business or financial experience, or by reason of the business or financial experience of his, her or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he, she or it is capable of evaluating the risks and merits of an investment in the Units and of protecting his, her or its own interests in connection with this investment.

12.2    Investment Intent.  He, she or it is acquiring the Units for investment purposes for his, her or its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Units. No other Person will have any direct or indirect beneficial interest in or right to the Units.

12.3    Accredited Investor.  He, she or it is an "accredited investor" as defined in Rule 501(a) promulgated by the Securities and Exchange Commission, or is otherwise eligible for exemption under such rules.

12.4    Purpose of Entity.  If an entity, it was not organized for the specific purpose of acquiring the Units.

12.5    Economic Risk.  He, she or it is financially able to bear the economic risk of an investment in the Units, including the total loss thereof.

12.6    No Registration of Units.  He, she or it acknowledges that the Units have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or qualified any applicable blue sky laws, in reliance, in part, on his, her or its representations, warranties, and agreements herein.

12.7    Investment in Restricted Security.  He, she or it understands that the Units are "restricted securities" under the Securities Act in that the Units will be acquired from the Company in a transaction not involving a public offering, and that the Units may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Units must be held indefinitely.

CONFIDENTIAL

12.8    No Obligations to Register.  He, she or it represents, warrants, and agrees that the Company and the Board of Directors are under no obligation to register or qualify the Units under the Securities Act or under any state securities law, or to assist her, him or it in complying with any exemption from registration and qualification.

12.9    No Disposition in Violation of Law.  Without limiting the representations set forth above, and without limiting Article VII of this Agreement, he, she or it will not make any disposition of all or any part of the Units which will result in the violation by her, him or it or by the Company of the Securities Act, the Delaware General Corporation Law, the Act, or any other applicable securities laws.  Without limiting the foregoing, he, she or it agrees not to make any disposition of all or any part of the Units unless and until he, she or it has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Board of Directors, he, she or it has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

12.10    Investment Risk.  He, she or it acknowledges that the Units are speculative investments which involve a substantial degree of risk of loss of an entire investment in the Company, that he, she or it understands and takes full cognizance of the risks related to the purchase of the Units, and that the Company is newly organized and has no financial or operating history.

12.11    Investment Experience.  He, she or it is an experienced investor in unregistered and restricted securities of limited liability companies.

12.12    Restrictions on Transferability.  He, she or it acknowledges that there are substantial restrictions on the transferability of the Units pursuant to this Agreement, that there is no public market for the Units and none is expected to develop, and that, accordingly, it may not be possible to liquidate his, her or its investment in the Company.

12.13    Information Reviewed.  He, she or it has received and reviewed this Agreement and the information it considers necessary or appropriate for deciding whether to purchase the Units.  He, she or it has relied only on the information contained in this Agreement in making its investment decision.

12.14    Tax Consequences.  He, she or it acknowledges that the tax consequences of investing in the Company will depend on its particular circumstances, and neither the Company, the Directors, the Members, nor the partners, shareholders, members, Directors, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to him, her or it of an investment in the Company.  He, she or it will look solely to, and rely upon, his, her or its own advisers with respect to the tax consequences of this investment.

12.15    No Assurance of Tax Benefits.  He, she or it acknowledges that there can be no assurance that the Code or the Treasury Regulations will not be amended or interpreted in the

4814-1837-3141.5                                                  CONFIDENTIAL

future in such a manner so as to deprive the Company and the Members of some or all of the tax benefits they might now receive nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service.

12.16   Indemnity.  He, she or it shall defend, indemnify and hold harmless the Company, each and every Director, each and every other Member, and any officers, directors, shareholders, Directors, members, employees, partners, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him, her or it including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the company, each and every Director, each and every other Member, and any officers, directors, shareholders, Directors, members, employees, partners, attorneys, accountants, agents, registered representatives, and control persons of any such Person (including attorneys' fees, judgments, fines and amounts paid in settlement, payable as incurred) incurred by such person in connection with such action, suit, proceeding, or the like.

