

**ORDERED in the Southern District of Florida on May 20, 2021.**

Laurel M. Isicoff
Chief United States Bankruptcy Judge

_____

*Tagged Opinion*
*Do not publish*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                         Case No. 20-23359-LMI

MICRON DEVICES, LLC,                           Chapter 11

Debtor.

_____/

**ORDER GRANTING TRUSTEE'S MOTION FOR APPROVAL OF SETTLEMENT
AGREEMENT (ECF #234) AND APPROVING SETTLEMENT AGREEMENT**

  **THIS CAUSE** having come before the Court for evidentiary hearing on April

30, 2021 and May 7, 2021 (the "Evidentiary Hearing") upon the *Trustee's Motion*

*For Approval Of The Settlement Agreement Entered Into By The Subchapter V*

*Chapter 11 Trustee, Kennedy Lewis Investment Management, LLC And Stimwave Technologies, Inc.* (the "9019 Motion") (ECF #234) filed by Tarek Kiem, the Subchapter V Chapter 11 Trustee (the "Trustee"), pursuant to Fed. R. Bankr. P. Rule 9019, seeking approval of Settlement Agreement filed with the Court on April 20, 2021 (the "Settlement Agreement") (ECF #256, Trustee Ex. 2), as revised by the redlined modifications in the Trustee's Exhibit 56 and by the modifications announced on the record at the Evidentiary Hearing and reflected at the end of this Order.   The Court, having reviewed the 9019 Motion, Settlement Agreement, the Objections filed by Maryam Amiri, Brandyn J. Perryman, Patrick Larson, Marlene Pena, Ronald Perryman, Gary Perryman, Micron Medical Corporation ("MMC"), Luis Fernandez, Micron Devices, LLC ("Debtor"), and Cobalt Capital, LLC (ECF ##269, 270, 271, 272, 273, 274, 283, 289, 290, 291, 312, 317, 322) ("Objections"), all evidence admitted by the Court at the Evidentiary Hearing, including the Declaration of the Trustee ("Trustee Dec.") (ECF #310) and Supplemental Declaration of the Trustee[1] ("Trustee Suppl. Dec.") (ECF #321), the Declaration of Jeff Goldberg ("Goldberg Dec.") (ECF #300), the Certification of the Records Custodian of Stimwave Technologies Inc. (ECF #301), the Declaration of David Kho ("Kho Dec.") (ECF #299), the Exhibits 1-62 submitted by the Trustee ("Trustee Ex.") (ECF ##302, 303, 304, 305, 306, 307, 308, 309, 320), the Exhibits 1, 2, and 20 submitted by the Debtor ("Debtor Ex.") (ECF ##356, 361) the Exhibits 2-4, 6-9, 11, 19-26, and 27-29 submitted by MMC ("MMC Ex.") (ECF ##315, 355), the live testimony of the Trustee, Jeff Goldberg, David Kho, Sanjay

---

[1] The Supplemental Declaration of the Trustee was admitted with the exception of the paragraphs 25 through 42, which related to the Trustee's Exhibits 63 and 64, which were excluded from evidence.

Gupta, Pamela Beidleman, and Brandyn Perryman, and all arguments presented by the parties, and having taken judicial notice of the procedural record and all pleadings filed in this proceeding, pursuant to Fed. R. Bankr. P. 7052, makes the following findings of fact and conclusions of law in support of the Court **GRANTING** the 9019 Motion and **OVERRULING** the Objections.[2]

## FINDINGS OF FACT

### Procedural History of the Bankruptcy Proceedings

A.    On December 7, 2020 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") for relief under subchapter V of chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida.  (ECF #1.)

B.    Laura Perryman, the Debtor's majority shareholder executed the Petition, Schedules, and Statement of Financial Affairs on behalf of the Debtor as the Debtor's Manager. (ECF #1 at 4, 6.)  Laura Perryman managed and controlled the Debtor from the Petition Date through at least March 6, 2021. (Trustee Dec. ¶11.)

C.    On February 19, 2021, the Court entered an *Order to Show Cause Why Debtor Should Not Be Removed as Debtor-In-Possession and Setting Hearing* ("Order to Show Cause").  (ECF #180.) The Order to Show Cause noted that there were "disputes as to who is in charge of the Debtor, concerns regarding alleged

---

[2] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

interference by the co-founder/majority shareholder, and concerns about the majority shareholder taking action *ultra vires.*"

      D.     On March 8, 2021, following a hearing, the Court entered an *Order Removing the Debtor-in-Possession and Expanding the Powers of Subchapter V Trustee.* (ECF #206.)

      E.     Subsequently, the Trustee took over operating the business of the Debtor and possession of all property of the Debtor's estate. (Trustee Dec. ¶15.)

      F.     The 9019 Motion and *Order Setting Evidentiary Hearing* (ECF #235) were served on all creditors of the Debtor's estate, all counter-parties to executory contracts with the Debtor, all current and former directors of the Debtor, all current and former Managers of the Debtor, all of the Debtor's employees, all holders of equity in Stimwave and the Debtor, and any interested party eligible for notice pursuant to the Court's CM/ECF system. (ECF ##238, 239.)

**The Trustee's Assessment of the Debtor's Business and the Settlement Agreement**

      G.     Upon his appointment, the Trustee examined the Debtor's business records. (Trustee Dec. ¶20.) The Debtor's accounting records reflect that during the approximately one-year prepetition period the Debtor operated at a net loss on a cash basis of $591,110. (Trustee Dec. ¶54.) The Trustee concluded that, absent the Court's approval of the Settlement Agreement, the Debtor will likely become administratively insolvent and this chapter 11 case could be converted to a chapter 7 liquidation. (Trustee Dec. ¶¶48, 50, 55.) If the Settlement Agreement is not approved, the Debtor's continued operations would generate a

negative cash flow and the Trustee concluded that ceasing Debtor's operations is in the best interests of creditors. (Trustee Dec. ¶¶55-56.)

H.    The Trustee acknowledged the existence of a Micron Devices LLC Manufacturing Agreement with MMC (the "Manufacturing Agreement") (MMC Ex. 6.) dated January 1, 2020. The Manufacturing Agreement was not listed as an executory contract on the Debtor's schedules. (ECF #1 at 30.) The Trustee testified that he was concerned about the validity of the Manufacturing Agreement and that he did not thoroughly review the agreement, but his understanding was that the agreement was supposed to provide inventory to MMC. (Tr. of April 30,2021 Hearing at 97 (ECF #381.)) The Trustee also acknowledged the existence of a Master Services Agreement between the Debtor and MMC (the "Services Agreement") (MMC Ex. 2.) dated January 1, 2020. The Services Agreement was listed as an executory contract on the Debtor's schedules. (ECF #1 at 30.)

I.    Neither the Manufacturing Agreement nor the Services Agreement has been rejected or assumed by the Trustee, although MMC filed an *Expedited Motion to Compel Assumption of the Manufacturing Agreement and the Services Agreement* (ECF #389) (the "Emergency Assumption Motion") on May 18, 2019. The Court has not ruled on the Emergency Assumption Motion. However, the relief sought will be moot in light of this ruling.

J.    The Trustee testified that the proposed payment by Stimwave of $1,000,000 (the "Settlement Payment"), coupled with the consensual subordination of all KLIM and Stimwave claims provided for in the Settlement Agreement, would be sufficient to fund payment in full of administrative and

priority claims and to make a meaningful distribution to allowed unsecured creditors. (Trustee Dec. ¶49.) Based on his reasoned business judgment, the Trustee has made a determination that the Settlement Agreement provides a certain and prompt recovery for creditors and he recommends its approval. (Trustee Dec. ¶61.)

## **Alternatives to Settlement**

K.      The Debtor filed its Subchapter V plan on March 4, 2021 (ECF #196) (the "Plan"). At a status conference held prior to the hearing on the 9019 Motion, the Debtor advised the Court that it was not proceeding to confirmation of the Plan until after the Court ruled on the 9019 Motion.