## ARTICLE XIII
## MISCELLANEOUS

13.1   Counsel to the Company.  The Company has selected Wilson Sonsini Goodrich & Rosati, P.C. ("Company Counsel") as legal counsel to the Company. Each Member acknowledges that Company Counsel represents Stimwave Technologies Incorporated (who owns the originally issued Class C Units as of the Effective Date (the "Stimwave Member")) in certain matters; the Company and each Member waives any potential conflict of interest in this regard.  As such, in respect of the preparation of this Agreement, it is hereby disclosed that Company Counsel may advise the Stimwave Member with respect hereto, but does not represent any other Member in the absence of a clear and explicit written agreement to such effect between such Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to any such other Member.

13.2   Complete Agreement.  This Agreement and the Certificate constitute the complete and exclusive statement of agreement among the Members and Directors with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Directors or any of them.  No representation, statement, condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or Directors or have any force or effect whatsoever.  To the extent that any provision of the Certificate conflict with any provision of this Agreement, the Certificate shall control.

13.3   Binding Effect.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

CONFIDENTIAL

4814-1837-3141.5

13.4    <u>Parties in Interest</u>.    Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Directors and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

13.5    <u>Pronouns; Statutory References</u>. All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require.    Any reference to the Code, the Treasury Regulations, the Act, Delaware Act or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

13.6    <u>Headings</u>. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

13.7    <u>Interpretation</u>. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or its counsel.

13.8    <u>References to this Agreement</u>. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

13.9    <u>Jurisdiction</u>. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Delaware in any action on a claim between or among any of the Company, the Directors or the Members arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement.    Each Member further agrees that personal jurisdiction over it may be effected by service of process by registered or certified mail addressed as provided in Section 13.13 of this Agreement, and that when so made shall be as if served upon it personally within the State of Delaware.

13.10    <u>Exhibits</u>. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

13.11    <u>Severability</u>. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

13.12    <u>Additional Documents and Acts</u>. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

CONFIDENTIAL

13.13   Notices.  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile and email) and will be deemed to have been given and received when delivered to the address, facsimile number or email address specified by the party to receive the notice.  Such notices will be given to a Member or Director at the address, facsimile number or email address specified in Exhibit A, Exhibit B, Exhibit C or Exhibit D hereto.  Any party may, at any time by giving five business (5) days' prior written notice to the other parties, designate any other address, facsimile number and/or email address in substitution of the foregoing address, facsimile number and/or email address to which such notice will be given.

13.14   Amendments. All amendments to this Agreement shall be in writing and approved and executed by a Majority Interest of the outstanding Units, voting together as a single class; provided, however, that any amendment to Section 5.4(b)(i) of this Agreement shall also require the consent or approval of a Majority Interest of the outstanding Class A Units.  Any amendment executed in compliance with this Section shall be binding upon all Members whether or not such Member executed the amendment. Notwithstanding the foregoing, no amendment to this Agreement (including, but not limited to, any amendment to Sections 3.4, 3.9, or 4.2) may be made that (i) obligates a Member to make additional Capital Contributions, (ii) could cause any Member to be personally liable for any debt, obligation or liability of the Company, or (iii) could result in any Member incurring or becoming subject to, any personal obligation or liability with respect to the Company, without the prior written consent of any Member who is, or could be, affected thereby.

13.15   Confidentiality.  Each party to this Agreement agrees that, except with the prior written consent of the Company, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the Company to which such party has been or shall become privy, including without limitation by reason of this Agreement or such party's acquisition of Units, the due diligence or discussions relating to this Agreement and/or such party's acquisition of Units, the performance of such party's obligations pursuant to this Agreement and/or the ownership of the Units (so long as such information is not in the public domain or otherwise available from a third party without confidentiality restrictions).   The provisions of this Section 13.15 shall be in addition to, and not in substitution for, the provisions of any separate nondisclosure agreement executed by any of the parties to this Agreement. Subject to the obligations under any separate nondisclosure agreement, each party to this Agreement may disclose such proprietary or confidential information to any director, officer, employee, representative, agent, partner, subsidiary or parent of such party for the sole purpose of evaluating its investment in the Company as long as such director, officer, employee, representative, agent, partner, subsidiary or parent is advised of the confidentiality provisions of this Section 13.15.

13.16   Reliance on Authority of Person Signing Agreement.  Neither the Company nor any Member will be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual.