L.      On April 28, 2021 the Debtor filed its *Motion, Pursuant to Sections 105(a), 349(b) and 1112(b) of the Bankruptcy Code, for Entry of an Order (a) Approving Procedures for the Distribution of Assets to Administrative and Undisputed General Unsecured Creditors; (b) Voluntary Dismissal of the Debtors [sic] Chapter 11 Case and (c) Granting Related Relief* (ECF #311) (the "First Motion to Dismiss"). The Court denied that motion by Order dated May 4, 2021. (ECF #343.)

M.      On May 6, 2021, the Debtor filed its *Motion, Pursuant to Sections 105(a), 349(b) and 1112(b) of the Bankruptcy Code, for Entry of an Order (a) Approving Procedures for the Distribution of Assets to Administrative and Undisputed General Unsecured Creditors; (b) Voluntary Dismissal of the Debtors [sic] Chapter 11 Case and (c) Granting Related Relief* (ECF #368) (the "Second Motion to Dismiss" and together with the First Motion to Dismiss the "Motions

to Dismiss"). In the Second Motion to Dismiss the Debtor stated as one of the "causes" for dismissal that "the Debtor cannot confirm or consummate a Chapter 11 plan." The Court denied the Second Motion to Dismiss by Order dated May 14, 2021. (ECF #384.)

N.      On April 21, 2021, an entity called MidAtlantic Medical Association, Inc. ("MidAtlantic") submitted a letter to the Trustee that expressed an interest in negotiating with the Trustee for the purchase of Debtor's assets and liabilities for $1,750,000 (the "MidAtlantic Letter"). The MidAtlantic Letter was admitted into evidence as Debtor's Exhibit 1. The $1,750,000 has been deposited in the trust account of attorney Adam Skolnick, who represents MMC as well as MidAtlantic in this case.

O.      Another entity called "Cobalt Capital, LLC" made a written offer to the Trustee that expressed an interest in purchasing the Debtor's assets free and clear of all liabilities for $2,000,000. (Tr. of April 30,2021 Hearing at 95:18-22 (ECF #381.)) That offer was not filed with the Court or submitted as evidence at the Evidentiary Hearing by the Debtor or MMC.

P.      The Trustee testified that he had phone conversations with several other parties about a possible purchase of the Debtor's assets. Laura Perryman arranged for several of the calls and attended some but not all of the calls. However, the Trustee testified, none of those calls resulted in any written offers being submitted.[3]

---

[3] Debtor's counsel claims she knew nothing about either the MidAtlantic Letter or the Cobalt offer because the Trustee did not tell her about either. It is for this reason that the Court gave the Debtor the opportunity to file additional exhibits and witnesses with respect to the "best interests" portion of the *Justice Oaks* test to be considered at the second day of the Evidentiary Hearing. However, the Court finds it was reasonable for the Trustee to assume Debtor's counsel

**The Transfer Agreements**

Q.      The Debtor and Stimwave Technologies Inc. ("Stimwave") are former affiliates.  (Trustee Ex. 41, 301:24-25.)  Laura Perryman formerly served as the Manager of the Debtor.  (Trustee Ex. 24 at 19.)  Ms. Perryman also served as Chief Executive Officer of Stimwave and separated from Stimwave in November 2019.  (Goldberg Dec. ¶27; Kho Dec. ¶26.)

R.      Between March 2018 and January 2019, the Debtor entered into a series of agreements with Stimwave pursuant to which the Debtor transferred or assigned shares it owned in a related entity and certain intellectual property, including but not limited to licenses, patents, and certain other contractual rights  (the "Assigned IP"), to Stimwave (the "Transfer Agreements"), as follows:

i.      Contribution Agreement: The Debtor contributed its ownership interests (the "StimQ Equity") in StimQ Medical LLC ("StimQ") to Stimwave via the Stimwave Technologies Incorporated Contribution Agreement dated as of March 25, 2018 (the "Contribution Agreement"). (Trustee Ex. 3.)  Laura Perryman executed the Contribution Agreement on behalf of both the Debtor and Stimwave.  (Trustee Ex. 3.)

ii.      License Assignment Agreement.  The Debtor assigned all its duties, liabilities and obligations under certain licenses to Stimwave pursuant to the Assignment and Assumption Agreement dated as of October 13, 2018 (the "License Assignment Agreement").  (Trustee Ex. 4.)  Mark Coleman, a director, executed the License Assignment Agreement on behalf of the Debtor, and Ms. Perryman executed it on behalf of Stimwave.   (Trustee Ex. 4.)

---

knew about the offers due to counsel's day to day contact with Laura Perryman and the fact that Debtor's counsel was working with counsel for MidAtlantic, who also represents MMC, on a daily basis in connection with the 9019 Motion and other matters. As for Debtor's counsel's argument that had she known about the MidAtlantic Letter sooner she could have negotiated a better deal, the Court notes that Dr. Gupta, MidAtlantic's principal, has been involved with this case from the beginning, and may or may not have been a director of the Debtor when the case was filed (another of Ms. Perryman's possibly *ultra vires* acts), and both counsel and Ms. Perryman had every opportunity to negotiate any deal with Dr. Gupta well before the MidAtlantic Letter was sent to Trustee's counsel.

iii.  Patent Assignment Agreement.  The Debtor assigned certain patents and inventions to Stimwave pursuant to the Patent Assignment, dated as of November 6, 2018 (the "Patent Assignment Agreement").  (Trustee Ex. 5.)  Laura Perryman executed the Patent Assignment on behalf of both the Debtor and Stimwave.  (Trustee Ex. 5.)

iv.  Epimed Assignment Agreement.  The Debtor assigned to Stimwave all of its rights under a contract with Epimed International, Inc. (the "Epimed Contract") pursuant to the Epimed Assignment Agreement dated as of January 23, 2019 (the "Epimed Assignment Agreement," and together with the License Assignment Agreement and Patent Assignment Agreement, the "IP Assignment Agreements").  (Trustee Ex. 6.)  Mark Coleman, a director, executed the Epimed Assignment Agreement on behalf of the Debtor, and Ms. Perryman executed it on behalf of Stimwave.  (Trustee Ex. 6 at 4.)

S.  At Stimwave's board meeting on February 22, 2018, Laura Perryman proposed that she and Debtor could contribute their respective ownership interests in StimQ Medical LLC to Stimwave for no consideration "on the premise that she and the holders of Micron Devices already have equity [sic] interests in the Company [Stimwave] and such contribution was expected not to have an impact for tax purposes." (Trustee Ex. 15 at 1.) The Stimwave board authorized going forward with the contribution. (Trustee Ex. 15) (the "Contribution Board Resolution").  Three of the members of the Stimwave board were also members of the Debtor's board. (Trustee Ex. 15.) There is nothing in the record to indicate whether the Debtor's Board of Directors approved the Contribution Agreement. However, the Contribution Agreement recites that the contribution is for no consideration, and "qualifies under the appropriate provision of the Internal Revenue Code of 1986, as amended (the "Code"), as a tax free capital contribution."

T.    The Debtor's Board of Directors authorized the IP Assignment Agreements pursuant to an Action by Written Consent executed on October 13, 2018 (Trustee Ex. 7.) (the "IP Board Consent").

U.    No one has disputed the validity of the Transfer Agreements. On May 3, 2021, Laura Perryman, in her *Objection to Stimwave Motion in Limine to Preclude Testimony* (ECF #337), wrote that she had previously testified under oath as to the validity of her signature on the Transfer Agreements and that "[t]hese documents were attested to as accurate in the Delaware Chancery Court proceeding trial." The basis for contesting the validity of the transfers is the lack of approval by the members of the Debtor or lack of prior consent of the Debtor's board of directors allegedly in violation of  The Limited Liability Company Agreement for Micron Devices LLC (the "LLC Agreement") (Trustee Ex. 24). *See* The Declaratory Judgement Action (defined *infra*).