CONFIDENTIAL

4814-1837-3141.5

13.17   <u>No Interest in Company Property; Waiver of Action for Partition</u>. No Member has any interest in specific property of the Company.  Without limiting the foregoing, each Member irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

13.18   <u>Multiple Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

13.19   <u>Remedies Cumulative</u>. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

[Remainder of this page intentionally left blank]

CONFIDENTIAL

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Limited Liability Company Agreement of Micron Devices LLC, a Delaware limited liability company.

"MEMBERS"

For: _____

By: _____

Title: _____

Address: _____

_____

Fax: _____

Email: _____

Date: _____

Initial Capital Contribution: _____

Number and Class of Units:
[_____ Class A Units]
[_____ Class B Units]
[_____ Class C Units]


Signed:_____

CONFIDENTIAL

4814-1837-3141.5

## SPOUSAL CONSENT

The undersigned is the spouse of _____ and acknowledges that he/she has read the foregoing Agreement dated as of July 31st, 2013, and understands its provisions.  The undersigned hereby expressly approves of and agrees to be bound by the provisions of the Agreement in its entirety, including, but not limited to, those provisions relating to the sales and transfers of Membership Interests and the restrictions thereon. If the undersigned predeceases his/her spouse when his/her spouse owns any Membership Interest in the Company, he/she hereby agrees not to devise or bequeath whatever community property interest or quasi-community property interest he/she may have in the Company in contravention of the Agreement.