V.    The LLC Agreement requires an affirmative vote or written consent of a majority of the outstanding interests (greater than 50%) with respect to any "action that would constitute a Liquidation Event." (the "Member Approval Requirement") (LLC Agreement, 5.4(b).)  A Liquidation Event is defined as "(a) a liquidation, dissolution or winding up of the Company; (b) a sale of all or substantially all of the assets of the Company; or (c) a merger or consolidation of the Company into another entity in which the Members of the Company retain less than a majority of the voting control of the surviving entity." (LLC Agreement, 1.26.)

W.    Section 5.4(a) of the LLC Agreement states that, without the prior consent of the Board of Directors, the Manager shall not "enter into any corporate

strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $50,000."(the "Board Approval Requirement").

X.    At the time of and following the execution of the Transfer Agreements, there was significant overlap between the ownership of the Debtor and Stimwave. (Trustee Exs. 8, 9, 13, 14, 16, 17, and 18; Goldberg Dec. ¶19.)

Y.    Following the execution of the Transfer Agreements, Laura Perryman filed a cancellation of the Debtor's active status with the Delaware Secretary of State on December 28, 2018 (the "Certificate of Cancellation"). (Trustee Ex. 10.)  The Debtor closed its only bank account in July 2019. The Debtor also filed its 2018 federal income tax return indicating that the 2018 return was a final return, and sent each of its members final K-1s indicating the 2018 federal income tax return was the final return for the Debtor. There is nothing in the Debtor's records to indicate that any shareholder raised any concerns or objections after receiving the final K-1. (Trustee Dec. ¶38(d); Trustee Exs. 8, 13; ECF #1 at 39.)[4]

**<u>The Kennedy Lewis Loan</u>**

Z.    On May 13, 2019, Stimwave entered into a loan and security agreement (the "LSA") with Kennedy Lewis Investment Management LLC ("KLIM") under which KLIM received a first-priority lien on and a security interest in Stimwave's personal property, including the StimQ Equity and the Assigned IP.

---

[4] The Debtor prepared, and may or may not have filed, a new 2018 tax return sometime in early 2020. (Trustee Ex. 14; Trustee Ex. 41 at 27-28.)

In the course of negotiations, and in the LSA and documents and agreements executed in conjunction therewith, Laura Perryman, on behalf of Stimwave, made numerous representations as to Stimwave's ownership of the Assigned IP and StimQ Equity.  (Trustee Ex. 20 at 3; Ex. A; 4.1, 5.2; Trustee Exs. 21, 22; Kho Dec. ¶¶19, 20.) Laura Perryman executed the KLIM loan documents on behalf of Stimwave in her then-capacity as CEO.  (Trustee Ex. 20, 21, 22; Kho Dec. ¶¶19, 20, 21.)

AA.    KLIM negotiated and executed the LSA at arm's length and in good faith.  (Kho Dec. ¶23; Goldberg Dec. ¶26.)  KLIM entered into the LSA in reliance upon Laura Perryman's representations regarding the Assigned IP and StimQ Equity, among other things, and the documentation she provided.  (Kho Dec. ¶23, Trustee Ex. 29, 30.)  At the time the LSA was executed and the perfection of all liens granted pursuant to the LSA, KLIM had no knowledge that any legal or factual basis existed, or was claimed to exist, to avoid the Debtor's transfers of the StimQ Equity or Assigned IP to Stimwave.  (Kho Dec. ¶25.)

**Laura Perryman Separates from Stimwave and Seeks to Revive Debtor**

BB.    In the fall of 2019, Laura Perryman was placed on administrative leave by the Stimwave board.  Ms. Perryman resigned as Stimwave's CEO on November 25, 2019, hours before a meeting at which her continued employment was going to be discussed. (Goldberg Dec. ¶27.)

CC.    Subsequent to Ms. Perryman's resignation, on November 25, 2021, she filed a Certificate of Correction of the Certificate of Cancellation in which

Ms. Perryman stated, "Due to clerical error, the entity was voluntarily cancelled when it should not have been." (Trustee Ex. 23.)

## The Adversary Proceedings and Stimwave's and KLIM's Claims

DD.    Beginning in December 2019, Stimwave sued the Debtor and Laura Perryman in connection with, among other things, confirming the effectiveness of the Transfer Agreements, the ownership and use of the Assigned IP and the StimQ Equity, and the inclusion of those assets as KLIM's loan collateral (the "Prepetition Litigation").[5]  *See Stimwave Tech., Inc. v. Micron Devices, LLC*, No. 2019-1003-SG (Del. Ch. 2019) (the "Delaware Action").  The Debtor and Laura Perryman filed counterclaims and third-party claims in the Delaware Action, including third-party claims against KLIM.  (Goldberg Dec. ¶30.)  The Delaware Action was set for trial in January 2021.[6]  (Goldberg Dec. ¶30.)

EE.    The Debtor commenced two adversary proceedings against Stimwave (the "Adversary Proceedings" and collectively with the Prepetition Litigation, the "Litigation Matters").  In Case Number 21-01033-LMI (the "Turnover Action"), the Debtor seeks, *inter alia*, turnover of funds that it claims Stimwave owes the Debtor, totaling $4,479,928.27 (consisting of $1,081,405.16 owed by Stimwave and the remainder owed by Stimwave's affiliates). In Case Number 21-01034-LMI (the "Declaratory Judgment Action"), the Debtor seeks, *inter alia*, a declaratory judgment that the Contribution Agreement, License Assignment Agreement, and the Patent Assignment Agreement were null and

---

[5] For a detailed summary of the Prepetition Litigation, see allegations in ECF ##27 and 45.
[6] Following the Debtor's petition for bankruptcy protection, the Delaware Action was removed to the United States District Court for the District of Delaware.

void *ab initio,* and for related monetary relief.[7]   KLIM intervened in the Declaratory Judgment Action. (Declaratory Judgment Action, ECF ##8, 19.) On April 26, 2021, Stimwave and KLIM filed answers, affirmative defenses, and counterclaims in the Declaratory Judgment Action. (Declaratory Judgment Action, ECF ##40, 42.)

FF.   Stimwave has asserted general unsecured claims against the Debtor's estate in the amounts of $67,929.07, $3,772,073.00, and $3,042,158.28.  *See* Claim Nos. 18-1, 19-2, 20-2. (Trustee Exs. 43, 44, 35.) Stimwave also has an allowed administrative claim against the Debtor's estate in an amount to be determined by the Court. (ECF #163; Trustee Ex. 48 ¶¶5-7; ECF #157 ¶3.)

GG.   KLIM has asserted general unsecured claims against the Debtor based on fraudulent inducement, *see* Claim No. 23-1, as well as contingent secured claims against the Debtor that exceed $20,000,000, *see* Claim No. 22-3, KLIM also has an allowed administrative claim against the Debtor's estate in an amount to be determined by the Court. (ECF #163; Trustee Ex. 48 at ¶¶5-7; ECF #174 ¶3.)

HH.   The Debtor has filed objections to the Stimwave filed claims and the KLIM filed claims. (ECF ##329, 330, 358, 360). The basis for the Debtor's objection to the Stimwave claims is that the Transferred Assets were conveyed without the proper authority of Debtor. The basis for the Debtor's objection to

---

[7] The Declaratory Judgment Action did not seek a declaratory judgment as to the Epimed Assignment.  However, the validity of the Epimed Assignment was a subject of the declaratory judgment sought by Stimwave, and contested by Debtor, in Delaware Action. (Goldberg Dec. ¶32, n. 6.)

the KLIM claims is, with respect to the unsecured claims based on fraudulent inducement, that the signatory to the LSA Agreement is Stimwave, not the Debtor and so any obligation is not an obligation of the Debtor; and with respect to the contingent secured claim, is that there was no transfer of the assets claimed as collateral by KLIM and that KLIM's reliance of any misrepresentations made by Stimwave or Laura Perryman rests squarely with those parties and not with the Debtor.