Dated as of: _____

By:_____

Name:_____

CONFIDENTIAL

4814-1837-3141.5

## EXHIBIT A: CLASS A MEMBERS

| Member | Address | Units | Capital |
|---|---|---|---|
| Laura Perryman | 16699 Collins Ave Apt 3003, Sunny Isles, FL 33160 | 2,111,111 | $21,111.11 |
| LSA Investors VIII, LLC | 1230 Bordeaux Drive, Sunnyvale, CA 94089 | 311,292 | $3,112.92 |
| Robert K. Anderson | 8070 N. Coconino Rd., Paradise Valley, AZ 85253 | 243,569 | $2,435.69 |
| Emergent Medical Partners LP | 205 South Drive, Suite 2, Mountain View CA 94040 | 211,632 | $2,116.32 |
| Yeung Family Trust | 5448 East Valle Vista Road, Phoenix AZ 85018 | 204,837 | $2,048.37 |
| Stephen Hochschuler, MD | 5239 E. Paradise Canyon Rd., Paradise Valley, AZ 85253 | 186,047 | $1,860.47 |
| BioAccel | 445 N Fifth Street, Suite 120, Phoenix, AZ 85004 | 174,294 | $1,742.94 |
| Stuart Essig, PhD | 311 Enterprise Drive, Plainsboro, NJ 08536 | 158,872 | $1,588.72 |
| Research Corporation Technologies | 5210 E. Williams Circle, Suite 240, Tucson AZ 85711 | 152,913 | $1,529.13 |
| Taube Investment Partners, LP | 1050 Ralston Ave, Belmont CA 94002 | 120,000 | $1,200.00 |
| Yuan Family Trust | 3692 Nelson's Walk, Naples, FL 34102 | 111,628 | $1,116.28 |
| Wilmington Investor Network, LLC | 1802 South Churchill Drive, Wilmington, NC 28403 | 108,333 | $1,083.33 |
| David Auth, PhD | 490 S. Beach Road, Hobe Sound, FL 33455 | 107,712 | $1,077.12 |
| Nancy L. Auth | 490 S. Beach Road, Hobe Sound, FL 33455 | 107,712 | $1,077.12 |
| NeuroStim LLC | | 100,000 | $1,000.00 |
| Tatyana Shine North | 1100 Copper Hill Road, Baltimore, MD 21209 | 86,169 | $861.69 |
| Robert Green | 11208 Greenbriar Preserve Lane, Potomac MD 20854 | 80,305 | $803.05 |
| Jacobson Family Trust | 5525 E Lincoln Dr., #112, Paradise Valley AZ 85253 | 72,171 | $721.71 |
| Patrick Larson | 8935 Froude Ave, Surfside FL 33154 | 70,000 | $700.00 |
| Ralph Rashbaum 5x5 Trust | 3508 Twin Lakes Way, Dallas TX 75093 | 69,947 | $699.47 |
| Les Zuckerman, MD | 75 Thomas Johnson Dr., Suite C, Frederick MD 21702 | 64,102 | $641.02 |
| Marc Loev, MD | 13609 Canal Vista Court, Potomac MD 20854 | 64,102 | $641.02 |
| David Mohler, MD | 450 Broadway St, MC 6342, Redwood City CA 94063 | 60,000 | $600.00 |
| Sunil Panchal, MD | 4911 Van Dyke Road, Lutz FL 33558 | 60,000 | $600.00 |
| Emergent Medical Associates LP | 205 S Drive, Suite 2, Mountain View CA 94040 | 57,236 | $572.36 |
| Chad Andresen | 860 N Shore Dr., Miami Beach FL 33141 | 50,000 | $500.00 |
| Aneesh Singla, MD | 5501 Lincoln St., Bethesda, MD 20817 | 48,868 | $488.68 |
| Richard Weiner, MD | 8230 Walnut Hill Lane, Suite 220, Dallas TX 75231 | 45,000 | $450.00 |
| Thomas Haider, MD | PO Box 8910, Rancho Santa Fe CA 92067 | 43,084 | $430.84 |
| Ali El-Mohandes, MD | 11248 Eastwood Dr., Hagerstown MD 21742 | 42,735 | $427.35 |
| Mark Hungerford, MD | 301 Saint Paul Street, Baltimore MD 21202 | 41,367 | $413.67 |
| Todd Lanman, MD | 2812 Paseo Del Mar, Palos Verdes Estates CA 90274 | 40,000 | $400.00 |
| Mark Coleman, MD | 10 Chris Eliot Court, Cockeysville MD 21030 | 37,000 | $370.00 |
| Akhil Jay and Roma Khanna, MD | 10725 Ardnave Place, Potomac, MD 20854 | 31,367 | $313.67 |
| Amir H. Fayyazi, MD | 234 Kristin Lane, Allentown PA 18104 | 29,049 | $290.49 |
| Michael Daly, MD | 1600 Crain Highway, # 301, Glen Burnie, MD 21061 | 25,641 | $256.41 |
| Andrej Simeunovic | 9850 North 73rd Street, #2059, Scottsdale AZ 85258 | 25,000 | $250.00 |
| Benjamin Speck | 19635 N Cave Creek Rd., #370, Phoenix AZ 85024 | 25,000 | $250.00 |
| Gary King, PhD | 1319 Hillcrest Drive NE, Fridley MN 55432-5827 | 25,000 | $250.00 |
| Elizabeth Greene | 1502 Jefferson Ave, 301, Miami Beach, FL 33139 | 25,000 | $250.00 |
| Wilson Sonsini Goodrich & Rosati | 650 Page Mill Road, Palo Alto CA 94304 | 23,256 | $232.56 |
| WS Investment Company, LLC | 650 Page Mill Road, Palo Alto CA 94304 | 21,542 | $215.42 |
| Abdul Shaheed Soudan, MD | 304 Kerneway, Baltimore MD 21212 | 21,094 | $210.94 |
| Richard Guyer, MD | 6020 W Parker Rd, #200, Plano TX 75093 | 20,781 | $207.81 |
| Jack Zigler, MD | 5612 Stone Cliff Court, Dallas TX 75287 | 20,781 | $207.81 |
| James J. Yue, MD | 50 Dover Court, Guilford, CT 06437 | 20,605 | $206.05 |
| Ajay Panchal | 101 Bridewell Street, Apt 119, Los Angeles CA 90042 | 20,000 | $200.00 |
| Graham Family Investments LLC | 10171 N Cliff Dweller Place, Tucson AZ 85737 | 13,298 | $132.98 |
| Shauket Sherali | | 12,205 | $122.05 |
| J. Casey McGlynn | 650 Page Mill Road, Palo Alto CA 94304 | 10,771 | $107.71 |
| Eric Boyd, MD | 6309 E Baywood Avenue, Mesa AZ 85206 | 10,000 | $100.00 |
| Carey-Walter Closson, MD | 5200 Harvey Lane, Ellicott City MD 21043 | 8,547 | $85.47 |
| Ali Chahlavi | 4533 Swilcan Bridge Lane N, Jacksonville FL 32224 | 8,000 | $80.00 |
| Usha Singla | 9117 Bowling Green Dr., Frederick MD 21704 | 5,000 | $50.00 |
| Anish Sharad Patel, MD | 14548 Edgewoods Way, Glenelg MD 21737 | 4,273 | $42.73 |
| Unallocated | | 111,757 | |
| | TOTAL | 5,960,005 | $58,482.28 |