**The Trustee's Conclusions Supporting the Settlement**

II.    The Trustee has concluded that it is highly uncertain whether the Debtor could prevail on the merits of the Litigation Matters, including any Prepetition Litigation forming the basis of the Settled Claims.  (Trustee Dec. ¶35.)

JJ.    The Trustee has concluded that the ability of the Debtor's estate to collect on any monetary judgment from Stimwave in the Turnover Action is uncertain, given the claimed lien of KLIM on the property subject to the Transfer Agreements, and the likelihood that the Debtor's estate would need to satisfy all of KLIM's secured claims and all administrative expense claims prior to realizing any net benefit for creditors of the Debtor's estate.  (Trustee Dec. ¶40.)

KK.    The Trustee has concluded that the ability of the Debtor's estate to realize a net benefit from the Declaratory Judgment Action will be affected by the likelihood of claims in favor of KLIM and Stimwave resulting from, among other barriers described in the declaration, the representations made by Laura Perryman in the various Transfer Agreements which are directly inconsistent with the allegations of the Debtor, and Laura Perryman's assertion of her Fifth

Amendment right against self-incrimination with respect to everything relating to these claims. (Trustee Dec. ¶¶38(e), 42.)

LL.    The Trustee has testified that the Settled Claims, as defined by the 9019 Motion, are deeply complex in nature, involve significant factual disputes dating as far back as 2013, and require resolution of legal issues spanning corporate governance, contract, tort and intellectual property law. (Trustee Dec. ¶44.) The Trustee has further concluded that adjudication of the Settled Claims would require substantial efforts and expense by the parties to complete discovery, develop their claims and defenses, and prepare for trial. (Trustee Dec. ¶45.)

MM.   With the exception of the claims alleged by Stimwave and KLIM against the Debtor's estate, there do not exist any recorded encumbrances against any property of the Debtor's estate. (Trustee Dec. ¶31; Debtor's Schedules (ECF #1); Trustee Exs. 31, 32, 33, 34, 39, 40.)

NN.    No party has appeared in this case alleging an encumbrance against property of the Debtor's estate. (Trustee Exs. 31, 32, 33, and 34.)

OO.    A public records search reflects that there are no liens in the Palm Beach, Miami Dade or Broward Counties, the state of Florida, the state of Delaware, or the United States Patent and Trademark Office. (Trustee Exs. 39, 40.)

## CONCLUSIONS OF LAW

1.      The Bankruptcy Court has jurisdiction over this motion pursuant to 28 U.S.C. §§157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§1408 and 1409.

3.      The statutory and legal predicates for the relief granted herein are sections 105(a), 363(b), and 365 of the Bankruptcy Code, Bankruptcy Rule 9019(a) and Local Rule 9019-1(A).

4.      Pursuant to Fed. R. Bankr. P. 2002, 6004, 6006, and 9019, the parties to the Settlement Agreement have complied with all notice requirements, which constitutes good and adequate notice, and no further notice is necessary.

5.      The Subchapter V Chapter 11 Trustee has authority to file and prosecute the 9019 Motion pursuant to Fed. R. Bank P. 9019, 6009 and 28 U.S.C. §§323, 1183(b)(5).


## The Settlement Agreement Meets the Standard for Approval

6.      A compromise or settlement under Bankruptcy Rule 9019 must be fair, equitable, reasonable, and in the interests of the debtor's estate. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968); *In re Se. Banking Corp.,* 314 B.R. 250, 272 (Bankr. S.D. Fla. 2004).  A proposed settlement will be approved unless it "fall[s] below the lowest point in the range of reasonableness. *See, e.g., Martin v. Pahiakos (In re Martin),* 490 F.3d 1272, 1274 (11th Cir. 2007); *In re Arrow Air, Inc.,* 85 B.R.

886, 891 (Bankr. S.D. Fla. 1988).   In considering a proposed settlement, the bankruptcy court "may certainly give weight to the trustee's informed judgment that a compromise is fair and equitable." *In re S & I Investments,* 421 B.R. 569, 584 (Bankr. S.D. Fla. 2009).

7.     A trustee exercises sound business judgment when he evaluates "the strength and weaknesses of the potential claims and the cost and time it would take to litigate the claims." *See United States v. Hartog (In re Exporther Bonded Corp.),* 597 B.R. 673, 679 (S.D. Fla. 2019), *appeal dismissed sub nom. In re Exp. Bonded Corp.,* No. 19-11937-FF, 2019 WL 4137769 (11th Cir. July 15, 2019).

8.     In measuring whether the Trustee's business judgment has been appropriately exercised, the Court must consider the following factors: (i) the probability of success in litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved and the expense, inconvenience, and delay attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. *Wallace v. Justice Oaks II, Ltd. (In re Justice Oaks, II, Ltd.),* 898 F.2d 1544, 1549 (11th Cir. 1990).

9.     "[P]ublic policy strongly favors pretrial settlement in all types of litigation because such cases, depending on their complexity, [like the Adversary Proceedings] 'can occupy a court's docket for years on end, depleting the resources of parties and the taxpayers while rendering meaningful relief increasingly elusive.'" *Shearson Lehman Brothers, Inc. v. Munford, Inc. (In re*

*Munford, Inc.)*, 97 F.3d 449, 455 (11th Cir. 1996) (quoting *U.S. Oil & Gas v. Wolfson,* 967 F.2d 489, 493 (11th Cir. 1992)).

10.    Based on the findings of fact set forth herein, the Court concludes that the arguments, representations, proffers, and other evidence introduced in support of the 9019 Motion at the Evidentiary Hearing support and warrant the conclusions of law that the Settlement Agreement is an appropriate exercise of the Trustee's business judgment, as it falls well above the lowest point in the range of reasonableness, and also meets the standards set out in *In re Justice Oaks II, Ltd.*, 898 F.2d at 1549.

11.    <u>Probability of Success</u>.    The Court finds that the probability of success on the litigation in the Turnover Action and the Declaratory Judgment Action is highly uncertain at best, based on the Court's review of the evidence and applicable Delaware law.  The Court finds the Trustee's reasoning is a sound analysis of the challenges to success.   The Court cannot ignore that the key witness for the Debtor in all the Litigation Matters, and any objection to claims, is Laura Perryman. Yet Ms. Perryman has asserted her Fifth Amendment right against self-incrimination with respect to every element of any claims or defenses the Debtor might assert. Thus, regardless of any of those claims or defenses are actually viable, the Debtor would be unable to put on an effective case. *See SEC v. Zimmerman*, 854 F. Supp. 896, 899 (N.D. Ga. 1993) (citing *McGahee v. Massey*, 667 F.2d 1357, 1362 (11th Cir. 1982); *In re Edmond*, 934 F.2d 1304, 1308 (4th Cir. 1991)).

12.    <u>Difficulties in Collection</u>.    This factor is not as compelling with respect to approval of the Settlement Agreement.  The Court finds that the ability

of the Debtor's estate to collect on any monetary judgment from Stimwave in the Turnover Action could be problematic, given the claimed lien of KLIM on the property subject to the Transfer Agreements. Jeff Goldberg testified that, if the Settlement Agreement is not approved, Stimwave will continue to litigate this issue because "resolution of the dispute regarding the Transfer Agreements is critical to Stimwave's going concern value." (Goldberg Dec. ¶34.) The Litigation Matters are certainly expensive[8] and have clearly been a financial drain on the Debtor.  Thus, it is fair for the Trustee to assume that collection, even if the Trustee were able to overcome the evidentiary hurdles, might be at least problematic.