## **EXHIBIT B**

### NAMES AND ADDRESSES OF CLASS B MEMBERS

| Member | Address | Units | Capital Contribution** |
|---|---|---|---|
| Laura Perryman | 16699 Collins Ave Apt 3003, Sunny Isles Beach FL 33160 | 6%* 447,000 | $2,235.00 |
| Patrick Larson | 8935 Froude Ave, Surfside FL 33154 | 5%* 372,500 | $1,241.67 |
| Chad Andersen | 860 N Shore Dr., Miami Beach FL 33141 | 1%* 74,500 | $248.33 |
| Unallocated | | 3%*223,500 | |
| | | 1,117,500 | $3,725.00 |

### Contributions

US Provisional Patent Application Serial Numbers:

(1) 61/786,069, filed March 14, 2013 and titled Wireless Implantable Power Receiver System and Methods
(2) 61/799,988, filed March 15, 2013 and titled Method, System and Apparatus for Remote Neural Modulation Brain Stimulation and Feedback Control
(3) 61/786,049, filed March 14, 2013 and titled Devices and Methods for Treating Inflammation, Chronic Pain and Other Disorders with Neuromodulation
(4) 61/786,098, filed March 14, 2013 and titled Miniature Implantable Lead and Methods
(5) 61/786,131, filed March 14, 2013 and titled Devices and Methods for Treating CranioFacial Pain
(6) 61/786,181, filed March 14, 2013 and titled Devices and Methods for Treating Urological Disorders
(7) 61/838,239, filed June 22, 2013 and titled Methods and Devices for the Selective Modulation of Excitable Tissue

*Subject to vesting requirements set forth in the applicable Employment Agreements.

**Agreed-upon value of Contributions detailed above in exchange for initial vested portion of Class B Units. [Laura is 2% (223,500 Units), Patrick is 1.67% (124,167 Units), Chad is .033% (24,833 Units)].

**EXHIBIT C**

ADDRESSES OF CLASS C MEMBERS
AS OF JULY 30th, 2013

| Member | Address | Units | Initial Capital Contribution |
|---|---|---|---|
| Stimwave Technologies Incorporated | 9375 Shea Blvd., Suite 147, Scottsdale, AZ 85260 | 5% 372,495 | $3,724.95 |

Contributions

License Agreement, dated July 31st, 2013 granting non-SCS IP rights to exploit the following:

Case 1.  "Neural Stimulator System" PCT/US2012/023029, USPTO US13/551/050

Case 2. "Implantable Lead" PCT/US2012/32200

Case 3.  "Remote Control of Power or Polarity Selection for a Neural Stimulator" PCT/US2012/023029, USPTO US 13/562,221

Case 4. "Microwave Field Stimulator" PCT/US12/50633, USPTO US13/584,618

Case 5.  "Relay Module for Implant" PCT/US12/55746, USPTO US13/621,530

Case 6. "Methods and Devices for Modulating Excitable Tissue of the Exiting Spinal Nerves" PCT/US13/897,427

Case 7. Provision Patent USPTO 61/733,867, filed December 5, 2012 and titled Direct Stimulator Connector Systems and Methods

Case 8. Provision Patent USPTO 61/745,952, filed December 26, 2012 and titled Wearable Antenna Assembly

**EXHIBIT D**

NAMES AND ADDRESSES OF DIRECTORS AS OF JULY 31st, 2013

(Class A Directors, 3 votes)
Mark Coleman
10 Chris Eliot Court
Cockeysville MD 21030

Bob Anderson
8070 N. Coconino Rd.
Paradise Valley AZ 85253

Laura Perryman
16699 Collins Ave, Apt 3003
Sunny Isles Beach, FL 33160

(Class B Directors, 1 vote)
TBD

(Industry Director, 1 vote)
TBD