13.    <u>Complexity of the Litigation</u>.  The Court finds that the Litigation Matters are complex in nature by virtue of significant factual disputes exacerbated by serious discovery violations[9], and require resolution of legal issues spanning corporate governance, contract, tort, and intellectual property law.

14.    <u>Paramount Interest of the Creditors</u>. Several creditors support the 9019 Motion.  The Debtor has argued that the Court should not consider the support for the 9019 Motion by Stimwave or KLIM, both of whom are disputed creditors by virtue of objections filed by the Debtor and not impartial, or the support for the settlement by creditor Stryker Corporation, another creditor to

---

[8] Prepetition litigation attorneys' fees and costs are at least $3,042,158.28 (Claim No. 20-2, page 6).

[9] *See* Final Report and Recommendation of the Special Discovery Master Concerning Motions Directed to Represented Defs, *Stimwave Tech. Inc. v. Laura Tyler Perryman et al.,* Case No. 2019-1003-SG (Del. Ch. Nov. 6, 2020), *as adopted by* Order Adopting Report and Recommendations, *Stimwave Tech. Inc. v. Laura Tyler Perryman et al.,* Case No. 2019-1003-SG (Del. Ch. Nov. 20, 2020). The Delaware court's order is attached as Exhibit H to ECF #45.

whose claim the Debtor has filed an objection (ECF #350). However, while there may be times that a court might disregard or discount the support of disputed creditors, the Debtor did not cite to any authority, or any persuasive facts that would support the Court disregarding these creditors in this case.[10]

15.    Moreover, the creditors whose interests this Court must consider include the administrative creditors, including the landlord, the Subchapter V Trustee and his professionals. *See In re Vazquez*, 325 B.R. 30, 41 (Bankr. S.D. Fla. 2005).

16.    Since the Debtor has acknowledged that it cannot proceed with a confirmable plan, the only other option is dismissal.[11]  For the reasons previously cited by the Court at the Evidentiary Hearing, as evidenced by the two orders denying the two last minute Motions to Dismiss - the "structured dismissals" the Debtor has asked for, first directly and then indirectly - would not pass muster under *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017). Thus, if this case were dismissed it would have to be a straight dismissal.  The Court finds that,

---

[10] Debtor's counsel has argued that this Court cannot rule on the 9019 Motion without first adjudicating the Debtor's objections to the Stimwave and KLIM claims.  However, as the Court explained to Debtor's counsel at the Evidentiary Hearing, the very nature of compromise considers that there are unresolved issues that are being compromised.  Moreover, the bases of the Debtor's objections are the issues that are being resolved in the Settlement Agreement. "In approving the settlement agreement, the Bankruptcy Court did not have to rest its approval upon a resolution of the ultimate factual issues underlying the disputes that are compromised." *U.S. v. Hartog*, 597 B.R. at 679.  Finally, the Court notes the Debtor waited to file the objections until April 30, 2021, the same day as the first day of the Evidentiary Hearing.

[11] The Debtor had every opportunity both before and after the 9019 Motion was filed to file an amended plan that included an exit strategy the incorporated MidAtlantic's offer, subject to higher and better bids.  But, putting aside the confirmability of such a plan, the Debtor never did so.  Moreover, every other exit strategy motion filed by the Debtor, including the two Motions to Dismiss (ECF ##311, 368) and the motion to sell free and clear of liens (ECF #364), were filed at the last minute, literally on the eve of the Evidentiary Hearing.  Thus, the Court finds that the Debtor has only filed these motions for the purpose of seeking to delay adjudication of the 9019 Motion and not with the good faith intention to put forth a viable alternative.  Indeed, the Court gave the Debtor a full week to put together a case on the "best interests" element and the Debtor's presentation fell well short of demonstrating to this trier of fact that the Trustee's business judgment was unreasonable on this point.

even if, after dismissal, MidAtlantic went through with an offer, at a minimum the administrative claimants would probably not get paid.  There is nothing this Debtor has done that would lead this Court to believe that the Debtor would honor any financial commitment, and certainly not to the Trustee or his professionals, regardless of whether the Debtor was legally obligated to do so.

17.    The MidAtlantic offer does not offer a viable solution for the Trustee if the case was not dismissed.  The sale had no details other than money in a trust account. While Dr. Gupta, the principal of MidAtlantic, is clearly a passionate doctor, with very legitimate reasons for wanting to pursue the success of the Moventis product[12], that is not relevant to the criteria either the Trustee or the Court must consider. The MidAtlantic offer contemplates a further negotiating period; it does not specify the additional terms upon which it is conditioned; it does not contemplate any good faith deposit; it does not specify what assets of the Debtor MidAtlantic seeks to purchase or the process by which the sale would take place. Moreover, the MidAtlantic offer proposes to pay certain creditors while not paying or reserving for all creditors' claims which is not authorized by the Bankruptcy Code, does not specify how or by whom the existing litigation would be funded (although Dr. Gupta testified he would fund the litigation with his personal money if need be), does not address the issue of a reserve in the event of an adverse judgment, including the potential attorney fees liabilities[13], or address the effect such adverse judgment would have on

---

[12] The product that MMC has apparently developed using the technology that is the subject of the Litigation Matters.

[13] If the Debtor did not prevail in the pending Prepetition Litigation Stimwave could seek prevailing party legal fees under federal patent law, *see* 35 U.S.C. §285, and the Florida Unfair and Deceptive Trade Practices Act, *see* Fla. Stat. §501.2105.

parties holding administrative, priority, and general unsecured claims against Debtor's estate. These postpetition administrative expenses would likely be substantial, and such liability would reduce or eliminate any recovery for creditors of the estate.

18.    Dr. Gupta's testimony that he would "close that very day" is an uninformed promise.  With so many blanks to fill, it is also an empty promise. Thus, the Debtor has not provided any alternative that would benefit the creditors.

19.    The Court finds that the Settlement Agreement is in the paramount interest of creditors because absent court approval of the settlement and the receipt of the settlement payment, the Debtor will likely become administratively insolvent.    This is supported by the Trustee's projections that continued operations will generate a negative cash flow and will not be sufficient to cover administrative expenses. (Trustee Dec. ¶55-56.)[14, 15]

20.    The proposed settlement payment, coupled with the consensual subordination of all claims of KLIM and Stimwave, projects to fund a meaningful distribution to holders of undisputed allowed claims, all secured claims, subchapter V administrative expenses, all unsecured priority claims, with approximately $100,000 available for distribution to general unsecured

---

[14] Brandyn Perryman testified that the Debtor could make "tens of millions of dollars" but neither MMC nor the Debtor provided any evidence to support this statement.  Mr. Perryman's testimony contradicts not only the Trustee's financial analysis, which is based on the Debtor's books and records (Trustee Dec. ¶¶19-20, 48, 54-55) but also the Debtor's own projections appended to the Plan.

[15] Debtor argues in its Objection and at the Evidentiary Hearing that the Debtor would have plenty of money if the Trustee would just sell MMC the inventory that it is allegedly entitled to purchase.  However, the Court finds the Trustee's reasons for not concluding that sale are sound.

creditors, in addition to recoveries from avoidance actions and professional negligence claims. (Trustee Dec. ¶¶49, 59.)

**The Transfer Agreements Are Valid**

21.    The Court concludes that the Transfer Agreements are valid, binding, and enforceable as of the respective date of each Transfer Agreement's execution.

22.    The only issue raised regarding the enforceability of the Transfer Agreements is that they were all executed without either the Member Approval Requirement in the Debtor's LLC Agreement, or, in the case of the Contribution Agreement, the Board Approval Requirement. However, the Court finds that even if the Member Approval Requirement or Board Approval Requirement was triggered by any of the Transfer Agreements, the Debtor may not raise that in order to seek to avoid the Transfer Agreements. Moreover, even if the Member Approval Requirement or Board Approval Requirement was appropriately raised, it does not appear that any of the Transfer Agreements triggered a Liquidation Event or a corporate strategic relationship as those terms are defined under the LLC Agreement. And, finally, even *if* any one of the Transfer Agreements constituted a Liquidation Event, the members of the Debtor ratified the Transfer Agreements after the fact.

23.    A corporation may not seek to invalidate an act or the transfer of personal property on the basis that the corporation did not have the authority to take such act or convey such property. *See* 8 Del. C. §124. Assuming, *arguendo,* that any of the Transfer Agreements were within the Member Approval

Requirement or the Board Approval Requirement the Transfer Agreements were voidable rather than void.

24.    A contract entered into by a Delaware limited liability company without the receipt of an approval required under its operating agreement will ordinarily fall within the power and capacity of the company notwithstanding the failure to obtain such approval. *CompoSecure, L.L.C. v. CardUX, LLC,* 206 A.3d 807, 817 (Del. 2018). The remedies available to *shareholders* where a corporation engages in a transaction for which it lacks capacity or power, are enumerated in Section 124 of Delaware's General Corporation Law and do not include the ability to unwind, reverse, or void a consummated transaction on the basis that it falls outside the corporation's power and authority.[16] *Se. Pennsylvania Transp. Auth. v. Volgenau*, No. CIV.A. 6354-VCN, 2012 WL 4038509, at *3 (Del. Ch. Aug. 31, 2012), aff'd, 91 A.3d 562 (Del. 2014) (Under Delaware Law, "corporate actions will not be set aside and that capacity can only be challenged in three instances [identified in 8 Del. C. §124]"). Because neither of the Adversary Proceedings[17] falls into one of these three procedural categories, the Transfer Agreements are enforceable irrespective of whether Member or Board approval was required

---

[16] 8 Del. C. §124 titled Effect of lack of corporate capacity or power; ultra vires provides: "No act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation was without capacity or power to do such act or to make or receive such conveyance or transfer, but such lack of capacity or power may be asserted: (1) In a proceeding by a stockholder against the corporation to enjoin the doing of any act or acts or the transfer of real or personal property by or to the corporation. . . . (2) In a proceeding by the corporation . . . against an incumbent or former officer or director of the corporation, for loss or damage due to such incumbent or former officer's or director's unauthorized act; (3) In a proceeding by the Attorney General to dissolve the corporation, or to enjoin the corporation from the transaction of unauthorized business."

[17] Since the beginning of this bankruptcy case all parties to the Prepetition Litigation, including Stimwave and KLIM ,have expressed a willingness to have all the Debtor-related litigation relating to the issue of ownership of the property subject of the Transfer Agreements, litigated in the Adversary Proceedings.

25.    Even if the Debtor was not barred procedurally from asserting lack of authority as a basis to set aside the Transfer Agreements, it does not appear that any of the Transfer Agreements constituted a Liquidation Event requiring Member approval. None of the Transfer Agreements constitutes a merger or consolidation. No merger or consolidation agreements were prepared or contemplated. Moreover, even if there were some basis to treat the Transfer Agreements as deemed mergers or consolidations, the members of Stimwave and of the Debtor at the time of the transfers were either all the same or virtually the same, such that the majority of voting control survived.

26.    The Transfer Agreements did not constitute a liquidation, dissolution or winding up of the Debtor. The only acts that constituted a liquidation, dissolution or winding up of the Debtor were the filing by Laura Perryman the Certificate of Cancellation and the filing of the 2018 final tax return.  Those acts were clearly ratified by the members of the Debtor since none of them objected to, or even commented on, the wind down when they received the final K-1s.

27.    None of the Transfer Agreements constituted a sale of all or substantially all of the assets of the Debtor.  While it is clear that with the last Transfer Agreement there were no remaining assets in the Debtor, the LLC Agreement does not say "sale or transfer"; it just says "sale".  And even this provision would have no applicability to the Contribution Agreement which was clearly not a transfer of either all or substantially all of the Debtor's assets, that agreement was signed months before the other Transfer Agreements were signed.

28.    The Contribution Agreement might constitute a "corporate strategic relationship" under the LLC Agreement, but, even *if* the Debtor were procedurally able to challenge the possible lack of board authority, the fact that three members of the Debtor's Board of Directors signed the Contribution Board Resolution would create a significant hurdle to any such challenge.

29.    The License Assignment Agreement and the Patent Assignment Agreement were both executed in accordance with the IP Board Consent. The IP Board Consent makes clear that the execution of these agreements was not a sale, but rather, as set forth in the IP Board Consent, a transfer between two entities with the same ownership that "would improve the value and business prospects for Stimwave and better enable each of the respective companies to operate more efficiently." Not only was this not a contemplated sale, it was also not contemplated that the Debtor would cease existence after the agreements were executed. Indeed, after the License Assignment Agreement and the Patent Assignment Agreement were executed, the Debtor clearly had assets left; those were conveyed through the final Transfer Agreement, the Epimed Transfer Agreement, which agreement the Debtor has not sought to set aside in the Declaratory Judgment Action.

30.    The Court finds that even if the Debtor could assert lack of member or board approval, which it cannot, and even if board approval or member approval was required, which it was not, the Court finds that at least a majority of the members of the Debtor were aware or became aware of the transfers. First of all, all the members received final K-1s sometime in early 2019. That is a clear indication that the Debtor had transferred its assets. Second, the directors

who signed the IP Board Consent (Laura Perryman, Robert Anderson, and Mark Coleman) held 37.32% of the interests in the Debtor. Mr. Goldberg testified[18] that the following unit holders were also aware of the transfers: (i)  Echo Vibration Limited a/k/a Orchid, which held 6.15% of Debtor's units and whose designee on the Stimwave board was present as an observer at the Stimwave board meeting at which the IP Assignments were approved (Goldberg Dec. ¶17; Trustee Exs. 8, 25); (ii) Elizabeth Greene, who owned 0.33% of the Debtor's units and acted as Secretary at the same Stimwave board meeting (Goldberg Dec. ¶17, Trustee Ex. 8); (iii) the Debtor's current Manager Patrick Larson, who was an employee of Stimwave and owned 5.84% of the Debtor's units (Goldberg Dec. ¶ 17; Trustee Exs. 11, 8); and Mark Loev, a current member of Stimwave's board of directors who owned 0.85% of Debtor's units (Goldberg Dec. ¶17; Trustee Ex. 8). Those interests, together with the interests of Ms. Perryman and Messrs. Coleman and Anderson, constitute a majority of Debtor's units as of December 31, 2018, a total of 50.49%.[19]  None of these investors sought to repudiate or challenge the transfers. Based on this, Stimwave might be able to seek application of equitable doctrines such as acquiescence, ratification, and laches to the Debtor's challenges to the transfers.[20]

---

[18] No one disputed Mr. Goldberg's testimony on this point or provided contradictory evidence.
[19] Stimwave also owned over 5% of Debtor at the time, bringing the total units held by members with knowledge of the Transfer Agreements to over 55%, well over the majority required by the LLC Agreement.
[20] The equitable doctrine of acquiescence could apply on the basis that the Debtor's members with knowledge of their rights and the material facts, (1) remained inactive for a considerable time; or (2) freely did what amounts to recognition of the Transfer Agreements; or (3) acted in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved. *Klaassen v. Allegro Development Corp.*, 106 A.3d 1035, 1047 (Del. 2014). The doctrine of ratification would apply on the basis that the conduct of the Debtor's members was "such as reasonably to warrant the conclusion that [they] accepted or adopted" the Transfer Agreements. *Genger v. TR Invs., LLC*, 26 A.3d 180, 195 (Del. 2011). Laches would apply on the basis that the Debtor's members had (i) actual or constructive knowledge of the Transfer

## **The Debtor's Assets Will be Transferred Free and Clear of Liens, Claims and Encumbrances**

31.     The property the Trustee is required to convey under the Settlement Agreement is free and clear of all claims, liens, and encumbrances as authorized pursuant to 11 U.S.C. §363(f)(2). No lien was of record in any relevant jurisdiction and no party alleging an encumbrance against property of the Debtor's estate has interposed an objection to the proposed conveyance under the Settlement Agreement.

---

Agreements; (ii) unreasonably delayed in bringing any claim; and (iii) prejudiced Stimwave as a result. *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005). And of course, the doctrine of unclean hands would apply to any challenge by Laura Perryman, the architect of all of the Transfer Agreements. The doctrine of unclean hands would apply to any individuals who authorized, and are now seeking to repudiate, or who made and benefitted from later statements concerning the validity of, the Transfer Agreements. *Encite LLC v. Soni*, No. 2476–VCG, 2011 WL 5920896, at *23 (Del. Ch. Nov. 28, 2011) (unclean hands applies where conduct would would "offend the very sense of equity").

**The Debtor's Objection Presents Further Delay with No Evidence of a Viable Alternative Settlement or Plan**

32.　The Debtor's amended objection to the 9019 Motion (ECF #317) (the "Debtor's Objection") requests further time to "allow for a restructuring plan which will not require liquidation" and additional "time to consider the offer presented" by the Debtor's First Motion to Dismiss. (ECF #317, ¶¶2-3, 5, 7.)  The Court has already addressed both the untimeliness of these arguments and the reasons why they are not sufficient to overcome the Trustee's evidence.

**MMC's Objection is Overruled**

33.　MMC filed an objection to the 9019 motion ("MMC's Objection") on April 28, 2021 (ECF #312).  MMC's Objection is based on the contention that the proposed Settlement Agreement would "force it to forfeit its property" (ECF #312, at 2), and "will cause MMC to fail as well" (ECF #312, ¶6).  The premise of this objection is that because MMC has created a product using the technology that is the subject of the Litigation Matters, an agreement that resolves the ownership of the underlying technology will interfere with MMC's product and will allow Stimwave to compete directly with MMC and use MMC's know-how.

34.　MMC did not introduce any evidence that the Debtor is in possession of MMC's property.  Section 2.1 of the Settlement Agreement states that Debtor is conveying only "Debtor's right, title and interest in, to, and under the Transferred Assets" and the Trustee has submitted unrebutted testimony that the Settlement Agreement does not convey MMC's property. (Trustee Dec. ¶57; Trustee Ex. 2 at 9.) MMC has argued, including in the Emergency Assumption

Motion, that Debtor is holding inventory, which the Trustee refuses to sell to MMC, with a total value of $250,000, which inventory can only be used by MMC. But MMC did not file the Emergency Assumption Motion until one week after competing orders were submitted to the Court, almost two weeks after the second day of the Evidentiary Hearing, almost three weeks after MMC's counsel made an ore tenus motion seeking the sale and almost six weeks after the 9019 Motion was filed.[21] Moreover, the sale of the inventory to MMC would interfere with the Trustee's obligations under the Settlement Agreement, if the 9019 Motion were to be granted. And, the Trustee testified he was concerned that the Manufacturing Agreement was fabricated due to its sudden appearance.  The inventory is property of the Debtor, not property of MMC, and the Trustee has the right to sell it.

35.    The evidence shows that MMC can negotiate directly with the third parties that the Debtor was working with to supply MMC.  Moreover, there was no evidence presented by MMC that there are any unique FDA approvals that the Debtor has that requires the Debtor's continued operations for the benefit of MMC.[22]

36.    A consequence of approval of the 9019 Motion apparently will expose MMC to litigation regarding patent infringement.  That is not the Court's concern.

---

[21] This delay does not excuse the Trustee's delay in failing to file a motion to reject the Manufacturing Agreement and the Services Agreement.

[22] At the conclusion of the first day of the Evidentiary Hearing counsel made an *ore tenus* motion to compel the Trustee to sell the inventory under the terms of the Manufacturing Agreement because "there are patients, pursuant to the FDA studies, that require and need these devices." (Tr. of April 30,2021 Hearing at 231 (ECF #381.)) The Court directed the parties to determine if anyone was in danger, and if so, to file an emergency motion. No emergency motion was filed, and, until May 18, 2021, MMC did not file any motion seeking to compel the sale.

The Court notes that Laura Perryman is in control of MMC.[23]  Ms. Perryman knows better than anyone that any intellectual property that she used to develop MMC's devices, which intellectual property she had previously caused to be transferred to Stimwave, carried a risk.[24]

## The Other Objections Are Overruled

37.    The objections filed by individuals who identify themselves as former employees and priority wage creditors – Maryam Amiri (ECF #269), Brandyn J. Perryman (ECF #270), Patrick Larson (ECF #271), Marlene Pena (ECF #272), Ronald Perryman (ECF #273), and Luis Fernandez (ECF #290) – are overruled because these objections do not contest any of the *Justice Oaks* factors; rather they raise an issue as to projected employment with an affiliate of the Debtor, which is wholly unrelated to the legal standard for approving a settlement. Finally, the Trustee has submitted unrebutted testimony that if the Settlement Agreement is approved, he anticipates these creditors' unsecured priority claims will be paid in full.  Thus, these objections are overruled.

38.    Gary Perryman filed an objection to the 9019 Motion based on his belief that the Debtor and MMC "will enable payment in full according to the restructure plan." (ECF #274.)  Gary Perryman did not submit any evidence to support his objection, nor did he participate in the Evidentiary Hearing.

---

[23] The fact that Ms. Perryman may or may not be an interest holder doesn't seem to have any impact on her total control of MMC.  She created MMC. (MMC Ex. 22.)
[24] Whether or not MMC's product is "better" than what Stimwave has or has not developed is not relevant to this Court's decision.

Moreover, the Debtor has not advanced its Plan and has now acknowledged it cannot reorganize.  Thus, this objection is overruled.

39.    Cobalt Capital, LLC filed an objection to the 9019 Motion. (ECF #322.)  As stated on the record at the Evidentiary Hearing on April 30, 2020, Cobalt Capital, LLC is not a creditor of the estate, and has no standing to object to the 9019 Motion. (Tr. of April 30, 2021 Hearing at 53:23-54:2 (ECF #381.))

40.    After the conclusion of the Evidentiary Hearing, Laura Perryman filed an untimely objection to the 9019 Motion. (ECF #383.)  Much of the objection sets forth arguments that were raised by others and are addressed in this Order.  Some of the objections lay out facts that were never introduced into evidence.  Ms. Perryman had the opportunity to present evidence at the Evidentiary Hearing but chose not to do so. Thus, this objection is overruled as well.

**BASED UPON THE FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS HEREBY ORDERED as follows:**

1.    The Objections are **OVERRULED** and the 9019 Motion is **GRANTED**.

2.    The Settlement Agreement[25], as modified in ¶¶9 and 14 below, is **APPROVED.**

3.    Pursuant to 11 U.S.C. §363, upon entry of this Order and compliance with the requirements to close set forth under the Settlement Agreement, all of Debtor's right, title, and interest in, to, and under the Transferred Assets shall be transferred by the Trustee to the Stimwave Parent

---

[25] All capitalized terms not defined in this Order shall have the meaning ascribed in the Settlement Agreement as corrected (Trustee Ex. 56). To the extent the defined meanings differ, the definitions in the Settlement Agreement shall control.

(or its designee), or pursuant to Section 2.1(d) of the Settlement Agreement, a KLIM Party or its Affiliate, as the case may be free and clear of all encumbrances. The Transferred Assets consist of all of Debtor's assets and properties of every type and description, including but not limited to tangible, intangible, intellectual, personal, and real, and Causes of Action (whether known or unknown and whether or not currently asserted, and whether based on tort, contract, statute, common, law of other authority or theory), including: (i) the Transferred Contracts; (ii) all technical information owned or co-owned by the Debtor, including all technical information, know how, masks, software, and other information or data related in any way to any medical device of any type; (iii) all communications with legal counsel providing advice in any way related to patents or patent applications in any form whatsoever, including paper, digital, electronic, however or wherever stored; and (iv) the assets described in Schedule 1.1 to the Settlement Agreement, and in each case, all of Debtor's rights with respect thereto, but excluding the Retained Assets and the Micron Assignment Documents.

4.      The transfer of the Transferred Assets will be in all respects a valid, legal, and effective transfer of property under Section 363 of the Bankruptcy Code.   The transfer is being made at arm's length and Stimwave and KLIM are good faith purchasers entitled to the protections of 11 U.S.C. §363(m).

5.      At any time prior to the expiration of the Designation Right Deadline, the Stimwave Parties may designate any of the Debtor's executory contracts or unexpired leases to be assigned to the Stimwave Parties by the Trustee pursuant to 11 U.S.C. §365.  To exercise the designation rights provided in Section 2.1(e),

the Stimwave Parties shall file and serve a Designation Document on the Trustee and any counter-party to the executory contract(s) or unexpired lease(s) subject to the Designation Document. The Stimwave Parties shall assume all liabilities associated with a Designated Agreement assigned to the Stimwave Parties upon the exercise of any designation right in Section 2.1(d) of the Settlement Agreement.

6.    Within three business days of the Effective Date, the parties shall file a joint stipulation of dismissal of the Declaratory Judgment Action and Turnover Action with prejudice based on this Order.

7.    The following claims are subordinated to all other allowed claims in the Bankruptcy Case, but shall remain senior in priority to any equity interests in the Debtor:

   i.   any legal fees awarded by the Bankruptcy Court to the Stimwave Parties or the KLIM Parties pursuant to ECF #135, 136, 157, 163, or 174;

   ii.  Stimwave Parent's Claim No. 18-1 in the amount of $67,929.07;

   iii. Stimwave Parent's Claim No. 19-2 in the amount of $3,772,073.00;

   iv.  Stimwave Parent's Claim No. 20-2 in the amount of $3,042,158.28.

   v.   KLIM's Claim No. 22-3 in the amount of $21,193,481.45; and

   vi.  KLIM's Claim No. 23-1.

The Trustee shall have a right to object to any of these claims other than the claims described in paragraph 7.i.

8.    Effective as of the Effective Date, the Debtor Releasing Parties, the Stimwave Releasing Parties and the KLIM Releasing Parties are permanently

enjoined and barred from pursuing, commencing or continuing in any manner any action or other proceeding of any kind on account of any Causes of Action that are released pursuant to the releases set forth in Section 3.1 of the Settlement Agreement, as applicable.

9.    The Debtor and any interested party purporting to act on behalf of the Debtor are hereby enjoined from taking any action (or failing to take any action) in violation or contravention of Sections 4.3 and 4.5 of the Settlement Agreement.  This injunction applies to all interested parties that received notice of the 9019 Motion and this Order. However, nothing in this Order shall be interpreted as an injunction against any person who is not the Debtor or a party purporting to act on behalf of the Debtor. The Stimwave Parties and the KLIM Parties will have the right to pursue any other parties not falling within the description of the preceding sentence for injunctive or other relief in whatever fora are available under non-bankruptcy law.[26]

10.    Any automatic stay in this case in favor of or for the benefit of Debtor or any of its employees or Affiliates shall be lifted in favor of the Stimwave Parties

---

[26] It appears that Section 4.1(d) of the Settlement Agreement could be interpreted to enjoin parties other than the Debtor and non-Debtor parties purporting to act on behalf of the Debtor. At the Evidentiary Hearing the Court expressly raised concerns about whether the Movants took the position that the Settlement Agreement would enjoin non-Debtor parties. In fact, at some point during the hearing on May 7, 2020 the Court observed that approval of the 9019 Motion would apparently mean that the litigation would probably continue with respect to any alleged use by MMC of the assets subject of the Transfer Agreements. Counsel for KLIM, on behalf of the Movants, specifically stated that the Movants were not asking this Court to impose an injunction against non-Debtor parties. But notwithstanding that this Order will not act as an injunction of non-Debtor parties other than those purporting to act on behalf of the Debtor, and for the avoidance of doubt, MMC, the former employees who raised objections, and Ms. Perryman, as well as all other parties in interest who received notice, had the opportunity to participate in the Evidentiary Hearing and to raise objections to the admission of evidence, cross-examine the Movants' witnesses, and present their own evidence to contradict the evidence that forms the basis for this Court's findings of fact and conclusions of law.  The fact that some chose not to do so does not mean they are not bound by the findings of this Court set forth in this Order; they are.

and KLIM Parties to expressly authorize the Stimwave Parties and/or the KLIM Parties to provide written notice to any employee, agent, or other representative of the Debtor or anyone else purporting to act on behalf of the Debtor (i) to immediately cease (a) any development, manufacture, marketing, sales, commercial distribution or clinical trials of any Pain Product by Debtor, or any other entity acting on behalf of the Debtor, including Micron Medical Delaware, Micron Medical Florida, or any other Person acting on behalf of the Debtor, and (b) any development, manufacture, marketing, sales, commercial distribution or clinical trials of any Pain Product on behalf of the Debtor or provide services on behalf of the Debtor to or otherwise assist or support any Affiliate of Debtor on behalf of the Debtor, including Micron Medical Delaware, Micron Medical Florida, Laura Perryman, Patrick Larson, or any other employee or former employee of Debtor or any of its Affiliates, or any other Person, in the development, manufacture, marketing, sales, commercial distribution or clinical trials of any pain relief product or system, or method, including without limitation the Pain Product or any other PNS wireless neurostimulator; and (ii) otherwise to proceed with, initiate or pursue any claim, demand, or Cause of Action against any Non-Released Parties.

11.    The Trustee, Stimwave, and KLIM are authorized to take any and all action necessary to effectuate the Settlement Agreement.

12.    The effect of this Order shall survive the conversion, dismissal and/or closing of the Debtor's chapter 11 case, appointment of a chapter 11 trustee, and/or confirmation of a plan of reorganization or liquidation.

13.    The Court reserves sole and exclusive jurisdiction to interpret and enforce the terms of this Order and the Settlement Agreement between the parties and to enter further orders as necessary to implement the Settlement Agreement.

14.    The Settlement Agreement shall include the following modifications:

    i.    A new section 4.9 of the Settlement Agreement shall provide as follows:  The Stimwave Parties agree to and shall indemnify the Debtor's estate in an amount up to $180,000 for any claims allowed by a final order of the Bankruptcy Court arising from the rejection of that certain Distribution Agreement between the Debtor and Miami Medtech, LLC. Stimwave is granted and shall retain sole authority to litigate or settle any claim with Miami Medtech, LLC on behalf of the Debtor's estate.

    ii.    The definition of "Retained Claims" in Article I, Section 1.1 of the Settlement Agreement shall be modified to provide as follows: "Retained Claims" means any Cause of Action of the Debtor (i) that the Debtor has against any licensed professional for professional negligence arising out of services performed for the Debtor; (ii) that are prohibited from being assigned under applicable law; or (iii) to enforce the terms of this Agreement or the Ancillary Agreements; *provided,* that for the avoidance of doubt, Retained Claims shall include any Cause of Action pursuant to chapter 5 of the Bankruptcy Code other than (x) Causes of Action involving turnover provisions of Bankruptcy Code sections 542 and 543 and (y) Causes of Action against the Stimwave Released Parties and KLIM Released Parties.

### 

Copies to:
Marc Barmat, Esq.
Julia Kefalinos, Esq.
Eyal Berger, Esq.
Patricia Redmond, Esq.
Adam Skolnik, Esq.

    *Attorney Barmat is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*